Jerome J. Schlichter
SCHLICHTER BOGARD & DENTON LLP
100 South Fourth Street, Suite 1200
St. Louis, MO, 63102
(314) 621-6115
(314) 621-5934 (fax)
jschlichter@uselaws.com
[additional counsel on signature page]
*Counsel for Plaintiff*

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| BETH BERKELHAMMER and NAOMI RUIZ, individually and as representatives of a class of participants and beneficiaries on behalf of the ADP TotalSource Retirement Savings Plan, | No. _____ |
| *Plaintiffs*, | CLASS ACTION |
| v. | |
| ADP TOTALSOURCE GROUP, INC., AUTOMATIC DATA PROCESSING, INC., ADP TOTALSOURCE RETIREMENT SAVINGS PLAN COMMITTEE, NFP RETIREMENT, INC., AND JOHN DOES 1–40, | |
| *Defendants*. | |

Table of Contents

COMPLAINT ........................................................................ 1

JURISDICTION AND VENUE ................................................ 4

PARTIES .............................................................................. 7

   I.  The ADP TotalSource Retirement Savings Plan ........................... 7

   II. Plaintiffs ........................................................................... 9

   III. Defendants ....................................................................... 9

ERISA'S FIDUCIARY STANDARDS ...................................... 14

BACKGROUND FACTS ........................................................ 18

DEFENDANTS BREACHED THEIR FIDUCIARY DUTIES .............. 25

   I.  Defendants breached their fiduciary duties and engaged in
      prohibited transactions by failing to monitor and control the
      Plan's recordkeeping fees and causing the Plan to pay
      excessive fees. ................................................................. 25

      A. Prudent fiduciaries negotiate reasonable recordkeeping
         fees, monitor all sources of revenue paid to plan
         recordkeepers, regularly monitor plan fees and compare
         them to competitive market rates, and diligently negotiate
         fee reductions to benefit participants. ................................. 25

      B. Contrary to the practices of prudent fiduciaries and in
         violation of ERISA's prohibitions on self-dealing
         transactions, Defendants failed to monitor and control
         recordkeeping fees, resulting in significant Plan losses due
         to excessive fees, and improper benefit to ADP ...................... 36

   II. The ADP Defendants breached their fiduciary duties and
      engaged in prohibited transactions by unlawfully paying
      themselves from Plan assets. ................................................ 44

A. ERISA's self-dealing and prohibited transactions provisions. ................................................................44

B. ADP Defendants paid themselves unreasonable and unnecessary amounts for purported administrative services provided to the Plan....................................47

III. Defendants selected and retained imprudent investments in the Plan. ..........................................................................51

A. Prudent fiduciaries regularly monitor the performance and fees of investments and remove those investments that underperform and charge excessive fees. ......................51

B. Defendants selected and retained imprudent, consistently underperforming, high-cost investments................................58

C. Defendants failed to ensure reasonable investments management expenses for investment alternatives in the Plan.........................................................................83

IV. Defendants breached their fiduciary duties and engaged in prohibited transactions by causing the Plan to pay excessive managed account fees....................................................87

A. The managed account services market....................................87

B. Defendants failed to monitor the Plan's managed account fees resulting in the participants paying excessive fees. .......98

V. Defendants breached their fiduciary duties and engaged in prohibited transactions by allowing the Plan's service providers to collect and use Confidential Plan Participant Data for profit. ...............................................................101

A. Confidential Plan Participant Data and its value to recordkeepers with affiliates offering financial products and services. ..........................................................................101

B. Defendants failed to monitor or restrict Plan service providers' misuse of Confidential Plan Participant Data. ...106

CLASS ACTION ALLEGATIONS ........................................................ 112

COUNT I: Breach of Fiduciary Duties (29 U.S.C. §1104(a)(1)) Related to Unreasonable Recordkeeping Fees ............................... 121

COUNT II: Prohibited Transactions (29 U.S.C. §1106(a)(1)) Related to Unreasonable Recordkeeping Fees ............................... 124

COUNT III: Prohibited Self-Dealing Transactions (29 U.S.C. §1106(b)) ................................................................................. 125

COUNT IV: Prohibited Transactions Between the Plan and ADP TotalSource (29 U.S.C. §1106(a)) ...................................... 127

COUNT V: Breach of Fiduciary Duties (29 U.S.C. §1104(a)(1)) Related to Imprudent and Poorly Performing Investments .......... 130

COUNT VI: Breach of Fiduciary Duties (29 U.S.C. §1104(a)(1)) Related to Excessive Investment Management Fees .................... 133

COUNT VII: Breach of Fiduciary Duties (29 U.S.C. §1104(a)(1)) Related to Unreasonable Managed Account Fees .......................... 135

COUNT VIII: Prohibited Transactions (29 U.S.C. §1106(a)(1)) Related To Investment Services and Fees .................................... 137

COUNT IX: Breach of Fiduciary Duties (29 U.S.C. §1104(a)(1)) Related To Failure to Safeguard Confidential Plan Participant Data ................................................................................. 138

COUNT X: Prohibited Transactions Between the Plan and a Party in Interest Related To Confidential Plan Participant Data (29 U.S.C. §1106(a)) ........................................................... 140

COUNT XI: Failure To Monitor Fiduciaries ........................................ 142

COUNT XII: Other Remedies (29 U.S.C. §1132(a)(3)) ........................ 147

JURY TRIAL DEMANDED ................................................................ 148

PRAYER FOR RELIEF ..................................................................... 149

iv

## COMPLAINT

1.      Plaintiff Beth Berkelhammer's address is 717 2nd Ave, San Francisco, California, 94118. Plaintiff Naomi Ruiz's address is 1900 Onion Creek Parkway, Unit 635, Austin, Texas 78748. Defendant Automatic Data Processing, Inc.'s principal place of business is located at 1 ADP Boulevard, Roseland, New Jersey, 07068. Defendants ADP TotalSource, Inc. and ADP TotalSource Retirement Savings Plan Committee's principal place of business is located at 10200 Sunset Drive, Miami, Florida, 33173. Defendant NFP Retirement Inc.'s principal place of business is located at 120 Vantis, Suite 400, Aliso Viejo, California, 92656. The addresses of John Does 1–40 are unknown.

2.      Plaintiffs Beth Berkelhammer and Naomi Ruiz, individually and as representatives of a class of participants and beneficiaries of the ADP TotalSource Retirement Savings Plan (the "Plan"), bring this action under 29 U.S.C. §1132(a)(2) and (a)(3) on behalf of the Plan against Defendants ADP TotalSource, Inc., Automatic Data Processing, Inc., the ADP TotalSource Retirement Savings Plan Committee, NFP Retirement, Inc., and John Does 1–40 (collectively the "Defendants"),

for breach of fiduciary duties and prohibited transactions under ERISA.[1]

3.    The Plan's fiduciaries, including Defendants, are obligated to act for the exclusive benefit of Plan participants and beneficiaries and to ensure that Plan expenses are reasonable and the Plan's investments are prudent.

4.    The marketplace for retirement plan services is established and competitive. Multi-billion dollar defined contribution plans, like the Plan, have tremendous bargaining power to obtain high quality, low-cost administrative, managed account, and investment management services. Instead of using the Plan's bargaining power to benefit participants and beneficiaries, Defendants allowed unreasonable expenses to be charged to participants for administration of the Plan and for managed account services, and retained poorly performing investments that similarly situated prudent fiduciaries would have removed from their plans.

---

[1] The Employee Retirement Income Security Act, 29 U.S.C. §§1001–1461.

5.     Additionally, Defendants selected and retained imprudent higher-cost investment alternatives in the Plan when lower-cost investment vehicles were available for the Plan based on its bargaining power to obtain such vehicles.  Defendants also failed to ensure that the lowest-cost available share classes of the designated investment alternatives were included in the Plan, resulting in the Plan paying excessive investment management and other unnecessary fees.

6.     Even worse, Defendants allowed the Plan's service providers to use Plan participants' highly confidential data, including social security numbers, financial assets, investment choices, and years of investment history to aggressively market lucrative non-Plan retail financial products and services, which enriched the service providers at the expense of participants' retirement security.

7.     To remedy these breaches of duty, Plaintiffs, individually and as representatives of a class of participants and beneficiaries of the Plan, bring this action on behalf of the Plan under 29 U.S.C. §1132(a)(2) and (3) to enforce Defendants' personal liability under 29 U.S.C. §1109(a) to make good to the Plan all losses resulting from each breach of fiduciary duty and to restore to the Plan profits made through

3

Defendants' use of Plan assets. In addition, Plaintiffs seek equitable or remedial relief for the Plan as the Court may deem appropriate.

## JURISDICTION AND VENUE

8.     **Subject-matter jurisdiction.** This Court has exclusive jurisdiction over the subject matter of this action under 29 U.S.C. §1132(e)(1) and 28 U.S.C. §1331 because it is an action under 29 U.S.C. §1132(a)(2).

9.     **Venue.** This District is the proper venue for this action under 29 U.S.C. §1132(e)(2) and 28 U.S.C. §1391(b) because it is a district in which the subject Plan is administered, where at least one of the alleged breaches took place, and where at least one defendant resides.

10.     **Standing.** An action under §1132(a)(2) allows recovery only for a plan, and does not provide a remedy for individual injuries distinct from plan injuries. *LaRue v. DeWolff, Boberg & Assocs.*, 552 U.S. 248, 256 (2008). The plan is the victim of any fiduciary breach and the recipient of any recovery. *Id*. at 254. Section 1132(a)(2) authorizes any participant, fiduciary, or the Secretary of Labor to sue derivatively as a representative of a plan to seek relief on behalf of the plan. 29 U.S.C.

4

§1132(a)(2). As explained in detail below, the Plan suffered millions of dollars in losses resulting from Defendants' fiduciary breaches and remains exposed to harm and continued future losses, and those injuries may be redressed by a judgment of this Court in favor of Plaintiffs. To the extent the Plaintiffs must also show an individual injury even though §1132(a)(2) does not provide redress for individual injuries, each Plaintiff has suffered such an injury, in at least the following ways:

    a. The named Plaintiffs and all participants in the Plan suffered financial harm as a result of the imprudent options in the Plan because Defendants' selection and retention of those options deprived participants of the opportunity to grow their retirement savings by investing in prudent options with reasonable fees, which would have been available in the Plan if Defendants had satisfied their fiduciary obligations. All participants continue to be harmed by the ongoing inclusion of these imprudent options and payment of excessive recordkeeping fees.

b. The named Plaintiffs' individual accounts in the Plan were harmed because they invested in Plan investment options that would have been excluded from the Plan had Defendants discharged their fiduciary duties. These investment options underperformed numerous prudent alternatives that were available to the Plan, resulting in a loss of retirement savings.

c. The named Plaintiffs' individual accounts in the Plan suffered losses because each participant's account was assessed an excessive amount for recordkeeping and administrative fees, which would not have been incurred had Defendants discharged their fiduciary duties to the Plan and reduced those fees to a reasonable level.

d. The named Plaintiffs' individual accounts in the Plan suffered losses because each participant's account in a managed account was assessed an excessive amount for managed account fees, which would not have been incurred had Defendants discharged their fiduciary duties to the Plan and reduced those fees to a reasonable level.

6

## PARTIES

### I.   The ADP TotalSource Retirement Savings Plan

11.   The Plan is a defined contribution, individual account, employee pension benefit plan under 29 U.S.C. §1002(2)(A) and §1002(34).

12.   The Plan is intended to be a multiple employer plan pursuant to IRS Code §413(c) ("MEP").

13.   The Plan is established and maintained under a written document in accordance with 29 U.S.C. §1102(a)(1).

14.   Defendant Automatic Data Processing, Inc. ("ADP") offers the Plan to employees of small- and medium-sized businesses whose employer has contracted with ADP to serve as its off-site human resources department. This structure is known as a Professional Employment Organization ("PEO").

15.   An ADP client company enters into a "Client Service Agreement" with a subsidiary of ADP that operates its PEO—Defendant ADP TotalSource Group, Inc. ("ADP TotalSource")—to provide off-site, full-service human resource services to the client company. Under this Client Service Agreement, ADP and its clients

7

have a co-employment relationship with the clients' employees. ADP assumes some employer responsibilities such as payroll processing and tax filings, while ADP's client maintains control of certain other business responsibilities.

16.   ADP's client then has the option of entering into a "401(k) Adoption Agreement" with ADP TotalSource to permit employees to participate in the Plan.

17.   The Plan provides for retirement benefits for the eligible employees of the Adopting Employers, *i.e.*, the co-employees of ADP TotalSource and its clients. The amount of these retirement benefits depends upon contributions made on behalf of each employee by his or her employer, deferrals of employee compensation and employer matching contributions, and the performance of investment options net of fees and expenses exclusively controlled by the fiduciaries of the Plan.

18.   As of December 31, 2018, the Plan had over $4.44 billion in assets and 114,254 participants with account balances.

19.   The Plan is among the largest 0.02% of all defined contribution plans in the United States based on plan assets.

8

Professionals commonly refer to plans of such great size as "jumbo plans" or "mega plans." The Plan's massive size gives it enormous bargaining power to command very low investment management, managed account, and recordkeeping fees for its participants.

## II. Plaintiffs

20.     Beth Berkelhammer resides in San Francisco, California and is a participant in the Plan under 29 U.S.C. §1002(7) because she and her beneficiaries are eligible to receive benefits under the Plan.

21.     Naomi Ruiz resides in Austin, Texas and is a participant in the Plan under 29 U.S.C. §1002(7) because she and her beneficiaries are eligible to receive benefits under the Plan.

## III. Defendants

22.     ADP is a publicly traded corporation organized under Delaware law with its principal place of business in Roseland, New Jersey.

23.     ADP acts through its employees, including those acting as Plan fiduciary committee members, and administers the Plan through its subsidiaries.

24.     ADP is an employer of other Plan fiduciaries.

9

25.    As alleged herein, ADP is a fiduciary under 29 U.S.C. §1002(21)(A) because it exercises discretionary authority or discretionary control respecting management of the Plan, exercises authority or control respecting management or disposition of Plan assets, or has discretionary authority or discretionary responsibility in the administration of the Plan. ADP executives who undertook the acts alleged below did so for the benefit of and as agents for ADP.

26.    ADP TotalSource is a corporation organized under Florida law with its principal place of business in Miami, Florida. ADP TotalSource is a wholly owned subsidiary and/or business unit of ADP. ADP and ADP TotalSource act as an integrated enterprise and alter egos of each other. ADP controls ADP TotalSource from its headquarters in New Jersey. ADP TotalSource serves as a professional employer organization providing human resources services throughout the United States.

27.    As alleged herein, ADP TotalSource is a fiduciary under 29 U.S.C. §1002(21)(A) because it exercises discretionary authority or discretionary control respecting management of the Plan, exercises authority or control respecting management or disposition of Plan

10

assets, or has discretionary authority or discretionary responsibility in the administration of the Plan. ADP TotalSource executives who undertook the acts alleged below did so for the benefit of and as agents of ADP TotalSource.

28.     The ADP TotalSource Retirement Savings Plan Committee ("Committee") is provided in the Plan as the Plan Administrator. Section 8.1 of the Plan names the Committee as the Plan Administrator and reserves to ADP TotalSource the right to designate any other person or entity to act as Plan Administrator in its sole discretion. The Committee is headquartered in and conducts its operations from Miami, Florida.

29.     Section 8.8 of the Plan provides that ADP TotalSource has appointed the Committee as Plan Administrator and has delegated its duties for administration of the Plan to the Committee. The Plan limits membership of the Committee to members of the board of directors of ADP TotalSource. Further, the Plan provides that at any time, ADP TotalSource may abolish the Committee, in which case all fiduciary and Plan administrator duties will revert to ADP TotalSource.

11

30.     Section 5.1 of the Plan designates the Committee as the named fiduciary with respect to the management and investment of the assets of the Plan. Thus, ADP TotalSource retained for itself the remainder of its fiduciary authority and responsibilities, including as to the selection, retention, and compensation of service providers.

31.     The Committee and its individual members are fiduciaries to the Plan because they are named fiduciaries under 29 U.S.C. 1102(a) and exercised discretionary authority or discretionary control respecting the management of the Plan or exercised authority or control respecting the management or disposition of its assets, and have or had discretionary authority or discretionary responsibility in the administration of the Plan. 29 U.S.C. §1002(21)(A)(i) and (iii).

32.     John Does 1–40 are unknown members of the Committee and other ADP employees that exercised discretionary authority or discretionary control respecting the management of the Plan or exercised authority or control respecting the management or disposition of its assets, and have or had discretionary authority or discretionary responsibility in the administration of the Plan. 29 U.S.C. §1002(21)(A)(i) and (iii).

12

33.     Because the ADP individuals and entities described above acted as alleged herein as agents of ADP, all such Defendants are collectively referred to hereafter as the "ADP Defendants."

34.     NFP Retirement, Inc. f/k/a 401k Advisors, Inc. ("NFP") is a California corporation headquartered in Aliso Viejo, California. At all relevant times, NFP has been the Plan's investment consultant responsible for providing investment advice to the Committee regarding the selection and retention of Plan investment options.

35.     Section 8.9 of the Plan provides that the Committee may appoint an Investment Manager, pursuant to 29 U.S.C. §1002(38). Section 5.2 provides that if the Committee appoints an independent investment consultant, that consultant shall be responsible for advising the Committee regarding the reasonable of the fees from all sources received by all service providers with respect to the Plan's investment program. The Committee retained final decision-making authority over the selection and retention of Plan investment options and service providers.

36.     NFP is a fiduciary to the Plan because it exercised discretionary authority or discretionary control respecting the

13

management of the Plan or exercised authority or control respecting the

management or disposition of its assets, rendered investment advice or

a fee or other compensation with respect to the Plan or had authority to

do so, and/or has or had discretionary authority or discretionary

responsibility in the administration of the Plan. 29 U.S.C.

§1002(21)(A)(i)–(iii).

## ERISA'S FIDUCIARY STANDARDS

37.    ERISA imposes strict fiduciary duties of loyalty and

prudence upon Defendants as fiduciaries of the Plan. 29 U.S.C.

§1104(a), states, in relevant part, that:

> [A] fiduciary shall discharge his duties with respect to a plan
> solely in the interest of the participants and beneficiaries and –
>
> (A)    for the exclusive purpose of
>
>        (i)  providing benefits to participants and their
>        beneficiaries; and
>        (ii) defraying reasonable expenses of administering the
>        plan;
>
> [and]
>
> (B)    with the care, skill, prudence, and diligence under the
>        circumstances then prevailing that a prudent man
>        acting in a like capacity and familiar with such matters

would use in the conduct of an enterprise of like character and with like aims.

38.     Under ERISA, fiduciaries that exercise any authority or control over plan assets, including, but not limited to, the selection of plan investments and service providers, must act prudently and for the *exclusive* benefit of participants in the plan, monitor the funds in the plan and remove imprudent or excessively expensive funds. Fiduciaries cannot act for the benefit of third parties, including service providers to the plan such as recordkeepers, affiliated businesses, brokerage firms, or managed account service providers and those who provide investment products. Fiduciaries must ensure that the amount of fees paid to service providers is no more than reasonable. DOL Adv. Op. 97-15A; DOL Adv. Op. 97-16A; *see also* 29 U.S.C. §1103(c)(1) (plan assets "shall be held for the exclusive purposes of providing benefits to participants in the plan and their beneficiaries and defraying reasonable expenses of administering the plan").

39.     An ERISA "trustee has a continuing duty to monitor trust investments and remove imprudent ones." *Tibble v. Edison Int'l*, 135 S. Ct. 1823, 1828 (2015). Prudence requires a review at "regular intervals."

15

*Id.* When making investment decisions, an ERISA fiduciary "is duty-
bound 'to make such investments and only such investments as a
prudent [person] would make of his own property. . . .'" *In re Unisys*, 74
F.3d 420, 434 (3d Cir. 1996) (quoting Restatement (Second) of Trusts §
227 (1959)). "[T]he duty to conduct an independent investigation into
the merits of a particular investment" is "the most basic of ERISA's
investment fiduciary duties." *Id*. at 435. A defined contribution plan
fiduciary cannot "insulate itself from liability by the simple expedient of
including a very large number of investment alternatives in its portfolio
and then shifting to the participants the responsibility for choosing
among them." *Hecker v. Deere & Co.*, 569 F.3d 708, 711 (7th Cir. 2009).
Instead, fiduciaries must "initially determine, and continue to monitor,
the prudence of *each* investment option available to plan participants."
*DiFelice v. U.S. Airways, Inc*., 497 F.3d 410, 423 (4th Cir. 2007)
(emphasis original); *see also* 29 C.F.R. § 2550.404a-1; DOL Adv. Op. 98-
04A; DOL Adv. Op. 88-16A. Fiduciaries have "a continuing duty to
monitor investments and remove imprudent ones" within a reasonable
time. *Tibble*, 135 S. Ct. at 1828–29.

