Not for Publication

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

|  |  |
|---|---|
| **BETH BERKELHAMMER**, *et al.*,<br><br>                    **Plaintiffs,**<br><br>        v.<br><br>**AUTOMATIC DATA PROCESSING, INC.**, *et al.*,<br><br>                    **Defendants.** | Civil Action No.: 20-5696 (ES) (JRA)<br><br>OPINION |

SALAS, DISTRICT JUDGE

Plaintiffs Beth Berkelhammer and Naomi Ruiz bring various claims of breach of fiduciary duty and prohibited transactions under the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1001 *et seq.*  (D.E. No. 1 ("Compl.")).  They bring those claims against Defendants Automatic Data Processing, Inc.; ADP TotalSource Group, Inc.; and the ADP TotalSource Retirement Savings Plan Committee.  Defendants move to dismiss the Complaint.  (D.E. No. 32). Having considered the parties' submissions and having held oral argument on the motion on June 10, 2021 (D.E. No. 95; *see also* D.E. No. 100 ("Oral Arg. Tr.")), the Court is prepared to rule.  For the following reasons, Defendants' motion is **GRANTED in part** and **DENIED in part**.

## I.      BACKGROUND

The Court briefly outlines only the essential factual background to place Plaintiffs' claims in the proper context.  Additional facts are cited throughout the Court's analysis.

As alleged in the Complaint, Plaintiffs are participants of a multiple-employer 401(k) defined contribution plan, called the ADP TotalSource Retirement Savings Plan (the "Plan").

(Compl. ¶¶ 2, 11–12 & 20–21).[1]  Defendant Automatic Data Processing ("ADP") offers the Plan to eligible employees whose employers contracted with ADP to serve as their off-site human resources department.  (*Id.* ¶ 14).  ADP administers the Plan through its subsidiaries, one of which is Defendant ADP TotalSource Group ("TotalSource").  (*Id.* ¶¶ 23 & 26).  The Plan names Defendant ADP TotalSource Retirement Savings Plan Committee (the "Committee") as plan administrator.  (*Id.* ¶ 28).  TotalSource may, "in its sole discretion," designate another person or entity as plan administrator.  (*Id.*).  The Committee's members are selected from TotalSource's board of directors.  (*Id.* ¶ 29).

The Plan is governed under ERISA, and Plaintiffs claim that Defendants are fiduciaries of the Plan and breached their ERISA-imposed duties in several ways.  First, Plaintiffs claim that Defendants caused the Plan to pay excessive recordkeeping fees to Voya Institutional Plan Services, LLC ("Voya").  (*Id.* ¶¶ 72–91).  Voya has served as the Plan's recordkeeper since August 2013.  (*Id.* ¶ 72).  Recordkeeping is a necessary service for every defined contribution plan.  (*Id.* ¶ 55).  Recordkeepers keep track of each participant's investments and provide each participant with a quarterly account statement.  (*Id.*).  Recordkeepers also often maintain a plan website or call center for participants to obtain information about the plan and their accounts.  (*Id.*).  In addition, recordkeepers may provide participants with educational materials or investment advice.  (*Id.*).  The market to become a recordkeeper is highly competitive, especially for large plans.  (*Id.* ¶¶ 55–56).  According to Plaintiffs, the Plan at issue is massive:  It has over 114,000 participants and has accumulated assets worth over $4.4 billion.  (*Id.* ¶ 18).  But despite the size of the Plan, its concomitant ability to negotiate price, and the competitive nature of recordkeeping, Plaintiffs allege that Defendants caused the Plan to pay Voya recordkeeping fees that were higher than fees

---

[1]     A multiple-employer plan is an ERISA plan that is, among other things, "sponsored by more than one employer."  Lee T. Polk, ERISA Practice and Litigation § 2:6 (2021).

paid by smaller plans. (*Id.* ¶ 85). During the relevant period, Defendants also allegedly permitted recordkeeping fees to increase while fees in the market either remained the same or decreased. (*Id.* ¶¶ 68–71, 75, 77 & 85). This occurred in part, Plaintiffs say, because Defendants failed to conduct a competitive bidding process for the Plan's recordkeeping services from before 2014 until at least 2018. (*Id.* ¶ 77).

Second, Plaintiffs allege that Defendants caused the Plan to pay unnecessary administrative fees to TotalSource. (*Id.* ¶ 104). These fees, according to Plaintiffs, "are wholly unconnected to any services that ADP TotalSource provides to the Plan." (*Id.* ¶ 105). And the fees "are wholly duplicative of other fees that" participating employers pay when contracting with ADP to serve as their off-site human resources department. (*Id.* ¶ 113). These fees, Plaintiffs allege, come from Plan assets that should have been restored to the Plan "since they constituted excessive fees generated from participant investments." (*Id.* ¶ 106; *see also id.* ¶¶ 101–04).

Third, Plaintiffs claim that Defendants caused the Plan to offer participants poor-performing investment options, which charged excessive concomitant fees. (*Id.* ¶¶ 115 & 128–87). Plaintiffs name five such investment options, three of which were Voya proprietary investment products. (*Id.* ¶¶ 128, 140, 148, 158 & 165).

Fourth, Plaintiffs claim that Defendants caused participants of the Plan to pay unreasonable fees for managed account services. (*Id.* ¶¶ 214–24). An affiliate of Voya, Voya Retirement Advisors LLC ("Voya Retirement"), has provided managed account services to the Plan since July 2013. (*Id.* ¶¶ 214–15). "Managed accounts are investment services under which providers make investment decisions for participants to allocate their retirement savings among a mix of assets classes, commonly referred to as asset allocation." (*Id.* ¶ 188). This service is optional for participants. (*Id.* ¶ 194). According to Plaintiffs, Voya Retirement's fees were as much as 2,000%

of other managed account providers that provide similar services.  (*Id.* ¶ 220).  The fees charged by Voya Retirement, Plaintiffs also allege, increased between 2014 and 2018.  (*Id.* ¶ 223).  Plaintiffs attribute this inflated fee, in part, to Defendants' failure to put the managed account services out for competitive bidding.  (*Id.* ¶ 224).

Fifth, Plaintiffs allege that Defendants permit Voya, through its affiliate Voya Financial Advisors, Inc. ("VFA"), to use plan participant data to market and sell non-Plan investment products to participants.  (*Id.* ¶¶ 236–59).  Investment advisors of VFA, Plaintiffs allege, sell non-Plan investment products under a conflicted commission-based salary.  (*Id.* ¶¶ 237–46).  According to Plaintiffs, Plan participants were harmed because "[t]heir data was made available to conflicted sales representatives who had access to their personal details, including at vulnerable times in their lives, such as contemplating rollovers or other major investment decisions, under the imprimatur of employer-sponsored Plan approval."  (*Id.* ¶ 257).  "The sales representatives," Plaintiffs go on, "had an incentive to offer advice and induce [participants] to purchase non-Plan products and services that were not in their best interests."  (*Id.*).  According to Plaintiffs, "Defendants could have, but did not, negotiate restrictions on the sharing Confidential Plan Participant Data, on a Plan-wide basis, protecting this valuable Plan asset and this confidential information."  (*Id.* ¶ 255).

Sixth, undergirding many of Plaintiffs' allegations is their claim that Defendants had a separate and conflicting business arrangement with Voya:

> [T]he ADP Defendants stood to gain financially and were incentivized to retain Voya despite th[e] fact that its high-cost structure was imprudent and contrary to the interests of Plan participants for multiple reasons.  For example, unlike some competing low-cost, open architecture defined contribution recordkeeping providers, Voya and its affiliates use information obtained in Voya's role as recordkeeper to market and sell numerous other products and services to the small-business clientele including accident, critical illness/specified disease, hospital confinement indemnity, group life and disability income insurance products, and

> health savings and spending accounts. *This existing client base provides lucrative marketing opportunities for ADP to extend its TotalSource client base. Indeed, in a press release, Voya touted a partnership with ADP to provide "integrated employee benefits solutions" via a "one-stop-shop" solution—effectively sharing Voya and ADP's client base.*

(*Id.* ¶ 81 (emphasis added)).  Said another way, and as clarified by counsel at oral argument, Plaintiffs allege that Defendants retain Voya's services, that Defendants provide Voya with plan participant data, that Voya sells non-Plan products to participants, and that Voya separately markets and sells Defendants' business.  (Oral Arg. Tr. at 42:5–15).  "So they're cross-selling," counsel said, "they're each using their books of business to cross-sell business to each other."  (*Id.* at 42:13–14).

Against this backdrop, Plaintiffs filed a twelve-count complaint against Defendants on May 7, 2020.  Plaintiffs claim that Defendants breached their duties of prudence and loyalty in violation of 29 U.S.C. § 1104(a)(1) by causing the Plan to pay Voya unreasonable recordkeeping fees (Count I); to provide imprudent and poorly performing investment opinions to participants (Count V); to pay excessive fees for imprudent investment options (Count VI); and to pay Voya Retirement unreasonable fees for managed account services (Count VII).  (*Id.* ¶¶ 265–73 & 297–320).  Plaintiffs further claim that Defendants engaged in prohibited transactions under § 1106(a) and (b) by causing the Plan to pay Voya for recordkeeping services (Count II); TotalSource for putative reimbursements (Counts III & IV); and Voya for investment services (Count VIII).  (*Id.* ¶¶ 274–96 & 321–27).  Plaintiffs also claim Defendants breached their duties of prudence and loyalty (Count IX) and engaged in prohibited transactions (Count X) by allowing Voya and VFA to use confidential plan participant data in an unrestricted manner.  (*Id.* ¶¶ 328–44).  Finally, Plaintiffs assert derivative claims against Defendants for failure to monitor fiduciaries (Count X), and for equitable relief under § 1132(a)(3) (Count XII).  (*Id.* ¶¶ 345–59).