16

40.    "Fiduciaries must also understand and monitor plan expenses." *Sweda v. Univ. of Penn.*, 923 F.3d 320, 328 (3d Cir. 2019). "'Expenses, such as management or administrative fees, can sometimes significantly reduce the value of an account in a defined-contribution plan,' by decreasing its immediate value, and by depriving the participant of the prospective value of funds that would have continued to grow if not taken out in fees." *Id.* (quoting *Tibble*, 135 S.Ct. at 1826). "Fiduciaries must also consider a plan's power to obtain favorable investment products, particularly when those products are substantially identical—other than their lower cost—to products the trustee has already selected." *Sweda*, 923 F.3d at 328–29 (internal citations and quotation marks omitted).

41.    ERISA also imposes explicit co-fiduciary liabilities on plan fiduciaries. 29 U.S.C. §1105(a) provides a cause of action against a fiduciary for knowingly participating in a breach by another fiduciary and knowingly failing to cure any breach of duty. The statute states, in relevant part, that:

> In addition to any liability which he may have under any other provisions of this part, a fiduciary with respect to a plan shall be liable for a breach of fiduciary responsibility of another fiduciary with respect to the same plan in the following circumstances:

17

(1)   if he participates knowingly in, or knowingly undertakes to conceal, an act or omission of such other fiduciary, knowing such act or omission is a breach; [or]

(2)   if, by his failure to comply with section 1104(a)(1) of this title in the administration of his specific responsibilities which give rise to his status as a fiduciary, he has enabled such other fiduciary to commit a breach; or

(3)   if he has knowledge of a breach by such other fiduciary, unless he makes reasonable efforts under the circumstances to remedy the breach.

## BACKGROUND FACTS

42.   "Defined contribution plans dominate the retirement plan scene today." *LaRue v. DeWolff, Boberg & Assocs.*, 552 U.S. 248, 255 (2008). In the private sector, such plans have largely replaced the defined benefit pension plans that were America's retirement system when ERISA was enacted in 1974. The consulting firm Towers Watson studied Fortune 100 companies from 1985 to 2012 and found that the type of retirement plan offered by the companies has essentially flipped over the last three decades. Whereas in 1985, 89 of the Fortune 100 companies offered a traditional defined benefit plan, in 2012, only eleven of the Fortune 100 companies offered defined benefit plans to

newly hired employees. Thus, defined contribution plans have become America's retirement system.

43.    A fundamental difference between traditional pension plans and defined contribution plans is that in the former, the employer's assets are at risk. In a defined contribution plan, it is the employees' and retirees' funds at risk.

44.    Each participant in a defined contribution plan has an individual account and directs plan contributions into one or more investment alternatives in a lineup chosen by the plan's fiduciaries. "[P]articipants' retirement benefits are limited to the value of their own individual investment accounts, which is determined by the market performance of employee and employer contributions, less expenses." *Tibble*, 135 S. Ct. at 1826.

45.    Most of the fees assessed to participants in a defined contribution plan are attributable to two general categories of services: plan administration (including recordkeeping), and investment management. Since the early 2000s, managed account services make up a third category of fees assessed to participants. These expenses "can

19

sometimes significantly reduce the value of an account in a defined-contribution plan." *Id.*

46.     The plan's fiduciaries have control over these expenses. The fiduciaries are responsible for hiring recordkeeping service providers, such as recordkeepers, and negotiating and approving those service providers' compensation. The fiduciaries also have exclusive control over the menu of investment alternatives to which participants may direct the assets in their accounts. Those selections each have their own fees that are deducted from the returns that participants receive on their investments. The fiduciaries are responsible for hiring managed account providers and negotiating and approving those service providers' compensation.

47.     These fiduciary decisions have the potential to dramatically affect the amount of money that participants are able to save for retirement. According to the U.S. Department of Labor, a 1% difference in fees over the course of a 35-year career makes a difference of *28%* in savings at retirement. U.S. Dep't of Labor, *A Look at 401(k) Plan Fees,*

at 2 (Sept. 2019).[2] Accordingly, fiduciaries of defined contribution plans must engage in a rigorous process to control these costs and ensure that participants pay no more than a reasonable level of fees. This is particularly true for multi-billion dollar plans like the Plan, which have the bargaining power to obtain the highest level of service and the very lowest fees. The fees available to multi-billion dollar retirement plans are orders of magnitude lower than the much higher retail fees available to small investors.

48.     The entities that provide services to defined contribution plans have an incentive to maximize their fees by putting their own higher-cost funds in plans, collecting the highest amount possible for recordkeeping and managed account services, rolling Plan participants' money out of the Plan and into proprietary IRAs, soliciting the purchase of wealth management services, credits cards and other retail financial products, and maximizing the number of non-plan products sold to participants. For each additional dollar in fees paid to a service provider, participants' retirement savings are directly reduced by the

---

[2] Available at https://www.dol.gov/sites/dolgov/files/ebsa/about-ebsa/our-activities/resource-center/publications/a-look-at-401k-plan-fees.pdf.

same amount, and participants lose the potential for those lost assets to grow over the remainder of their careers. Accordingly, the level of diligence used by plan fiduciaries to control, negotiate, reduce the plan's fees, and safeguard plan assets directly affects participants' retirement security.

49.     Fiduciaries must be cognizant of providers' self-interest in maximizing fees, and cannot simply accede to the providers' desires and recommendations—*e.g.*, by including proprietary funds and managed account services that will maximize the provider's fees without negotiating or considering alternatives. In order to act in the exclusive interest of participants and not in the service providers' interest, fiduciaries must negotiate as if their own money and information is at stake. Instead of simply accepting the investment funds and fees sought by these conflicted providers, fiduciaries must consider whether participants would be better served by using alternative investment products or services.

50.    PEOs "provide payroll, benefits, regulatory compliance assistance, and other HR services to small and mid-sized companies."[3]

51.    By definition, the function of a PEO is to "becom[e] a co-employer . . . allow[ing] it to combine the employees of several companies in order to offer those companies lower costs, reduced paperwork, and increased efficiency" including to offer "better retirement . . . packages for their employees."[4]

52.    A key selling point for PEOs that offer their clients the opportunity to join a multiple employer defined contribution plan is the ability to leverage the assets and efficiencies of the whole group to drive down costs.[5]

53.    Plans that bundle together employers offer significant cost efficiencies, because costs are spread across a larger participant and

[3] National Association of Professional Employer Organizations, *Key Information about NAPEO and PEOs*, https://www.napeo.org/quick-facts-about-napeo-and-the-peo-industry.

[4] Professional Employer Organization Definition, Investopedia, https://www.investopedia.com/professional-employer-organization-definition-4766977.

[5] *See, e.g.*, ADP TotalSource, A Trusted HR Advisor for You and Your Business Clients, https://docplayer.net/19816697-Adp-totalsource-a-trusted-hr-advisor-for-you-and-your-business-clients.html; Insperity, Inc. Form 10-K (2016), https://insperityinc.gcs-web.com/static-files/66dfc19c-424a-4026-9550-b9a6e9fc6fcd.

23

asset base.[6] Prudently managed, such plans should be able to reduce costs for every participant.

54. The "substantial economies of scale and cost efficiencies" include, but are not limited to a single annual Form 5500 filing, a single periodic IRS qualification filing, and a single annual independent audit.[7] Further, MEPs may provide the ability for employers to transfer fiduciary responsibility and oversight to a single, centralized entity.[8]

---

[6] Newport Retirement Services, *The Impact of the Secure Act of Multiple Employer Plans*, https://www.newportgroup.com/NewportGroup/media/Documents/MEPS-PEPS-White-Pape-from-Newport.pdf.

[7] Transamerica Retirement Services, *Multiple Employer Plans: An Opportunity for Expanding Retirement Plan Coverage*,https://www.ta-retirement.com/resources/5913-1010_final.pdf.

[8] Six8Advisors, *The Multiple Employer Plan "MEP" Advantage*, www.six8advisors.com/blog-employers-1/2017/11/14/the-multiple-employer-plan-mep-advantage.

## DEFENDANTS BREACHED THEIR FIDUCIARY DUTIES

**I. Defendants breached their fiduciary duties and engaged in prohibited transactions by failing to monitor and control the Plan's recordkeeping fees and causing the Plan to pay excessive fees.**

**A. Prudent fiduciaries negotiate reasonable recordkeeping fees, monitor all sources of revenue paid to plan recordkeepers, regularly monitor plan fees and compare them to competitive market rates, and diligently negotiate fee reductions to benefit participants.**

55.    Recordkeeping is a service necessary for every defined contribution plan. The recordkeeper keeps track of the amount of each participant's investments in the various options in the plan, and typically provides each participant with a quarterly account statement. The recordkeeper often maintains a plan website or call center that participants can access to obtain information about the plan and to review their accounts. The recordkeeper may also provide access to investment education materials or investment advice. These services are largely commodities, and the market for recordkeeping services is highly competitive.

56.    Numerous recordkeepers in the marketplace are capable of providing a high level of service and will vigorously compete to win a recordkeeping contract for a jumbo defined contribution plan. These

25

recordkeepers will readily respond to a request for proposal and will tailor their bids based on the desired services (*e.g.*, recordkeeping, website, call center, etc.). In light of the commoditized nature of the essential recordkeeping services, recordkeepers primarily differentiate themselves based on price, and will aggressively bid to offer the best price in an effort to win the business, particularly for jumbo plans.

57.     The cost of recordkeeping services depends on the number of participants (or participant accounts), not on the amount of assets in the participant's account.[9] Thus, the cost of providing recordkeeping services to a participant with a $100,000 account balance is the same for a participant with $1,000 in her retirement account. Consequently,

---

[9] "[T]he actual cost of administrative services is more dependent on the number of participants in the plan." There is no "logical or practical correlation between an increase in administrative fees and an increase in plan assets." *Be a Responsible Fiduciary: Ask the Right Questions About 401(k) Plan Fees*, *Hewitt Assoc.,* October 2008; *see also* Mercer Investment Consulting, Inc*., DC Fee Management—Mitigating Fiduciary Risk and Maximizing Plan Performance*, available at https://www.mercer.com/content/dam/mercer/attachments/global/Retire ment/DC%20Fee%20Management%20-%20Mitigating%20Fiduciary%20Risk%20and%20Maximizing%20Plan% 20Performance.pdf  (hereinafter, "Mercer Best Practices") ("Conversely, utilizing a pricing model that is dependent on the value of plan assets arbitrarily 'builds in' fee increases that are not linked to the level or quality of the recordkeeper's services.")

prudent fiduciaries negotiate a fixed dollar amount for the

recordkeeper's annual compensation, usually based on a rate of a fixed

dollar amount per participant. Because of economies of scale, large

plans get lower effective rates per participant than smaller plans. Plans

with 100,000 participants can obtain much lower rates per participant

than a plan with 1,000 participants.

58.    A study commissioned by the U.S. Department of Labor in

1998 demonstrates these economies of scale, finding that as the number

of plan participants increases, the cost per participant decreases:[10] Per

the Study, the below expenses were based on quotations "of major

401(k) service providers."

| Number of Participants | Service Provider Cost Per Participant |
|------------------------|---------------------------------------|
| 200                    | $42                                   |
| 500                    | $37                                   |
| 1,000                  | $34[11]                               |

59.    Because recordkeeping costs are not affected by account size,

prudent fiduciaries of defined contribution plans negotiate

[10] U.S. Dept. of Labor, *Study of 401(k) Plan Fees and Expenses* (1998), available at https://www.dol.gov/sites/default/files/ebsa/researchers/analysis/retirement/study-of-401k-plan-fees-and-expenses.pdf.

[11] *Id.* at § 4.2.2 ("Recordkeeping and Administration Expenses").

recordkeeping fees as a fixed dollar amount rather than as a percentage of plan assets.[12] Otherwise, as plan assets increase, such as through participant contributions or investment gains, the recordkeeping compensation increases without any change in the recordkeeping services, leading to unreasonable fees.[13]

60.    For example, if a plan has 50,000 participants, a fiduciary could negotiate a plan-level contract to pay the recordkeeper $1,500,000 per year, based on a rate of $30 per participant fee per year. The negotiated $1,500,000 recordkeeping fee then can be assessed to participant accounts pro rata so that smaller accounts pay a smaller portion of the fee. If the plan's assets increase during the contract while the number of participants stays constant, the recordkeeper's

---

[12] Mercer Best Practices at 3 ("1. Price administrative fees on a per-participant basis.").

[13] *Id.* ("Negotiate a fixed-rate recordkeeping fee, based on the number of participants with account balances in the plan, that is independent of the investment structure (referred to as an 'open investment architecture' model). This approach, unlike an 'asset-based' or 'bundled' model, provides fee transparency and affords fiduciaries a sound basis for documenting the 'reasonableness' of recordkeeping fees. Conversely, utilizing a pricing model that is dependent on the value of plan assets arbitrarily 'builds in' fee increases that are not linked to the level or quality of the recordkeeper's services.")

compensation does not change, because the services provided have not
changed.

61.    A fixed-dollar compensation arrangement does not
necessarily mean, however, that every participant in the plan must pay
the same $30 fee from his or her account. The fiduciary could
reasonably determine that it is equitable to charge each participant the
same $30 (for example, through a quarterly charge of $7.50 to each
account in the plan). Alternatively, the fiduciary could conclude that
assessing the same fee to all investors would discourage participants
with relatively small accounts from participating in the plan; and that,
once the aggregate flat fee for the plan has been determined, a
proportional asset-based charge would be best. In that case, the rate of
$30 per-participant multiplied by the number of participants would be
converted to an asset-based charge, such that every participant pays
the same percentage of his or her account balance. If the plan in the
example had $6 billion in assets, each participant would pay a direct
recordkeeping fee of .025% of her account balance annual for
recordkeeping ($1,500,000/$6,000,000,000 = .00025). As the plan assets
increase thereafter, the *plan* is still paying the same $1,500,000 price

29

that was negotiated at the plan level, but the fees paid by individual participants changes as they are proportionally allocated among participants based on account balance. Alternatively, the plan fiduciary could negotiate that plan participants with a particular low asset level in their accounts not pay any recordkeeping fees or adopt a tiered structure with varying rates depending on asset level.[14]

62.     Mutual funds are commonly provided as investment options in retirement plans. Mutual funds sometimes agree to pay recordkeepers a percentage of fund assets to compensate for the cost of recordkeeping a plan, an arrangement called "revenue sharing." This asset-based fee is negotiated between the mutual fund and the recordkeeper and usually is concealed. It is designed to compensate recordkeepers for smaller plans, and thus can overcompensate a recordkeeper in large plans with large investments in the mutual funds because it is asset based. Although paying for recordkeeping with an asset-based fee is not a *per se* violation of ERISA, it can lead to excessive fees if not monitored and capped by the plan fiduciary. If a fiduciary allows the plan recordkeeper to be compensated with an asset-

---

[14] Mercer Best Practices at 5–6.

based fee then the payments can become excessive based on an increase in plan assets alone. For example, the S&P 500 increased over 25% in 2019, leading to large increases in asset-based fees for services which have not changed. The opposite is generally not true. If plan assets decline, participants will not receive a sustained benefit of paying lower fees, because the recordkeeper will demand that the plan make up the shortfall through additional direct payments.

63.    To make an informed assessment as to whether a recordkeeper is receiving no more than reasonable compensation for the services provided to a plan, prudent fiduciaries of defined contribution plans monitor *all* sources of compensation received by plan recordkeepers—including without limitation any revenue sharing or payments from managed account providers—and determine whether the compensation is reasonable for the services provided.

64.    Thus, if a fiduciary decides to use an asset-based fee to pay for recordkeeping, prudent fiduciaries recognize that it is critical to (1) negotiate a fixed amount of recordkeeping compensation based on a reasonable rate per participant per year, (2) determine all revenue sharing and other sources of compensation the recordkeeper receives

31

from plan investment options, and then (3) recover all revenue sharing payments that exceed the negotiated compensation.

65.     Experts in the field agree that the most certain way to determine the least compensation a plan must pay for a desired level of recordkeeping services is to put the plan's recordkeeping services out for competitive bidding on a regular basis. Prudent fiduciaries do this every three years.[15] For example, Fiduciary360's Prudent Practices for

---

[15] *See* Donald Stone, *Conducting a Successful Fee Review: How to determine whether plan fees are reasonable,* Defined Contribution Insights, January/February 2006, at 4 (stating "most reliable way of determining whether fees the plan is paying are reasonable" is through an RFP or an RFI search process); Tyler Polk, *Is it Time for a Change? Best Practice in Retirement Plan Record Keeper Searches*, Fiduciary Investment Advisors (April 2015) available at https://www.fiallc.com/wp-content/uploads/2017/03/Is-it-Time-For-a-Change_4.15.pdf; John Carl, *Including Regular RFPs as Part of a Fiduciary Liability Reduction Strategy*, January 24, 2018 ("The DOL assumes that plan sponsors solicit RFPs for service providers every three to five years as part of their fiduciary duty to monitor plan service providers."), available at: https://www.napa-net.org/news/technical-competence/case-of-the-week/including-regular-rfps-part-fiduciary-liability-reduction-strategy/; Roger Levy, *Selecting Service Providers, Competitive Bidding, & RFP's Importance in a Fiduciary Investment Process,* InHub, May 18, 2015, available at https://d1yoaun8syyxxt.cloudfront.net/br189-76a8e37a-950c-41a0-b246-47bb6162f4a4-v2.

Investment Stewards, [16] which is widely accepted as the global fiduciary standard of excellence, advised fiduciaries that they must determine "whether the fees are reasonable in light of the services provided" and "[c]onsideration is given to putting vendor contracts back out to bid every three years."[17]

66.   Cerulli Associates stated in early 2012 that more than half of the plan sponsors asked indicated that they "are likely to conduct a search for [a] recordkeeper within the next two years." These RFPs were conducted even though many of the plan sponsors indicated that they "have no intention of leaving their current recordkeeper."[18]

---

[16] *Prudent Practices for Investment Stewards* handbook defines the Global Fiduciary Standard of Excellence, initially published in April 2003, that was derived from a prior publication (*Prudent Investment Practices*) co-produced by the Foundation for Fiduciary Studies and the American Institute of Certified Public Accountants. This publication was written by Fiduciary 360, the identity brand for three related entities: the Foundation for Fiduciary Studies, the Center for Fiduciary Studies, and Fiduciary Analytics. The Foundation for Fiduciary Studies defines and substantiates specific investment fiduciary practices for trustees and investment committee members, investment advisors and investment managers and is widely used in the industry.

[17] Fiduciary360, *Prudent Practices for Investment Stewards*, Practices S-1.4, S-4.4 (2007).

[18] "Recordkeeper Search Activity Expected to Increase Within Next Two Years," *Cerulli Assoc.*, January 8, 2013, https://www.plansponsor.com/most-recordkeeping-rfps-to-benchmark-fees/

67.    The Department of Labor provides the use of an RFP to assess the reasonableness of the service provider's fees every three to five years is common practice.[19]

68.    A large corporate 401(k) plan recordkept by Hewitt Associates (n/k/a Alight Solutions) ("Hewitt") during the relevant period is the Nike Inc.'s 401(k) Plan. Public documents show that this large plan, which had roughly 19,000 to 26,000 participants, paid the following fees for recordkeeping services.[20]

| Nike, Inc. 401(k) Plan | 2016 | 2012 |
|---|---|---|
| Per participant for recordkeeping services | **$21** | **$21** |

69.    Another large plan, the New Albertson's Inc. 401(k) plan, left Fidelity Investments Institutional Operations Company, Inc. ("Fidelity") for Vanguard in 2016. A fee disclosure after this change states that this plan pays a fixed annual fee of $31 per participant for

---

[19] "Meeting Your Fiduciary Responsibilities," *U.S. Dept. of Labor*, 2012, at pages 5–6.

[20] Nike, Inc. 2016 Form 5500 with 26,568 participants with an account balance and compensation to recordkeeper, Hewitt. Nike, Inc. 2012 Form 5500 with 19,362 participants with an account balance and compensation to recordkeeper, Hewitt. No additional source of compensation to Hewitt is identified or discernable on the Forms 5500.

recordkeeping services.[21] The Form 5500 in 2016 confirms that the New Albertson's 401(k) Plan, with approximately 31,000 participants, paid approximately $31 per participant for recordkeeping services.[22]

70.     Similarly, a previously related company to New Albertson's Inc., Albertson's LLC 401(k) Plan, with approximately 17,200 plan participants in 2016, paid approximately $29 per participant for recordkeeping services.[23]

71.     Fidelity recently stipulated in litigation that the value of the recordkeeping service it provided its own 55,000-participant plan was $21 per participant in 2014, $17 per participant in 2015 and 2016 and $14 per participant after 2017. *Moitoso v. FMR LLC*, --- F.Supp.3d ----, 2020 WL 1495938, at *15 (D. Mass. Mar. 27, 2020) ("The parties have stipulated that if Fidelity were a third party negotiating this fee structure at arms-length, the value of services would range from $14–$21 per person per year over the class period, and that the

---

[21] New Albertson's Inc. 401(k) Plan Fee Disclosure, *Cates v. Tr. of Columbia Univ.*, No. 16-cv-06524, Doc. 292-6 (S.D.N.Y. July 1, 2019).