Defendants move to dismiss the Complaint under Federal Rule of Civil Procedure 12(b)(1) and (6).  (D.E. No. 32; *see also* D.E. No. 32-1 ("Mov. Br."); D.E. No. 42 ("Opp. Br."); D.E. No. 62 ("Reply")).  Defendants challenge Plaintiffs' Article III standing to assert claims based on Voya and VFA's use of plan participant data, and they challenge the sufficiency of Plaintiffs' factual allegations supporting all counts.  The Court held oral argument on the motion on June 10, 2021, and is now prepared to rule.

## II.    LEGAL STANDARD

Under Rule 12(b)(1), a court may dismiss a claim at the pleading stage if the court does not have jurisdiction.  "A motion to dismiss for want of standing is also properly brought pursuant to Rule 12(b)(1), because standing is a jurisdictional matter." *Ballentine v. United States*, 486 F.3d 806, 810 (3d Cir. 2007).  "Two types of challenges can be made under Rule 12(b)(1)—'either a facial or a factual attack.'" *In re Horizon Healthcare Servs. Inc. Data Breach Litig.*, 846 F.3d 625, 632 (3d Cir. 2017) (quoting *Davis v. Wells Fargo*, 824 F.3d 333, 346 (3d Cir. 2016)).  Defendants a raise a facial attack to Plaintiffs' constitutional standing under Counts IX and X; therefore, the Court accepts Plaintiffs' factual allegations as true.  *See In re Schering Plough Corp. Intron/Temodar Consumer Class Action*, 678 F.3d 235, 243 (3d Cir. 2012).

In assessing whether a complaint states a cause of action sufficient to survive dismissal under Rule 12(b)(6), the Court accepts "all well-pleaded allegations as true and draw[s] all reasonable inferences in favor of the plaintiff." *City of Cambridge Ret. Sys. v. Altisource Asset Mgmt. Corp.*, 908 F.3d 872, 878 (3d Cir. 2018).  "[T]hreadbare recitals of the elements of a cause of action, legal conclusions, and conclusory statements" are all disregarded. *Id.* at 878–79 (quoting *James v. City of Wilkes-Barre*, 700 F.3d 675, 681 (3d Cir. 2012)).  The complaint must "contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face,"

and a claim is facially plausible when the plaintiff "pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Zuber v. Boscov's*, 871 F.3d 255, 258 (3d Cir. 2017) (first quoting *Santiago v. Warminster Twp.*, 629 F.3d 121, 128 (3d Cir. 2010); and then quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)).

## III.    DISCUSSION

The Court first will address Plaintiffs' claims for breach of fiduciary duties, which consist of Counts I, V, VI, and VII; then address their claims for prohibited transactions, which consist of Counts II, III, IV, and VIII; then address their claims related to plan-participant data, which consist of Counts IX and X; and finally address their derivative claims, which consist of Counts XI and XII.

### A.    Breach of Fiduciary Duties (Counts I, V, VI, and VII)

A claim of fiduciary breach has three elements: "(1) a plan fiduciary (2) breaches an ERISA-imposed duty (3) causing a loss to the plan." *Leckey v. Stefano*, 501 F.3d 212, 225–26 (3d Cir. 2007), *as amended* (Dec. 21, 2007).  With respect to the second prong, which is the central dispute for Plaintiffs' fiduciary breach claims, ERISA imposes a duty of loyalty, *see* § 1104(a)(1)(A), and a duty of prudence, *see* § 1104(a)(1)(B).  The Court will address Plaintiffs' prudence and then loyalty claims.

#### i.    Breach of Prudence

As noted, Plaintiffs claim that Defendants breached their duty of prudence by causing the Plan to pay Voya unreasonable recordkeeping fees (Compl. ¶¶ 265–73, Count I); to provide imprudent and poorly performing investment options and pay excessive concomitant fees (*id.* ¶¶ 297–304, Count V; *id.* ¶¶ 305–12, Count VI); and to pay Voya Retirement unreasonable managed

account services fees (*id.* ¶¶ 313–20, Count VII).   After outlining the general standard for prudence, the Court will address each claim more particularly.

ERISA fiduciaries are held to the "prudent man" standard of care, which requires fiduciaries to exercise "the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims."  § 1104(a)(1)(B).  "It is not enough to avoid misconduct, kickback schemes, and bad-faith dealings.  The law expects more than good intentions.  '[A] pure heart and an empty head are not enough.'"  *Sweda v. Univ. of Pennsylvania*, 923 F.3d 320, 329 (3d Cir. 2019) (alteration in original) (quoting *DiFelice v. U.S. Airways, Inc.*, 497 F.3d 410, 418 (4th Cir. 2007)).   In assessing this duty, a court must look at the process rather than the results.  *Id.*  Hindsight indeed is 20/20, so the focus must be "on a fiduciary's conduct in arriving at [a] . . . decision."  *Id.* (alteration in original) (quoting *In re Unisys Sav. Plan Litig.*, 74 F.3d 420, 434 (3d Cir. 1996)).  A court should ask "whether a fiduciary employed the appropriate methods to investigate and determine the merits of a particular [course of action]."  *Id.* (quoting *Unisys*, 74 F.3d at 434).  At the pleading stage, however, factual allegations do not have to "directly address[] the process by which the [p]lan was managed."  *Braden v. Wal-Mart Stores, Inc.*, 588 F.3d 585, 596 (8th Cir. 2009).  A plaintiff's allegations are sufficient if a court can reasonably infer that "the process was flawed."  *Renfro v. Unisys Corp.*, 671 F.3d 314, 327 (3d Cir. 2011) (quoting *Braden*, 588 F.3d at 596).

### a.   *Unreasonable Recordkeeping Fees*

In Count I, Plaintiffs allege that Defendants breached their duty of prudence under § 1104(a)(1)(B) by paying Voya excessive recordkeeping fees.  (Compl. ¶¶ 265–73).

Encompassed within the duty of prudence is that fiduciaries must "understand and monitor plan expenses." *Sweda*, 923 F.3d at 328. "'Expenses, such as management or administrative fees, can sometimes significantly reduce the value of an account in a defined-contribution plan,' by decreasing its immediate value, and by depriving the participant of the prospective value of funds that would have continued to grow if not taken out in fees." *Id.* (quoting *Tibble v. Edison Int'l*, 575 U.S. 523, 525 (2015)). Accordingly, "fiduciaries should be vigilant in 'negotiation of the specific formula and methodology' by which fee payments such as 'revenue sharing will be credited to the plan and paid back to the plan or to plan service providers.'" *Id.* (quoting DOL Advisory Opinion 2013-03A, 2013 WL 3546834, at *4). A fiduciary must also leverage the plan's size and bargaining power to obtain favorable outcomes for the plan. *Id.* at 328–29, 332. "Many allegations concerning fiduciary conduct, such as reasonableness of 'compensation for services' are 'inherently factual question[s]' for which neither ERISA nor the Department of Labor give specific guidance." *Id.* at 329 (alternation in original) (quoting DOL Advisory Opinion 2013-03A, 2013 WL 3546834, at *4–5).

Bearing in mind the necessarily fact-intensive inquiry of this claim, Plaintiffs have sufficiently alleged fiduciary breach with respect to the allegedly excessive recordkeeping fees. Plaintiffs allege, and the Court accepts as true, that Defendants caused the Plan to pay exorbitant recordkeeping fees to Voya. In particular, Plaintiffs allege that the Plan's approximate payment per year for recordkeeping services from 2014 to 2018 was between $6.9 million and $10.5 million—or approximately $80 to $124 per participant. (Compl. ¶ 84). That amount, according to Plaintiffs, was over 400% higher than a reasonable fee for these services. (*Id.*). Plaintiffs claim that the maximum reasonable recordkeeping fee should have been $1.9 million to $2.9 million per year—or $25 to $30 per participant—in light of "the Plan's features, the nature and type of

recordkeeping and administrative services provided by the Plan's recordkeeper, the number of Plan participants and the recordkeeping market."  (*Id.* ¶ 83).  The reasonable fee prescribed by Plaintiffs is on par, they allege, with recordkeeping fees paid by even smaller plans such as Nike, New Albertson's, and Fidelity during the same period.  (*Id.*).

|  | ADP TotalSource | Nike | New Albertson's | Fidelity |
|---|---|---|---|---|
| Perparticipant recordkeeping fee | $80 to $124[27] | $21 | $31 to $29 | $21 to $14 |

(*Id.* ¶¶ 83 & 85; *see also id.* ¶¶ 68–70 & 85).[2]

Plaintiffs also allege that recordkeeping fees increased inexplicably—services did not change—during a time that fees in the market either remained the same or decreased.  (*Id.* ¶¶ 68–71, 75, 77 & 85).  Specifically, Plaintiffs allege that by 2016, "the fees collected by Voya for the *same services* were at least $10,460,592—a figure 52% greater than the direct compensation [Voya] reported in 2015."  (*Id.* ¶ 75 (emphasis added)).

In addition, Plaintiffs allege that Defendants failed to conduct competitive bidding for the Plan's recordkeeping services from prior to 2014 until at least 2018.  (Compl. ¶ 77).  Had Defendants conducted competitive bidding, Plaintiffs claim they would have avoided paying excessive recordkeeping fees because such a process would have produced reasonable recordkeeping fees for the Plan.  (*Id.*).  That is especially so, Plaintiffs allege, in light of the Plan's size—larger plans, they posit, are more formidable at the negotiation table because they can leverage their size and scale.  (*Id.* ¶ 57).

---

[2]       Contrary to Defendants' argument, Plaintiffs do not purport that ERISA requires plans to charge recordkeeping fees on a flat-fee per participant basis.  (Mov. Br. at 12; Reply at 2–3).  Instead, Plaintiffs allege that fiduciaries use a flat-fee per participant metric to inform their negotiations of fee arrangements with the recordkeeper. (Compl. ¶ 57; Opp. Br. at 14).  They accordingly use that metric to aid the Court's understanding of their claim.

Considering these facts in combination and bearing in mind that the prudent man standard presents a fact-intensive inquiry, Plaintiffs sufficiently plead that Defendants breached their duty of prudence under § 1104(a)(1)(B).