[22] *See* Form 5500 for 2016 for New Albertson's Inc. 401(k) Plan and Master Trust Form 5500.

[23] *See* Form 5500 for 2016 for Albertson's LLC 401(k) Plan and Master Trust Form 5500.

35

recordkeeping services provided by Fidelity to this Plan are not more valuable than those received by other plans of over $1,000,000,000 in assets where Fidelity is the recordkeeper."); *Moitoso v. FMR, LLC*, No. 18-12122, Doc. 138-67, at 3–4 (D. Mass.) (stipulating to the recordkeeping fees discussed above and further stipulating that "[h]ad the Plan been a third-party plan and negotiated a fixed fee for recordkeeping services at arms-length with Fidelity, it could have obtained recordkeeping services for these amounts during the period.").

### B. Contrary to the practices of prudent fiduciaries and in violation of ERISA's prohibitions on self-dealing transactions, Defendants failed to monitor and control recordkeeping fees, resulting in significant Plan losses due to excessive fees, and improper benefit to ADP.

72.    Voya Institutional Plan Services, LLC ("Voya") has been the Plan's recordkeeper since August 2013, when it was known as ING U.S. Prior to that time, the recordkeeper was MassMutual.

73.    Since at least January 1, 2014, Defendants failed to analyze whether the direct and indirect compensation paid to Voya and its affiliates was reasonable compared to market rates for the same services. Defendants also failed to retain an independent third party to

36

appropriately assess the reasonableness of Voya's compensation in light of the services rendered to the Plan.

74.     The Plan paid Voya millions of dollars each year for recordkeeping services, from at least 2013 until 2018 during a period of dramatic decreases in recordkeeping fees across the market and dramatic growth in assets in the Plan.

75.     For example, according to the Plan's Department of Labor Forms 5500, in 2015, the Plan paid Voya at least $6.8 million[24] in recordkeeping fees, which translates to roughly .23% of the Plan's $3 billion dollars in assets, or an average of $91.36 per participant. By 2016, the Plan reported that its assets had grown to over $3.5 billion—an increase of approximately 18%. Yet the fees collected by Voya for the same services were at least $10,460,592—a figure 52% greater than the

---

[24] The recordkeeping compensation figures discussed in this section include only publicly reported direct compensation to Voya and are therefore highly likely an underestimate of total recordkeeping compensation. Further, as alleged below, the ADP Defendants paid themselves additional amounts for "administrative" expenses, which may include putative compensation for recordkeeping, making the Plan's recordkeeping fees even more unreasonable. Plaintiffs will demonstrate the precise amount of recordkeeping fees and damages, which are continuing, through discovery and trial.

direct compensation reported in 2015, translating to approximately

.30% of the Plan's assets, or an average of $117 per participant.

76.    If Defendants had been monitoring and prudently

controlling the costs for the Plan's recordkeeping services, they would

not have allowed the Plan to pay fees that grew in this manner,

allowing the recordkeeping fees to increase dramatically based upon

nothing but asset growth, for the same amount of services.

77.    For the same reason, it is clear that Defendants also failed to

conduct a competitive bidding process for the Plan's recordkeeping

services from prior to 2014 until at least 2018. A competitive bidding

process for the Plan's recordkeeping services would have produced a

reasonable recordkeeping fee for the Plan. That is particularly so

because recordkeeping fees for enormous plans such as the Plan have

been declining since 2013. By failing to engage in a competitive bidding

process for Plan recordkeeping fees, Defendants caused the Plan to pay

excessive recordkeeping fees.

78.    Instead of obtaining a cap on the Plan's fees on a per-

participant or total basis, Defendants allowed the Plan's service

providers to collect excessive asset-based fees as payment for administrative services.

79.    Defendants permitted the Plan to pay unreasonable recordkeeping fees to Voya, resulting in excessive recordkeeping fees.

80.    Defendants were required under ERISA to determine and monitor all sources of Voya's compensation, and to ensure that the compensation was limited to a reasonable amount for the services provided. Defendants' failure to properly monitor and cap the recordkeepers' compensation caused the Plan to pay excessive recordkeeping fees.

81.    However, the ADP Defendants stood to gain financially and were incentivized to retain Voya despite that fact that its high-cost structure was imprudent and contrary to the interests of Plan participants for multiple reasons. For example, unlike some competing low-cost, open architecture defined contribution recordkeeping providers, Voya and its affiliates use information obtained in Voya's role as recordkeeper to market and sell numerous other products and services to the small-business clientele including accident, critical illness/specified disease, hospital confinement indemnity, group life and

disability income insurance products, and health savings and spending accounts. This existing client base provides lucrative marketing opportunities for ADP to extend its TotalSource client base. Indeed, in a press release, Voya touted a partnership with ADP to provide "integrated employee benefits solutions" via a "one-stop-shop" solution—effectively sharing Voya and ADP's client base.[25]

82.     On information and belief, ADP receives or received additional indirect and/or direct compensation in exchange for paying Voya excessive recordkeeping fees, inclusion of high-cost Voya proprietary financial products and/or providing access to Plan participants and their confidential information to Voya, as further alleged herein.

83.     Based on the Plan's features, the nature and type of recordkeeping and administrative services provided by the Plan's recordkeeper, the number of Plan participants and the recordkeeping market, at maximum the reasonable recordkeeping fee for the Plan would have been $1.9 million to $2.9 million per year (an average of $30

---

[25] https://corporate.voya.com/newsroom/news-releases/voya-financial-announces-agreement-adp-provide-integrated-employee-benefits.

per-participant from 2014 to 2015 and $25 per-participant from 2016 to 2018). This is consistent with the fees of Nike, New Albertson's, Fidelity, and other large plans recordkept by prominent recordkeepers after requests for proposal during the period.

84.    Based on compensation disclosed in the Plan's Form 5500s filed with the Department of Labor, the Plan paid between approximately $6.9 million and $10.5 million (or approximately $80 to $124 per participant)[26] per year from 2014 to 2018, up to over *400%* higher than a reasonable fee for these services, resulting in millions of dollars in excessive recordkeeping fees each year.

85.    Even much smaller plans like Nike and New Albertson's plans paid much less for recordkeeping services. Plans like Fidelity's were priced many multiples lower:

|  | ADP TotalSource | Nike | New Albertson's | Fidelity |
|---|---|---|---|---|
| Per-participant recordkeeping fee | $80 to $124[27] | $21 | $31 to $29 | $21 to $14 |

---

[26] As above, this calculation is limited only to direct payments to Voya for recordkeeping and is likely a substantial underestimate.

[27] *Ibid.*

41

86.    Had Defendants adequately monitored the Plan's recordkeeping fees, the Plan's recordkeeping fees would have been reduced to a level below $30 per participant before 2016 and $25 per-participant in 2016 and later, fee rates that other large plans have obtained, even plans with far fewer participants such as the Nike and New Albertson's plans discussed *supra*.

87.    Defendants' failure to monitor, control and ensure that participants were charged only reasonable fees for recordkeeping services caused the Plan to lose over $40.8 million due to unreasonable recordkeeping fees and lost investment opportunity. This is calculated by multiplying the reasonable fee per participant in the applicable year by the number of participants, subtracting the reasonable fees from the disclosed direct compensation to Voya for recordkeeping in the Plan's Form 5500 from April 2014 until 2018. The damages are then brought forward yearly by the return of an S&P 500 index fund to account for lost investment opportunity.

88.    As alleged above, the Plan, despite being a MEP, has uniform features across all its participating employers. It is a single Plan with a single Plan document that all participating employers must

42

agree to and cannot alter. It files a single Form 5500 with the Department of Labor. It provides for eligibility and vesting procedures that are generally the same for all Adopting Employers. Any differences can be easily automated. The employees of each Adopting Employer, in fact, become co-employees of the ADP TotalSource PEO.

89.    Thus, comparisons to similarly sized single employer defined contribution plans are appropriate in determining reasonable recordkeeping fees.

90.    Fees paid by the Plan are unreasonable given the bargaining power and inherent efficiencies of the MEP model and in light of the PEO structure.

91.    It is clear that Defendants allowed the Plan's recordkeepers to collect fees which are grossly excessive and imprudent. Even if the Plan had only managed to obtain fees of $4.1–$7.4 million (averaging $65 per-participant[28]) from 2014–2018, it could have avoided losses of

---

[28] Approximately reflecting, according to one source, median fees for defined contribution plans during the statutory period, overwhelmingly consisting of much smaller and less sophisticated plans than the Plan. *See* NEPC, *Defined Contribution Plan Fees Continue To Decline: 2013 NEPC Plan & Fee Study*; NEPC, *NEPC 2014 Defined Contribution Plan & Fee Survey: What Plan Sponsors Are Doing Now*; NEPC, *Corporate Defined Contribution Plans Report Flat Fees*.

over $19.3 million[29] in excessive recordkeeping fees and lost investment

opportunity to the Plan's participants.

## II. The ADP Defendants breached their fiduciary duties and engaged in prohibited transactions by unlawfully paying themselves from Plan assets.

### A. ERISA's self-dealing and prohibited transactions provisions.

92.     ERISA imposes strict fiduciary duties of loyalty and

prudence upon Defendants as fiduciaries of the Plan. 29 U.S.C.

§1104(a), states, in relevant part, that a fiduciary "shall discharge his

duties with respect to a plan solely in the interest of the participants

and beneficiaries and (A) for the exclusive purpose of (i) providing

benefits to participants and their beneficiaries; and (ii) defraying

reasonable expenses of administering the plan."

93.     Plan assets "shall be held for the exclusive purposes of

providing benefits to participants in the plan and their beneficiaries

and defraying reasonable expenses of administering the plan." 29

U.S.C. §1103(c)(1).

---

[29] As above, this calculation is limited only to direct payments to Voya for recordkeeping and is likely a substantial underestimate because certain Plan investments paid indirect compensation (or revenue sharing) to pay for recordkeeping and administrative services, and because the ADP Defendants paid themselves additional amounts.

44

94.     Supplementing these general fiduciary duties, certain

transactions are prohibited *per se* by 29 U.S.C. §1106 because they

entail a high potential for abuse. Section 1106(a)(1) [ERISA §406(a)]

states, in pertinent part, that the fiduciary

> shall not cause the plan to engage in a transaction, if he
> knows or should know that such transaction constitutes a
> direct or indirect –
>   (C) furnishing of goods, services, or facilities between the
> plan and party in interest; [or]
>   (D) transfer to, or use by or for the benefit of a party in
> interest, of any assets of the plan[.]

95.     As the employer of the participants in the Plan and a

fiduciary, ADP TotalSource is a party in interest. 29 U.S.C.

§1002(14)(A) and (C).

96.     Under 29 U.S.C. §1106(b) [ERISA §406(b)], fiduciaries are

prohibited from engaging in self-dealing with Plan assets. Section

1106(b) provides that the fiduciary

> shall not—
>   (1) deal with the assets of the plan in his own interest or for
> his own account, [or]
>   (2) in his individual or in any other capacity act in any
> transaction involving the plan on behalf of a party (or
> represent a party) whose interests are adverse to the
> interests of the plan or the interests of its participants or
> beneficiaries[.]

97.     "Section 406(b) prohibits a plan fiduciary from engaging in

45

various forms of self-dealing. Its purpose is to 'prevent[] a fiduciary

from being put in a position where he has dual loyalties and, therefore,

he cannot act exclusively for the benefit of a plan's participants and

beneficiaries.'" *Reich v. Compton*, 57 F.3d 270, 287 (3d Cir. 1995) (Alito,

J., quoting H.R. Rep. No. 93-1280 (1974)); see also 29 C.F.R.

§2550.408b-2(e)(1).

98.    The DOL explains in 29 C.F.R. § 2550.408b-2(e)(1):

> These prohibitions are imposed upon fiduciaries to deter
> them from exercising the authority, control, or responsibility
> which makes such persons fiduciaries when they have
> interests which may conflict with the interests of the plans
> for which they act. In such cases, the fiduciaries have
> interests in the transactions which may affect the exercise of
> their best judgment as fiduciaries.

99.    Although ERISA provides for exemptions from §1106(a)

prohibited transactions (as set forth in 29 U.S.C. §1108 and the

regulations thereunder), there are no exemptions from §1106(b)

prohibited transaction. 29 C.F.R. §2550.408b-2(a); 29 C.F.R.

§2550.408b-2(e); *Barboza v. Cal. Ass'n of Prof'l Firefighters*, 799 F.3d

1257, 1269 (9th Cir. 2015)(citing *Patelco Credit Union v. Sahni*, 262

F.3d 897, 910–11 (9th Cir. 2001)); *Hi-Lex Controls, Inc. v. Blue Cross*

*Blue Shield of Mich.*, 751 F.3d 740, 750 (6th Cir. 2014); DOL Adv. Op. 89-09A (June 13, 1989)(1989 ERISA LEXIS 9).

100.  29 U.S.C. §1132(a)(2) authorizes a plan participant to bring a civil action to enforce a breaching fiduciary's liability to the plan under 29 U.S.C. §1109. Section 1109(a) provides in relevant part:

> Any person who is a fiduciary with respect to a plan who breaches any of the responsibilities, obligations, or duties imposed upon fiduciaries by this subchapter shall be personally liable to make good to such plan any losses to the plan resulting from each such breach, and to restore to such plan any profits of such fiduciary which have been made through use of assets of the plan by the fiduciary, and shall be subject to such other equitable or remedial relief as the court may deem appropriate, including removal of such fiduciary.

### B. ADP Defendants paid themselves unreasonable and unnecessary amounts for purported administrative services provided to the Plan.

101.  A portion of the gross annual operating expense of each investment in the Plan is purportedly credited to a Plan account to pay administrative expenses.

102.  In 2019, an asset-based fee of 0.32% of all Plan assets was deducted as part of the expense ratio of each investment alternative in the Plan to fund this Plan account (*i.e.*, revenue sharing).

103.  The Plan pays Voya's recordkeeping fees from these revenue

sharing funds. In addition, the Plan pays other administrative fees, such as legal, trustee, or accounting fees from these funds.

104.  The ADP Defendants caused the Plan to pay any remaining revenue sharing, after administrative expenses are paid, to ADP TotalSource.

105.  These payments are wholly unconnected to any services that ADP TotalSource provides to the Plan. Indeed, the amounts of these self-payments, as reported in the Plan's Forms 5500, are unconnected and bear no discernable relationship to the primary factor that, according to industry literature and experts, drive recordkeeping and administration cost—number of participants.

106.  All these excess amounts were Plan assets, since they constituted excessive fees generated from participant investments, and should have been restored to the Plan.

107.  From 2014 to 2018, the ADP Defendants took for themselves out of these Plan assets nearly $10 million in putative reimbursement of administrative costs in the following amounts per year:

| | |
|---|---|
| 2014 | $1,444,430.00 |
| 2015 | $1,013,076.00 |
| 2016 | $2,366,337.00 |
| 2018 | $4,963,534.00 |
| Total[30] | **$9,787,377.00** |

108.   These amounts contributed to the already excessive recordkeeping compensation paid to the Plan's recordkeeper, Voya. For 2018, ADP TotalSource was paid $4.9 million, representing more than 50% of the compensation paid to Voya for providing recordkeeping and administrative services to the Plan. This increased the fees paid by participants by over 33% for recordkeeping and administrative services.

109.   Defendants failed to loyally and prudently monitor this purported compensation to ensure that only reasonable and necessary expenses were charged for services actually provided to the Plan. This is shown by the dramatic increase from $1.4 million in fees for 2014 to approximately $5.0 million in fees for 2018.

110.   The ADP Defendants did not reduce the amounts paid through the asset-based charges paid by the Plan's investments because

---

[30] The ADP Defendants did not disclose any amount ADP TotalSource received during 2017 on the Plan's Form 5500. Because ADP TotalSource putatively provided services to the Plan and was paid from Plan assets, the total amounts identified above understate the total compensation ADP TotalSource received from 2014 through 2018.

49

they sought to maintain excessive amounts to pay themselves for putatively Plan-related services.

111.  On information and belief, the ADP Defendants failed to enter into a reasonable contract or arrangement for reimbursement of proper Plan expenses, but instead just paid themselves from Plan assets under this scheme when they had a clear conflict of interest with the Plan and Plan participants.

112.  The ADP Defendants did not engage an independent fiduciary to review and approve the arrangement between ADP TotalSource and the Plan. The ADP Defendants failed to engage an independent fiduciary determine whether it was in the interest of Plan participants to engage in this scheme or whether the services the ADP employees performed were necessary for the operation of the Plan, whether the amounts charged for those services were reasonable, and whether ADP TotalSource was paid only its direct expenses incurred in providing necessary services to the Plan.

113.  Further, each Adopting Employer separately pays ADP TotalSource fees under their respective Client Services Agreements for the costs to maintain payroll and other services—a component of the

PEO arrangement. ADP TotalSource must maintain detailed records regarding each of the Adopting Employers' employees (which are also ADP TotalSource co-employees) in order to accomplish these separately agreed human resources-related services. These recordkeeping and other tasks are duplicative of the typical core recordkeeping and administration functions provided to defined contribution plans. Thus, the fees that the ADP Defendants collect from the Plan (and its participants) for administration are wholly duplicative of other fees that Participating Employers must pay as a condition of joining the PEO.

114.  Had Defendants performed their fiduciary duties, the Plan would not have suffered over $13.5 million in losses from May 2014 through 2019, accounting for lost investment opportunity.

## III.  Defendants selected and retained imprudent investments in the Plan.

### A. Prudent fiduciaries regularly monitor the performance and fees of investments and remove those investments that underperform and charge excessive fees.

115.  Plan fiduciaries have exclusive control over the investment alternatives available in the plan. Plan participants direct and allocate the assets in their accounts to one or more of these alternatives. The investment returns are credited to participants' accounts.

51

116.   Each investment alternative is typically a pooled investment product, such as a mutual fund, and invests in a diversified portfolio of securities in a broad asset class such as fixed income or equities. Fixed income funds may include conservative principal protection options, such as stable value funds, or other diversified portfolios of government or corporate debt securities. Equity funds invest in diversified portfolios of stocks of large, mid-size, or small domestic or international companies in a particular style such as growth or value (or a blend of the two). Balanced funds invest in a mix of stocks and bonds in varying percentages.

117.   Investment alternatives can be passively or actively managed. In a passively managed or "index" fund, the investment manager attempts to match the performance of a given benchmark index by holding a representative sample of securities in that index, such as the S&P 500. In an actively managed fund, the investment manager uses their judgment in buying and selling individual securities (*e.g.*, stocks, bonds, etc.) in an attempt to generate investment returns that surpass a benchmark index, net of fees. Because no stock selection or research is necessary for the manager to track the index and trading

52

is limited, passively managed investments charge significantly lower fees than actively managed funds.

118.  The fees of mutual funds and other investment alternatives are usually expressed as a percentage of assets under management, or "expense ratio." For example, if the fund deducts 1% of fund assets each year in fees, the fund's expense ratio would be 1%, or 100 basis points (bps).[31] The fees deducted from a fund's assets reduce the value of the shares owned by fund investors.

119.  When selecting investments, the importance of fees cannot be overstated. Indeed, "the duty to avoid unwarranted costs is given increased emphasis in the prudent investor rule" under the common law of trusts, which informs ERISA's fiduciary duties. Restatement (Third) of Trusts ch. 17, intro. note (2007); *see Tibble*, 135 S. Ct. at 1828 (citing Restatement (Third) of Trusts § 90 in finding a continuing duty to monitor under ERISA). As the Restatement explains, "cost-conscious management is fundamental to prudence in the investment function." Restatement (Third) of Trusts § 90 cmt. b. While a fiduciary may consider higher-cost, actively-managed mutual funds as an alternative

---

[31] One basis point is 1/100th of one percent or 0.01%.

to index funds, "active management strategies involve investigation expenses and other transaction costs . . . that must be considered, realistically, in relation to the likelihood of increased return from such strategies." Restatement (Third) of Trusts ch. 17, intro. note; *id.* § 90 cmt. h(2).