Defendants' arguments to the contrary are not persuasive.  First, Defendants argue that Plaintiffs inappropriately rely on single-employer plans as a comparator to assess the fees paid by the Plan, which is a multiple-employer plan.  (Mov. Br. at 13).  They argue that a multiple-employer plan is more difficult and expensive to administer than a single-employer plan.  (*Id.*).  In particular, Defendants argue that the services the Plan provides are different from those provided by the single-employer plans because the Plan

> (1) allows each of the thousands of adopting employers to design unique plan terms that apply only to its employees, (2) is *required* by the IRS to be operated and administered like a collection of thousands of small, individual plans, and (3) has thousands of employers and hundreds of thousands of worksite employees and Plan participants moving in and out of the Plan each year.

(*Id.* (emphasis in original)).  Because of these differences, Defendants argue, Plaintiffs fail to provide examples of similarly situated fiduciaries.

However, as Plaintiffs point out, this argument is merits-based and better suited for summary judgment or at trial.  (Opp. Br. at 15).  In response to Defendants' fact-based argument, Plaintiffs point to their competing factual allegations, which at this stage the Court must accept as true.  As Plaintiffs pointed out at oral argument, they do not limit comparator plans only to large single-employer plans; instead, they offer "small plans and medium size plans."  (Oral Arg. Tr. at 29:5–9; *see also* Compl. ¶ 85 (outlining recordkeeping fees for "much smaller plans like Nike and New Albertson's")).  According to Plaintiffs, "[b]ecause of economies of scale, large plans," such as the Plan here, "get lower effective rates per participant than smaller plans."  (Compl. ¶ 57).  Plaintiffs also allege that "[a]ny differences" between a multiple-employer plan and a similarly

sized single-employer plan "can be easily automated." (*Id.* ¶ 88). Plaintiffs' "economies of scale" and "automation" allegations should be tested through discovery, in the adversarial process, and not summarily rejected as a matter of law at the motion-to-dismiss stage. Tellingly, the key case on which Defendants rely was decided on summary judgment, on a fully developed factual record. (Mov. Br. at 14–15 (citing *Pledger v. Reliance Trust Co.*, No. 15-4444, 2019 WL 10886802, at *28 (N.D. Ga. Mar. 28, 2019))). Moreover, Plaintiffs point out that Defendants "cite no authority . . . that shows *how much* more multiple employer plans cost to administer." (Opp. Br. at 15 (emphasis in original)). While Plaintiffs bear the burden of pleading their claim, they do not bear the burden of rebutting Defendants' competing factual narrative.[3]

Second, Defendants argue that competitive bidding is not required under ERISA. (Mov. Br. at 16 (citing *Marks v. Trader Joe's Co.*, No. 19-10942, 2020 WL 2504333, at *7 (C.D. Cal. Apr. 24, 2020); *Ferguson v. Ruane Cunniff & Goldfarb, Inc.*, No. 17-6685, 2019 WL 4466714, at *8 (S.D.N.Y. Sept. 18, 2019); *Marshall v. Northrop Grumman Corp.*, No. 16-6794, 2019 WL 4058583, at *10 (C.D. Cal. Aug. 14, 2019); *White v. Chevron Corp.*, No. 16-0793, 2016 WL 4502808, at *14 (N.D. Cal. Aug. 29, 2016))). Plaintiffs do not dispute this, but correctly argue it is a factor that supports a finding of imprudent conduct. (Opp. Br. at 16–17 (citing *Sweda*, 923 F.3d at 330; *George v. Kraft Foods Glob., Inc.*, 641 F.3d 786, 798–99 (7th Cir. 2011))). And courts have found that a defendant's "fail[ure] to conduct a competitive bidding process" is a relevant factor. *Nicolas v. Trs. of Princeton Univ.*, No. 17-3695, 2017 WL 4455897, at *4 (D.N.J. Sept. 25, 2017); *see also Sweda*, 923 F.3d at 330; *Kraft Foods Glob.*, 641 F.3d at 798–99. Notably,

---

[3]     The Court does not, as a matter of law, decide how "tightly" one must "define 'similarly situated,'" as counsel for Plaintiffs put it at oral argument. (Oral Arg. Tr. at 28:4–6). Accepting Plaintiffs' factual allegations as true and drawing all reasonable and plausible inferences in their favor, the Court is satisfied they state a plausible claim under Count I, regardless of how one defines the term "similarly situated."

Defendants conceded at oral argument that whether a fiduciary puts a service out for competitive bidding is "a consideration."  (Oral. Arg. Tr. at 71:18).

Finally, Defendants argue that "Plaintiffs' Complaint implicitly recognizes that there was competitive bidding" in 2018 and prior to 2014.  (Mov. Br. at 16).  But for the Court to accept this "implicit" concession, it would have to review the Complaint most favorably to Defendants, not Plaintiffs.  Moreover, Plaintiffs appear to allege that a *true* competitive bidding process could not have produced Voya's recordkeeping fee.  (Opp. Br. at 17).

Accordingly, the Court declines to dismiss Count I, which claims breach of the duty of prudence related to excess recordkeeping fees.

### b.     *Poorly Performing Investment Options & Excessive Management Fees*

In Count V, Plaintiffs claim that Defendants breached their duty of prudence by failing to prudently monitor the Plan's investment options and remove imprudent options within a reasonable period.  (Compl. ¶¶ 297–304).  Plaintiffs allege that this failure resulted in the Plan continuing to offer excessively expensive funds with inferior historical performance compared to superior lower-cost, available alternatives.  (*Id.* ¶ 302).  Moreover, Plaintiffs allege that three of the five high-cost and underperforming investment options that Defendants allegedly did not remove are options provided by Voya.  (*Id.* ¶¶ 128–47 & 165–81).  In Count VI, Plaintiffs allege that these failures resulted in participants paying excessive concomitant fees.  (*Id.* ¶¶ 305–12).

With respect to investment options, "ERISA plans should offer meaningful choices to their participants."  *Sweda*, 923 F.3d at 329.  "[T]he range of investment options and the characteristics of those included options—including the risk profiles, investment strategies, and associated fees— are highly relevant and readily ascertainable facts against which the plausibility of claims challenging the overall composition of a plan's mix and range of investment options should be

measured." *Id.* at 330 (quoting *Renfro*, 671 F.3d at 327).  Thus, "a fiduciary breach claim must be examined against the backdrop of the mix and range of available investment options."  *Id.* However, a meaningful mix and range of investment options does not necessarily "insulate[] plan fiduciaries from liability for breach of fiduciary duty."  *Id.*  "Such a standard would allow a fiduciary to avoid liability by stocking a plan with hundreds of options, even if the majority were overpriced or underperforming."  *Id.*  Instead, a fiduciary has "a continuing duty to monitor investments and remove imprudent ones."  *Tibble*, 575 U.S. at 529–30.  As the Supreme Court recently reaffirmed, "[i]f the fiduciaries fail to remove an imprudent investment from the plan within a reasonable time, they breach their duty."  *Hughes v. Nw. Univ.*, 142 S. Ct. 737, 742 (2022) (citing *Tibble*, 575 U.S. at 529–30).

Assessed against these standards, Plaintiffs plausibly plead a claim for breach of fiduciary duty.  Plaintiffs allege, and the Court accepts as true, that Defendants caused the Plan to offer several poor performing investment options over an unreasonable period of time without considering readily available and better performing alternatives.  (Compl. ¶ 301).  In particular, Plaintiff cite five investment options, each of which were actively managed funds,[4] that underperformed without removal for an extended period.  (*Id.* ¶¶ 128–81 & 297–304).  For example:

1. The Voya Large Cap Value Portfolio underperformed over the course of six years compared to (i) its benchmark (Russell 1000 Value) by up to 3.45%; and (ii) a lower-cost alternative (Vanguard Value Index) by up to 3.61%.  (*Id.* ¶ 134).

---

[4]	Investment options can be passively or actively managed.  (Compl. ¶ 117).  A passively managed investment is safer because "the investment manager attempts to match the performance of a given benchmark index by holding a representative sample of securities in that index, such as the S&P 500."  (*Id.*).  Meanwhile, an actively managed investment is riskier because "the investment manager uses their judgment in buying and selling individual securities (*e.g.*, stocks, bonds, etc.) in an attempt to generate investment returns that surpass a benchmark index, net of fees." (*Id.*).  Passively managed investments charge lower fees, which are charged as a percentage of assets under management, because "trading is limited" and because "no stock selection or research is necessary for the manager to track the index.  (*Id.*).

2.  The Voya Large Cap Growth Portfolio consistently underperformed compared to its benchmark (Russell 1000 Growth) "over year-to-date, one-, three-, five-, and ten-year reporting periods."  (*Id.* ¶ 143).

3.  The Federated Clover Small Cap Value Fund underperformed (i) its benchmark (Russell 2000 Value); and (ii) a lower-cost alternative (Vanguard Small Cap Value Index) over a one-year period by 4.73%, a five-year period by 2.37%, and a ten-year period by 0.62%. (*Id.* ¶¶ 149–53).

4.  The American Funds Washington Mutual Investors Fund underperformed (i) its benchmark (S&P 500 Index) over a ten-year period by 0.50% and a five-year period by 1.39%; and (ii) a lower-cost alternative (Vanguard Institutional Index) over a five- and ten-year period.  (*Id.* ¶¶ 159–60).

5.  The Voya Target Solution Collective Trusts (i) underperformed their benchmark (S&P Target Data Index) prior to being added to the Plan for the trailing three-year reporting period (*id.* ¶ 172), after being included in the Plan for over two years for the trailing five-year reporting period (*id.* ¶ 173), and as of December 31, 2019, for the trailing five-year period (*id.* ¶ 179); and (ii) underperformed lower-cost alternatives, like the Vanguard Target Retirement target data mutual funds, from 2013 through 2019 (*id.* ¶ 178).

Plaintiffs further allege that Defendants needed to be especially vigilant in monitoring the above actively managed investment options because such options rarely outperform passively managed investment options.  (*Id.* ¶ 124).  Finally, Plaintiffs specifically outline how the fees for these poor-performing investment options (and others) were higher than the fees associated with other better-performing options.  (*Id.* ¶¶ 182–87).