120.  Academic and financial industry literature demonstrate that high expenses are not correlated with superior investment management. Indeed, funds with high fees on average perform worse than less expensive funds even on a *pre-fee basis*. Javier Gil-Bazo & Pablo Ruiz-Verdu, *When Cheaper is Better: Fee Determination in the Market for Equity Mutual Funds*, 67 J. Econ. Behav. & Org. 871, 873 (2008); *see also* Jill E. Fisch, *Rethinking the Regulation of Securities Intermediaries*, 158 U. Pa. L. Rev. 1961, 1993 (2010) (summarizing numerous studies showing that "the most consistent predictor of a fund's return to investors is the fund's expense ratio").

> [T]he empirical evidence implies that superior management is not priced through higher expense ratios. On the contrary, it appears that the effect of expenses on after-expense performance (even after controlling for funds' observable characteristics) is more than one-to-one, which would imply that low-quality funds charge higher fees. Price and quality thus seem to be inversely related in the market for actively managed mutual funds.

54

Gil-Bazo & Ruiz-Verdu, *When Cheaper is Better*, at 883.

121.  In light of this effect of fees on expected returns, fiduciaries must carefully consider whether the added cost of actively managed funds is realistically justified by an expectation of higher returns net of all expenses. Restatement (Third) of Trusts ch. 17, intro. note; *id.* § 90 cmt. h(2). Nobel Prize winners in economics have concluded that virtually no investment manager consistently beats the market over time after fees are taken into account. "Properly measured, the average actively managed dollar must underperform the average passively managed dollar, net of costs." William F. Sharpe, *The Arithmetic of Active Management,* 47 Fin. Analysts J. 7, 8 (Jan./Feb. 1991);[32] Eugene F. Fama & Kenneth R. French, *Luck Versus Skill in the Cross-Section of Mutual Fund Returns*, 65 J. Fin. 1915, 1915 (2010) ("After costs . . . in terms of net returns to investors, active investment must be a negative sum game.").

122.  To the extent managers show any sustainable ability to beat the market before expenses, the outperformance is nearly always

---

[32] Available at https://www.tandfonline.com/doi/10.2469/faj.v47.n1.7.

dwarfed by mutual fund expenses. Fama & French, *Luck Versus Skill in the Cross-Section of Mutual Fund Returns*, at 1931–34; *see also* Russ Wermers, *Mutual Fund Performance: An Empirical Decomposition into Stock-Picking Talent, Style, Transaction Costs, and Expenses*, 55 J. Fin. 1655, 1690 (2000) ("on a net-return level, the funds underperform broad market indexes by one percent per year").

123.  If an individual high-cost mutual fund exhibits market-beating performance over a short period of time, studies demonstrate that outperformance during a particular period is not predictive of whether a mutual fund will perform well in the future. Laurent Barras et al., *False Discoveries in Mutual Fund Performance: Measuring Luck in Estimated Alphas*, 65 J. Fin. 179, 181 (2010); Mark M. Carhart, *On Persistence in Mutual Fund Performance*, 52 J. Fin. 57, 57, 59 (1997) (measuring thirty-one years of mutual fund returns and concluding that "persistent differences in mutual fund expenses and transaction costs explain almost all of the predictability in mutual fund returns"). However, the *worst-performing* mutual funds show a strong, persistent tendency to continue their poor performance. Carhart, *On Persistence in Mutual Fund Performance*, at 57.

56

124.   Accordingly, investment costs are of paramount importance to prudent investment selection, and a prudent investor will not select higher-cost actively managed funds without a documented process to realistically conclude that the fund is likely to be that extremely rare exception, if one even exists, that will outperform its benchmark index over time, net of investment expenses.

125.   Prudent fiduciaries require that a fund's time-weighted returns over a relevant period must compare favorably with the performance of the appropriate benchmark index or passively managed equivalent when deciding whether to select or retain an investment in a defined contribution plan. Experts in the industry state that when an actively managed fund underperforms the proper benchmark for three-years trailing, then it is highly unlikely it will outperform in the future, including over the five-year trailing period. When the fund's prior rolling performance falls below the benchmark over a three-year period, the fiduciary should remove the fund from the defined contribution plan. Moreover, the path to meeting this criterion includes several other triggers (such as qualitative concerns and risk assessments) whereby

the fiduciary would have initiated other analysis and communicated accordingly to the underperforming manager.

126.  Defendants select and retain investment alternatives into which participants' investments are directed. Defendants also select those investment options that are removed from the Plan. These investments are designated by Defendants as designated investment alternatives offered under the Plan.

127.  Defendants failed to adequately monitor performance for investments in the Plan, and failed to engage in a prudent decision-making process when adding investments to the Plan after 2014.

**B. Defendants selected and retained imprudent, consistently underperforming, high-cost investments.**

### *1. Voya Large Cap Value Portfolio*

128.  The Voya Large Cap Value Portfolio I (IPEIX) was a large cap value investment option in the Plan from August 2013 until it was replaced during 2017. In 2014, the Fund changed its name from ING Large Cap Value Portfolio. It was added to the Plan immediately after Voya became the recordkeeper. Defendants replaced the MassMutual Fundamental Value Fund with the Voya Large Cap Value Portfolio I

(IPEIX).[33] Defendants changed this fund option from one recordkeeper's proprietary fund to the new recordkeeper's proprietary fund, with no reason other than to benefit the recordkeeper and themselves.

129.  From 2013 through 2016, the Fund held $133 million to $158.4 million of participants' retirement assets.

130.  When the Voya Large Cap Value Portfolio was added to the Plan, the Fund's performance had already begun to deteriorate. As of March 31, 2013, for the prior one-year period, the Voya Large Cap Value Portfolio substantially underperformed its benchmark (Russell 1000 Value Index) by 202 bps.[34]

131.  The Fund's underperformance continued. As of December 31, 2013, the Fund underperformed its benchmark by 167 bps for one year, and 79 bps over the trailing five-year period.[35] *See infra.* The Fund also underperformed its benchmark over the trailing three-year period.

---

[33] *See* ADP TotalSource Retirement Savings Plan, *Exciting Changes Coming to Your 401(k) Plan* at 4 ("Transition Guide").

[34] Transition Guide at 16.

[35] ING Investors Trust, N-CSR, Dec. 31, 2013, https://www.sec.gov/Archives/edgar/data/837276/000119312514086721/d657793dncsr.htm.

|                              | 1 Year | 5 Year |
|------------------------------|--------|--------|
| Voya Large Cap Value Portfolio | 30.86% | 15.88% |
| Russell 1000 Value Index     | 32.53% | 16.67% |

132.  Apart from the benchmark, the Fund underperformed lower-cost alternatives of the same investment style. The Vanguard Value Index I (VIVIX) is a comparable large cap value index fund that charged 8 bps as of December 31, 2013, and was available to the Plan.[36] In contrast to the Vanguard index fund, Voya charged 60 bps (net) on the Voya Large Cap Value Portfolio during 2013.[37] The Vanguard index fund was 650% cheaper than the Voya Large Cap Value Portfolio, and had a history of superior investment returns. A similar difference in fees existed from 2014 through 2017.[38]

133.  For the trailing one- and five-year periods as of December 31, 2013, the Vanguard index fund outperformed the Voya Large Cap

---

[36] Vanguard Index Funds, N-CSR, Dec. 31, 2013, https://www.sec.gov/Archives/edgar/data/36405/000093247114004906/index_final.htm.

[37] Transition Guide at 16.

[38] Vanguard charged 4–8 bps, in comparison to 64 bps charged by Voya. *See* Morningtar; ADP TotalSource Retirement Savings Plan, Disclosure of Plan-Related Information, Dec. 31, 2015, at 5.

Value Portfolio.[39] *See infra.* The Fund also underperformed the

Vanguard index fund over the trailing three-year period.

| Fund | 1 Year | 5 Year |
|------|--------|--------|
| Voya Large Cap Value Port I (IPEIX) | 30.86% | 15.88% |
| Vanguard Value Index (Inst) (VIVIX) | 33.07% | 16.29% |
| (+/-) Difference | -2.21% | -0.41% |

134.  In each year from 2012 through 2017, the Fund

underperformed both its benchmark (Russell 1000 Value) and the

Vanguard Value Index Fund.[40]

| Fund | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 |
|------|------|------|------|------|------|------|
| Voya Large Cap Value Port I (IPEIX) | 14.71% | 30.86% | 10.09% | -4.46% | 13.89% | 13.55% |
| Vanguard Value Index (Inst) (VIVIX) | 15.20% | 33.07% | 13.19% | -0.85% | 16.87% | 17.14% |
| (+/-) Difference | -0.49% | -2.21% | -3.10% | -3.61% | -2.98% | -3.59% |

| Fund | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 |
|------|------|------|------|------|------|------|
| Voya Large Cap Value Port I (IPEIX) | 14.71% | 30.86% | 10.09% | -4.46% | 13.89% | 13.55% |
| Russell 1000 Value Index | 17.51% | 32.53% | 13.45% | -3.83% | 17.34% | 13.66% |
| (+/-) Difference | -2.80% | -1.67% | -3.36% | -0.63% | -3.45% | -0.11% |

---

[39] Vanguard Index Funds, N-CSR, Dec. 31, 2013.
[40] Investment returns obtained from Morningstar.

135. A prudent fiduciary will thoroughly monitor the performance of investment options provided in a defined contribution plan at least on a quarterly basis. An actively managed fund's returns over a prior rolling three-year period must compare favorably with the performance of an appropriate benchmark index or passively managed equivalent. When the fund's prior rolling three-year performance falls below the benchmark, the fiduciary would remove the fund from a defined contribution plan. This is because once an actively managed fund has failed to outperform its benchmark or passively managed equivalent over a trailing three-year period, it is highly unlikely that the Fund will outperform relative to the benchmark in coming years.

136. Defendants failed to continuously monitor the performance of the Voya Large Cap Value Portfolio. They failed to make a reasoned determination that maintaining the Fund was prudent in light of lower-cost and better-performing alternatives, in the best interest of Plan participants, or would generate investment returns that would exceed the benchmark or passively managed equivalent. Given the consistent underperformance, and deteriorating performance since the Voya Large Cap Value Portfolio was added to the Plan, a prudent fiduciary

continuously monitoring the Plan's investment options would have removed the Fund and replaced it with a lower-cost and better performing alternative.

137.   Had Defendants removed the Voya Large Cap Value Portfolio I and replaced it with the Vanguard Value Index (Instl) as of the start of the class period (no later than June 30, 2014), Plan participants would not have lost in excess of $39.4 million of their retirement savings.[41]

138.   Given its consistent poor performance, and in light of the ADP Defendants' incentives to act for the benefit of Voya, as alleged in more detail herein, the ADP Defendants  added and retained the Voya Large Cap Value Portfolio I to benefit Voya rather than based on an independent investigation of the merits of the investment.

139.   A fiduciary with any semblance of prudent investment monitoring process would have removed the Voya Large Cap Value

---

[41] Damages are measured by the difference in investment returns of the Voya Fund and the Vanguard alternative from June 30, 2014 through December 31, 2017. The losses are carried forward through December 31, 2019 using the investment returns of the Vanguard alternative to account for lost investment opportunity. Total Plan losses will be determined at trial after complete discovery in this case and are continuing.

Portfolio I from the Plan after engaging in a diligent review at any one of multiple points in time throughout the class period.

### 2. Voya Large Cap Growth Portfolio

140.  The Voya Large Cap Growth Portfolio I (IEOHX), another Voya proprietary fund, was added to the Plan in August 2013 only because of the change in recordkeepers from MassMutual to Voya. In 2014, the Fund changed its named from ING Large Cap Growth Portfolio. The Fund still remains an investment option in the Plan, charging 69 bps.[42]

141.  As of December 31, 2014, the Voya Large Cap Growth Portfolio underperformed its benchmark (Russell 1000 Growth) over the trailing five-year period.[43] As of December 31, 2015, the Fund underperformed its benchmark index for the trailing three years.[44]

142.  The Vanguard Growth Index Fund (Instl) (VIGIX) is a comparable large cap growth fund, and was available to the Plan. In

---

[42] ADP TotalSource Retirement Savings Plan, Disclosure of Plan-Related Information, Sept. 30, 2019, at 6.

[43] Voya Investors Trust, N-CSR, Dec. 31, 2014, https://www.sec.gov/Archives/edgar/data/837276/000157104915001720/t1402358_ncsr.htm.

[44] *See* ADP TotalSource Retirement Savings Plan, Disclosure of Plan-Related Information, Dec. 31, 2015, at 4.

2015, the Vanguard Growth Index charged 7 bps. From 2016–2019, the Fund charged 5–4 bps.[45] In comparison, Voya charged 67 bps on the Voya Large Cap Growth Fund in 2015, and 69 bps as of 2019.[46] The Vanguard index fund was up to 1,625% cheaper than the Plan's Voya large cap growth fund.

143. As of March 31, 2020, the Voya Large Cap Growth Portfolio I underperformed its benchmark over year-to-date, one-, three-, five-, and ten-year reporting periods.[47]

|  | YTD | 1 year | 3 years | 5 years | 10 years |
|---|---|---|---|---|---|
| Voya Large Cap Growth Port I | -14.32 | -1.00 | 9.96 | 9.05 | 12.37 |
| Russell 1000 Growth TR USD | -14.10 | 0.91 | 11.32 | 10.36 | 12.97 |
| US Fund Large Growth | -15.52 | -3.81 | 8.61 | 7.53 | 10.52 |

144. Given the deteriorating performance since the Voya Large Cap Growth Portfolio was added to the Plan, a prudent fiduciary continuously monitoring the Plan's investment options would have

---

[45] The expense ratios were obtained from Morningstar.

[46] ADP TotalSource Retirement Savings Plan, Disclosure of Plan-Related Information, Dec. 31, 2015, at 5; ADP TotalSource Retirement Savings Plan, Disclosure of Plan-Related Information, Sept. 30, 2019, at 6.

[47] Voya Large Cap Growth Portfolio I Fact Sheet, Q1 2020.

removed the Fund and replaced it with a lower-cost and better performing alternative once it underperformed its benchmark over a trailing three-year period.

145.  Given its consistent poor performance, and in light of the ADP Defendants' incentives to act for the benefit of Voya, as alleged in more detail herein, the ADP Defendants added and retained the Voya Large Cap Growth Portfolio I to benefit Voya and themselves rather than based on an independent investigation into the merits of the investment.

146.  As demonstrated by the Fund's retention after years of underperforming its benchmark, Defendants failed to continuously monitor the performance of the Voya Large Cap Growth Portfolio. Defendants failed to make a reasoned decision that maintaining the actively managed Voya Large Cap Growth Portfolio was prudent, in the best interest of Plan participants, or would generate returns in excess of the benchmark or passively managed equivalent in subsequent periods.

147.  Had Defendants removed the Voya Large Cap Growth Portfolio I and replaced it with the Vanguard Growth Index (Instl) by December 31, 2015 after it underperformed its benchmark over the

66

trailing three year period, Plan participants would not have lost in excess $10.4 million of their retirement savings.[48]

### 3. Federated Clover Small Cap Value Fund

148.  In connection with the selection of Voya as recordkeeper, the Federated Clover Small Cap Value Fund (Instl) (VSFIX) was added as a Plan investment option. The Fund replaced the MassMutual Select Small Company Value Fund.[49]

149.  At the time the Fund was added to the Plan, it already had a recent history of underperformance. As of March 31, 2013, for the prior one- and three-year periods, the Federated Clover Small Cap Value Fund underperformed its benchmark (Russell 2000 Value).[50] The Fund also charged 104 bps.

150.  Following its inclusion in the Plan, the Fund's performance did not improve but continued to underperform. As of December 31, 2013, for the trailing one- and three-year periods, the Fund

---

[48] Damages are measured by the difference in investment returns of the Voya Fund and the Vanguard alternative from December 31, 2015 through December 31, 2019. Total Plan losses will be determined at trial after complete discovery in this case and are continuing.

[49] Transition Guide at 4.

[50] Transition Guide at 16.

substantially underperformed its benchmark. For one year, the Fund underperformed by 270 bps, and for three years, it underperformed cumulatively by 684 bps.[51]

151.   Apart from underperforming its benchmark, the Fund underperformed lower-cost alternatives. The Vanguard Small Cap Value Index (Instl) (VSIIX) is a small cap value index that charged 8 bps as of December 31, 2013, and was available to the Plan.[52] In contrast, the Federated Fund charged 104 bps during 2013.[53] From 2016–2019, the Federated Fund charged 101 bps compared to 6 bps for Vanguard.[54] As a result, the Vanguard index fund was up to 1,583% cheaper than the Federated Fund yet substantially outperformed.

152.   For the trailing one-, five-, and ten-year periods, as of December 31, 2013, the Vanguard index fund substantially

---

[51] Investment returns obtained from Morningstar. The cumulative underperformance was determined by summing the prior years of underperformance: 2011 (4 bps), 2012 (382 bps), and 2013 (270 bps).

[52] Vanguard Index Funds, N-CSR, Dec. 3,1 2013, https://www.sec.gov/Archives/edgar/data/36405/000093247114004906/index_final.htm.

[53] Transition Guide at 14.

[54] Expense ratios obtained from Morningstar.

outperformed the Federated Fund. *See infra*. The Vanguard index fund also substantially outperformed over the trailing 3 years.[55]

| Fund | 1 Year | 5 Year | 10 Year |
|---|---|---|---|
| Federated Clover Small Cap Value (Instl) (VSFIX) | 31.82% | 18.17% | 9.11% |
| Vanguard Small Cap Value Index (Inst) (VSIIX) | 36.55% | 20.54% | 9.73% |
| (+/) Difference | -4.73% | -2.37% | -0.62% |

153.  For each year from 2011 through 2016, the Federated Fund underperformed the Vanguard index fund, and for eight of the nine years from 2011 through 2019, it underperformed that comparable index fund.

154.  As of March 31, 2020, the Federated Clover Small Cap Value Fund underperformed its benchmark over the trailing one-, three-, five-, and ten-year periods.[56]

155.  Defendants failed to continuously monitor the performance of the Federated Small Cap Value Fund when it became clear the active manager was unable to outperform its benchmark net of expenses. They failed to make a reasonable determination that maintaining the

---

[55] Investment returns obtained from Morningstar.
[56] Federated Clover Small Cap Value Fund Fact Sheet, Q1 2020.

69

Federated Fund was prudent, in the best interest of Plan participants, or would generate returns in excess of the benchmark or passively managed equivalent in subsequent periods.

156.   Given the Federated Clover Small Cap Value Fund underperformed its benchmark since it was added to the Plan, and that underperformance continued thereafter, a prudent fiduciary continuously monitoring the Plan's investment alternatives would have removed the Fund and replaced it with a lower-cost and better performing investment alternative, including once it underperformed its benchmark over a trailing three-year period.

157.   Had Defendants removed the Federated Clover Small Cap Value Fund (Instl) and replaced it with the Vanguard Small Cap Value Index (Instl) as of the start of the class period (no later than June 30, 2014), Plan participants would not have lost in excess $15.1M of their retirement savings.[57]

---

[57] Damages are measured by the difference in investment returns of the Federated Fund and the Vanguard alternative from June 30, 2014 through December 31, 2019. Total Plan losses will be determined at trial after complete discovery in this case and are continuing.

70

### 4. *American Funds Washington Mutual Investors Fund*

158.   The American Funds Washington Mutual Investors Fund

(R4) (RWMEX) is a large cap blend investment option that was added to

the Plan during 2017. When the Fund was added, it charged 64 bps.[58]

159.   American Funds identifies the S&P 500 Index as its

benchmark. At the time Defendants were considering adding the

American Funds Washington Mutual Investors Fund to the Plan, the

manager demonstrated its inability meet its active management

investment objective of generating investment returns that exceeded its

benchmark net of expenses. As of December 31, 2016, the Fund

underperformed its benchmark over five- and ten-year periods.[59]

| Fund | 5-Year | 10-Year |
|---|---|---|
| American Funds Washington Mutual Investors (R4) (RWMEX) | 13.27% | 6.45% |
| S&P 500 Index | 14.66% | 6.95% |
| (+/) Difference | -1.39% | -0.50% |

[58] Expense ratio obtained from Morningstar.

[59] Washington Mutual Investors Fund, Form N-1A, Apr. 7, 2017, https://www.sec.gov/Archives/edgar/data/104865/000005193117000682/wmif485b.htm.

160.  As of December 31, 2016, the Fund likewise underperformed the Vanguard Institutional Index (Instl Plus) (VIIIX), an S&P 500 index fund that charged only 2 bps, over five- and ten-year periods.[60] The Vanguard index fund also was available to the Plan. For the trailing three-year period as of December 31, 2016, the American Funds mutual fund underperformed both its benchmark and the Vanguard S&P 500 index fund.