Taken together, Plaintiffs' allegations in Counts V and VI are sufficient to proceed beyond the motion-to-dismiss stage.  Plaintiffs' allegations are strikingly similar to those offered by the plaintiff in *Sweda*, which the Third Circuit found sufficient to plead a claim of fiduciary breach:

> In Count V, Sweda alleged that Penn breached its fiduciary duties by: paying unreasonable investment fees, including and retaining high-cost investment options with historically poor performance compared to available alternatives, and retaining multiple options in the same asset class and investment style.  Specifically, Sweda alleged that despite the availability of low-cost institutional class shares, Penn selected and retained identically managed but higher cost retail class shares.  She included a table comparing options in the Plan with the readily available cheaper alternatives.  Sweda also

15

> alleged that some options in the line-up had layers of unnecessary fees.

923 F.3d at 331 (footnote omitted).  As here, the plaintiff in *Sweda* alleged that the plan fiduciary included high-cost investment options that historically performed poorly as compared to available alternatives.  *Id.*  The plaintiff in *Sweda* offered, as Plaintiffs do here in their pleading, "specific comparisons between returns on Plan investment options and readily available alternatives."  *Id.* at 332.

Defendants' arguments in response are not persuasive because they primarily contradict Plaintiffs' pleading or go to the merits of this case.  (Mov. Br. at 18–23).  For example, Defendants argue that the Plan's actively managed funds are not comparable to other passively managed funds.  (*Id.* at 22).  True, courts have held that actively managed and passively managed funds are not comparable, even at the motion-to-dismiss stage.  *See Davis v. Washington Univ. in St. Louis*, 960 F.3d 478, 485 (8th Cir. 2020).  But Plaintiffs also allege that those five listed actively managed investment options underperformed their benchmarks.  Moreover, Plaintiffs argue that the performance of a passively managed fund is still relevant, even if not as a comparator fund, because fiduciaries must be especially vigilant in monitoring actively managed funds given that they rarely outperform passively managed funds.  (Opp. Br. at 25; Compl. ¶¶ 120–24).  The merits of these competing factual narratives cannot be decided on this procedural posture.  So too with Defendants' argument that underperformance was "modest" and short in duration.  (Mov. Br. at 21).  Whether underperformance is modest and short in duration raise factual questions that should be tested through discovery, not summarily decided at the motion-to-dismiss stage.  *See Sweda*, 923 F.3d at 333 ("As to Penn's second argument, that it did in fact employ a prudent process, this argument goes to the merits and is misplaced at this early stage.").

Accordingly, the Court declines to dismiss Counts V and VI, which claim breach of the duty of prudence related to investment options and concomitant fees.

### c.      *Unreasonable Managed Account Services Fees.*

In Count VII, Plaintiffs allege that Defendants caused the Plan to pay Voya Retirement, a subsidiary of Voya, unreasonably high fees for managed account services.  (Compl. ¶¶ 313–20).  "Managed accounts are investment services under which providers make investment decisions for participants to allocate their retirement savings among a mix of assets classes, commonly referred to as asset allocation."  (*Id.* ¶ 188).  In particular, Plaintiffs allege that Defendants failed to engage in a reasoned decision-making process that compared Voya Retirement's services and fees to other providers, failed to monitor the amount of revenue received by Voya Retirement, and failed to solicit bids from competing providers.  (*Id.* ¶ 316).

Allegations of unreasonable managed account fees may support a claim for breach of fiduciary duties under certain circumstances.  *See Turner v. Schneider Elec. Holdings, Inc.*, No. 20-11006, 2021 WL 1178308, at *6 (D. Mass. Mar. 26, 2021); *Ramos v. Banner Health*, 461 F. Supp. 3d 1067, 1132 (D. Colo. 2020).  For example, in *Turner*, the district court denied a motion to dismiss based on unreasonably high managed account fees because the plaintiff "proffer[ed] specific comparisons to cheaper services 'at least equal to the quality of [the disputed] services.'" 2021 WL 1178308, at *6.  "A high fee alone does not mandate a conclusion that recordkeeping fees are excessive; rather, fees must be evaluated 'relative to the services rendered.'"  *Ramos*, 461 F. Supp. 3d at 1132 (quoting *Young v. General Motors Inv. Mgmt. Corp.*, 325 F. App'x 31, 33 (2d Cir. 2009)).

Plaintiffs sufficiently allege breach of prudence based on the unreasonably high fees for managed account services.  In their Complaint, Plaintiffs list various competitors that provided the

same services as Voya Retirement but at a lower cost: Russell Investments Capital, LLC, Morningstar Retirement Manager, ProManage, LLC, and GuidedChoice.   (Compl. ¶ 220). Plaintiffs allege that Voya Retirement "charged Plan participants as much as 2,000% of other managed account providers that provide similar services," and that Defendants failed to utilize lower-fee competitors and ensure the Plan was well-monitored.  (*Id.*).  Plaintiffs also allege that the fees the Plan paid to Voya Retirement "rose dramatically" (*id.* ¶ 223) during a time that "managed account fees fell" in the market (*id.* ¶ 211).   Further, Plaintiffs allege that "unlike investment advisors who choose from the wide array of investments available in the market, Voya Retirement[] limits its investment recommendations to the investment alternatives available in the Plan, a far smaller number, and many of which are its own proprietary funds." (*Id.* ¶ 218).  Finally, Plaintiffs allege that Defendants "never . . . put the managed account services out to bid."  (*Id.* ¶ 224).  Taken together—the high fees paid by the Plan in comparison to fees offered by competitors, the increase in fees while the relevant market price fell, and Defendants' failure to pursue other options through competitive bidding—Plaintiffs plead a plausible claim for fiduciary breach in Count VII.

Defendants' arguments to the contrary are not persuasive.  Defendants assign significance to the fact that Voya Retirement's managed account service is optional. (Mov. Br. 16–18).  Thus, because participants of the Plan can personalize their investment strategy, nothing precludes participants from instead using an outside financial advisor or requires them to use the optional service provided by Voya Retirement.  (*Id.*).  Accordingly, Defendants claim that the optional nature of the managed account services precludes Plaintiffs' claim as a matter of law because "[p]lan participants need not choose to use the managed account services, and thus need not pay for them."  (*Id.* at 18).  However, as the Supreme Court recently explained in *Hughes*, it is not

appropriate to exclusively "rely[] on the participants' ultimate choice over their investments to excuse allegedly imprudent decisions by [a fiduciary]."   142 S. Ct. at 742.   While *Hughes* concerned investment options, and while Count VII involves an account service, the Court perceives no reason why the same principle does not apply in both contexts.   Fiduciary breach claims are necessarily fact intensive.   A court must look at the totality of the allegations in the complaint—a court may not "parse[]" it "piece by piece to determine whether each allegation, in isolation, is plausible."   *Sweda*, 923 F.3d at 331 (quoting *Braden*, 588 F.3d at 594).

Defendants also repeat their previous argument that the failure to solicit competitive bids on a regular basis does not alone mean they violated their fiduciary duty.   (Mov. Br. at 17). However, as explained above, and as conceded by Defendants' counsel at oral argument, Defendants' failure to conduct competitive bidding is an appropriate consideration in assessing fiduciary breach.   *See Sweda*, 923 F.3d at 330; *Kraft Foods Glob.*, 641 F.3d at 798–99; *Nicolas*, 2017 WL 4455897, at *4.   And, importantly, their failure to conduct competitive bidding is not the only reason Plaintiffs plausibly plead a claim of fiduciary breach.   Instead, it is that failure *plus* Defendants' failure to leverage the Plan's size in negotiations, *and* the availability of less expensive similar services, *and* the increase in fees while fees from other providers in the market dropped.

Therefore, the Court declines to dismiss Count VII, which claims breach of the duty of prudence related to fees for managed account services.

### ii.     Breach of Loyalty

In Counts I, V, VI, and VII, Plaintiffs allege that Defendants breached their duty of loyalty by engaging in the imprudent conduct described above but for the purpose of benefiting themselves

and Voya.  In other words, Plaintiffs allege that Defendants were not acting for the exclusive purpose to benefit participants and beneficiaries of the Plan.

As discussed above, ERISA imposes a duty of loyalty.  Specifically, a fiduciary must "discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries . . . for the exclusive purpose of . . . providing benefits to participants and their beneficiaries" and "defraying reasonable expenses of administering the plan."  § 1104(a)(1)(A)(i), (ii).  In other words, the fiduciary must act with "'an eye single' toward beneficiaries' interests."  *Pegram v. Herdrich*, 530 U.S. 211, 235 (2000) (quoting *Donovan v. Bierwirth*, 680 F.2d 263, 271 (2d Cir. 1982)).

There is some split in authority over whether a plausible prudence claim can be pled alongside a parallel loyalty claim—in other words, whether the loyalty claim should be dismissed as duplicative.  *McGowan v. Barnabas Health, Inc.*, No. 20-13119, 2021 WL 1399870, at *7 n.7 (D.N.J. Apr. 13, 2021) (collecting split).  Under the more restrictive approach, "a plaintiff may not simply 'recast' a claim of imprudence as an independent claim of disloyalty without additional facts suggesting an improper motive or financial benefit."  *Silva v. Evonik Corp.*, No. 20-2202, 2020 WL 12574912, at *8 (D.N.J. Dec. 30, 2020).  Accordingly, "[t]o state a claim for breach of the duty of loyalty," a plaintiff must additionally allege, with supporting facts, that the fiduciary "made decisions for the purpose of benefitting itself or a third party."  *Id.*  As Judge McNulty has explained, "[i]t might be theorized that a breach of the duty of loyalty imputes an untoward motive, whereas a breach of the duty of prudence could be either intentional or negligent."  *McGowan*, 2021 WL 1399870, at *7 n.7.

Defendants argue that Plaintiffs repackage their breach of prudence claims as breach of loyalty claims and fail to sufficiently allege that the Defendants had the intent to benefit themselves

or someone else.  (Mov. Br. at 27–31).  The Court, however, disagrees: Plaintiffs plausibly allege, with supporting facts, that Defendants made decisions on behalf of the Plan with the intent to benefit themselves or Voya.