161.  With an expense ratio of 2 bps compared to 64 bps for the American Funds option from 2017 through 2019, the Vanguard S&P 500 index fund was 3,100% cheaper.[61]

162.  As of March 31, 2020, the American Funds Washington Mutual Investors Fund underperformed its benchmark over all reporting periods (year-to-date, one-, three-, five-, and 10-years).[62]

163.  Given the American Funds Washington Mutual Investors Fund's underperformance, including its inability to outperform its

---

[60] Vanguard Institutional Index Funds, Form N-CSR, Dec. 31, 2016, https://www.sec.gov/Archives/edgar/data/862084/000093247117003360/instit lindexfinal.htm.

[61] Expense ratios obtained from Morningstar.

[62] American Funds Washington Mutual Investors Fund Fact Sheet, Q1 2020.

benchmark and a passively managed alternative over a trailing three-year period as of December 31, 2016, a prudent fiduciary would not have included this actively managed fund in the Plan.

164.  Had Defendants selected the Vanguard Institutional Index Fund (Instl Plus) rather than the underperforming American Funds Washington Mutual Investors Fund (R4) during 2017, Plan participants would not have lost in excess $7.96M of their retirement savings.[63]

### 5. Voya Target Solution Collective Trusts

165.  Target date funds are designed to provide a single diversified investment vehicle for participants. In general, they can be attractive to participants who do not want to actively manage their retirement savings to maintain a diversified portfolio. Target date funds automatically rebalance their portfolios to become more conservative as the participant gets closer to retirement. The "target date" refers to the participant's target retirement date, and is often part of the name of the

---

[63] Damages are measured by the difference in investment returns of the American Funds' fund and the Vanguard alternative from January 1, 2018 through December 31, 2019. Total Plan losses will be determined at trial after complete discovery in this case and are continuing.

fund. For instance, target date "2030" funds are designed for individuals who intend to retire in the year 2030.

166.  Since August 2013, the Voya Target Solution Trusts have been the Plan's target date fund solution. The target date funds were previously named the ING Target Solution Trusts. From 2014 through 2018, the Voya Target Solution Trusts held a substantial percentage of the Plan's total assets. According to the Plan's Form 5500, in 2014, the Voya target date funds accounted for $856.6 million of the Plan's $2.734 billion in assets (or 31%). By 2018, the Voya target date funds had $1.5 billion of the Plan's $4.4 billion in assets (or 34%).

167.  The Voya Target Solution Trusts are actively managed target date funds. Defendants added the Voya target date funds to the Plan shortly after the selection of Voya as the Plan's recordkeeper during 2013, because Voya became recordkeeper. These funds replaced the existing target date fund solution, the Wells Fargo Advantage target date funds.[64] At the time they were added to the Plan, the Voya

---

[64] *See* Transition Guide at 4.

target date funds had less than five years of performance history since they were created on December 1, 2009.[65]

168.   Given their consistent poor performance, and in light of the ADP Defendants' incentives to act for the benefit of Voya, as alleged in more detail herein, Defendants retained the Voya target date funds to benefit Voya and themselves rather than based on an independent investigation of the merits of the investments.

169.   The Voya Target Solution Trusts became the Qualified Default Investment Alternative ("QDIA"). If a participant has not made or does not make an investment election, any contributions she receives or makes to the Plan are automatically defaulted in the QDIA.

170.   Selecting, monitoring, and replacing the QDIA takes added importance. 401(k) participants rarely make trades in their plan account.[66] Therefore, participants may solely rely on their single target date fund selection over their investment horizon to meet their retirement goals, which underscores the importance of a prudent and

---

[65] Transition Guide at 20.
[66] Olivia Mitchell, Gary Mottola, Stephen Utkus, and Takeshi Yamaguchi, *The Inattentive Participant: Portfolio Trading Behaviors in 401(k) Plans*, at 17–18 (June 2006).

75

loyal section and continuous oversight of a plan's target date fund vehicle.

171.   Both prior to and after the Voya Target Retirement Trusts were added to the Plan, they have underperformed their stated benchmark index. ADP and Voya have identified the S&P Target Date Index for the corresponding target dated fund as the benchmark.[67]

172.   Prior to being added to the Plan, as of March 31, 2013, each of the target dated Voya Target Solution Trusts underperformed their benchmark for the trailing three-year reporting period.[68]

| Plan  Investment | Benchmark | Percentage of Underperformance (Three Year) |
|---|---|---|
| ING Target Solution Trust: 2015 | S&P Target Date 2015 Index | 15.32% |
| ING Target Solution Trust: 2020 | S&P Target Date 2020 Index | 13.24% |
| ING Target Solution Trust: 2025 | S&P Target Date 2025 Index | 8.52% |
| ING Target Solution Trust: 2030 | S&P Target Date 2030 Index | 9.62% |

---

[67] *E.g.,* Transition Guide at 16; ADP TotalSource Retirement Savings Plan, Disclosure of Plan-Related Information, Dec. 31, 2015, at 3.
[68] Transition Guide at 16.

| ING Target Solution Trust: 2035 | S&P Target Date 2035 Index | 6.79% |
|---|---|---|
| ING Target Solution Trust: 2040 | S&P Target Date 2040 Index | 12.40% |
| ING Target Solution Trust: 2045 | S&P Target Date 2045 Index | 7.00% |
| ING Target Solution Trust: 2050 | S&P Target Date 2050 Index | 8.41% |
| ING Target Solution Trust: 2055 | S&P Target Date 2055 Index | 5.41% |

173.  After being included in the Plan for over two years, as of December 31, 2015, each of the target dated Voya Target Solution Trusts underperformed their benchmark for the trailing five-year reporting period.[69]

| Plan  Investment | Benchmark | Percentage of Underperformance (Five Year) |
|---|---|---|
| Voya Target Solution Trust: 2020 | S&P Target Date 2020 Index | 8.25% |
| Voya Target Solution Trust: 2025 | S&P Target Date 2025 Index | 9.31% |

[69] ADP TotalSource, Quarterly Investment Summary, Dec. 31, 2015, at 3.

77

| Voya Target Solution Trust: 2030 | S&P Target Date 2030 Index | 6.97% |
|---|---|---|
| Voya Target Solution Trust: 2035 | S&P Target Date 2035 Index | 8.37% |
| Voya Target Solution Trust: 2040 | S&P Target Date 2040 Index | 7.65% |
| Voya Target Solution Trust: 2045 | S&P Target Date 2045 Index | 5.72% |
| Voya Target Solution Trust: 2050 | S&P Target Date 2050 Index | 5.87% |
| Voya Target Solution Trust: 2055 | S&P Target Date 2055 Index | 4.72% |

174. Despite the Voya target date funds' underperformance relative to their benchmarks prior to and after their inclusion in the Plan, Defendants failed to make a reasoned decision whether maintaining the actively managed Voya target date funds was in the best interest of Plan participants or prudent as the QDIA when lower-cost and better performing alternatives were available in the market. Defendants thus failed to make a reasoned determination whether the actively managed Voya target date funds could be expected to generate

returns in excess of the benchmark index net of expenses in subsequent periods.

175.  From 2013 through at least 2015, the Voya Retirement Solution Trusts charged 91 bps.[70] As of September 30, 2019, Voya presently charges 66 bps.[71]

176.  In comparison, Vanguard offers substantially lower-cost mutual funds and collective trust target date funds that were available to the Plan. Since 2003, Vanguard has offered the Vanguard Target Retirement Funds (Investor shares), and since June 2015, has offered them in the lower-cost Institutional Target Retirement Funds.[72] From 2013 through 2019, the Investor shares charged 16–17 bps, and the Institutional funds charged 9 bps.[73] The Voya Retirement Solution

---

[70] Transition Guide at 16; ADP TotalSource Retirement Savings Plan, Disclosure of Plan-Related Information, Dec. 31, 2015, at 5.

[71] ADP TotalSource Retirement Savings Plan, Disclosure of Plan-Related Information, Sept. 30, 2019, at 4.

[72] Vanguard Chester Funds, Form N-CSR, Mar. 31, 2006, https://www.sec.gov/Archives/edgar/data/752177/000093247106000887/c hesterfundsfinal.htm; Vanguard Chester Funds, Form N-CSR, Sept. 30, 2019, https://www.sec.gov/Archives/edgar/data/752177/000110465919068922/a 19-22238_1ncsr.htm.

[73] *E.g.,* Vanguard Chester Funds, Form N-CSR, Sept. 30, 2014, https://www.sec.gov/Archives/edgar/data/752177/000093247114006878/c

trusts thus charged as much as over 1,000% the fees of Vanguard target date funds. Since June 2007, Vanguard also has offered lower-cost collective trust versions of its target date funds called the Vanguard Target Retirement Trusts. From 2013 through 2019, the Plus shares charged 6–7 bps, and from 2015 through 2019, the Select shares charged 5 bps.[74]

177.  In addition to the Voya Retirement Solution Trusts, since December 2012, Voya has offered the retail mutual fund equivalent of the collective trust target date funds through the Voya Target Retirement Funds.[75] The collective trusts and mutual funds are managed by the same portfolio manager using the same investment

---

hester_final.htm; Vanguard Chester Funds, Form N-CSR, Sept. 30, 2019, https://www.sec.gov/Archives/edgar/data/752177/000110465919068922/a19-22238_1ncsr.htm.

[74] *E.g.,* Vanguard Target Retirement 2020 Trust Plus Fact Sheet, Mar. 31, 2019, https://institutional.vanguard.com/iippdf/pdfs/FS1653.pdf; Vanguard Target Retirement 2020 Trust Select Fact Sheet, Mar. 31, 2019, https://institutional.vanguard.com/iippdf/pdfs/FS1676.pdf.

[75] Voya Separate Portfolios, Form N-CSR, May 31, 2014, https://www.sec.gov/Archives/edgar/data/1392116/000157104914003741/t1401474_n-csr.htm.

objective and glide path.[76] Accordingly, the investment returns of the Voya target date mutual funds reasonably approximate the returns of the similar Voya Retirement Solution Trusts included in the Plan.[77]

178.  From 2013 through 2019, the Voya Target Retirement I target date mutual funds have consistently underperformed the lower-cost Vanguard Target Retirement target date mutual funds.[78] For 2013 and 2014, each of the target dated Voya funds (*i.e.*, 2020–2060 target date) underperformed the comparable Vanguard Target Retirement target date funds. For the three-year period ending December 31, 2015, these Voya target date funds cumulatively underperformed the

[76] *See, e.g.*, Voya Separate Portfolios, Form N-CSR, May 31, 2014, https://www.sec.gov/Archives/edgar/data/1392116/000157104914003741/t1401474_n-csr.htm; Transition Guide at 19; Voya Target Solution Trust Series, Holistic Retirement Solution: Helping Participants Meet Their Retirement Goals, https://institutional.voya.com/document/investor-guide/voya-target-solution-trust-series-investor-guide.pdf; Voya Target Retirement 2030 Fund Fact Sheet, 4Q 2019, file:///C:/Users/kurt/Downloads/voya-target-retirement-2030-fund-fact-sheet.pdf..

[77] Because the annual returns for the Voya Retirement Solution Trusts are not publicly available, the investment returns of the Voya Target Retirement mutual funds were relied on for comparison purposes.

[78] Vanguard Target Retirement Investor "Inv" shares were used from 2013–2015, and the Vanguard Institutional Target Retirement Funds were used thereafter. The investment returns were obtained from Morningstar.

Vanguard target date alternatives based on the relative performance of the Voya and Vanguard funds during that period.

179.  As of December 31, 2019, each of the Voya Retirement Solution Trusts in the Plan underperformed their benchmarks for the trailing five-year period.[79]

| Plan  Investment | Benchmark | Percentage of Underperformance (Five Year) |
|---|---|---|
| Voya Target Solution Income Trust | S&P Target Date Retirement Income | 3.55% |
| Voya Target Solution Trust:  2020 | S&P Target Date 2020 Index | 12.41% |
| Voya Target Solution Trust:  2025 | S&P Target Date 2025 Index | 6.49% |
| Voya Target Solution Trust:  2030 | S&P Target Date 2030 Index | 5.67% |
| Voya Target Solution Trust:  2035 | S&P Target Date 2035 Index | 4.86% |
| Voya Target Solution Trust:  2040 | S&P Target Date 2040 Index | 5.87% |
| Voya Target Solution Trust:  2045 | S&P Target Date 2045 Index | 5.85% |
| Voya Target Solution Trust:  2050 | S&P Target Date 2050 Index | 7.20% |
| Voya Target Solution Trust:  2055 | S&P Target Date 2055 Index | 8.06% |

---

[79] ADP TotalSource Retirement Savings Plan, Disclosure of Plan-Related Information, Dec. 31, 2019, at 4.

180.  Given the Voya Retirement Solution Trusts underperformed their benchmark and lower-cost alternatives since December 31, 2013, a prudent fiduciary would have removed the actively managed Voya target date funds in favor of a prudent alternative at least by the start of the class period.

181.  Had Defendants removed the Voya Retirement Solution Trusts and replaced them with the lower-cost and better performing Vanguard Target Retirement Funds as of the start of the class period (no later than June 30, 2014), Plan participants would not have lost in excess of $46 million of their retirement savings.[80]

## C. Defendants failed to ensure reasonable investments management expenses for investment alternatives in the Plan.

182.  It is a simple principle of investment management that the larger the size of an investor's available assets, the lower the investment management fees that can be obtained in the market. Thus,

---

[80] Based on the lack of publicly available information on the Voya Retirement Solution Trusts, damages are measured by the difference in the annual investment returns of the Voya Target Retirement I Funds and the Vanguard Target Retirement Funds from June 30, 2014 through December 31, 2019. Vanguard Target Retirement Investor "Inv" shares were used from 2013–2015, and the Vanguard Institutional Target Retirement Funds were used thereafter.

large retirement plans have substantial bargaining power to negotiate low fees for investment management services. Jumbo multi-billion dollar plans, such as the Plan, have even greater bargaining power.

183.   Mutual funds and collective trusts frequently offer multiple share classes, which are often classified as either "retail" class or "institutional" class. Retail-class shares are identical to institutional-class shares in every way, except that retail shares charge higher fees, which reduce the investor's assets. Although institutional share classes typically have minimum investment thresholds, funds will waive the minimums for large institutional investors, even those much smaller than the Plan.

184.   Since the only difference between the share classes is cost, a prudent investor will select the lower cost option, because doing so saves money. That did not happen in the Plan. Throughout the relevant time period, the Plan's investment lineup has included higher-cost share classes instead of the identical lower-cost share classes that were available to the Plan.

84

185.  The Plan included the following investments, which were up to 113% more expensive than the available identical lower-cost alternatives:

| Year | Plan Investment Alternative | Plan Fee | Identical Lower Cost Mutual Fund | | Plan's Excess Cost |
|---|---|---|---|---|---|
| 2015 | American Funds EuroPacific Growth | 84 bps | American Funds EuroPacific Growth (R6) (RERGX) | 49 bps | 71.43% |
| 2017 | American Funds Washington Mutual Fund | 64 bps | American Funds Washington Mutual Fund Investors (R6) (RWMGX) | 30 bps | 113.33% |
| 2017 | Federated Clover Small Cap Value | 102 bps | Federated Clover Small Cap Value (R6) (VSFSX) | 95 bps | 7.37% |
| 2015 | Fidelity Total Bond | 45 bps | Fidelity Advisor Total Bond (Z) (FBKWX) | 36 bps | 25.00% |
| 2018 | Fidelity Advisor Total Bond | 36 bps | Fidelity Total Bond (K6) (FTKFX) | 30 bps | 50.00% |
| 2015 | John Hancock Disciplined Value Mid Cap | 87 bps | John Hancock Disciplined Value Mid Cap (R6) (JVMRX) | 73 bps | 19.18% |
| 2016 | T. Rowe Price Mid Cap Growth | 101 bps | T. Rowe Price Mid Cap Growth (I) (RPTIX) | 63 bps | 60.32% |

| 2016 | T. Rowe Price New Horizons | 78 bps | T. Rowe Price New Horizons (I) (PRJIX) | 65 bps | 20.00% |
| 2015 | Vanguard Balanced Index | 8 bps | Vanguard Balanced Index (Inst) (VBAIX) | 7 bps | 14.29% |

186.  At all relevant times, the Plan's investment options charged unreasonable fees for the services provided to the Plan compared to alternatives that were readily available to the Plan, including lower-cost share classes of otherwise identical mutual funds, separately managed accounts, and collective trust investments.

187.  Though it is difficult to discern the share classes or total Plan investment alternative expense ratios from available data, preliminary calculations indicate that Defendants' failure to include the least-expensive shares of identical investments in the Plan resulted in losses to participants of nearly $9 million.[81]

---

[81] Total Plan losses will be determined at trial after complete discovery in this case and are continuing.

IV. **Defendants breached their fiduciary duties and engaged in prohibited transactions by causing the Plan to pay excessive managed account fees.**

**A. The managed account services market.**

188.  Managed accounts are investment services under which providers make investment decisions for participants to allocate their retirement savings among a mix of assets classes, commonly referred to as asset allocation.

189.  Managed account providers in 401(k) plans limit the investment options they consider to those funds chosen by the plan sponsor to create plan participants' asset allocations. Thus, managed account service providers create a fund of a plan's funds for plan participants.

190.  Most managed account service providers, including Financial Engines Advisors LLC ("Financial Engines") and their competitors, utilize computer programs based on modern portfolio theory and Monte Carlo simulations to create plan participants' asset allocations. Representatives can modify client-directed inputs but cannot modify outputs and recommendations from the software program. There is no quality advantage in choosing one providers'

87

algorithm over another. Therefore, fees play a large role in the returns based on the managed account providers' services.

191.  Plan participants can allocate any percentage of their portfolio or contributions to managed account services.

192.  Managed account service providers act as fiduciaries with respect to the investment advice their software systems provide retirement plan participants.

193.  Plan fiduciaries can contract directly with a managed account provider to offer managed account services to plan participants. Alternatively, some managed account providers use "subadvised" arrangements to offer their services through a recordkeeper. In a subadvised arrangement, the plan fiduciary retains the ultimate decision-making power on whether to offer managed accounts and the fees charged to participants.

194.  Plan fiduciaries can also contract with multiple managed account providers, only incurring a fee if Plan participants utilize the managed account services, thus increasing access to managed account providers and spurring competition without incurring additional fees.

88

195.   Recordkeepers, including Voya, can provide a data feed to multiple managed account service providers in order to provide managed account services to a defined contribution plan.

196.   Managed account service providers use two types of information strategies to create asset allocations for participants. The first type of strategy is referred to as customized service—allocating a participant's account based solely on age or other factors that can be easily obtained from the plan's recordkeeper, such as gender, income, current account balance, and current savings rate. The other strategy is referred to as personalized service, which purports to take into account additional personal information to inform asset allocations, such as risk tolerance or spousal assets.

197.   From 2012 to 2014, managed account service providers that offered a personalized service reported that generally fewer than one-third, and sometimes fewer than 15 percent of Plan participants using the managed account service furnish this personalized information.[82]

---

[82] United States Government Accountability Office, Report to Congressional Requesters, 401(K) PLANS, Improvements Can be Made to Better Protect Participants in Managed Accounts, June 2014, available at https://www.gao.gov/assets/670/664391.pdf (hereinafter "2014 GAO Study").

When the personalized data is used, asset allocations are nearly the same (less than a 5 percent difference), or do not change, from the customized services asset allocation decisions.[83] Therefore, when a plan sponsor selects a managed account provider that charges for personalized services, participants are not getting the full value of the services for which they are paying an unnecessarily higher fee.

198.  Additionally, without personalized information from plan participants, managed accounts are similar to other lower-cost asset allocation solutions. For example, target-date funds, like managed accounts, provide simple investment portfolio decisions for plan participants by providing a professionally managed asset allocation that is targeted to participant time horizons with a professional managing the asset allocation glide path. Indeed, Financial Engines cites target-date funds as potential substitutes for its management account services in its 2016 Form 10-K.

199.  Customized and personalized managed accounts often offer little to no advantage over lower-cost funds, such as target-date funds, risk-based funds, and balanced funds. Vanguard reported in August

---

[83] *Id.*

2013 that managed account services generally return less than or equal to the returns of Vanguard's lower-cost professionally managed allocation products, such as target-date funds, risk-based funds and balanced funds.[84] Nonetheless, managed account participants with lower rates of return still pay substantial additional fees for managed account services compared to the fees they would incur for target-date funds, risk-based funds and balanced funds, which provide similar asset allocations.

200.  As with any investment product, prudent fiduciaries monitor whether the managed account service is providing plan participants value beyond substitute lower cost alternatives, such as target date funds. As demonstrated by the chart below, lower-cost alternatives, such as balanced funds or target date funds, are prudent alternatives, which provide the objective of participants being able to avoid having to make frequent decisions about asset allocations.

---

[84] 2014 GAO Study, citing Vanguard, *Professionally Managed Allocations and the Dispersion of Participant Portfolios* (Valley Forge, PA; August 2013).