As noted above, Plaintiffs plausibly allege *four* breaches of the duty of prudence—two of which center around, and the other two of which concern, unjustified business opportunities and benefits that Defendants gave Voya to the detriment of participants and beneficiaries of the Plan. The sheer consistency at which Defendants allegedly benefited Voya to the detriment of participants and beneficiaries suggests that Defendants acted with a duty towards advancing their own and Voya's interests.  In addition, as pointed out at oral argument, after viewing the allegations most favorably to Plaintiffs, the timing of some benefits conferred upon Voya is suspect.  (Oral Arg. Tr. at 33:22–25 & 39:15–40:5).  Voya's investment products were added to the Plan only after Voya became recordkeeper, and some of those products were already poor performers.  (Compl. ¶¶ 128, 140 & 167).  What is more, Plaintiffs allege, and the Court accepts as true, that Defendants had an incentive to steer business in Voya's direction to receive other business opportunities from Voya:

> [T]he ADP Defendants stood to gain financially and were incentivized to retain Voya despite th[e] fact that its high-cost structure was imprudent and contrary to the interests of Plan participants for multiple reasons.  For example, unlike some competing low-cost, open architecture defined contribution recordkeeping providers, Voya and its affiliates use information obtained in Voya's role as recordkeeper to market and sell numerous other products and services to the small-business clientele including accident, critical illness/specified disease, hospital confinement indemnity, group life and disability income insurance products, and health savings and spending accounts.  *This existing client base provides lucrative marketing opportunities for ADP to extend its TotalSource client base.  Indeed, in a press release, Voya touted a partnership with ADP to provide "integrated employee benefits solutions" via a "one-stop-shop" solution—effectively sharing Voya and ADP's client base.*

(Compl. ¶ 81 (emphasis added)).  As clarified by counsel at oral argument, a plausible inference can be drawn that Defendants retained Voya's services and provided Voya with plan participant data in exchange for Voya to market and sell Defendants' business.  (Oral Arg. Tr. at 42:5–15).  Said another way, "they're cross-selling," counsel explained, "they're each using their books of business to cross-sell business to each other."  (*Id.* at 42:13–14).

These facts—the exorbitant fees paid to Voya, the sheer consistency at which Defendants benefited Voya, and the mutually beneficial business relationship between Defendants and Voya—are sufficient to allow the Court to draw the plausible inference that Defendants intended to benefit Voya.  *See Ahrendsen v. Prudent Fiduciary Servs., LLC*, No. 21-2157, 2022 WL 294394, at *6 (E.D. Pa. Feb. 1, 2022) (holding that plaintiffs' allegations "that the Trustee did not perform due diligence in conducting this transaction" and "was incentivized to act in favor of the Wells defendants by the possibility of business from other companies who understand the Trustee to apply less than due diligence" could "plausibly be interpreted as including an intent on the part of the Trustee to benefit the Wells defendants"); *cf. Cho v. Prudential Ins. Co. of Am.*, No. 19-19886, 2021 WL 4438186, at *12–13 (D.N.J. Sept. 27, 2021) ("By way of example, allegations that a plan fiduciary was obscuring the relationship between itself and a party in interest that was receiving benefits from the fiduciary could be sufficient to establish the requisite intent.").

Therefore, the Court declines to dismiss Plaintiffs' claims for breach of the duty of loyalty in Counts I, V, VI, and VII.

## B.    Prohibited Transactions (Counts II, III, IV, and VIII)

In Counts II, III, IV, and VIII, Plaintiffs bring prohibited transaction claims under 29 U.S.C. § 1106.  Section 1106(a) and (b) prohibit fiduciaries from causing an ERISA plan to engage in certain transactions.  Section 1106(a) is concerned with transactions between an ERISA plan

and a party in interest, which 29 U.S.C. § 1002(14) defines to include any fiduciary or person providing services to the plan.  Section 1106(b) is concerned with transactions between an ERISA plan and its fiduciary.  Plaintiffs asserts claims under both subsections.

The elements of a "party-in-interest" claim under § 1106(a) are as follows: (i) a fiduciary causes (ii) a listed transaction to occur (iii) between a plan and a party in interest (iv) for the subjective intent to benefit the party in interest.  *See Sweda*, 923 F.3d at 335–38; *Reich v. Compton*, 57 F.3d 270, 278 (3d Cir. 1995) (Alito, J.).  With respect to the second element of the claim, relevant here, § 1106(a) lists the following transactions as prohibited: "(A) sale or exchange, or leasing, of any property between the plan and a party in interest; . . . (C) furnishing of goods, services, or facilities between the plan and a party in interest; (D) transfer to, or use by or for the benefit of a party in interest, of any assets of the plan."  § 1106(a)(1)(A), (C), and (D).

In contrast to § 1106(a), which requires a subjective intent to benefit, § 1106(b) erects a *per se* bar on transactions between an ERISA plan and its fiduciary.  *See Sweda*, 923 F.3d at 336. This prohibition applies "regardless of whether the transaction is 'fair' to the plan."  *Reich*, 57 F.3d at 288 (Alito, J.).  The purpose of § 1106(b) is to "prevent[] a fiduciary from being put in a position where he has dual loyalties and, therefore, he cannot act exclusively for the benefit of a plan's participants and beneficiaries."  *Id.* at 287 (quoting H.R. Rep. No. 93-1280, 93rd Cong., 2d Sess. (1974), *reprinted in* 1974 U.S.C.C.A.N. 5038, 5089).  Thus, under § 1106(b), a fiduciary may never

> (1) deal with the assets of the plan in his own interest or for his own account,
>
> (2) in his individual or in any other capacity act in any transaction involving the plan on behalf of a party (or represent a party) whose interests are adverse to the interests of the plan or the interests of its participants or beneficiaries, or

(3) receive any consideration for his own personal account from any party dealing with such plan in connection with a transaction involving the assets of the plan.

§ 1106(b).

### i. Recordkeeping Fees to Voya

In Count II, Plaintiffs bring a § 1106(a), party-in-interest claim for Defendants' causing the Plan to pay Voya—a party in interest—unreasonable fees for recordkeeping services.  (Compl. ¶ 277).

Defendants first argue that Plaintiffs do not plausibly allege ADP intended to benefit Voya. (Mov. Br. at 33).  But for the same reasons stated with respect to Plaintiffs' loyalty claims, the Court disagrees.  Plaintiffs allege, and the Court accepts as true, that Defendants paid Voya millions of dollars each year for recordkeeping services despite the "dramatic decreases in recordkeeping fees across the market and dramatic growth in assets in the Plan."  (Compl. ¶ 74). In 2015, the Plan paid Voya at least $6.8 million in recordkeeping fees, which is about $91.36 per participant; the following year, the Plan paid Voya $10,460,592 in recordkeeping fees for the same services, translating to an average of $117 per participant.  (*Id.* ¶ 75).  Plaintiffs also allege, and the Court cannot ignore, a consistency at which Defendants allegedly benefited Voya.  Plaintiffs also allege Defendants stood to gain financially through its partnership with Voya, as explained above, by the exorbitant increase in fees.  (*Id.* ¶ 81).

Defendants next argue that ERISA contains "an exemption . . . for necessary services rendered to the Plan," and that Plaintiffs fail to plausibly allege that the payments made to Voya for recordkeeping services were for anything other than for necessary services.  (Mov. Br. at 33; *see also* Reply Br. at 11 (citing *Sweda*, 923 F.3d at 339)).  In this particular section of their brief, Defendants do not explicitly cite the exemption they rely on.  (Mov. Br. at 33).  Defendants appear to rely on § 1108, which contains various exemptions to claims under § 1106(a).  In particular,

§ 1108(b)(2)(A) provides that "[t]he prohibitions provided in section 1106" do not apply to "[c]ontracting or making reasonable arrangements with a party in interest for office space, or legal, accounting, or other services necessary for the establishment or operation of the plan, if no more than reasonable compensation is paid therefor."

Plaintiffs do not dispute that the affirmative defenses in § 1108, and hence the particular defense contained in § 1108(b)(2)(A), apply to claims brought under § 1106(a).  (Opp. Br. at 19). And under Third Circuit precedent and the clear text of § 1106(a), which explicitly carves out transactions described in § 1108, those affirmative defenses clearly apply to § 1106(a).  *See Sweda*, 923 F.3d at 336.  The parties instead dispute whether a plaintiff asserting a § 1106(a) claim must affirmatively plead, with supporting facts, that the § 1108 defenses do not apply.  (*See* Mov. Br. at 33–35; Opp. Br. at 19; Reply Br. at 11–13).[5]

While affirmative defenses are "generally not part of a court's consideration of a motion to dismiss under Rule 12(b)(6)," *Sweda*, 923 F.3d at 331 n.6, the Third Circuit in *Sweda* held that Congress intended to deviate from that general rule and place the burden on the plaintiff to plead around the § 1108 defenses to support a § 1106(a) claim, *id.* at 336.  In particular, the Third Circuit explicitly disagreed with the Seventh Circuit's approach, *id.*, which does not require a "plaintiff . . . to negate any or all of the[]" § 1108 defenses, *Allen v. GreatBanc Tr. Co.*, 835 F.3d 670, 676 (7th Cir. 2016).  The Third Circuit in *Sweda* explained that "it is improbable that § 1106(a)(1), which was designed to prevent 'transactions deemed likely to injure the . . . plan' and 'self-dealing,' would prohibit ubiquitous service transactions and require a fiduciary to plead

---

[5]       It is not clear whether Plaintiffs dispute that they must plead around § 1108 in any manner, or whether they dispute the extent to which they must do so.  In their opposition brief, they could be understood as arguing the latter, where they contend that "[b]ecause this arrangement was not an ordinary recordkeeping arrangement, Plaintiffs were not required to plead how no exemption among the many exemptions in 29 U.S.C. §1108 applied."  (Opp. Br. at 19 (citing *Sweda*, 923 F.3d at 336)).  However, as discussed above, *Sweda* does not limit their burden to merely pleading that an arrangement is not "ordinary."

reasonableness as an affirmative defense under § 1108 to avoid suit."  923 F.3d at 336 (quoting *Nat'l Sec. Sys., Inc. v. Iola*, 700 F.3d 65, 92 (3d Cir. 2012)).  "Interpreting § 1106(a)(1) to prohibit necessary services," the Third Circuit concluded, "would be absurd."  *Id.* at 337; *see also Ahrendsen*, 2022 WL 294394, at *4 (explaining that a plaintiff bringing a claim under § 1106(a) must plead around the § 1108(e) defense).  Plaintiffs must therefore plead around § 1108's defenses to assert a plausible § 1106(a) claim.