Figure 8: Example of Annualized Rates of Return from One Record Keeper for Different Types of Professionally Managed 401(k) Portfolios, 2007-2012, Net of Additional Fees

Source: GAO representation of Vanguard returns data.  |  GAO-14-310

201.  Plan fiduciaries are required to act prudently in selecting and monitoring managed account providers, including monitoring managed account providers' fees in relation to the services provided and other managed account providers' fees, and monitoring the performance of the managed account providers in relation to other alternative, lower-cost products.

202.  The 2014 GAO study cites information stating that the additional fee a participant generally pays for a managed account is the primary disadvantage of managed account services.

203.   Each managed account providers' publicly filed Form ADV disclosure states that all managed account service fees are negotiable. The fees are charged through various methods: a flat fee, a capped percentage of assets under management, a tiered assets-under-management fee, an uncapped percentage of assets under management fee, or some combination. Therefore, two participants with a similar balance but a different provider, or a fee that was not negotiated, can pay vastly different amounts for the same service. *See* 2014 GAO Study.

204.   As of 2014, managed account providers that did not charge a flat rate charged annual fees ranging from 8 bps to 100 bps of a participant's account balance.[85] At least one provider in the 2014 study offered a $20 per-participant flat fee. The 2014 table below, created by the GAO, shows the difference in fees for participants with an account balance of $10,000 or $500,000 at the start of the class period.

---

[85] *See* 2014 GAO Study.

**Table 4: Example of Variation in 401(k) Plan Managed Account Fees**

| Provider | Type of fee | Example of annual fee charged on $10,000 account balance | Example of annual fee charged on $500,000 account balance |
|---|---|---|---|
| A | Flat fee | $20 | $20 |
| B | Variable fee,[a] capped[b] | $25 | $250 |
| C | Variable fee | $10 | $500 |
| D | Variable fee, direct arrangement[c] | As low as $8 | As low as $400 |
|  | Variable fee, subadvised arrangement[d] | As high as $40 | As high as $2,000 |
| E | Variable fee, tiered,[e] default[f] | As high as $35 | As high as $1,100 |
|  | Variable fee, tiered, opt-in[f] | As high as $60 | As high as $2,350 |
| F | Variable fee, tiered | Averages $45-$50 | Averages $2,250-$2,500 |
| G | Variable fee, default | As low as $45 | As low as $2,250 |
|  | Variable fee, opt-in | As high as $55 | As high as $2,750 |
| H | Variable fee, large plan | As low as $25 | As low as $1,250 |
|  | Variable fee, small plan | As high as $100 | As high as $5,000 |

Source: GAO analysis of managed account provider case studies.  |  GAO-14-310

205.   To demonstrate the impact of fees, the below illustration shows the impact of a participant charged an additional annual fee of 8 to 100 bps of their account balance against what the participant would pay in other investments without the managed account fee:



Figure 10: Variation in Additional Participant Fees Paid for a Managed Account Over a 20-Year Period Given Different Fee Rates

Source: GAO analysis of information from providers and published data on managed account fees and returns.  |  GAO-14-310

206. The 2014 GAO Study reported that there are few independent sources of comprehensive and consistent information on managed account fees charged by providers that participants could use to compare fees across providers, and that even fee information provided in managed account providers' SEC filings was confusing or incomplete. For example, Financial Engines' 2020 Part 2A Form ADV states that retirement program clients pay 50 to 100 basis points in a tiered-assets under management structure, negotiable to less than 50 bps for plans over $20 million and that "[s]ervice and fees are generally

95

negotiated and subject to agreement."[86] Financial Engines' Form ADV demonstrates that managed account fees are subject to economies of scale.

207. The 2014 GAO study also noted that managed account fees are subject to economies of scale. Participants in large plans, like the Plan, can obtain significantly lower fees than participants in small plans.[87]

208. Because managed account service providers provide confusing and incomplete fees in their disclosures, the duty of a plan sponsor—held to the standard of a prudent expert under ERISA—is to carefully analyze fees charged by multiple providers and diligently negotiate fees.

209. The only way for a plan sponsor to accurately compare fees of managed account providers is to perform competitive bidding through a request for proposal.

---

[86] Available at https://www.edelmanfinancialengines.com/media/pdf/edelman-financial-engines-adv, 17, 20-21.

[87] *See* 2014 GAO Study at 40.

210.  In November 2017, retirement plan investment advisor Cammack Retirement Group stated that managed account service provider contract terms and fees are a major fiduciary concern and described the importance of conducting an RFP for managed account services to show a due diligence process by interviewing vendors and "test-driving" their respective products.[88]

211.  Regular negotiation of managed account fees is also necessary because managed account fees fell during the class period. For example, as of 2019, based on Form ADVs of managed account providers that did not charge a flat rate, fees were as low as 3 bps, compared to a low of 8 bps in 2014. Financial Engines 2016 Form 10-K references a "downward pressure on fees we charge for services." In 2017, Financial Engines' CEO stated that traditionally Financial Engines had a 1 bps step down per year in fees and a 2-point step down in 2018.

---

[88] John Buckley, *Fiduciary Considerations When Adding and Reviewing Managed Accounts*, Cammack Retirement Group, November 2017, https://cammackretirement.com/knowledge-center/insights/fiduciary-considerations-when-adding-and-reviewing-managed-accounts.

212.  From the early 2000s to the present, as recordkeeping fees compressed, managed account services have become more utilized in defined contribution plans, and competition for managed account services has increased.

213.  Therefore, in order to capture market conditions and negotiate current fees, prudent practice requires that Plan sponsors conduct requests for proposals for managed account services every three to five years.

**B. Defendants failed to monitor the Plan's managed account fees resulting in the participants paying excessive fees.**

214.  The Plan's fiduciaries contracted with Voya Retirement Advisors LLC ("Voya Retirement Advisors") to provide managed account services throughout the relevant time period.  This was a direct conflict of interest as is set forth below.

215.  In July 2013, the Plan began allowing Voya Retirement Advisors' predecessor, ING Investment Advisors, LLC, to offer managed account services to the Plan's participants.

216.  Financial Engines has acted as sub-advisor for the Plan's managed accounts since July 2013.

217.  Defendants allowed Voya to decide the Plan's managed account provider not based on merit, but because Voya requested that Voya Retirement Advisors provide managed account services. This enabled Voya to obtain lucrative revenues for its affiliate without any acquisition cost.

218.  Moreover, unlike investment advisors who choose from the wide array of investments available in the market, Voya Retirement Advisors limits its investment recommendations to the investment alternatives available in the Plan, a far smaller number, and many of which are its own proprietary funds..

219.  Voya Retirement Advisors charges Plan participants on an uncapped percentage of assets basis. As of March 2018, Voya Retirement Advisors' fees were 60 bps per year on assets up to $100,000, 40 bps on assets between $100,001 to $250,000 and 20 bps on assets of $250,001 or more. The fee is deducted monthly.

220.  Voya Retirement Advisors' fees in the Plan are excessive. Voya Retirement Advisors charged Plan participants as much as 2,000% of other managed account providers that provide a similar service. For example, Russell Investments Capital, LLC charges

managed account fees as low as 3 bps annually for large plans, and no greater than 28 bps annually for managed account services in any plan. Morningstar Retirement Manager charges retirement plan participants in large plans, such as the Plan, fees as low as 5 bps annually for managed account services. ProManage provides managed account services for as low as 5 bps. GuidedChoice charges less than 45 bps for any size plan, and the fee is only applied to the first $100,000 in assets. The Plan's managed account fee applies to all participant assets, even those over $100,000. The Plan could have utilized these competitors to provide managed account services to Plan participants for a lower fee.

221.  Financial Engines cites Morningstar, GuidedChoice and ProManage, LLC as direct competitors in a "competitive industry" in Financial Engines' 2016 Form 10-K.

222.  The managed account service of each of these providers, as well as Russell, is superior or at least equal in quality to Voya Retirement Advisors' managed account services.

223.  The amounts Plan's participants paid to Voya Retirement Advisors for managed account services rose dramatically between 2014 and 2018, from approximately $770,000 to $2.3 million.

224.  Defendants never investigated Voya Retirement Advisors'
growing revenue, determined whether Voya Retirement Advisors'
managed account fees were reasonable, or put the managed account
services out to bid.

## V.  Defendants breached their fiduciary duties and engaged in prohibited transactions by allowing the Plan's service providers to collect and use Confidential Plan Participant Data for profit.

### A. Confidential Plan Participant Data and its value to recordkeepers with affiliates offering financial products and services.

225.  Some defined contribution plan recordkeepers have affiliated
businesses that sell other financial products and services.

226.  Recordkeepers receive not only the names and contact
information of plan participants, but also social security numbers,
financial information and other non-public highly confidential and
sensitive information relating to those participants, such as home and
cellular phone numbers, work and personal email addresses,
investment history, identity of their investments, account balances,
investment contribution amounts, age, income, marital status, call
center notes, and access to knowledge of "triggering events" such as

101

when a plan participant is nearing retirement, among other valuable information (hereinafter "Confidential Plan Participant Data").

227.  The financial services industry is highly competitive, and it is generally known in the financial services industry, and by investment professionals and plan fiduciaries, that such Confidential Plan Participant Data is an extremely valuable asset.[89]

228.  Financial Engines has stated that the wealth management industry is highly competitive, and a company's competitive advantage is substantially dependent upon its ability to obtain, maintain and protect client goodwill and relationships and confidentiality, competitively-valuable and trade secret information pertaining to clients, prospective clients, and referral sources.

229.  MassMutual recently encouraged its financial salespersons to cross-sell non-plan products to retirement plan participants in order to "build a stream of business in the future."[90] MassMutual advises that

---

[89] *See*, *e.g.*, *Fidelity Brokerage Serv. LLC v. Michael Miller*, No. 13-02390, Doc. 1–2 (M.D.Fla, Sep. 16, 2013)(Fidelity policy stating that "*Information is an asset of tremendous value in the financial services industry*.").

[90] MassMutual@WORK, Why Sell retirement plans? For Financial Professional Use Only. Not For Use With The Public, 2019,

"Advisors who sell and manage retirement plans tend to have significantly more assets under management. They also are in a position to capture downstream retail sales opportunities through IRA rollovers and other ancillary sales. Consider the personal assets of CEOs, CFOs, senior executives and other plan participants."[91]

230.  However, retirement plan participants have an absolutely reasonable expectation that their Confidential Plan Participant Data will be protected by the plan sponsor and not disclosed outside of the plan for non-plan purposes, such as allowing the plan's recordkeeper use this Confidential Participant Data to proactively solicit participants to invest in retail financial products and services.

231.  Further, allowing a retirement plan's recordkeeper to exploit Confidential Plan Participant data is contrary to plan participants' best interests because the recordkeeper has the advantage of employer approval of it selection for the Plan and the implicit endorsement of these non-plan services and products, without competition.

---

https://webcache.googleusercontent.com/search?q=cache:KKzfEh8Ie08J: https://wwwrs.massmutual.com/retire/pdffolder/rs3264.pdf+&cd=1&hl= en&ct=clnk&gl=us.

[91] *Id.*

232.  The revenue generated by these sales is significant and often represents multiples of the recordkeeping fees received by the recordkeeper with an affiliated brokerage and other affiliated entities that sell non-plan financial, banking and insurance products and services. The illustration below is used by professionals in the retirement plan industry to demonstrate the effect of non-plan product sales by recordkeepers with affiliated businesses on total recordkeeper compensation:



104

233.  In January 2011, a Government Accountability Office Report stated that:

> Cross-selling products outside of a plan to participants can substantially increase a service provider's compensation, which creates an incentive for the service provider to steer participants toward the purchase of these products even though such purchases may not serve the participants best interest. For example, products offered outside a plan may not be well suited to participants' needs or participants may be able to secure lower fees by choosing investment funds within their plans comparable with products offered outside their plan. Industry professionals we spoke with said that cross-selling IRA rollovers to participants, in particular, is an important source of income for service providers. For example, according to an industry professional, a service provider could earn $6,000 to $9,000 in fees from a participant's purchase of an IRA, compared with $50 to $100 in fees if the same participant were to invest in a fund within a plan. Plan sponsors can take steps to preclude service providers from cross-selling non-plan products and services to plan participants.[92]

234.  By March 2013, another GAO study found that "service providers' call center representatives encouraged rolling 401(k) plan savings into an IRA even with only minimal knowledge of a caller's financial situations. Participants may also interpret information about their plans' service providers' retail investment products contained in

---

[92] 2011 GAO Study at 36.

their plans' educational materials as suggestions to choose those products."[93]

235.   As early as 2010, other defined contribution plan fiduciaries, recognizing the value of Confidential Plan Participant Data, prohibited cross-selling by their plans' recordkeepers. For example, in 2010, Jefferson County Public Schools in Colorado required in its Request for Proposal that the recordkeeper contractually agree not to have the recordkeeping representative cross-sell products. Recently, in August 2019, fiduciaries on the Oregon Savings Growth Plan advisory committee discussed the importance that its recordkeeper not cross-sell any products and confirmed that the language existed in the current recordkeeping contract.

**B. Defendants failed to monitor or restrict Plan service providers' misuse of Confidential Plan Participant Data.**

236.   Contrary to their fiduciary obligations of acting for the sole benefit of Plan participants, and in violation of ERISA's prohibited

---

[93] United States Government Accountability Office, Report to Congressional Requesters, 401(K) PLANS, Labor and IRS Could Improve the Rollover Process for Participants, March, 2013, available at https://www.gao.gov/assets/660/652881.pdf (hereinafter "2013 GAO Study").

transactions rules, Defendants allow Voya and its affiliates to collect, use, transmit, and profit from Confidential Plan Participant Data.

237.  For example, Defendants advertise to Plan participants (including in Plan enrollment materials) that participants may "speak with a retirement consultant," who is in fact an Investment Advisor Representative ("IAR") of Voya Financial Advisors, Inc. ("VFA"), an affiliate of Voya.

238.  While Defendants disclose to Plan participants that "neither Voya nor its affiliated companies or representatives offer legal or tax advice," Defendants do not disclose to Participants that VFA IARs are compensated for these services based on a conflicted commission-based structure.

239.  VFA discloses via its publicly filed Form ADVs Part 2A that its IARS have a "conflict of interest" that "affects the judgment of IARS when making recommendations" because they receive "commission-based" compensation.

240.  VFA also provides tuition rebates and prizes to IARs who meet goals for achieving assets under management, which VFA acknowledges creates a conflict of interest.

241.   IARs who provide phone services to participants of plans recordkept by VFA affiliates are paid referral fees to steer participants to managed accounts—including the excessively priced managed account in the Plan, as alleged above.

242.   Moreover, VFA acknowledges that, through its IARS, it solicits participants to roll-over their assets out of the ERISA-protected Plan and into Voya' proprietary financial products.

243.   Some VFA IARs own insurance agencies and are therefore incentivized to sell, for example, fixed annuities, which earn them additional fees.

244.   VFA acknowledges that IARs have a "number of conflicts of interest" that incentivize them to "choose which . . . product to recommend to you based on the fees that the IAR will incur, rather than your investment needs."

245.   While VFA acknowledges and discloses to its clients this conflicted compensation structure, Defendants advertise VFA's services to Plan participants under the imprimatur of their fiduciary oversight without disclosing or explaining that the IARs' advice is admittedly conflicted and that the IARs are compensated for their work as

"retirement consultants" to Plan participants based on sales commissions, prizes, and other conflicted compensation.

246.  As a result of having conflicted commissioned salespeople have direct access to Plan participants under the guise of providing "consulting services" Voya receives significant additional compensation.

247.  This compensation directly results from the access Defendants gave to Voya in connection with the provision of recordkeeping and other services.

248.  Defendants failed to monitor or ensure that this additional compensation was reasonable, in violation of their fiduciary duties.

249.  Voya discloses in its "Privacy Notice" to Plan participants that it collects private, confidential information, such as Social Security numbers, account balances, assets, transactions, investment:

| What? | The types of personal information we collect and share depend on the product or service you have with us. This information can include:<br>• Social Security number and account balance<br>• Assets and transaction or loss history<br>• Investment experience and employment information |
| --- | --- |

250.  Voya collects Confidential Plan Participant Data as a direct result of Voya's recordkeeping relationship with the Plan.

251.  Voya acknowledges that it automatically collects this data whenever a participant, through their employer-sponsored Plan, opens an account.

| How does Voya collect my personal information? | We collect your personal information, for example, when you<br>• open an account or give us your contact information<br>• apply for insurance or seek advice about your investments<br>• tell us about your investment or retirement portfolio<br>We also collect your personal information from others, such as credit bureaus, affiliates, or other companies. |
|---|---|

252.  Voya further admits that it uses this data for its own marketing purposes, yet does not allow Plan participants to opt out of this marketing.

| Reasons we can share your personal information | Does Voya share? | Can you limit this sharing? |
|---|---|---|
| **For our everyday business purposes –** such as to process your transactions, maintain your account(s), respond to court orders and legal investigations, detect and prevent fraud, or report to credit bureaus | Yes | No |
| **For our marketing purposes –** to offer our products and services to you | Yes | No |
| **For joint marketing with other financial companies** | No | We don't share |
| **For our affiliates' everyday business purposes –** information about your transactions and experiences | Yes | No |
| **For our affiliates' everyday business purposes –** information about your creditworthiness | No | We don't share |
| **For our affiliates to market to you** | Yes | Yes |
| **For nonaffiliates to market to you** | No | We don't share |

253.  Voya shares Confidential Plan Participant Data with its affiliates for marketing purposes, including account balances, contact information, and other data, without restriction.

254.  The fact that Voya agrees to limit this sharing—though only for affiliate marketing—upon request by participants shows, at minimum, it is possible for Voya to implement such limitations.

255.  Defendants could have, but did not, negotiate restrictions on the sharing Confidential Plan Participant Data, on a Plan-wide basis, protecting this valuable Plan asset and this confidential information.

256.  Defendants failed to protect Plan participants and their valuable Confidential Plan Participant Data. Instead, Defendants have actively participated in Voya's efforts to disclose and profit from Confidential Plan Participant Data.

257.  As a result, Plan participants have suffered significant losses.  Their data was made available to conflicted sales representatives who had access to their personal details, including at vulnerable times in their lives, such as contemplating rollovers or other major investment decisions, under the imprimatur of employer-sponsored Plan approval. The sales representatives admittedly had an incentive to offer advice and induce them to purchase non-Plan products and services that were not in their best interests.

258.   Further, Plan participants' valuable Confidential Plan Participant Data, a Plan asset, was transferred to a party in interest in violation of 29 U.S.C. §1106(a)(1)(D), entitling the Plan to complete disgorgement of the profits generated therefrom.

259.   Even if Confidential Plan Participant Data were not a Plan asset, permitting the use of Confidential Plan Participant Data is a fiduciary breach, as set forth above.

## CLASS ACTION ALLEGATIONS

260.   29 U.S.C. §1132(a)(2) authorizes any participant or beneficiary of the Plan to bring an action individually on behalf of the Plan to enforce a breaching fiduciary's liability to the Plan under 29 U.S.C. §1109(a).

261.   In acting in this representative capacity and to enhance the due process protections of unnamed participants and beneficiaries of the Plan, as an alternative to direct individual actions on behalf of the Plan under 29 U.S.C. §1132(a)(2), Plaintiffs seek to certify this action as a class action on behalf of all participants and beneficiaries of the Plan. Plaintiffs seek to certify, and to be appointed as representatives of, the following Class:

112

All participants and beneficiaries of the ADP TotalSource
Retirement Savings Plan from May 7, 2014 through the date
of judgment, excluding Defendants.

And the following subclass:

All participants and beneficiaries of the ADP TotalSource
Retirement Savings Plan who utilized the Plan's managed
account services from May 7, 2014 through the date of
judgment, excluding Defendants.

262.  This action meets the requirements of Rule 23 and is

certifiable as a class action for the following reasons:

a.     The Class includes over 100,000 members and is so

large that joinder of all its members is impracticable.

b.     There are questions of law and fact common to the

Class because Defendants owed fiduciary duties to the Plan and to

all participants and beneficiaries and took the actions and made

omissions alleged herein as to the Plan and not as to any

individual participant. Thus, common questions of law and fact

include the following, without limitation: who are the fiduciaries

liable for the remedies provided by 29 U.S.C. §1109(a); whether

the fiduciaries of the Plan breached their fiduciary duties to the

Plan; what are the losses to the Plan resulting from each breach of

113

fiduciary duty; and what Plan-wide equitable and other relief the court should impose in light of Defendants' breaches of duty.

c.      Plaintiffs' claims are typical of the claims of the Class because each Plaintiff was a participant during the time period at issue in this action and all participants in the Plan were harmed by Defendants' misconduct.

d.      Plaintiffs are adequate representatives of the Class because they were participants in the Plan during the Class period, have no interest that is in conflict with any other member of the Class, are committed to the vigorous representation of the Class, and have engaged experienced and competent attorneys to represent the Class.

e.      Prosecution of separate actions for these breaches of fiduciary duties by individual participants and beneficiaries would create the risk of (A) inconsistent or varying adjudications that would establish incompatible standards of conduct for Defendants in respect to the discharge of their fiduciary duties to the Plan and personal liability to the Plan under 29 U.S.C. §1109(a), and (B) adjudications by individual participants and beneficiaries

regarding these breaches of fiduciary duties and remedies for the Plan would, as a practical matter, be dispositive of the interests of the participants and beneficiaries not parties to the adjudication or would substantially impair or impede those participants' and beneficiaries' ability to protect their interests. Therefore, this action should be certified as a class action under Rule 23(b)(1)(A) or (B).