However, Plaintiffs satisfy that burden.  Pursuant to § 1108(b)(2)(A), § 1106(a) does not prohibit transactions for necessary services such as recordkeeping services so long as the transaction involves "reasonable arrangements . . . if no more than reasonable compensation is paid therefor."  § 1108(b)(2)(A).  As recounted above, Plaintiffs plausibly allege that Voya received unreasonable compensation for recordkeeping services.  The Plan allegedly paid Voya exorbitant fees, even though it could have paid lower fees in light of fee arrangements for similarly situated plans, and the Plan's fees increased over the years, even though fees in the market generally dropped.  Plaintiffs further allege that Defendants failed to use competitive bidding for recordkeeping services—a process during which Defendants could have leveraged the Plan's size to obtain a low fee.  Finally, in light of Defendants and Voya's alleged business relationship, and sheer consistency at which Defendants allegedly benefited Voya to the detriment of participants and beneficiaries of the Plan, Plaintiffs plausibly impugn Defendants' motive for retaining Voya as the recordkeeper.  Thus, Defendants plausibly plead around § 1108(b)(2)(A).

Accordingly, the Court will not dismiss Count II, which asserts a party-in-interest claim related to Voya's recordkeeping fees.

### ii.    Transactions with TotalSource

In Counts III and IV, Plaintiffs bring prohibited transactions claims for Defendants causing

the Plan to pay Plan assets to TotalSource.  (Compl. ¶¶ 281–96).  In particular, Defendants allegedly caused the Plan to pay unnecessary administrative fees to TotalSource that were, according to Plaintiffs, "wholly unconnected to any services that ADP TotalSource provides to the Plan" (*id.* ¶ 105), and "wholly duplicative of other fees that" participating employers already pay to ADP (*id.* ¶ 113).  According to Plaintiffs in Count III, these transactions violate § 1106(b), because TotalSource is an entity whose interests were represented by Defendants.  And as Plaintiffs describe in Count IV, these transactions violate § 1106(a), because TotalSource is a party in interest as a fiduciary.

Defendants argue that Counts III and IV should be dismissed pursuant to § 1108(c)(2)'s affirmative defense.  (Mov. Br. at 34).  Section 1108(c)(2) provides that "nothing in section 1106 of this title shall be construed to prohibit any fiduciary from . . . receiving any reasonable compensation for services rendered, or for the reimbursement of expenses properly and actually incurred, in the performance of his duties with the plan."  However, the Court disagrees that § 1108(c)(2) compels dismissal, though for different reasons with respect to Counts III and IV.

With respect to Count III, § 1108(c)(2) provides no defense to § 1106(b).  Section 1106(b) erects a *per se* bar on certain transactions between a fiduciary and an ERISA plan.  *See Sweda*, 923 F.3d at 336.  Thus, while the text of § 1108(c)(2) appears to apply to all § 1106 claims, the Third Circuit has held that it does not apply to § 1106(b) claims.  *See Nat'l Sec. Sys.*, 700 F.3d at 96 ("[W]e hold that [§ 1108(c)(2)] affords [the defendant] no defense to liability for knowingly participating in [a] § [1106(b)(3)] violation."); *see also Sweda*, 923 F.3d at 336 ("In *National Security Systems*, we held that a transaction between a plan and fiduciary that is tainted by self-dealing is a *per se* violation of § 1106(b)(3) 'regardless of the reasonableness of compensation.' 700 F.3d at 93.").

27

Defendants argue that the facts in *Iola* are distinguishable.  (Reply at 12).  But *Iola* concerned not just the facts of the case, but more broadly the interplay between §§ 1106(b) and 1108.  *See* 700 F.3d at 96.  And *Iola*'s holding—that "[§ 1108(c)(2)] affords [the defendant] no defense to liability for knowingly participating in [a] § [1106(b)(3)] violation"—was unequivocal. *Id.*  Accordingly, the Court will not dismiss Count III based on § 1108.

Nor will the Court dismiss Count IV, which is brought under § 1106(a).  Plaintiffs plausibly plead that the transaction described in Count IV was not a transaction in which a fiduciary received "*reasonable* compensation for services rendered, or for the reimbursement of expenses *properly and actually incurred*, in the performance of his duties with the plan."  § 1108(c)(2); *see also Ahrendsen*, 2022 WL 294394, at *5 ("Although plaintiffs do not make specific reference to § 1108(e) in their amended complaint, they clearly allege that there was inadequate consideration for this transaction.").   Plaintiffs allege the payments to TotalSource were "putative reimbursement[s] of administrative costs" (Compl. ¶ 107),[6] but were duplicative of other fees and wholly unrelated to services rendered to the Plan (*id.* ¶¶ 107 & 113).  Not only do Plaintiffs allege a something-for-nothing transaction, but they plead a dramatic increase in payments to TotalSource from 2014 to 2018 for no apparent reason.  (*Id.* ¶ 107).  Moreover, as Plaintiffs articulated at oral argument, "[p]aying the subsidiary out of plan assets rises to a completely different level."  (Oral Arg. Tr. at 61:7–8).

The parties may dispute the appropriateness, legitimacy, or reasonableness of fees paid to TotalSource.  They may also dispute whether the fees were for services actually incurred.  But

---

[6]      Defendants contend that the Plaintiffs admit that the transactions described in Count IV were merely reimbursements because they are so named in the Complaint.  However, Plaintiffs refer to these transactions as "putative reimbursements."  (Compl. ¶ 107).  Such a statement is hardly an admission.  Rather, it only acknowledges that Defendants themselves identify the transactions as reimbursements.

those disputes are better suited for summary judgment or at trial, not at the motion-to-dismiss stage.

Accordingly, the Court declines to dismiss Counts III and IV, which claim self-dealing and party-in-interest claims related to Defendants causing the Plan to pay TotalSource putative reimbursements of administrative costs.

### iii.   Investment Services and Fees to Voya

In Count VIII, Plaintiffs claim that Defendants violated § 1106(a) by causing the Plan to pay investment fees to Voya for the three underperforming Voya proprietary investment products offered in the Plan.  As recounted above, § 1106(a) prohibits a fiduciary from causing a plan to engage in a transaction that constitutes a direct or indirect "(A) sale or exchange, or leasing, of any property between the plan and a party in interest; . . . (C) furnishing of goods, services, or facilities between the plan and a party in interest; (D) transfer to, or use by or for the benefit of a party in interest, of any assets of the plan."  § 1106(a)(1)(A), (C), and (D).

Defendants argue that ERISA contains a "statutory mutual fund exemption which provides that mutual funds are *not* [plan assets or property]."  (Mov. Br. at 36).[7]  Importantly, as alleged in the Complaint, the disputed fees were a percentage of assets under management; in other words, they were deducted from the "fund's assets," not the Plan's assets.  (Compl. ¶ 118).  In *Sweda*, the Third Circuit held that investment fees paid by revenue sharing from mutual funds do not constitute plan assets or property of a plan and therefore fall outside the scope of § 1106(a)(1)(A) and (D).

---

[7]    Defendants literally say "mutual funds are *not* **parties in interest** with respect to the Plan."  (Mov. Br. at 36 (additional emphasis added)).  But the "parties in interest" reference appears to be in error because the relevant exemption does not exempt mutual funds from the definition of party in interest.  *See Sweda*, 923 F.3d at 339 (describing the exemption as follows: "[m]utual fund assets are distinct from Plan assets, because, under the statute, assets of 'a plan which invests in any security issued by an investment company' do not 'include any assets of such investment company.'"  (quoting § 1101(b)(1))).

923 F.3d at 339.   At oral argument, Plaintiffs withdrew Count VIII as brought under §
1106(a)(1)(A) and (D) in light of *Sweda*.  (Oral Arg. Tr. at 76:11–17; 82:7–10).

Plaintiffs did not, however, withdraw their claim under § 1106(a)(1)(C).   Section
1106(a)(1)(C) is not limited to plan assets or property but instead applies to the furnishing of goods,
services, or facilities between a plan and a party in interest.   The above exemption therefore does
not preclude that claim.   *See Sweda*, 923 F.3d at 339–40 (separately analyzing § 1106(a)(1)(C)
claim).   Moreover, at oral argument, counsel for Plaintiffs explained why the disputed transaction
falls within the scope of § 1106(a)(1)(C): "[Voya is] providing services. . . . [It is] coming in to
provide investments."  (Oral Arg. Tr. at 77:12–13).   Defendants do not dispute this.

Instead, Defendants appear to argue, albeit indirectly, that Count VIII should be dismissed
because Plaintiffs fail to plausibly plead an intent to benefit.  (Mov. Br. at 31–32).   The Court
disagrees.   As with their claims for breach of the duty of loyalty, Plaintiffs point to the business
partnership between Defendants and Voya, the timing of adding Voya's investment products to
the Plan, the unreasonable fees paid to Voya, and the consistency at which Defendants benefited
Voya.

Accordingly, the Court declines to dismiss Count VIII insofar as it asserts a theory related
to § 1106(a)(1)(C).   However, insofar as Count VIII asserts a theory under § 1106(a)(1)(A) and
(D), those theories are dismissed in light of *Sweda* and Plaintiffs' concessions at oral argument.