263.  A class action is the superior method for the fair and efficient adjudication of this controversy because joinder of all participants and beneficiaries is impracticable, the losses suffered by individual participants and beneficiaries may be small and impracticable for individual members to enforce their rights through individual actions, and the common questions of law and fact predominate over individual questions. Given the nature of the allegations, no class member has an interest in individually controlling the prosecution of this matter, and Plaintiffs are aware of no difficulties likely to be encountered in the management of this matter as a class action. Alternatively, then, this action may be certified as a class under Rule 23(b)(3) if it is not certified under Rule 23(b)(1)(A) or (B).

264.   Plaintiffs' counsel, Schlichter Bogard & Denton, LLP, will fairly and adequately represent the interests of the Class and is best able to represent the interests of the Class under Rule 23(g). Schlichter Bogard & Denton has been appointed as class counsel in over 30 other ERISA class actions regarding excessive fees in large defined contribution plans. Courts in these cases have consistently and repeatedly recognized the firm's unparalleled success in the area of defined contribution excessive fee litigation:

- On November 3, 2016, Judge Michael Ponsor of the United States District Court for the District of Massachusetts found that by securing a $30.9 million settlement, Schlichter Bogard & Denton had achieved an "outstanding result for the class," and "demonstrated extraordinary resourcefulness, skill, efficiency and determination." *Gordan v. Mass Mutual Life Ins., Co.*, No. 14-30184, Doc. 144 at 5 (D. Mass. Nov. 3, 2016).

- As Chief Judge Michael J. Reagan of the Southern District of Illinois recognized in approving a settlement which was reached on the eve of trial after eight years of litigation, resulting in a $62 million monetary recovery and very substantial affirmative relief to benefit the Plans, the firm had shown "exceptional commitment and perseverance in representing employees and retirees seeking to improve their retirement plans," and "demonstrated its well-earned reputation as a pioneer and the leader in the field" of 401(k) plan excessive fee litigation. *Abbott v. Lockheed Martin Corp.*, No. 06-701, 2015 WL 43984750, at *1 (S.D. Ill. July 17, 2015). The court further recognized that the law firm of "Schlichter, Bogard & Denton has had a humongous impact over the entire 401(k) industry, which has benefited employees and retirees throughout the entire country by bringing sweeping

116

changes to fiduciary practices." *Id.* at *3 (internal quotations omitted).

- Other courts have made similar findings:

  - "It is clear to the Court that the firm of Schlichter, Bogard & Denton is preeminent in the field" "and is the only firm which has invested such massive resources in this area." *George v. Kraft Foods Global, Inc.*, No. 08-3799, 2012 WL 13089487 at *2 (N.D. Ill. June 26, 2012).

  - "As the preeminent firm in 401(k) fee litigation, Schlichter, Bogard & Denton has achieved unparalleled results on behalf of its clients." *Nolte v. Cigna Corp.*, No. 07-2046, 2013 WL 12242015 at *2 (C.D. Ill. Oct. 15, 2013).

  - "Litigating this case against formidable defendants and their sophisticated attorneys required Class Counsel to demonstrate extraordinary skill and determination." *Beesley v. Int'l Paper Co.*, No. 06-703, 2014 WL 375432 at *2 (S.D. Ill. Jan. 31, 2014). The court also emphasized that "the law firm of Schlichter, Bogard & Denton is the leader in 401(k) fee litigation." *Id.* at *8 (internal quotations omitted).

  - U.S. District Judge Harold Baker of the Central District of Illinois acknowledged the significant impact of the firm's work, finding that as of 2013, the nationwide "fee reduction attributed to Schlichter, Bogard & Denton's fee litigation and the Department of Labor's fee disclosure regulations approach *$2.8 billion in annual savings* for American workers and retirees." *Nolte*, 2013 WL 12242015, at *2 (emphasis added).

  - U.S. District Judge David Herndon of the Southern District of Illinois recognized the firm's extraordinary contributions to the retirement industry: "Schlichter, Bogard & Denton and lead attorney Jerome Schlichter's diligence and

117

perseverance, while risking vast amounts of time and money, reflect the finest attributes of a private attorney general. *Beesley*, 2014 WL 375432 at *2.

o  U.S. District Court Judge G. Patrick Murphy similarly recognized the work of Schlichter, Bogard & Denton as exceptional:

> "Schlichter, Bogard & Denton's work throughout this litigation illustrates an exceptional example of a private attorney general risking large sums of money and investing many thousands of hours for the benefit of employees and retirees. No case had previously been brought by either the Department of Labor or private attorneys against large employers for excessive fees in a 401(k) plan. Class Counsel performed substantial work[,] investigating the facts, examining documents, and consulting and paying experts to determine whether it was viable. This case has been pending since September 11, 2006. Litigating the case required Class Counsel to be of the highest caliber and committed to the interests of the participants and beneficiaries of the General Dynamics 401(k) Plans."

*Will v. General Dynamics Corp.*, No. 06-698, 2010 WL 4818174 at *3 (S.D. Ill. Nov. 22, 2010).

- Schlichter, Bogard & Denton handled the first full trial of an ERISA excessive fee case, resulting in a $36.9 million judgment for the plaintiffs that was affirmed in part by the Eighth Circuit. *Tussey v. ABB, Inc.*, 746 F.3d 327 (8th Cir. 2014). In awarding attorney's fees after trial, the district court concluded that "Plaintiffs' attorneys are clearly experts in ERISA litigation." *Tussey v. ABB, Inc.*, No. 06-4305, 2012 WL 5386033 at *3 (W.D. Mo. Nov. 2, 2012). Following remand, the district court again awarded Plaintiffs' attorney's fees, emphasizing the significant

118

contribution Plaintiffs' attorneys have made to ERISA litigation, including educating the Department of Labor and federal courts about the importance of monitoring fees in retirement plans:

> "Of special importance is the significant, national contribution made by the Plaintiffs whose litigation clarified ERISA standards in the context of investment fees. The litigation educated plan administrators, the Department of Labor, the courts and retirement plan participants about the importance of monitoring recordkeeping fees and separating a fiduciary's corporate interest from its fiduciary obligations."

*Tussey v. ABB, Inc.,* No. 06-4305, 2015 WL 8485265 at *2 (W.D. Mo. Dec. 9, 2015).

- In *Spano v. Boeing Co.*, in approving a settlement reached after nine years of litigation which included $57 million in monetary relief and substantial affirmative relief to benefit participants, the court found that "The law firm Schlichter, Bogard & Denton has significantly improved 401(k) plans across the country by bringing cases such as this one, which have educated plan administrators, the Department of Labor, the courts and retirement plan participants about the importance of monitoring recordkeeping fees." No. 06-cv-743, Doc. 587, at 5–6 (S.D.Ill. Mar. 31, 2016) (Rosenstengel, J.) (internal quotations omitted).

- In approving a settlement including $32 million plus significant affirmative relief, Chief Judge William Osteen in *Kruger v. Novant Health, Inc.*, No. 14-208, Doc. 61, at 7–8 (M.D.N.C. Sept. 29, 2016) found that "Class Counsel's efforts have not only resulted in a significant monetary award to the class but have also brought improvement to the manner in which the Plans are operated and managed which will result in participants and retirees receiving significant savings[.]"

- On January 28, 2020, Judge George L. Russell of the District of Maryland found Schlichter, Bogard & Denton "pioneered this

ground-breaking and novel area of litigation" that has "dramatically brought down fees in defined contribution plans" after the firm obtained a $14 million dollar settlement. *Kelly v. Johns Hopkins Univ.*, No. 1:16-CV-2835-GLR, 2020 WL 434473, at *2 (D. Md. Jan. 28, 2020).

- Schlichter, Bogard & Denton is also class counsel in and handled *Tibble v. Edison International*, 135 S. Ct. 1823 (2015), the first and only Supreme Court case to address the issue of excessive fees in a defined contribution plan—in which the Court held in a unanimous 9–0 decision that ERISA fiduciaries have "a continuing duty to monitor investments and remove imprudent ones[.]" *Id.* at 1829. Schlichter, Bogard & Denton successfully petitioned for a writ of certiorari and obtained amicus support from the United States Solicitor General and AARP, among others. Given the Court's broad recognition of an ongoing fiduciary duty, the *Tibble* decision will affect all ERISA defined contribution plans.

- The firm's work in ERISA excessive fee class actions has been featured in the New York Times, Wall Street Journal, NPR, Reuters, and Bloomberg, among other media outlets. *See, e.g.*, Anne Tergesen, *401(k) Fees, Already Low, Are Heading Lower*, Wall St. J. (May 15, 2016);[94] Gretchen Morgenson, *A Lone Ranger of the 401(k)'s*, N.Y. Times (Mar. 29, 2014);[95] Liz Moyer, *High Court Spotlight Put on 401(k) Plans*, Wall St. J. (Feb. 23, 2015);[96] Floyd Norris, *What a 401(k) Plan Really Owes Employees*, N.Y. Times (Oct. 16, 2014);[97] Sara Randazzo, *Plaintiffs' Lawyer Takes*

---

[94] Available at http://www.wsj.com/articles/401-k-fees-already-low-are-heading-lower-1463304601.

[95] Available at http://www.nytimes.com/2014/03/30/business/a-lone-ranger-of-the-401-k-s.html?_r=0.

[96] Available at http://www.wsj.com/articles/high-court-spotlight-put-on-401-k-plans-1424716527.

[97] Available at http://www.nytimes.com/2014/10/17/business/what-a-401-k-plan-really-owes-employees.html?_r=0.

*on Retirement Plans*, Wall St. J. (Aug. 25, 2015);[98] Jess Bravin and Liz Moyer, *High Court Ruling Adds Protections for Investors in 401(k) Plans*, Wall St. J. (May 18, 2015); [99] Jim Zarroli, *Lockheed Martin Case Puts 401(k) Plans on Trial*, NPR (Dec. 15, 2014);[100] Mark Miller, *Are 401(k) Fees Too High? The High-Court May Have an Opinion*, Reuters (May 1, 2014);[101] Greg Stohr, *401(k) Fees at Issue as Court Takes Edison Worker Appeal*, Bloomberg (Oct. 2, 2014).[102]

## COUNT I: BREACH OF FIDUCIARY DUTIES (29 U.S.C. §1104(a)(1)) RELATED TO UNREASONABLE RECORDKEEPING FEES

265.  Plaintiffs restate and incorporate the allegations in the preceding paragraphs.

266.  This Count alleges breach of fiduciary duties against all Defendants.

267.  Defendants were required to discharge their duties with respect to the Plan solely in the interest of, and for the exclusive purpose of providing benefits to Plan participants and beneficiaries,

---

[98] Available at http://blogs.wsj.com/law/2015/08/25/plaintiffs-lawyer-takes-on-retirement-plans/.

[99] Available at http://www.wsj.com/articles/high-court-ruling-adds-protections-for-investors-in-401-k-plans-1431974139.

[100] Available at http://www.npr.org/2014/12/15/370794942/lockheed-martin-case-puts-401-k-plans-on-trial.

[101] Available at http://www.reuters.com/article/us-column-miller-401fees-idUSBREA400J220140501.

[102] Available at http://www.bloomberg.com/news/articles/2014-10-02/401-k-fees-at-issue-as-court-takes-edison-worker-appeal.

defraying reasonable expenses of administering the Plan, and acting with the care, skill, prudence, and diligence required by ERISA.

268.  If a defined contribution plan overpays for recordkeeping services due to the fiduciaries' "failure to solicit bids" from other recordkeepers, the fiduciaries have breached their duty of prudence. *See George v. Kraft Foods Global, Inc.*, 641 F.3d 786, 798–99 (7th Cir. 2011).

269.  Separately, failing to "monitor and control recordkeeping fees" and "paying excessive revenue sharing" as a result of failures to "calculate the amount the Plan was paying . . . through revenue sharing," to "determine whether [the recordkeeper's] pricing was competitive," and to "leverage the Plan's size to reduce fees," while allowing the "revenue sharing to benefit" a third-party recordkeeper "at the Plan's expense" is a breach of fiduciary duties. *Tussey,* 746 F.3d at 336.

270.  Defendants used a flawed fiduciary process for monitoring and controlling the Plan's recordkeeping fees. In contrast to the actions of hypothetical and real-world prudent fiduciaries of similar defined contribution plans, Defendants failed to: monitor the amount of the asset-based fees received by the Plan's recordkeeper, determine if those

122

amounts were competitive or reasonable for the services provided to the Plan, use the Plan's size to reduce fees, or obtain sufficient rebates to the Plan for the excessive fees paid by participants. Moreover, Defendants failed to solicit bids from competing providers, which is the surest way to determine the market rate for the Plan's services. This conduct was a breach of fiduciary duties.

271.  Total Plan losses will be determined at trial after complete discovery in this case and are continuing.

272.  Each Defendant is personally liable under 29 U.S.C. §1109(a) to make good to the Plan any losses to the Plan resulting from the breaches of fiduciary duties alleged in this Count and is subject to other equitable or remedial relief as appropriate.

273.  Each Defendant knowingly participated in the breach of the other Defendants, knowing that such acts were a breach, enabled the other Defendants to commit a breach by failing to lawfully discharge its own fiduciary duties, knew of the breach by the other Defendants and failed to make any reasonable effort under the circumstances to remedy the breach. Thus, each Defendant is liable for the losses caused by the breach of its co-fiduciary under 29 U.S.C. §1105(a).

123

## COUNT II: PROHIBITED TRANSACTIONS (29 U.S.C. §1106(a)(1)) RELATED TO UNREASONABLE RECORDKEEPING FEES

274.  Plaintiffs restate and incorporate the allegations contained in the preceding paragraphs.

275.  This Count is asserted against all Defendants.

276.  As a service provider to the Plan, Voya is a party in interest. 29 U.S.C. §1002(14)(B).

277.  By causing the Plan to use Voya as the Plan's recordkeeper from year to year, Defendants caused the Plan to engage in transactions that Defendants knew or should have known constituted an exchange of property between the Plan and Voya prohibited by 29 U.S.C. §1106(a)(1)(A), a direct or indirect furnishing of services between the Plan and Voya prohibited by 29 U.S.C. §1106(a)(1)(C), and a transfer of Plan assets to, or use by or for the benefit of Voya prohibited by 29 U.S.C. §1106(a)(1)(D). These transactions occurred each time the Plan paid fees to Voya and in connection with the Plan's investments that generated additional revenues for Voya and its affiliates.

278.  Total losses to the Plan will be determined after complete discovery in this case and are continuing.

279.  Under 29 U.S.C. §1109(a), Defendants are liable to restore all losses to the Plan resulting from these prohibited transactions, and to provide restitution of all proceeds from these prohibited transactions, and are subject to other appropriate equitable or remedial relief.

280.  Each Defendant knowingly participated in these transactions with knowledge that the transactions were a breach, enabled the other Defendants to cause the Plan to engage in these transactions, and knew of these transactions and failed to make any reasonable effort under the circumstances to remedy or discontinue the transaction. Thus, under 29 U.S.C. §1105(a), each Defendant is liable for restoring all proceeds and losses attributable to these transactions.

## COUNT III: PROHIBITED SELF-DEALING TRANSACTIONS (29 U.S.C. §1106(b)) (AGAINST THE ADP DEFENDANTS)

281.  Plaintiffs restate and incorporate the allegations contained in the preceding paragraphs.

282.  This Count is asserted against the ADP Defendants.

283.  In causing the Plan to pay Plan assets to ADP TotalSource, the ADP Defendants, as directors of ADP, dealt with the assets of the Plan in their own interest or for their own account, in violation of 29

125

U.S.C. §1106(b)(1).

284.   In causing the Plan to use ADP TotalSource to provide putative services to the Plan and causing the Plan to pay Plan assets to ADP TotalSource, the ADP Defendants, as directors of ADP TotalSource, acted on behalf of a party whose interests were adverse to the interests of the Plan, its participants and beneficiaries in violation of 29 U.S.C. §1106(b)(2).

285.   In causing the Plan to pay Plan assets to ADP TotalSource, Defendant ADP TotalSource received consideration for its own personal account from parties dealing with the Plan in connection with transactions involving the assets of the Plan, in violation of 29 U.S.C. §1106(b)(3).

286.  Each Defendant is personally liable under 29 U.S.C. §1109(a) to make good to the Plan any losses to the Plan resulting from the breaches of fiduciary duties alleged in this Count and to restore to the Plan all profits they made through the use of Plan assets, and is subject to other equitable or remedial relief as appropriate, including removal as a fiduciary of the Plan.

## COUNT IV: PROHIBITED TRANSACTIONS (29 U.S.C. §1106(a)) BETWEEN THE PLAN AND ADP TOTALSOURCE (AGAINST THE ADP DEFENDANTS)

287.  Plaintiffs restate and incorporate the allegations contained in the preceding paragraphs.

288.  This Count is asserted against the ADP Defendants.

289.  Defendant ADP TotalSource is a party in interest because it is a Plan fiduciary, an entity providing services to the Plan, and an employer whose employees participate in the Plan.

290.  By causing the Plan to pay Plan assets to ADP TotalSource, the ADP Defendants cause the Plan to engage in a transaction that they knew or should have known constituted an exchange of property between the Plan and a party in interest in violation of 29 U.S.C. §1106(a)(1)(A).

291.  By causing the Plan to use ADP TotalSource to provide purported services to the Plan and causing the Plan to pay Plan assets to ADP TotalSource, the ADP Defendants caused the Plan to engage in a transaction they knew or should have known constituted the furnishing of services between the Plan and a party in interest in violation of 29 U.S.C. §1106(a)(1)(C).

127

292.  By causing the Plan to pay Plan assets to ADP TotalSource, the ADP Defendants caused the Plan to engage in a transaction they knew or should have known constituted a transfer of Plan assets to a party in interest in violation of 29 U.S.C. §1106(a)(1)(D).

293.  Although ERISA provides that §1106(a) "shall not apply to . . . (2) Contracting or making reasonable arrangements with a party in interest for . . . services necessary for the establishment or operation of the plan, if no more than reasonable compensation is paid therefor" (29 U.S.C. §1108(b)(2) [ERISA §408(b)(2)]), to satisfy that exemption the ADP Defendants must prove that each service for which ADP TotalSource was paid was (1) "necessary for the establishment or operation of the plan", (2) "furnished under a contract or arrangement which is reasonable," and (3) "[n]o more than reasonable compensation is paid for such . . . service." 29 C.F.R. §2550.408b-2(a). Proving satisfaction of this exemption is an affirmative defense on which the ADP Defendants have the burden of proof.

294.  The ADP Defendants could have been entitled to receive reimbursement of expenses without engaging in a prohibited transaction under §1106(a), among other things, only if an independent

128

fiduciary determined the services provided by the employee were necessary to the operation of the Plan and the reimbursement to the ADP Defendants was reasonable and constituted only the reimbursement of direct expenses. 29 C.F.R. § 2550.408b-2(e), §2550.408c-2(b); DOL Adv. Op. 89-09A (June 13, 1989); DOL Adv. Op. 97-03A (Jan. 23, 1997). On information and belief, an independent fiduciary did not determine the services for which the ADP Defendants were reimbursed were necessary to the operation of the Plan, that the amount of the reimbursement was reasonable for the services provided, or that the reimbursement paid only direct expenses under 29 C.F.R. § 2550.408b-2(e) and §2550.408c-2(b).

295.  As a direct result of these prohibited transactions, the ADP Defendants caused the Plan to suffer losses in the reduction of Plan assets in amount of the payments to ADP TotalSource and the lost investment returns on those assets.

296.  Each Defendant is personally liable under 29 U.S.C. §1109(a) to make good to the Plan any losses to the Plan resulting from the breaches of fiduciary duties alleged in this Count and to restore to the Plan all profits they made through the use of Plan assets, and is

subject to other equitable or remedial relief as appropriate, including

removal as a fiduciary of the Plan.