### C.   Plan Participant Data (Counts IX & X)

In Count IX, Plaintiffs allege that Defendants breached their duties of loyalty and prudence
by disclosing plan participant data to Voya, which used, through VFA, the data to sell non-plan,
retail, and expensive investment products to Plan participants.  (Compl. ¶¶ 328–35).  By doing so,
Plaintiffs allege, Defendants failed to act in the exclusive interest of Plan participants.  (*Id.* ¶ 332).

Similarly, in Count X, Plaintiffs claim the Defendants' transfer of plan participant data to Voya constituted a party-in-interest transaction prohibited under § 1106(a)(1)(D).  (*Id.* ¶¶ 336–44). Defendants' challenge Plaintiffs' Article III standing and the sufficiency of their allegations.  The Court will assess both challenges in turn.

### i.      Standing

Article III standing is derived from the "case or controversy" requirement of Article III. *Pub. Interest Research Grp. of New Jersey, Inc. v. Magnesium Elektron, Inc.*, 123 F.3d 111, 117 (3d Cir. 1997).  Because "[t]here is no ERISA exception to Article III," an ERISA plaintiff must, as any other plaintiff, satisfy the ordinary requirements of Article III standing.  *Thole v. U. S. Bank N.A*, 140 S. Ct. 1615, 1622 (2020).  Those requirements are three in number.  *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016) (citing *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992)). First, the plaintiff must suffer an injury in fact; second, the injury must be fairly traceable to the challenged conduct of the defendant; and third, the injury must be likely to be redressed by a favorable judicial decision.  *Id.*  The first element—injury in fact—is the "'foremost' of standing's three elements."  *Thorne v. Pep Boys Manny Moe & Jack Inc.*, 980 F.3d 879, 885 (3d Cir. 2020) (quoting *Spokeo*, 578 U.S. at 338).  It requires "the party invoking federal jurisdiction" to "establish three sub-elements: first, the invasion of a legally protected interest; second, that the injury is both 'concrete and particularized'; and third, that the injury is 'actual or imminent, not conjectural or hypothetical.'"  *Id.* (quoting *Spokeo*, 578 U.S. at 339).

Defendants argue that Plaintiffs lack standing for failure to allege injury in fact.  (Mov. Br. at 23–25).  However, insofar as Plaintiffs seek equitable monetary relief and injunctive relief, the Court disagrees.  *See TransUnion LLC v. Ramirez*, 141 S. Ct. 2190, 2208 (2021) ("[S]tanding is

not dispensed in gross; rather, plaintiffs must demonstrate standing for each claim that they press and for each form of relief that they seek (for example, injunctive relief and damages).").

First, Plaintiffs have standing to pursue a claim for disgorgement, a form of equitable monetary relief. As Plaintiffs point out, "[t]hey do not seek to recover as *Plan* losses the monetary harm that each individual participant suffered from the use of their data." (Opp. Br. at 30 (emphasis in original)). "Instead, they seek [disgorgement] from Voya's unjust profits from use of Plan assets or a surcharge against the Plan fiduciaries for the value of the use of this asset (such as a reduction in recordkeeping fees paid to Voya)." (*Id.*).[8] If granted, such relief, Plaintiffs claim, would flow through the Plan to Plaintiffs as participants. While "[c]laims demanding a monetary equitable remedy . . . require the plaintiff to allege an individualized financial harm traceable to the defendant's alleged ERISA violations," *Perelman*, 793 F.3d at 373, the Third Circuit has "clarified that where a plaintiff seeks disgorgement, rather than 'make-whole' relief such as restitution or surcharge, the financial harm need not necessarily take the form of a 'loss'—it may instead consist of the measure of the defendant's unjust profits coupled with the right of the beneficiary, as opposed to the plan, to those profits," *id.* at 373 n.4 (citing *Edmonson v. Lincoln Nat. Life Ins. Co.*, 725 F.3d 406, 418 (3d Cir. 2013)). Plaintiffs articulated this principle in their opposition brief and at oral argument. (Oral Arg. Tr. at 97:1–6). Defendants never responded to it.[9]

---

[8]    In their opposition brief, Plaintiffs say "restitution," not disgorgement. (Opp. Br. at 30). But in light of the nature of the relief they seek, and the cases they rely upon, they appear to mean disgorgement. (*Id.* (citing *Perelman v. Perelman*, 793 F.3d 368, 373 n.4 (3d Cir. 2015))). At oral argument, counsel for Plaintiffs clarified, "you have to disgorge the profits that were gained from the use of that information. That money that gets disgorged to, restituted to the plan is an asset that goes into the plan and then gets allocated among participant accounts, and the Third Circuit has recognized in those circumstances that the plaintiffs do have standing." (Oral Arg. Tr. at 97:1–6).

[9]    Counsel for defendants raised a separate point at oral argument. Counsel argued that Plaintiffs "put[] the cart before the horse"—that there is nothing to disgorge and place back into the Plan because "there's no money coming out of the [P]lan" and "because there's no loss to the [P]lan." (Oral Arg. Tr. at 97:8–12). However, "[f]or standing purposes *only*, a court must "accept as valid the merits of [the plaintiff's] legal claims." *FEC v. Cruz*, 142 S. Ct. 1638, 1647 (2022). Accordingly, for purposes of standing only, the Court must accept the premise that

Second, Plaintiffs may pursue injunctive relief.  Plaintiffs argue, and the Court agrees, that they "do not need to demonstrate actual harm in order to have standing to seek injunctive relief compelling Defendants to satisfy their statutory fiduciary responsibilities."  (Opp. Br. at 31; *see also* Oral Arg. Tr. at 95:13–16).  "With respect to claims for injunctive relief," the Third Circuit has held, "such injury may exist simply by virtue of the defendant's violation of an ERISA statutory duty, such as failure to comply with disclosure requirements."  *Perelman*, 793 F.3d at 373; *accord Krauter v. Siemens Corp.*, 725 F. App'x 102, 111 (3d Cir. 2018).  Accordingly, Plaintiffs may pursue injunctive relief if they plausibly plead a violation of an ERISA duty.  *See Krauter*, 725 F. App'x at 111.  For the reasons expressed in the next section, Plaintiffs fail to do so.

### ii.     Sufficiency of the Claims

As noted, Plaintiffs claim in Count IX that Defendants breached their fiduciary duties by disclosing plan participant data to Voya, which used, through VFA, the data to sell non-Plan, retail, and expensive investment products to Plan participants.  (Compl. ¶¶ 328–35).  Plaintiffs similarly allege in Count X that Defendants' transfer of plan participant data to Voya constituted a party-in-interest transaction prohibited under § 1106(a)(1)(D).  (*Id.* ¶¶ 336–44).

### a.     *Fiduciary Breach*

In opposing Defendants' motion to dismiss, Plaintiffs do not offer a single case supporting their fiduciary breach claim.[10]  One district court observed that there is not "a single case in which

---

plan participant data are plan assets, and that Defendants had a fiduciary duty to make use of the data to benefit the Plan and not simply permit unrestricted use by Voya and VFA.

[10]     Nor, as discussed below, do they cite a single case supporting their prohibited transactions claim.  At oral argument, counsel for Plaintiffs explained the novelty of their claims:

> [I]t is an issue that is developing now.  And the reason why that issue is developing now, is that because of the success of participant litigation reducing recordkeeping fees in plans, providers are looking for other ways to increase their revenues that they used to get before all of this litigation.  And one way they're doing that is by

a court has held that releasing confidential information or allowing someone to use confidential information constitutes a breach of fiduciary duty under ERISA.  This Court will not be the first . . . ."  *Divane v. Nw. Univ.*, No. 16-8157, 2018 WL 2388118, at *12 (N.D. Ill. May 25, 2018), *aff'd*, 953 F.3d 980 (7th Cir. 2020), *vacated and remanded on other grounds in Hughes*, 142 S. Ct. 737.  Nor will this Court be the first, at least not on these pleadings.

As *Divane* explained of an identical claim, "it is in no way imprudent for defendants to allow" a recordkeeper "to have access to each participant's contact information, their choice of investments, their employment status, their age and their proximity to retirement."  *Id.*  If anything, it might be imprudent *not* to disclose that information to Voya as recordkeeper.  The recordkeeper "need[s] that information in order to serve as record keeper."  *Id.*; (Oral Arg. Tr. at 86:23–25 ("This is information that, all agree, Voya, as recordkeeper, necessarily requires this information to record keep the plan.")).

To be sure, Plaintiffs argue that Defendants should have limited Voya's use of plan participant data solely for purposes of its recordkeeping functions.  (Opp. Br. at 33).  But absent from their Complaint are sufficient facts supporting this theory.  First, they do not explain what processes were flawed with respect to permitting Voya, through VFA, to use plan participant data for non-plan purposes.  Second, they do not articulate any harm to the Plan—i.e., diverted investments that would otherwise have increased Plan assets.  Third, while they claim that participants of the Plan paid higher fees when investing through non-Plan investment products—

---

exploiting their access to participant data to generate increased revenues from cross-sales.

So this is a fairly recent phenomena that is being pursued.  And Your Honor is right, I cannot cite you to a case that has concluded that that is -- we find the defendant liable for breach of fiduciary duties on those sorts of claims, but we believe that it derives from the nature of the fiduciary duties that are within the statute . . . .