### COUNT V: BREACH OF FIDUCIARY DUTIES (29 U.S.C. §1104(a)(1)) RELATED TO IMPRUDENT AND POORLY PERFORMING INVESTMENTS

297. Plaintiffs restate and incorporate the allegations contained

in the preceding paragraphs.

298. This Count alleges breach of fiduciary duties against all

Defendants.

299. The scope of the fiduciary duties and responsibilities of

Defendants includes managing the assets of the Plan for the sole and

exclusive benefit of Plan participants and beneficiaries and acting with

the care, skill, diligence, and prudence required by ERISA. Defendants

are directly responsible for selecting prudent investment options,

evaluating and monitoring the Plan's investments on an ongoing basis

and eliminating imprudent designated investment alternatives, and

taking all necessary steps to ensure that the Plan's assets are invested

prudently.

300.  As the Supreme Court has confirmed, ERISA's "duty of prudence involves a continuing duty to monitor investments and remove imprudent ones[.]" *Tibble,* 135 S. Ct. at 1829.

301.  Defendants selected and retained for years as Plan investment options the Voya Large Cap Value Portfolio, the Voya Large Cap Growth Portfolio, the Federated Clover Small Cap Value, the American Funds Washington Mutual Investors, and the Voya Target Solution Trusts with high expenses and poor performance relative to other investment options that were readily available to the Plan at all relevant times. In doing so, Defendants failed to make investment decisions based solely on the merits of the investment funds and what was in the interest of Plan participants. Defendants therefore failed to discharge their duties with respect to the Plan solely in the interest of the participants and beneficiaries and for the exclusive purpose of providing benefits to participants and their beneficiaries and defraying reasonable expenses of administering the Plan. This was a breach of fiduciary duties.

302.  Defendants failed to engage in a prudent process for monitoring the Plan's investments and removing imprudent ones within

a reasonable period. This resulted in the Plan continuing to offer excessively expensive funds with inferior historical performance compared to superior low-cost alternatives that were available to the Plan.

303. Total Plan losses will be determined at trial after complete discovery in this case and are continuing.

304. Each Defendant is personally liable under 29 U.S.C. §1109(a) to make good to the Plan any losses to the Plan resulting from the breaches of fiduciary duties alleged in this Count and is subject to other equitable or remedial relief as appropriate. Each Defendant knowingly participated in the breach of the other Defendants, knowing that such acts were a breach, enabled the other Defendants to commit a breach by failing to lawfully discharge its own fiduciary duties, knew of the breach by the other Defendants and failed to make any reasonable effort under the circumstances to remedy the breach. Thus, each Defendant is liable for the losses caused by the breach of its co-fiduciary under 29 U.S.C. §1105(a).

## COUNT VI: BREACH OF FIDUCIARY DUTIES (29 U.S.C. §1104(a)(1)) RELATED TO EXCESSIVE INVESTMENT MANAGEMENT FEES

305.  Plaintiffs restate and incorporate the allegations contained in the preceding paragraphs.

306.  This Count alleges breach of fiduciary duties against Defendants.

307.  The scope of the fiduciary duties and responsibilities of Defendants includes managing the assets of the Plan for the sole and exclusive benefit of Plan participants and beneficiaries and acting with the care, skill, diligence, and prudence required by ERISA. Defendants are directly responsible for selecting prudent investment options, evaluating and monitoring the Plan's investments on an ongoing basis and eliminating imprudent designated investment alternatives, and taking all necessary steps to ensure that the Plan's assets are invested prudently.

308.  As the Supreme Court has confirmed, ERISA's "duty of prudence involves a continuing duty to monitor investments and remove imprudent ones[.]" *Tibble,* 135 S. Ct. at 1829.

133

309.  Defendants' failure to adequately monitor and ensure that the Plan included only the least-expensive available share classes to the inclusion of funds with excessive investment management and other fees.

310.  Total Plan losses will be determined at trial after complete discovery in this case and are continuing.

311.  Each Defendant is personally liable under 29 U.S.C. §1109(a) to make good to the Plan any losses to the Plan resulting from the breaches of fiduciary duties alleged in this Count and is subject to other equitable or remedial relief as appropriate.

312.  Each Defendant knowingly participated in the breach of the other Defendants, knowing that such acts were a breach, enabled the other Defendants to commit a breach by failing to lawfully discharge its own fiduciary duties, knew of the breach by the other Defendants and failed to make any reasonable effort under the circumstances to remedy the breach. Thus, each Defendant is liable for the losses caused by the breach of its co-fiduciary under 29 U.S.C. §1105(a).

## COUNT VII: BREACH OF FIDUCIARY DUTIES (29 U.S.C. §1104(a)(1)) RELATED TO UNREASONABLE MANAGED ACCOUNT FEES

313.   Plaintiffs restate and incorporate the allegations in the preceding paragraphs.

314.   This Count alleges breach of fiduciary duties against Defendants.

315.   Defendants were required to discharge their duties with respect to the Plan solely in the interest of, and for the exclusive purpose of providing benefits to Plan participants and beneficiaries, defraying reasonable expenses of administering the Plan, and acting with the care, skill, prudence, and diligence required by ERISA.

316.   Defendants' process for monitoring and controlling the Plan's managed account fees was a fiduciary breach in that Defendants failed to engage in a reasoned decision-making process that compared Voya Retirement Advisors' services and fees to other providers. Defendants also failed to monitor the amount of revenue received by the Plan's managed account service provider, determine if those amounts were competitive or reasonable for the services provided to the Plan, or use the Plan's size to reduce fees. Moreover, Defendants failed to solicit bids

from competing providers. This caused the managed account compensation paid to Voya Retirement Advisors to exceed a reasonable fee for the services provided. This conduct was a breach of fiduciary duties.

317. Defendants were obligated to monitor all sources of compensation for each of the Plan's service providers, including Voya Retirement Advisors. Defendants' failure to monitor and control these payments caused the Plan to pay inflated managed account fees to Voya Retirement Advisors. Had Defendants monitored or controlled these payments, they could have recovered the excess for the benefit of the Plan.

318. Total Plan losses will be determined at trial after complete discovery in this case and are continuing.

319. Each Defendant is personally liable under 29 U.S.C. §1109(a) to make good to the Plan any losses to the Plan resulting from the breaches of fiduciary duties alleged in this Count and is subject to other equitable or remedial relief as appropriate.

320. Each Defendant knowingly participated in the breach of the other Defendants, knowing that such acts were a breach, enabled the

other Defendants to commit a breach by failing to lawfully discharge its own fiduciary duties, knew of the breach by the other Defendants and failed to make any reasonable effort under the circumstances to remedy the breach. Thus, each Defendant is liable for the losses caused by the breach of its co-fiduciary under 29 U.S.C. §1105(a).

### COUNT VIII: PROHIBITED TRANSACTIONS (29 U.S.C. §1106(a)(1)) RELATED TO INVESTMENT SERVICES AND FEES

321.  Plaintiffs restate and incorporate the allegations contained in the preceding paragraphs.

322.  This Count is asserted against all Defendants.

323.  As a provider of investment services to the Plan, Voya is a party in interest. 29 U.S.C. §1002(14)(B).

324.  By placing investment options in the Plan managed by Voya, Defendants caused the Plan to engage in transactions that Defendants knew or should have known constituted an exchange of property between the Plan and Voya prohibited by 29 U.S.C. §1106(a)(1)(A); a direct or indirect furnishing of services between the Plan and Voya prohibited by 29 U.S.C. §1106(a)(1)(C); and transfers of the Plan's assets to, or use by or for the benefit of Voya prohibited by 29 U.S.C. §1106(a)(1)(D). These transactions occurred each time the Plan paid

137

fees to Voya and its affiliates in connection with the Plan's investments in Voya investments and managed accounts.

325. Total losses to the Plan will be determined after complete discovery in this case and are continuing.

326. Under 29 U.S.C. §1109(a), Defendants are liable to restore all losses to the Plan resulting from these prohibited transactions, and to provide restitution of all proceeds of these prohibited transactions and are subject to other appropriate equitable or remedial relief.

327. Each Defendant knowingly participated in these transactions with knowledge that the transactions were a breach, enabled the other Defendants to cause the Plan to engage in these transactions, and knew of these transactions and failed to make any reasonable effort under the circumstances to remedy or discontinue the transaction. Thus, under 29 U.S.C. §1105(a), each Defendant is liable for restoring all proceeds and losses attributable to these transactions.

## COUNT IX: BREACH OF FIDUCIARY DUTIES (29 U.S.C. §1104(a)(1)) RELATED TO FAILURE TO SAFEGUARD CONFIDENTIAL PLAN PARTICIPANT DATA

328. Plaintiffs restate and incorporate the allegations in the preceding paragraphs.

329.  This Count alleges breach of fiduciary duties against all Defendants.

330.  Defendants were required to discharge their duties with respect to the Plan solely in the interest of, and for the exclusive purpose of providing benefits to Plan participants and beneficiaries, defraying reasonable expenses of administering the Plan, and acting with the care, skill, prudence, and diligence required by ERISA.

331.  Defendants' disclosure of Plan participant data to Voya, without any restrictions as to the use of Plan participant data, was a fiduciary breach in that sensitive, highly confidential personal financial data was disclosed and used for purposes of soliciting non-plan retail products from Plan participants.

332.  By allowing Voya and its affiliates to use Confidential Plan Participant Data to solicit the purchase of retail non-plan products, Defendants failed to act in the exclusive interest of participants.

333.  Total Plan losses will be determined at trial after complete discovery in this case and are continuing.

334.  Each Defendant is personally liable under 29 U.S.C. §1109(a) to make good to the Plan any losses to the Plan resulting from

the breaches of fiduciary duties alleged in this Count and is subject to other equitable or remedial relief as appropriate.

335.   Each Defendant knowingly participated in the breach of the other Defendants, knowing that such acts were a breach, enabled the other Defendants to commit a breach by failing to lawfully discharge its own fiduciary duties, knew of the breach by the other Defendants and failed to make any reasonable effort under the circumstances to remedy the breach. Thus, each Defendant is liable for the losses caused by the breach of its co-fiduciary under 29 U.S.C. §1105(a).

## COUNT X: PROHIBITED TRANSACTIONS (29 U.S.C. §1106(a)) BETWEEN THE PLAN AND A PARTY IN INTEREST RELATED TO CONFIDENTIAL PLAN PARTICIPANT DATA

336.   Plaintiffs restate and incorporate the allegations in the preceding paragraphs.

337.   This Count alleges that Defendants engaged in prohibited transactions.

338.   Defendants were involved in causing the Plan to use Voya as the Plan's recordkeeper.

339.   As recordkeeper, Voya is a party in interest.  Upon information and belief, Voya's affiliates are parties in interest because

140

they are wholly owned subsidiaries of Voya and/or Voya shares 10

percent or more in profits with its affiliates.

340.   Defendants knew or should have known that in its role as

recordkeeper, Voya received and had unfettered access to a valuable

asset of the Plan, Confidential Plan Participant Data.

341.   Defendants knew or should have known that by retaining

Voya as the Plan's recordkeeper year after year and allowing Voya to

receive unfettered access to Confidential Plan Participant Data which it

and its affiliates used to market their and Voya's non-plan products to

Plan participants, Defendants caused the Plan to engage in

transactions that constituted a direct or indirect transfer to, or use by or

for the benefit of a party in interest, a valuable asset of the Plan,

Confidential Plan Participant Data, in violation of 29 U.S.C.

§1106(a)(1)(D).

342.   Total Plan losses will be determined at trial after complete

discovery in this case and are continuing.

343.   Each Defendant is personally liable under 29 U.S.C.

§1109(a) to make good to the Plan any losses to the Plan resulting from

the breaches of fiduciary duties alleged in this Count and is subject to other equitable or remedial relief as appropriate.

344.   Each Defendant knowingly participated in the breach of the other Defendants, knowing that such acts were a breach, enabled the other Defendants to commit a breach by failing to lawfully discharge its own fiduciary duties, knew of the breach by the other Defendants and failed to make any reasonable effort under the circumstances to remedy the breach. Thus, each Defendant is liable for the losses caused by the breach of its co-fiduciary under 29 U.S.C. §1105(a).

## COUNT XI: FAILURE TO MONITOR FIDUCIARIES (AGAINST DEFENDANTS ADP TOTALSOURCE AND ADP TOTALSOURCE RETIREMENT SAVINGS PLAN COMMITTEE)

345.   Plaintiffs restate and incorporate the allegations contained in the preceding paragraphs.

346.   This Count is asserted against Defendants ADP TotalSource and ADP TotalSource Retirement Savings Plan Committee.

347.   Defendant ADP TotalSource Retirement Savings Plan Committee is the named fiduciary with the overall responsibility for the control, management and administration of the Plan, in accordance with 29 U.S.C. §1102(a). ADP TotalSource is the Plan Administrator of

the Plan,  under 29 U.S.C. §1002(16)(A)(i) with responsibility and complete discretionary authority to control the operation, management and administration of the Plan, with all powers necessary to enable it to properly carry out such responsibilities, including the selection and compensation of the providers of administrative services to the Plan and the selection, monitoring, and removal of the investment options made available to participants for the investment of their contributions and provision of their retirement income, and has delegated this role to the ADP TotalSource Retirement Savings Plan Committee.

348.  ADP TotalSource had ultimate responsibility for the Committee's decisions with respect to the Plan, and was responsible for monitoring the performance of Committee members and taking any necessary corrective actions, including removing Committee members who failed to fulfil their fiduciary duties.

349.  ADP TotalSource and the ADP TotalSource Retirement Savings Plan Committee had ultimate responsibility for the decisions of Defendant NFP and other consultants and/or delegees with respect to the Plan, and were responsible for monitoring their performance and

taking any necessary corrective actions, including removing delegees who failed to fulfil their fiduciary duties.

350.  A monitoring fiduciary must ensure that the person to whom it delegates fiduciary duties is performing its fiduciary obligations, including those with respect to the investment and holding of plan assets, and must take prompt and effective action to protect the plan and participants when the delegate fails to discharge its duties.

351.  To the extent any of the fiduciary responsibilities of the ADP TotalSource Retirement Savings Plan Committee or ADP TotalSource were delegated to another fiduciary, their monitoring duties included an obligation to ensure that any delegated tasks were being performed in accordance with ERISA's fiduciary standards.

352.  Defendants ADP TotalSource Retirement Savings Plan Committee and ADP TotalSource breached their fiduciary monitoring duties by, among other things:

> a.  Failing to monitor their appointees, including the Committee and its members, to evaluate their performance, or to have a system in place for doing so, and standing idly by as the Plan

suffered enormous losses as a result of its appointees'
imprudent actions and omissions with respect to the Plan;

b.  Failing to monitor their appointees' fiduciary process, which
would have alerted any prudent fiduciary to the potential
breach because of the excessive administrative and
investment management fees and consistent
underperformance of Plan investments in violation of
ERISA;

c.  Failing to ensure that the monitored fiduciaries had a
prudent process in place for evaluating the Plan's
administrative fees and ensuring that the fees were
competitive, including a process to identify and determine
the amount of all sources of compensation to the Plan's
recordkeeper and the amount of any revenue sharing
payments; a process to prevent the recordkeeper from
receiving revenue sharing that would increase the
recordkeeper's compensation to unreasonable levels even
though the services provided remained the same; and a

process to periodically obtain competitive bids to determine the market rate for the services provided to the Plan;

d.  Failing to ensure that the monitored fiduciaries considered the ready availability of comparable and better performing investment options that charged significantly lower fees and expenses than the Plan's mutual fund and insurance company variable annuity options; and

e.  Failing to remove appointees whose performance was inadequate in that they continued to maintain imprudent, excessive cost, and poorly performing investments, all to the detriment of Plan participants' retirement savings.

f.  Failing to remove appointees whose performance was inadequate in that they allowed the misuse of Confidential Plan Participant Data.

353.  Had Defendants ADP TotalSource Retirement Savings Plan Committee and ADP TotalSource discharged their fiduciary monitoring duties prudently as described above, the losses suffered by the Plan would have been minimized or avoided. Therefore, as a direct result of the breaches of fiduciary duty alleged herein, the Plan, the Plaintiffs,

146

and the other Class members lost tens of millions of dollars of retirement savings.

## COUNT XII: OTHER REMEDIES AGAINST ADP TOTALSOURCE (29 U.S.C. §1132(a)(3))

354.  Plaintiffs restate and incorporate the allegations contained in the preceding paragraphs.

355.  This Count is asserted against Defendant ADP TotalSource.

356.  Under 29 U.S.C. §1132(a)(3), a court may award "other appropriate equitable relief" to redress "any act or practice" that violates ERISA. A defendant may be liable under that section regardless of whether it is a fiduciary. A nonfiduciary transferee of proceeds from a breach of a fiduciary duty or prohibited transaction is subject to equitable relief if it had actual or constructive knowledge of the circumstances that rendered the transaction or payment unlawful.

357.  By virtue of its role and responsibilities in appointing and monitoring the ADP TotalSource Retirement Savings Plan Committee members and other ADP TotalSource directors who served as committee members and controlled the payments to ADP TotalSource, ADP TotalSource knew or should have known that ADP TotalSource employees were providing purported services to the Plan and that ADP

147

TotalSource was receiving payments of Plan assets, which were the circumstances constituting prohibited transactions as alleged in Counts III and IV and the inuring of Plan assets to the benefit of an employer in violation 29 U.S.C. §1103(c)(1).

358.  To the extent any proceeds from those transactions and the profits ADP TotalSource made through the use of Plan assets are not recovered under the preceding Counts, the Court should order restitution and disgorgement under 29 U.S.C. §1132(a)(3) to restore those funds to the Plan.

359.  On information and belief, ADP TotalSource has not dissipated the entirety of the proceeds on nontraceable items, and the proceeds can be traced to particular funds or property in ADP TotalSource's possession.

## JURY TRIAL DEMANDED

360.  Pursuant to Fed. R. Civ. P. 38 and the Constitution of the United States, Plaintiffs demand a trial by jury.

148

## PRAYER FOR RELIEF

For these reasons, Plaintiffs, on behalf of the Plan and all similarly situated Plan participants and beneficiaries, respectfully request that the Court:

- find and declare that Defendants have breached their fiduciary duties as described above;

- find and adjudge that Defendants are personally liable to make good to the Plan all losses to the Plan resulting from each breach of fiduciary duty, and to otherwise restore the Plan to the position it would have occupied but for the breaches of fiduciary duty;

- determine the method by which Plan losses under 29 U.S.C. §1109(a) should be calculated;

- order Defendants to provide all accountings necessary to determine the amounts Defendants must make good to the Plan under §1109(a);

- remove the fiduciaries who have breached their fiduciary duties and enjoin them from future ERISA violations;

149

- surcharge against Defendants and in favor of the Plan all amounts involved in any transactions which such accounting reveals were improper, excessive and/or in violation of ERISA;

- reform the Plan to include only prudent investments;

- reform the Plan to obtain bids for recordkeeping and to pay only reasonable recordkeeping expenses;

- reform the Plan to obtain bids for managed account services and to pay only reasonable managed account service fees if the fiduciaries determine that managed account services is a prudent alternative to target date or other asset allocation funds;

- certify the Class, appoint each of the Plaintiffs as a class representative, and appoint Schlichter, Bogard & Denton LLP as Class Counsel;

- award to the Plaintiffs and the Class their attorney's fees and costs under 29 U.S.C. §1132(g)(1) and the common fund doctrine;

150

- order the payment of interest to the extent it is allowed by law; and

- grant other equitable or remedial relief as the Court deems appropriate.

May 7, 2020                          Respectfully submitted,

                                     /s/    Eric H. Jaso
                                     SPIRO HARRISON
                                     Eric H. Jaso
                                     830 Morris Turnpike 2nd Floor
                                     Short Hills, NJ 07078
                                     (973) 310-4026
                                     ejaso@spiroharrison.com

                                     *Local Counsel for Plaintiffs*

                                     SCHLICHTER BOGARD & DENTON LLP
                                     Jerome J. Schlichter (*pro hac vice*
                                     forthcoming)
                                     Michael A. Wolff (*pro hac vice*
                                     forthcoming)
                                     Heather Lea (*pro hac vice*
                                     forthcoming)
                                     Andrew D. Schlichter (*pro hac vice*
                                     forthcoming)
                                     Kurt C. Struckhoff (*pro hac vice*
                                     forthcoming)
                                     Alexander L. Braitberg (*pro hac vice*
                                     forthcoming)
                                     100 South Fourth Street, Suite 1200
                                     St. Louis, MO, 63102
                                     (314) 621-6115
                                     (314) 621-5934 (fax)
                                     jschlichter@uselaws.com
                                     mwolff@uselaws.com
                                     hlea@uselaws.com
                                     aschlichter@uselaws.com
                                     kstruckhoff@uselaws.com
                                     abraitberg@uselaws.com

                                     *Lead Counsel for Plaintiffs*

152