(Oral Arg. Tr. at 83:15–84:3).

which were marketed to them by use of their data—these allegations are vague, general, and conclusory. (Compl. ¶ 232). They do not allege what Plan participants, *specifically*, paid in fees; instead, they allege, *generally*, that "revenue generated by . . . sales [of non-plan products] is significant." (*Id.*). But they cite nothing particular to the Plan or to Voya. Nor do they allege that these non-Plan products performed so poorly that the fees were unjustified. Fourth, Plaintiffs do not outline the conduct of comparable fiduciaries in like situations (e.g., Fiduciary X of Plan Y limited Recordkeeper Z from using plan participant data for non-recordkeeping purposes). While they allege that fiduciaries of two other plans considered limiting recordkeepers' use of plan participant data, they do not allege that those fiduciaries actually limited the recordkeeper. (*Id.* ¶ 235). And while they attached exhibits to their opposition brief suggesting that fiduciaries of other plans have entered settlement agreements limiting use of plan participant data by the recordkeeper, Plaintiffs may not amend their Complaint in opposition to a motion to dismiss. *See Commonwealth ex rel. Zimmerman v. PepsiCo, Inc.*, 836 F.2d 173, 181 (3d Cir. 1988) ("[I]t is axiomatic that the complaint may not be amended by the briefs in opposition to a motion to dismiss." (alternation in original) (quoting *Car Carriers, Inc. v. Ford Motor Co.*, 745 F.2d 1101, 1107 (7th Cir. 1984))).[11]

Accordingly, Plaintiffs' claim for breach of fiduciary duty in Count IX is dismissed. However, it is dismissed without prejudice. The Court cannot rule out the possibility that Plaintiffs

---

[11] Similarly, in their opposition brief and at oral argument, Plaintiffs raised a theory that Defendants had a duty to leverage plan participant data for the purpose of obtaining lower recordkeeping fees. (Opp. Br. at 32; Oral Arg. Tr. at 92:2–6). However, allegations supporting that theory are absent from their Complaint. Moreover, to the extent Plaintiffs can be understood to vaguely plead such facts, that theory appears to be duplicative of Count I, which claims breach of fiduciary duties based on Defendants causing the Plan to pay excessive recordkeeping fees. (*See* Compl. ¶ 80 (alleging that Defendants should have monitored "all sources of Voya's compensation"); ¶ 83 (offering what would have been a reasonable recordkeeping fee based, in part, "on the Plan's features"); *id.* ¶ 90 (alleging that "[f]ees paid by the Plan are unreasonable [in part] given the bargaining power")). So it is not clear whether such a claim could proceed with Count I.

might plausibly allege that a reasonable fiduciary in Defendants' situation would have conditioned use of plan participant data only for recordkeeping purposes.[12]

### b.    Prohibited Transactions

With respect to their prohibited transactions claim brought under § 1106(a)(1)(D), Plaintiffs must plausibly allege that plan participant data are "assets of the plan."  Whether something is an asset of a plan presents, in part, a question of law—so Plaintiffs must do more than simply allege that plan participant data are plan assets.  *See Divane*, 2018 WL 2388118, at *12.  The Court could not uncover, and Plaintiffs have not cited, a single case that has held plan participant data are plan assets under ERISA.  And at least three courts have squarely rejected such a proposition.  *Harmon v. Shell Oil Co.*, No. 20-0021, 2021 WL 1232694, at *2–3 (S.D. Tex. Mar. 30, 2021); *Divane*, 2018 WL 2388118, at *12; *Patient Advocs., LLC v. Prysunka*, 316 F. Supp. 2d 46, 48–49 (D. Me. 2004); *cf. Walsh v. Principal Life Ins. Co.*, 266 F.R.D. 232, 248 (S.D. Iowa 2010) (holding that the defendant did not act in a fiduciary capacity when it used plan confidential information because such use is not akin to "exercise[ing] discretionary authority or control respecting management of the plans").  In light of Plaintiffs' deficient pleadings, the Court follows that consensus.

---

[12]    In moving to dismiss Count IX, Defendants also argue that Plaintiffs fail to plead that Defendants acted in a fiduciary capacity with respect to plan participant data.  (Mov. Br. at 25).  In their opposition brief, Plaintiffs argued that the Court could "infer that Defendants exercised their fiduciary control over this asset to allow Voya to use it for soliciting non-Plan business from Plan participants," based on the fact that "Voya would not have access to that data, or the ability to use that data for its own business purposes, but for Defendants' granting that access and failing to limit Voya's use to what is necessary to administer the Plan." (Opp. Br. at 32).  At oral argument, counsel for Plaintiffs further elaborated:  "The fiduciaries of the plan have control over everything that happens in the plan, both participants coming in and providing their information and then the fiduciaries determine who has access to that information.  They hire a recordkeeper to keep everybody's records, keep accounts for everybody.  The only way that recordkeeper is able to use that information for its own purposes and benefits is if the fiduciaries allow it.  No one else controls that information." (Oral Arg. Tr. at 91:3–11).  Put another way, Plaintiffs appear to argue that because Defendants act in a fiduciary capacity in their dealings with Voya for recordkeeping services, Defendants act in their fiduciary capacity when they fail to include terms and conditions in the recordkeeping arrangement.  Because the Court dismisses Count IX on another basis, the Court need not address whether Plaintiffs plausibly plead that Defendants are fiduciaries with respect to plan participant data.

Pertinent here, ERISA defines "plan assets" by reference to "such regulations as the Secretary [of Labor] may prescribe." 29 U.S.C. § 1002(42). "Two such regulations have been prescribed." *Harmon*, 2021 WL 1232694, at *2.

First, 29 C.F.R. § 2510.3-101, which is titled "Definition of 'plan assets'—plan investments," provides:

> (2) Generally, when a plan invests in another entity, the plan's assets include its investment, but do not, solely by reason of such investment, include any of the underlying assets of the entity. However, in the case of a plan's investment in an equity interest of an entity that is neither a publicly-offered security nor a security issued by an investment company registered under the Investment Company Act of 1940 its assets include both the equity interest and an undivided interest in each of the underlying assets of the entity, unless it is established that—
>
> > (i) The entity is an operating company, or
> >
> > (ii) Equity participation in the entity by benefit plan investors is not significant.
>
> Therefore, any person who exercises authority or control respecting the management or disposition of such underlying assets, and any person who provides investment advice with respect to such assets for a fee (direct or indirect), is a fiduciary of the investing plan.

29 C.F.R. § 2510.3-101(a)(2). This regulation cannot be read to define plan assets to include plan participant data. As one district court has observed, this regulation expressly defines plan assets in terms of investments but conspicuously "makes no mention of any 'data.'" *Harmon*, 2021 WL 1232694, at *3.

Second, 29 C.F.R. § 2510.3-102, which is titled "Definition of 'plan assets'—participant contributions," provides that

> the assets of the plan include amounts (other than union dues) that a participant or beneficiary pays to an employer, or amounts that a participant has withheld from his wages by an employer, for contribution or repayment of a participant loan to the plan, as of the

> earliest date on which such contributions or repayments can reasonably be segregated from the employer's general assets.

29 C.F.R. § 2510.3-102(a)(1).  Like § 2510.3-101(a)(2), this regulation does not expressly mention plan participant data, nor can its language be stretched to include plan participant data by implication.

Plaintiffs appear not to dispute that the Secretary of Labor's regulations fail to capture plan participant data as plan assets.  Instead, Plaintiffs argue that the Secretary of Labor does not exclusively define plan assets.  (Opp. Br. at 34).  In support, Plaintiffs point out that the Secretary of Labor did not define plan assets until twelve years after ERISA's enactment, and that the regulations merely describe, as opposed to definitively define, the term plan assets.  (*Id.* at 34–35).  Citing regulatory guidance, Plaintiffs argue that the Department of Labor recognizes that when its regulations do not apply, "the assets of a plan generally are to be identified on the basis of ordinary notions of property rights under non-ERISA law.  In general, the assets of a welfare plan would include any property, tangible or intangible, in which the plan has a beneficial ownership interest."  DOL Advisory Op. 93-14A, 1993 WL 188473, at *4 (May 5, 1993).

But when considering ordinary notions of property rights, "[e]ven the broadest definition of 'plan assets[]' . . . contemplates something of value."  *Patient Advocs.*, 316 F. Supp. 2d at 48; *see also Divane*, 2018 WL 2388118, at *12 (similar).  The cases surveyed by Plaintiffs support this limiting principle.  (Opp. Br. at 36–38).  While plan participant data might be valuable to Voya and Defendants, nothing in Plaintiffs' Complaint supports the plausible inference that "[t]he information" is something the Plan could, for example, "sell or lease in order to fund retirement benefits."  *Divane*, 2018 WL 2388118, at *12.[13]  Absent the minimum allegation that plan

---

[13]     Fiduciaries might well be able to use plan participant data as leverage when negotiating lower fees.  See *supra* n.11.  But not only do Plaintiffs fail to allege this leverage theory as a source of value, it is not clear that the ability to leverage plan participant data or the size of the Plan constitutes a plan asset under ERISA.  Instead, the

participant data is something of value to the Plan, Plaintiffs fail to allege that plan participant data are plan assets.

Accordingly, Plaintiffs' Count X is dismissed.  However, Count X, like Count IX, is dismissed without prejudice because the Court cannot rule out the possibility that Plaintiffs may plausibly plead that plan participant data, when collected and aggregated, can be used as something of value to benefit the Plan and participants of the Plan.

### D.    Derivative Claims (Counts XI & XII)

In Count XI, Plaintiffs allege that Defendants breached their duty of prudence by failing to monitor other fiduciaries, and in Count XII, Plaintiffs assert a claim for other remedies.  (Compl. ¶¶ 345–59).  At oral argument, the parties agreed that Counts XI and XII are derivative of other claims and therefore survive if any other claim survives.  (Oral Arg. Tr. at 61:20–62:6 & 98:9–13).  Accordingly, Counts XI and XII may proceed.

## IV.   CONCLUSION

For the foregoing reasons, Defendants' motion to dismiss (D.E. No. 32) is **GRANTED in part** and **DENIED in part**.  Counts I through VII and Counts XI and XII may proceed as pled.  Count VIII may proceed, too, but only insofar as it asserts a claim under § 1106(a)(1)(C).  Otherwise, Count VIII is dismissed *with prejudice* insofar as it asserts claims under § 1106(a)(1)(A) and (D).  Finally, Counts IX and X are dismissed *without prejudice* for failure to state a claim upon which relief can be granted.  An appropriate Order follows.


Date:    August 23, 2022

Hon. Esther Salas, U.S.D.J.

---

failure to leverage a feature of an ERISA plan is likely more relevant to losses of *other* plan assets.  Separately, while Defendants have not argued this point, it is unclear that failing to restrict use of necessary recordkeeping information is a listed "transaction" under § 1106(a).