Jerome J. Schlichter
SCHLICHTER BOGARD LLP
100 South Fourth Street, Suite 1200
St. Louis, MO, 63102
(314) 621-6115
jschlichter@uselaws.com
[additional counsel on signature page]
*Counsel for Plaintiffs*

Thomas Kenny
SPIRO HARRISON
830 Morris Turnpike 2nd Floor
Short Hills, NJ 07078
(973) 310-4026
tkenny@spiroharrison.com
*Local Counsel for Plaintiffs*

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| BETH BERKELHAMMER and NAOMI RUIZ, individually and as representatives of a class of participants and beneficiaries on behalf of the ADP TotalSource Retirement Savings Plan, | No. 2:20-cv-05696-ES-JRA |
| *Plaintiffs,* | CLASS ACTION |
| v. | SECOND AMENDED COMPLAINT |
| ADP TOTALSOURCE GROUP, INC., AUTOMATIC DATA PROCESSING, INC., ADP TOTALSOURCE, INC. ADP TOTALSOURCE RETIREMENT SAVINGS PLAN | |

COMMITTEE,  MARK ACQUADRO,
ART BAUMANN, PAWAN
CHHABRA, MICHAEL EBERHARD,
KEISHA NEWELL, BRIAN
MICHAUD, JACK DREWRY, and
KRISTEN APPLEMAN,

       *Defendants.*

## Table of Contents

SECOND AMENDED COMPLAINT ........................................................... 1

JURISDICTION AND VENUE .................................................................. 4

PARTIES ................................................................................................ 7

    I.  Plaintiffs ........................................................................................ 7

    II.  Defendants ................................................................................... 7

    III. The ADP TotalSource Retirement Savings Plan ......................... 18

ERISA'S FIDUCIARY STANDARDS ..................................................... 19

BACKGROUND FACTS ......................................................................... 23

DEFENDANTS BREACHED THEIR FIDUCIARY DUTIES .............. 29

    I.  Prudent fiduciaries negotiate reasonable recordkeeping fees, monitor all sources of revenue paid to plan recordkeepers, regularly monitor plan fees and compare them to competitive market rates, and diligently negotiate fee reductions to benefit participants. ...................................................................... 29

    II. Defendants breached their fiduciary duties and engaged in prohibited transactions by unlawfully paying themselves from Plan assets. .................................................................................. 44

        A.  ERISA's self-dealing and prohibited transactions provisions. ........................................................................... 44

        B.  Defendants unlawfully paid themselves from the Plan. ........ 49

        C.  Defendants unlawfully caused the Plan to pay ADP's legal fees ............................................................................ 61

        D.  Defendants unlawfully caused the Plan to pay ADP's accounting expenses ................................................... 67

III. Defendants selected and retained imprudent investments in the Plan.................................................................................70

    A. Prudent fiduciaries regularly monitor the performance and fees of investments and remove those investments that underperform and charge excessive fees. .......................70

    B. Defendants selected and retained imprudent, consistently underperforming, high-cost investments. .............................77

    C. Defendants failed to ensure reasonable investment management expenses for investment alternatives in the Plan. ...................................................................................103

IV. Defendants breached their fiduciary duties and engaged in prohibited transactions by causing the Plan to pay excessive managed account fees..................................................................106

    A. The managed account services market. ...............................106

    B. Defendants failed to monitor the Plan's managed account fees resulting in the participants paying excessive fees. ......118

V. Defendants breached their fiduciary duties by allowing the Plan's service providers to collect and use Confidential Plan Participant Data for profit. ........................................................123

    A. Confidential Plan Participant Data and its value to recordkeepers with affiliates offering financial products and services. ........................................................................123

    B. Defendants failed to monitor or restrict Plan service providers' misuse of Confidential Plan Participant Data. ....131

CLASS ACTION ALLEGATIONS ........................................................146

COUNT I: Prohibited Self-Dealing Transactions  (29 U.S.C. §1106(b))..............................................................................................155

COUNT II: Prohibited transactions (29 U.S.C. §1106(a)) between the Plan and ADP TotalSource.............................................................157

COUNT III: Breach of Fiduciary Duties (29 U.S.C. §1104(a)(1)) Related To Imprudent And Poorly Performing Investments.......... 161

COUNT IV: Breach of Fiduciary Duties (29 U.S.C. §1104(a)(1)) Related To Excessive Investment Management Fees.................... 163

COUNT V: Breach of Fiduciary Duties (29 U.S.C. §1104(a)(1)) Related to Unreasonable Managed Account Fees........................... 165

COUNT VI: Prohibited transactions (29 U.S.C. §1106(a)(1)) Related To Investment Services and Fees.................................................... 168

COUNT VII: Breach of Fiduciary Duties (29 U.S.C. §1104(a)(1)) Related To Failure to Safeguard Confidential Plan Participant Data.................................................................................................... 169

COUNT VIII: Failure to Monitor Fiduciaries (Against Defendants ADP TotalSource Group, Inc. and ADP TotalSource Retirement Savings Plan Committee) ................................................................ 171

COUNT IX: Other Remedies Against ADP, ADP TotalSource, Inc., and ADP TotalSource Group, Inc. (29 U.S.C. §1132(a)(3)) ............. 176

JURY TRIAL DEMANDED ................................................................. 177

PRAYER FOR RELIEF ........................................................................ 178

## SECOND AMENDED COMPLAINT

1.      Plaintiff Beth Berkelhammer's address is 717 2nd Ave, San Francisco, California, 94118. Plaintiff Naomi Ruiz's address is 15150 SW Milikan Way, Beaverton, OR 97003. Defendant Automatic Data Processing, Inc.'s principal place of business is located at 1 ADP Boulevard, Roseland, New Jersey, 07068. Defendants ADP TotalSource, Inc., ADP TotalSource Group, Inc., and the ADP TotalSource Retirement Savings Plan Committee have their principal place of business at 10200 Sunset Drive, Miami, Florida, 33173. Defendant Mark Acquadro resides at 65 Morning Star Drive in Sparta, New Jersey. Defendant Art Baumann resides at 18005 SW 83rd Ct, Palmetto Bay, FL 33157-6125. Defendant Pawan Chhabra resides at  2210 Blackheath Trce, Alpharetta, GA 30005-6978. Defendant Michael Eberhard resides at 549 Beach Bridge Rd Pawleys Island, SC 29585-7774. Defendant Keisha Newell resides at 4318 Southwest 130th Avenue, Davie, Florida 33330. Defendant Brian Michaud resides at 6 Great Oak Rd., Orleans, MA 02653-3407. Defendant Jack Drewry resides at 3063 Indiana St Unit 16 Miami, FL 33133-4410. Defendant

Kristen Appleman resides at 4140 Millbrook Court, Suwanee, Georgia 30024.

2.     Plaintiffs Beth Berkelhammer and Naomi Ruiz, individually and as representatives of a class of participants and beneficiaries of the ADP TotalSource Retirement Savings Plan (the "Plan"), bring this action under 29 U.S.C. §1132(a)(2) and (a)(3) on behalf of the Plan against Defendants ADP TotalSource Group, Inc., ADP TotalSource, Inc., Automatic Data Processing, Inc., the ADP TotalSource Retirement Savings Plan Committee, and the individually named defendants (collectively the "Defendants"), for breach of fiduciary duties and prohibited transactions under ERISA.[1]

3.     The Plan's fiduciaries, including Defendants, are obligated to act for the exclusive benefit of Plan participants and beneficiaries and to ensure that Plan expenses are reasonable and the Plan's investments are prudent.

4.     The marketplace for retirement plan services is established and competitive. Multi-billion dollar defined contribution plans, like the

---

[1] The Employee Retirement Income Security Act, 29 U.S.C. §§1001–1461.

Plan, have tremendous bargaining power to obtain high quality, low-cost administrative, managed account, and investment management services. Instead of using the Plan's bargaining power to benefit participants and beneficiaries, Defendants allowed unreasonable expenses to be charged to participants for administration of the Plan and for managed account services, and retained poorly performing investments that similarly situated prudent fiduciaries would have removed from their plans.

5.     Additionally, Defendants selected and retained imprudent higher-cost investment alternatives in the Plan when lower-cost investment vehicles were available for the Plan based on its bargaining power to obtain such vehicles.  Defendants also failed to ensure that the lowest-cost available share classes of the designated investment alternatives were included in the Plan, resulting in the Plan paying excessive investment management and other unnecessary fees.

6.     Even worse, Defendants allowed the Plan's service providers to use Plan participants' highly confidential data, including social security numbers, financial assets, investment choices, and years of investment history to aggressively market lucrative non-Plan retail

3

financial products and services, which enriched the service providers at the expense of participants' retirement security.

7.     To remedy these breaches of duty, Plaintiffs, individually and as representatives of a class of participants and beneficiaries of the Plan, bring this action on behalf of the Plan under 29 U.S.C. §1132(a)(2) and (3) to enforce Defendants' personal liability under 29 U.S.C. §1109(a) to make good to the Plan all losses resulting from each breach of fiduciary duty and to restore to the Plan profits made through Defendants' use of Plan assets. In addition, Plaintiffs seek equitable or remedial relief for the Plan as the Court may deem appropriate.

## JURISDICTION AND VENUE

8.     **Subject-matter jurisdiction.** This Court has exclusive jurisdiction over the subject matter of this action under 29 U.S.C. §1132(e)(1) and 28 U.S.C. §1331 because it is an action under 29 U.S.C. §1132(a)(2).

9.     **Venue.** This District is the proper venue for this action under 29 U.S.C. §1132(e)(2) and 28 U.S.C. §1391(b) because it is a district in which the subject Plan is administered, where at least one of

the alleged breaches took place, and where at least one defendant resides.

10.   **Standing.** An action under §1132(a)(2) allows recovery only for a plan, and does not provide a remedy for individual injuries distinct from plan injuries. *LaRue v. DeWolff, Boberg & Assocs.*, 552 U.S. 248, 256 (2008). The plan is the victim of any fiduciary breach and the recipient of any recovery. *Id.* at 254. Section 1132(a)(2) authorizes any participant, fiduciary, or the Secretary of Labor to sue derivatively as a representative of a plan to seek relief on behalf of the plan. 29 U.S.C. §1132(a)(2). As explained in detail below, the Plan suffered millions of dollars in losses resulting from Defendants' fiduciary breaches and remains exposed to harm and continued future losses, and those injuries may be redressed by a judgment of this Court in favor of Plaintiffs. To the extent the Plaintiffs must also show an individual injury even though §1132(a)(2) does not provide redress for individual injuries, each Plaintiff has suffered such an injury, in at least the following ways:

    a.   The named Plaintiffs and all participants in the Plan suffered financial harm as a result of the imprudent options

in the Plan because Defendants' selection and retention of
those options deprived participants of the opportunity to
grow their retirement savings by investing in prudent
options with reasonable fees, which would have been
available in the Plan if Defendants had satisfied their
fiduciary obligations. All participants continue to be harmed
by the ongoing inclusion of these imprudent options and
payment of excessive recordkeeping fees.

b. The named Plaintiffs' individual accounts in the Plan were
harmed because they invested in Plan investment options
that would have been excluded from the Plan had
Defendants discharged their fiduciary duties. These
investment options underperformed numerous prudent
alternatives that were available to the Plan, resulting in a
loss of retirement savings.

c. The named Plaintiffs' individual accounts in the Plan
suffered losses because each participant's account was
assessed an excessive amount for recordkeeping and
administrative fees, which would not have been incurred had

6

Defendants discharged their fiduciary duties to the Plan and reduced those fees to a reasonable level.

d. The named Plaintiffs' individual accounts in the Plan suffered losses because each participant's account in a managed account was assessed an excessive amount for managed account fees, which would not have been incurred had Defendants discharged their fiduciary duties to the Plan and reduced those fees to a reasonable level.

## PARTIES

### I.   Plaintiffs

11.   Beth Berkelhammer resides in San Francisco, California and is a participant in the Plan under 29 U.S.C. §1002(7) because she and her beneficiaries are eligible to receive benefits under the Plan.

12.   Naomi Ruiz resides in Beaverton, Oregon and is a participant in the Plan under 29 U.S.C. §1002(7) because she and her beneficiaries are eligible to receive benefits under the Plan.

### II.   Defendants

13.   Defendant Automatic Data Processing, Inc. (ADP) is a publicly traded corporation organized under Delaware law with its principal place of business in Roseland, New Jersey. It does business

7

under the name "ADP®", which also is the trading symbol of its stock on the NASDAQ Global Select Market. ADP is in the business of providing human capital management solutions to employers around the world. It conducts its business in two segments: Employer Services, which provides a comprehensive range of business outsourcing and human capital management services; and Professional Employer Organization (PEO) Services that it conducts under the name of its business unit "ADP TotalSource®". ADP's PEO business offers small and mid-sized business a comprehensive employment administration outsourcing solution through a relationship in which employees who work for a client (worksite employees) are co-employed by the client and ADP. ADP administers its PEO business through indirectly wholly owned subsidiaries ADP TotalSource Group, Inc. and ADP TotalSource, Inc., among other corporations. ADP and its executives consider "ADP TotalSource" to be a business unit of ADP and make no distinction between the corporate entities ADP, ADP TotalSource Group, Inc., and ADP TotalSource, Inc. Executives do not even know which ADP corporation employs them.

8

14.    ADP generates its revenues, and hence its profits, from its PEO business through administrative fees to its clients based on their payroll costs and from the difference in the rate it charges and the rate it pays for worker's compensation and state unemployment insurance. ADP provides the Plan as an option for its PEO clients. ADP uses the Plan as a means for retaining clients in its PEO business, because clients that join the Plan will increase their tenure in the PEO business and continue to generate revenues and profits for the PEO business and ultimately ADP. The more that the expenses of ADP subsidiaries such as ADP TotalSource Group, Inc. and ADP TotalSource, Inc. are reduced, the higher are the profits of those subsidiaries and the higher are the profits of ADP and the more ADP's share price is likely to increase. The profits of ADP TotalSource, Inc. and ADP TotalSource Group, Inc. ultimately flow through to ADP.

15.    Under the insurance policies that cover liability for breaches of fiduciary duties to the Plan, ADP designates itself as the sponsor and fiduciary of the Plan.

16.    ADP acts through its employees, including those acting as
Plan fiduciary committee members, and administers the Plan through
its subsidiaries and executives.

17.    ADP TotalSource Group, Inc. and ADP TotalSource, Inc. are
corporations organized under Florida law with their principal place of
business at the same location in Miami, Florida. Through many
subsidiaries and directly, ADP TotalSource Group, Inc. administers
ADP's PEO Services business under the control of ADP. ADP controls
ADP TotalSource from its headquarters in New Jersey. ADP
TotalSource Group, Inc. and its subsidiaries are professional employer
organizations certified by the IRS. ADP TotalSource Group, Inc. does
not have a board of directors.

18.    Clients of ADP's TotalSource business execute a Client
Services Agreement with ADP TotalSource, Inc. in which ADP
TotalSource, Inc. assumes specified employer responsibilities such as
payroll and tax administration, HR management, and benefits and
workers' compensation administration and the client agrees to pay
specified fees to ADP through its subsidiary. ADP TotalSource, Inc.

10

then assigns the Client Services Agreement to various subsidiary or affiliate corporations.

19.     ADP TotalSource clients that choose to participate in the Plan execute a Retirement Savings Plan Adoption Agreement with ADP TotalSource Group, Inc., who is designated as the Plan sponsor.

20.     Employees of ADP and ADP TotalSource Group, Inc. and its subsidiaries do not participate in the Plan. Instead, they participate in ADP's corporate defined contribution plan—the ADP Retirement and Savings Plan. Both that plan and the Plan are covered by the same insurance policies that provide coverage to ADP as the sponsor and fiduciary of both plans. Another ADP subsidiary—ADP Retirement Services—provides recordkeeping and administrative services to the individual ERISA plans of ADP clients.

21.     The Plan document under 29 U.S.C. § 1102(a)(1) in effect from January 1, 2012 until January 1, 2017 (the "2012 Plan Document") states that ADP TotalSource Group, Inc. is the Plan sponsor and designates the Administrative Committee of the ADP TotalSource Retirement Savings Plan as the Plan administrator and the named fiduciary under 29 U.S.C. § 1102(a)(2) responsible for all aspects of

11

administering the Plan, including discretionary authority and control over Plan expenses. The 2012 Plan Document also designates an Investment Committee as the named fiduciary under 29 U.S.C. §1102(a)(2) with respect to the management and investment of Plan assets.  The members of the Administrative and Investment Committees are supposed to be individuals appointed by ADP TotalSource Group, Inc.

22.    Throughout the time the 2013 Plan Document was in effect, the members of the Administrative and Investment Committee were the same individuals. The two Committees have acted as a single Committee since 2016 and are referred to as the Committee herein, unless otherwise indicated.

23.    On December 21, 2017, ADP TotalSource Group, Inc. executed a new Plan document under 29 U.S.C. § 1102(a)(1) that it declared was effective as of January 1, 2017 (the "2017 Plan Document"). The 2017 Plan Document names the ADP TotalSource Retirement Savings Plan Committee (the "Committee") as the Plan Administrator and fiduciary under 29 U.S.C. § 1102(a)(2) for all aspects of the administration of the Plan, including the investment of Plan

12

assets. Members of the Committee are supposed to be appointed by ADP TotalSource Group, Inc. The members of the Administrative and Investment Committees became members of the Committee upon its creation.

24.    The Committee and its individual members are fiduciaries to the Plan because they are named fiduciaries under 29 U.S.C. 1102(a), were provided discretionary authority and control over the management of the Plan, and exercised discretionary authority or discretionary control respecting the management of the Plan and the disposition of its assets, and have or had discretionary authority or discretionary responsibility in the administration of the Plan. 29 U.S.C. §1002(21)(A)(i) and (iii).

25.    Defendant Mark Acquadro was an officer within ADP's corporate business unit and TotalSource business unit (including as CFO of TotalSource) but did not know by which specific ADP corporation he was employed. He was a member of the Administrative and Investment Committees since 2010 and then a member of the Committee until 2022. He was the chairman of the Committee from 2015 to 2022. As an executive in ADP's TotalSource business and at

13

ADP, Acquadro's compensation was based in part on the profitability of ADP's TotalSource business unit and on ADP's profits and included awards of stock or rights to stock of ADP.

26.     Defendant Art Baumann was at all relevant times a General Manager and/or Client Retention Executive officer of ADP TotalSource Group, Inc. He was a member of the Committees from at least February 6, 2013 through December 18, 2017. Plaintiffs believe that, as an executive in ADP's TotalSource business, his compensation was based in part on the profitability of ADP's TotalSource business unit and included awards of stock or rights to stock of ADP.

27.     Sergio Fernandez was an executive in ADP's TotalSource business unit, serving at some times as CFO of that business, although he does not recall what specific ADP corporation employed him. Fernandez was a member of the Committees since at least 2011 through September 21, 2015. His compensation was based in part on the profitability of ADP's TotalSource business unit and included awards of stock or rights to stock of ADP.

28.     David Imbrogno was at all relevant times a Vice President of ADP TotalSource Group, Inc. and a member of the Committees from

14

February 6, 2013 through February 5, 2014. Plaintiffs believe that, as an executive in ADP's TotalSource business, his compensation was based in part on the profitability of ADP's TotalSource business unit and included awards of stock or rights to stock of ADP.

29.   Maria Black was a member of the Investment Committee from May 28, 2014 and Administrative Committee from September 7, 2014 through September 15, 2016, during which time she was the President of the ADP TotalSource business unit and subsequently became the President of ADP. Plaintiffs believe that, as an executive in ADP's TotalSource business unit, her compensation was based in part on the profitability of ADP's TotalSource business unit and included awards of stock or rights to stock of ADP.

30.   Christian Orihuela was at all relevant times a Vice President of ADP TotalSource Group, Inc. and a member of the Committee from December 4, 2014 through September 15, 2016. Plaintiffs believe that, as an executive in ADP's TotalSource business, his compensation was based in part on the profitability of ADP's TotalSource business unit and included awards of stock or rights to stock of ADP.

15

31.    Defendant Keisha Newell served in various positions at ADP TotalSource Group, Inc. and was a member of the Committees from December 4, 2014 through November 8, 2021.

32.    Defendant Michael Eberhard is and was at all relevant times Corporate Vice President and Treasurer of Automatic Data Processing, Inc. and has been a member of the Committee since December 7, 2015. Eberhard was not appointed to the Committees by an executed resolution of ADP TotalSource Group, Inc.

33.    Defendant Brian Michaud was at all relevant times a Senior Vice President of ADP TotalSource Group, Inc. was a member of the Committees from September 15, 2016 through May 5, 2020. Plaintiffs believe that, as an executive in ADP's TotalSource business, his compensation was based in part on the profitability of ADP's TotalSource business unit and included awards of stock or rights to stock of ADP.

34.    Defendant Pawan Chhabra was at all relevant times Chief Financial Officer for ADP TotalSource Group, Inc. and a member of the Committees from September 15, 2016 through September 17, 2018. Plaintiffs believe that, as an executive in ADP's TotalSource business,

16

his compensation was based in part on the profitability of ADP's TotalSource business unit and included awards of stock or rights to stock of ADP.

35.    Defendant Jack Drewry was at all relevant times a Vice President of  ADP TotalSource Group, Inc. and has been a member of the Committee since June 7, 2018. Plaintiffs believe that, as an executive in ADP's TotalSource business, his compensation was based in part on the profitability of ADP's TotalSource business unit and included awards of stock or rights to stock of ADP.

36.    Defendant Kristen Appleman was at all relevant times a Vice President of ADP TotalSource Group, Inc. and has been a member of the Committee since June 7, 2018. Her compensation was and is based in part on the profitability of ADP and ADP's TotalSource business unit and included awards of stock or rights to stock of ADP.

37.    Because the ADP individuals and entities described above acted as alleged herein as agents of ADP, all such Defendants are collectively referred to hereafter as the "ADP Defendants."

38.    Section 8.9 of the Plan provides that the Committee may appoint an Investment Manager, pursuant to 29 U.S.C. §1002(38).

17

Section 5.2 provides that if the Committee appoints an independent

investment consultant, that consultant shall be responsible for advising

the Committee regarding the reasonable of the fees from all sources

received by all service providers with respect to the Plan's investment

program. The Committee retained final decision-making authority over

the selection and retention of Plan investment options and service

providers.

## III.    The ADP TotalSource Retirement Savings Plan

39.    The Plan is a defined contribution, individual account,

employee pension benefit plan under 29 U.S.C. §1002(2)(A) and

§1002(34) and is intended to be a multiple employer plan pursuant to

IRS Code §413(c) ("MEP").

40.    The Plan provides for retirement benefits for the eligible

employees of the Adopting Employers, *i.e.*, the co-employees of ADP

TotalSource and its clients. The amount of these retirement benefits

depends upon contributions made on behalf of each employee by his or

her employer, deferrals of employee compensation and employer

matching contributions, and the performance of investment options net

of fees and expenses exclusively controlled by the Investment

18

Committee, Administrative Committee, the Committee and its members, and effectively controlled by ADP and its subsidiaries.

41.     As of December 31, 2013, the Plan had over $2 billion in assets and 55,736 participants with account balances. As of December 31, 2021, the Plan had over $7.8 billion in assets and 148,353 participants with account balances.

42.     The Plan is among the largest 0.02% of all defined contribution plans in the United States based on plan assets. Professionals commonly refer to plans of such great size as "jumbo plans" or "mega plans." The Plan's massive size gives it enormous bargaining power to command very low investment management, managed account, and recordkeeping fees for its participants.

## ERISA'S FIDUCIARY STANDARDS

43.     ERISA imposes strict fiduciary duties of loyalty and prudence upon Defendants as fiduciaries of the Plan. 29 U.S.C. §1104(a), states, in relevant part, that:

> [A] fiduciary shall discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries and –
>
> (A)    for the exclusive purpose of

19

(i)  providing benefits to participants and their beneficiaries; and

(ii) defraying reasonable expenses of administering the plan;

[and]

(B)  with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of like character and with like aims.

44.    Under ERISA, fiduciaries that exercise any authority or control over plan assets, including, but not limited to, the selection of plan investments and service providers, must act prudently and for the *exclusive* benefit of participants in the plan, monitor the funds in the plan and remove imprudent or excessively expensive funds. Fiduciaries cannot act for the benefit of third parties, including service providers to the plan such as recordkeepers, affiliated businesses, brokerage firms, or managed account service providers and those who provide investment products. Fiduciaries must ensure that the amount of fees paid to service providers is no more than reasonable. DOL Adv. Op. 97-15A; DOL Adv. Op. 97-16A; *see also* 29 U.S.C. §1103(c)(1) (plan assets "shall be held for the exclusive purposes of providing benefits to

participants in the plan and their beneficiaries and defraying
reasonable expenses of administering the plan").

45.    An ERISA "trustee has a continuing duty to monitor trust
investments and remove imprudent ones." *Tibble v. Edison Int'l*, 575
U.S. 523, 529 (2015). Prudence requires a review at "regular intervals."
*Id.* When making investment decisions, an ERISA fiduciary "is duty-
bound 'to make such investments and only such investments as a
prudent [person] would make of his own property. . . .'" *In re Unisys*, 74
F.3d 420, 434 (3d Cir. 1996) (quoting Restatement (Second) of Trusts
§227 (1959)). "[T]he duty to conduct an independent investigation into
the merits of a particular investment" is "the most basic of ERISA's
investment fiduciary duties." *Id*. at 435. A defined contribution plan
fiduciary cannot "insulate itself from liability by the simple expedient of
including a very large number of investment alternatives in its portfolio
and then shifting to the participants the responsibility for choosing
among them." *Hecker v. Deere & Co.*, 569 F.3d 708, 711 (7th Cir. 2009).
Instead, fiduciaries must "initially determine, and continue to monitor,
the prudence of *each* investment option available to plan participants."
*DiFelice v. U.S. Airways, Inc.*, 497 F.3d 410, 423 (4th Cir. 2007)

(emphasis original); *see also* 29 C.F.R. § 2550.404a-1; DOL Adv. Op. 98-04A; DOL Adv. Op. 88-16A. Fiduciaries have "a continuing duty to monitor investments and remove imprudent ones" within a reasonable time. *Hughes v. Northwestern Univ.*, 142 S. Ct. 737, 741 (2022) (quoting *Tibble*, 575 U.S. at 530).

46.    "Fiduciaries must also understand and monitor plan expenses." *Sweda v. Univ. of Penn.*, 923 F.3d 320, 328 (3d Cir. 2019). "'Expenses, such as management or administrative fees, can sometimes significantly reduce the value of an account in a defined-contribution plan,' by decreasing its immediate value, and by depriving the participant of the prospective value of funds that would have continued to grow if not taken out in fees." *Id*. (quoting *Tibble*, 135 S.Ct. at 1826). "Fiduciaries must also consider a plan's power to obtain favorable investment products, particularly when those products are substantially identical—other than their lower cost—to products the trustee has already selected." *Sweda*, 923 F.3d at 328–29 (internal citations and quotation marks omitted).

47.    ERISA also imposes explicit co-fiduciary liabilities on plan fiduciaries. 29 U.S.C. §1105(a) provides a cause of action against a

fiduciary for knowingly participating in a breach by another fiduciary and knowingly failing to cure any breach of duty. The statute states, in relevant part, that:

> In addition to any liability which he may have under any other provisions of this part, a fiduciary with respect to a plan shall be liable for a breach of fiduciary responsibility of another fiduciary with respect to the same plan in the following circumstances:
>
> (1)    if he participates knowingly in, or knowingly undertakes to conceal, an act or omission of such other fiduciary, knowing such act or omission is a breach; [or]
>
> (2)    if, by his failure to comply with section 1104(a)(1) of this title in the administration of his specific responsibilities which give rise to his status as a fiduciary, he has enabled such other fiduciary to commit a breach; or
>
> (3)    if he has knowledge of a breach by such other fiduciary, unless he makes reasonable efforts under the circumstances to remedy the breach.

## BACKGROUND FACTS

48.    "Defined contribution plans dominate the retirement plan scene today." *LaRue v. DeWolff, Boberg & Assocs.*, 552 U.S. 248, 255 (2008). In the private sector, such plans have largely replaced the defined benefit pension plans that were America's retirement system when ERISA was enacted in 1974. The consulting firm Towers Watson studied Fortune 100 companies from 1985 to 2012 and found that the

23

type of retirement plan offered by the companies has essentially flipped over the last three decades. Whereas in 1985, 89 of the Fortune 100 companies offered a traditional defined benefit plan, in 2012, only eleven of the Fortune 100 companies offered defined benefit plans to newly hired employees. Thus, defined contribution plans have become America's retirement system.

49.     A fundamental difference between traditional pension plans and defined contribution plans is that in the former, the employer's assets are at risk. In a defined contribution plan, it is the employees' and retirees' funds at risk.

50.     Each participant in a defined contribution plan has an individual account and directs plan contributions into one or more investment alternatives in a lineup chosen by the plan's fiduciaries. "[P]articipants' retirement benefits are limited to the value of their own individual investment accounts, which is determined by the market performance of employee and employer contributions, less expenses." *Tibble*, 575 U.S. at 525.

51.     Most of the fees assessed to participants in a defined contribution plan are attributable to two general categories of services:

24

plan administration (including recordkeeping), and investment management. Since the early 2000s, managed account services make up a third category of fees assessed to participants. These expenses "can sometimes significantly reduce the value of an account in a defined-contribution plan." *Id.*

52.     The plan's fiduciaries have control over these expenses. The fiduciaries are responsible for hiring recordkeeping service providers, such as recordkeepers, and negotiating and approving those service providers' compensation. The fiduciaries also have exclusive control over the menu of investment alternatives to which participants may direct the assets in their accounts. Those selections each have their own fees that are deducted from the returns that participants receive on their investments. The fiduciaries are responsible for hiring managed account providers and negotiating and approving those service providers' compensation.

53.     These fiduciary decisions have the potential to dramatically affect the amount of money that participants are able to save for retirement. According to the U.S. Department of Labor, a 1% difference in fees over the course of a 35-year career makes a difference of *28%* in

savings at retirement. U.S. Dep't of Labor, *A Look at 401(k) Plan Fees,* at 2 (Sept. 2019).[2] Accordingly, fiduciaries of defined contribution plans must engage in a rigorous process to control these costs and ensure that participants pay no more than a reasonable level of fees. This is particularly true for multi-billion dollar plans like the Plan, which have the bargaining power to obtain the highest level of service and the very lowest fees. The fees available to multi-billion dollar retirement plans are orders of magnitude lower than the much higher retail fees available to small investors.

54.     The entities that provide services to defined contribution plans have an incentive to maximize their fees by putting their own higher-cost funds in plans, collecting the highest amount possible for recordkeeping and managed account services, rolling Plan participants' money out of the Plan and into proprietary IRAs, soliciting the purchase of wealth management services, credits cards and other retail financial products, and maximizing the number of non-plan products sold to participants. For each additional dollar in fees paid to a service

---

[2] Available at https://www.dol.gov/sites/dolgov/files/ebsa/about-ebsa/our-activities/resource-center/publications/a-look-at-401k-plan-fees.pdf.

provider, participants' retirement savings are directly reduced by the same amount, and participants lose the potential for those lost assets to grow over the remainder of their careers. Accordingly, the level of diligence used by plan fiduciaries to control, negotiate, reduce the plan's fees, and safeguard plan assets directly affects participants' retirement security.

55.    Fiduciaries must be cognizant of providers' self-interest in maximizing fees, and cannot simply accede to the providers' desires and recommendations—*e.g.*, by including proprietary funds and managed account services that will maximize the provider's fees without negotiating or considering alternatives. In order to act in the exclusive interest of participants and not in the service providers' interest, fiduciaries must negotiate as if their own money and information is at stake. Instead of simply accepting the investment funds and fees sought by these conflicted providers, fiduciaries must consider whether participants would be better served by using alternative investment products or services.

56.    PEOs "provide payroll, benefits, regulatory compliance assistance, and other HR services to small and mid-sized companies."[3]

57.    By definition, the function of a PEO is to "becom[e] a co-employer . . . allow[ing] it to combine the employees of several companies in order to offer those companies lower costs, reduced paperwork, and increased efficiency" including to offer "better retirement . . . packages for their employees."[4]

58.    A key selling point for PEOs that offer their clients the opportunity to join a multiple employer defined contribution plan is the ability to leverage the assets and efficiencies of the whole group to drive down costs.[5]

59.    Plans that bundle together employers offer significant cost efficiencies, because costs are spread across a larger participant and

---

[3] National Association of Professional Employer Organizations, *Key Information about NAPEO and PEOs*, https://www.napeo.org/quick-facts-about-napeo-and-the-peo-industry.

[4] Professional Employer Organization Definition, Investopedia, https://www.investopedia.com/professional-employer-organization-definition-4766977.

[5] *See, e.g.*, ADP TotalSource, A Trusted HR Advisor for You and Your Business Clients, https://docplayer.net/19816697-Adp-totalsource-a-trusted-hr-advisor-for-you-and-your-business-clients.html; Insperity, Inc. Form 10-K (2016), https://insperityinc.gcs-web.com/static-files/66dfc19c-424a-4026-9550-b9a6e9fc6fcd.

asset base.[6] Prudently managed, such plans should be able to reduce costs for every participant.

60.    The "substantial economies of scale and cost efficiencies" include, but are not limited to a single annual Form 5500 filing, a single periodic IRS qualification filing, and a single annual independent audit.[7] Further, MEPs may provide the ability for employers to transfer fiduciary responsibility and oversight to a single, centralized  entity.[8]

## DEFENDANTS BREACHED THEIR FIDUCIARY DUTIES

**I.    Prudent fiduciaries negotiate reasonable recordkeeping fees, monitor all sources of revenue paid to plan recordkeepers, regularly monitor plan fees and compare them to competitive market rates, and diligently negotiate fee reductions to benefit participants.**

61.    Recordkeeping is a service necessary for every defined contribution plan. The recordkeeper keeps track of the amount of each participant's investments in the various options in the plan, and

---

[6] Newport Retirement Services, *The Impact of the Secure Act of Multiple Employer Plans,* https://www.newportgroup.com/NewportGroup/media/Documents/MEPS-PEPS-White-Pape-from-Newport.pdf.

[7] Transamerica Retirement Services, *Multiple Employer Plans: An Opportunity for Expanding Retirement Plan Coverage,*https://www.ta-retirement.com/resources/5913-1010_final.pdf.

[8] Six8Advisors, *The Multiple Employer Plan "MEP" Advantage,* www.six8advisors.com/blog-employers-1/2017/11/14/the-multiple-employer-plan-mep-advantage.

typically provides each participant with a quarterly account statement. The recordkeeper often maintains a plan website or call center that participants can access to obtain information about the plan and to review their accounts. The recordkeeper may also provide access to investment education materials or investment advice. These services are largely commodities, and the market for recordkeeping services is highly competitive.

62. Numerous recordkeepers in the marketplace are capable of providing a high level of service and will vigorously compete to win a recordkeeping contract for a jumbo defined contribution plan. These recordkeepers will readily respond to a request for proposal and will tailor their bids based on the desired services (*e.g.*, recordkeeping, website, call center, etc.). In light of the commoditized nature of the essential recordkeeping services, recordkeepers primarily differentiate themselves based on price, and will aggressively bid to offer the best price in an effort to win the business, particularly for jumbo plans.

63. The cost of recordkeeping services depends on the number of participants (or participant accounts), not on the amount of assets in

30

the participant's account.[9] Thus, the cost of providing recordkeeping services to a participant with a $100,000 account balance is the same for a participant with $1,000 in her retirement account. Consequently, prudent fiduciaries negotiate a fixed dollar amount for the recordkeeper's annual compensation, usually based on a rate of a fixed dollar amount per participant. Because of economies of scale, large plans get lower effective rates per participant than smaller plans. Plans with 100,000 participants can obtain much lower rates per participant than a plan with 1,000 participants.

64.    A study commissioned by the U.S. Department of Labor in 1998 demonstrates these economies of scale, finding that as the number

---

[9] "[T]he actual cost of administrative services is more dependent on the number of participants in the plan." There is no "logical or practical correlation between an increase in administrative fees and an increase in plan assets." *Be a Responsible Fiduciary: Ask the Right Questions About 401(k) Plan Fees*, *Hewitt Assoc.,* October 2008; *see also* Mercer Investment Consulting, Inc*., DC Fee Management—Mitigating Fiduciary Risk and Maximizing Plan Performance*, available at https://www.mercer.com/content/dam/mercer/attachments/global/Retirement/DC%20Fee%20Management%20-%20Mitigating%20Fiduciary%20Risk%20and%20Maximizing%20Plan%20Performance.pdf  (hereinafter, "Mercer Best Practices") ("Conversely, utilizing a pricing model that is dependent on the value of plan assets arbitrarily 'builds in' fee increases that are not linked to the level or quality of the recordkeeper's services.")

of plan participants increases, the cost per participant decreases:[10] Per

the Study, the below expenses were based on quotations "of major

401(k) service providers."

| Number of Participants | Service Provider Cost Per Participant |
|---|---|
| 200 | $42 |
| 500 | $37 |
| 1,000 | $34[11] |

65.    Because recordkeeping costs are not affected by account size,

prudent fiduciaries of defined contribution plans negotiate

recordkeeping fees as a fixed dollar amount rather than as a percentage

of plan assets.[12] Otherwise, as plan assets increase, such as through

participant contributions or investment gains, the recordkeeping

compensation increases without any change in the recordkeeping

services, leading to unreasonable fees.[13]

---

[10] U.S. Dept. of Labor, *Study of 401(k) Plan Fees and Expenses* (1998), available at https://www.dol.gov/sites/default/files/ebsa/researchers/analysis/retirement/study-of-401k-plan-fees-and-expenses.pdf.

[11] *Id.* at § 4.2.2 ("Recordkeeping and Administration Expenses").

[12] Mercer Best Practices at 3 ("1. Price administrative fees on a per-participant basis.").

[13] *Id.* ("Negotiate a fixed-rate recordkeeping fee, based on the number of participants with account balances in the plan, that is independent of the investment structure (referred to as an 'open investment architecture' model). This approach, unlike an 'asset-based' or 'bundled'

66.    For example, if a plan has 50,000 participants, a fiduciary could negotiate a plan-level contract to pay the recordkeeper $1,500,000 per year, based on a rate of $30 per participant fee per year. The negotiated $1,500,000 recordkeeping fee then can be assessed to participant accounts pro rata so that smaller accounts pay a smaller portion of the fee. If the plan's assets increase during the contract while the number of participants stays constant, the recordkeeper's compensation does not change, because the services provided have not changed.

67.    A fixed-dollar compensation arrangement does not necessarily mean, however, that every participant in the plan must pay the same $30 fee from his or her account. The fiduciary could reasonably determine that it is equitable to charge each participant the same $30 (for example, through a quarterly charge of $7.50 to each account in the plan). Alternatively, the fiduciary could conclude that assessing the same fee to all investors would discourage participants

---

model, provides fee transparency and affords fiduciaries a sound basis for documenting the 'reasonableness' of recordkeeping fees. Conversely, utilizing a pricing model that is dependent on the value of plan assets arbitrarily 'builds in' fee increases that are not linked to the level or quality of the recordkeeper's services.")

33

with relatively small accounts from participating in the plan; and that, once the aggregate flat fee for the plan has been determined, a proportional asset-based charge would be best. In that case, the rate of $30 per-participant multiplied by the number of participants would be converted to an asset-based charge, such that every participant pays the same percentage of his or her account balance. If the plan in the example had $6 billion in assets, each participant would pay a direct recordkeeping fee of .025% of her account balance annual for recordkeeping ($1,500,000/$6,000,000,000 = .00025). As the plan assets increase thereafter, the *plan* is still paying the same $1,500,000 price that was negotiated at the plan level, but the fees paid by individual participants changes as they are proportionally allocated among participants based on account balance. Alternatively, the plan fiduciary could negotiate that plan participants with a particular low asset level in their accounts not pay any recordkeeping fees or adopt a tiered structure with varying rates depending on asset level.[14]

68.   Mutual funds are commonly provided as investment options in retirement plans. Mutual funds sometimes agree to pay

---

[14] Mercer Best Practices at 5–6.

recordkeepers a percentage of fund assets to compensate for the cost of recordkeeping a plan, an arrangement called "revenue sharing." This asset-based fee is negotiated between the mutual fund and the recordkeeper and usually is concealed. It is designed to compensate recordkeepers for smaller plans, and thus can overcompensate a recordkeeper in large plans with large investments in the mutual funds because it is asset based. Although paying for recordkeeping with an asset-based fee is not a *per se* violation of ERISA, it can lead to excessive fees if not monitored and capped by the plan fiduciary. If a fiduciary allows the plan recordkeeper to be compensated with an asset-based fee then the payments can become excessive based on an increase in plan assets alone. For example, the S&P 500 increased over 25% in 2019, leading to large increases in asset-based fees for services which have not changed. The opposite is generally not true. If plan assets decline, participants will not receive a sustained benefit of paying lower fees, because the recordkeeper will demand that the plan make up the shortfall through additional direct payments.

69.     To make an informed assessment as to whether a recordkeeper is receiving no more than reasonable compensation for the

services provided to a plan, prudent fiduciaries of defined contribution plans monitor *all* sources of compensation received by plan recordkeepers—including without limitation any revenue sharing or payments from managed account providers—and determine whether the compensation is reasonable for the services provided.

70.     Thus, if a fiduciary decides to use an asset-based fee to pay for recordkeeping, prudent fiduciaries recognize that it is critical to (1) negotiate a fixed amount of recordkeeping compensation based on a reasonable rate per participant per year, (2) determine all revenue sharing and other sources of compensation the recordkeeper receives from plan investment options, and then (3) recover all revenue sharing payments that exceed the negotiated compensation.

71.     Experts in the field agree that the most certain way to determine the least compensation a plan must pay for a desired level of recordkeeping services is to put the plan's recordkeeping services out for competitive bidding on a regular basis. Prudent fiduciaries do this every three years.[15] For example, Fiduciary360's Prudent Practices for

---

[15] *See* Donald Stone, *Conducting a Successful Fee Review: How to determine whether plan fees are reasonable,* Defined Contribution

Investment Stewards, [16] which is widely accepted as the global fiduciary standard of excellence, advised fiduciaries that they must determine "whether the fees are reasonable in light of the services provided" and

---

Insights, January/February 2006, at 4 (stating "most reliable way of determining whether fees the plan is paying are reasonable" is through an RFP or an RFI search process); Tyler Polk, *Is it Time for a Change? Best Practice in Retirement Plan Record Keeper Searches*, Fiduciary Investment Advisors (April 2015) available at https://www.fiallc.com/wp-content/uploads/2017/03/Is-it-Time-For-a-Change_4.15.pdf; John Carl, *Including Regular RFPs as Part of a Fiduciary Liability Reduction Strategy*, January 24, 2018 ("The DOL assumes that plan sponsors solicit RFPs for service providers every three to five years as part of their fiduciary duty to monitor plan service providers."), available at: https://www.napa-net.org/news/technical-competence/case-of-the-week/including-regular-rfps-part-fiduciary-liability-reduction-strategy/; Roger Levy, *Selecting Service Providers, Competitive Bidding, & RFP's Importance in a Fiduciary Investment Process,* InHub, May 18, 2015, available at https://d1yoaun8syyxxt.cloudfront.net/br189-76a8e37a-950c-41a0-b246-47bb6162f4a4-v2.

[16] *Prudent Practices for Investment Stewards* handbook defines the Global Fiduciary Standard of Excellence, initially published in April 2003, that was derived from a prior publication (*Prudent Investment Practices*) co-produced by the Foundation for Fiduciary Studies and the American Institute of Certified Public Accountants. This publication was written by Fiduciary 360, the identity brand for three related entities: the Foundation for Fiduciary Studies, the Center for Fiduciary Studies, and Fiduciary Analytics. The Foundation for Fiduciary Studies defines and substantiates specific investment fiduciary practices for trustees and investment committee members, investment advisors and investment managers and is widely used in the industry.

"[c]onsideration is given to putting vendor contracts back out to bid every three years."[17]

72.     Cerulli Associates stated in early 2012 that more than half of the plan sponsors asked indicated that they "are likely to conduct a search for [a] recordkeeper within the next two years." These RFPs were conducted even though many of the plan sponsors indicated that they "have no intention of leaving their current recordkeeper."[18]

73.     The Department of Labor provides the use of an RFP to assess the reasonableness of the service provider's fees every three to five years is common practice.[19]

74.     A large corporate 401(k) plan recordkept by Hewitt Associates (n/k/a Alight Solutions) ("Hewitt") during the relevant period is the Nike Inc.'s 401(k) Plan. Public documents show that this large

---

[17] Fiduciary360, *Prudent Practices for Investment Stewards*, Practices S-1.4, S-4.4 (2007).

[18] "Recordkeeper Search Activity Expected to Increase Within Next Two Years," *Cerulli Assoc.*, January 8, 2013, https://www.plansponsor.com/most-recordkeeping-rfps-to-benchmark-fees/

[19] "Meeting Your Fiduciary Responsibilities," *U.S. Dept. of Labor*, 2012, at pages 5−6.

plan, which had roughly 19,000 to 26,000 participants, paid the following fees for recordkeeping services.[20]

| Nike, Inc. 401(k) Plan | 2016 | 2012 |
|---|---|---|
| Per participant for recordkeeping services | **$21** | **$21** |

75.    Another large plan, the New Albertson's Inc. 401(k) plan, left Fidelity Investments Institutional Operations Company, Inc. ("Fidelity") for Vanguard in 2016. A fee disclosure after this change states that this plan pays a fixed annual fee of $31 per participant for recordkeeping services.[21] The Form 5500 in 2016 confirms that the New Albertson's 401(k) Plan, with approximately 31,000 participants, paid approximately $31 per participant for recordkeeping services.[22]

76.    Similarly, a previously related company to New Albertson's Inc., Albertson's LLC 401(k) Plan, with approximately 17,200 plan

---

[20] Nike, Inc. 2016 Form 5500 with 26,568 participants with an account balance and compensation to recordkeeper, Hewitt. Nike, Inc. 2012 Form 5500 with 19,362 participants with an account balance and compensation to recordkeeper, Hewitt. No additional source of compensation to Hewitt is identified or discernable on the Forms 5500.

[21] New Albertson's Inc. 401(k) Plan Fee Disclosure, *Cates v. Tr. of Columbia Univ.*, No. 16-cv-06524, Doc. 292-6 (S.D.N.Y. July 1, 2019).

[22] *See* Form 5500 for 2016 for New Albertson's Inc. 401(k) Plan and Master Trust Form 5500.

participants in 2016, paid approximately $29 per participant for recordkeeping services.[23]

77.   Fidelity recently stipulated in litigation that the value of the recordkeeping service it provided its own 55,000-participant plan was $21 per participant in 2014, $17 per participant in 2015 and 2016 and $14 per participant after 2017. *Moitoso v. FMR LLC*, 451 F.Supp.3d 189, 214 (D. Mass. 2020) ("The parties have stipulated that if Fidelity were a third party negotiating this fee structure at arms-length, the value of services would range from $14–$21 per person per year over the class period, and that the recordkeeping services provided by Fidelity to this Plan are not more valuable than those received by other plans of over $1,000,000,000 in assets where Fidelity is the recordkeeper."); *Moitoso v. FMR, LLC*, No. 18-12122, Doc. 138-67, at 3–4 (D. Mass.) (stipulating to the recordkeeping fees discussed above and further stipulating that "[h]ad the Plan been a third-party plan and negotiated a fixed fee for recordkeeping services at arms-length with

---

[23] *See* Form 5500 for 2016 for Albertson's LLC 401(k) Plan and Master Trust Form 5500.

Fidelity, it could have obtained recordkeeping services for these amounts during the period.").

78.    Voya Institutional Plan Services, LLC ("Voya") has been the Plan's recordkeeper since August 2013, when it was known as ING U.S. Prior to that time, the recordkeeper was MassMutual.

79.    The Plan paid Voya millions of dollars each year for recordkeeping services, from at least 2013 until 2018 during a period of dramatic decreases in recordkeeping fees across the market and dramatic growth in assets in the Plan.

80.    For example, according to the Plan's Department of Labor Forms 5500, in 2015, the Plan paid Voya at least $6.8 million[24] in recordkeeping fees, which translates to roughly .23% of the Plan's $3 billion dollars in assets, or an average of $91.36 per participant. By 2016, the Plan reported that its assets had grown to over $3.5 billion—

---

[24] The recordkeeping compensation figures discussed in this section include only publicly reported direct compensation to Voya and are therefore highly likely an underestimate of total recordkeeping compensation. Further, as alleged below, the ADP Defendants paid themselves additional amounts for "administrative" expenses, which may include putative compensation for recordkeeping, making the Plan's recordkeeping fees even more unreasonable. Plaintiffs will demonstrate the precise amount of recordkeeping fees and damages, which are continuing, through discovery and trial.

an increase of approximately 18%. Yet the fees collected by Voya for the same services were at least $10,460,592—a figure 52% greater than the direct compensation reported in 2015, translating to approximately .30% of the Plan's assets, or an average of $117 per participant.

81.   If Defendants had been monitoring and prudently controlling the costs for the Plan's recordkeeping services, they would not have allowed the Plan to pay fees that grew in this manner, allowing the recordkeeping fees to increase dramatically based upon nothing but asset growth, for the same amount of services.

82.   Defendants permitted the Plan to pay unreasonable recordkeeping fees to Voya, resulting in excessive recordkeeping fees.

83.   Defendants were required under ERISA to determine and monitor all sources of Voya's compensation, and to ensure that the compensation was limited to a reasonable amount for the services provided.

84.   However, Defendants stood to gain financially and were incentivized to retain Voya despite that fact that its high-cost structure was imprudent and contrary to the interests of Plan participants for multiple reasons. For example, unlike some competing low-cost, open

architecture defined contribution recordkeeping providers, Voya and its affiliates use information obtained in Voya's role as recordkeeper to market and sell numerous other products and services to the small-business clientele including accident, critical illness/specified disease, hospital confinement indemnity, group life and disability income insurance products, and health savings and spending accounts. This existing client base provides lucrative marketing opportunities for ADP to extend its TotalSource client base. Indeed, in a press release, Voya touted a partnership with ADP to provide "integrated employee benefits solutions" via a "one-stop-shop" solution—effectively sharing Voya and ADP's client base.[25]

85.     In return for retaining Voya as the Plan's recordkeeper and allowing Voya to provide its managed account services, Voya allowed ADP and its subsidiaries to set the amount of revenue sharing Voya investments charged participants to fund the PERA, described below, which directly benefitted ADP.

---

[25] https://corporate.voya.com/newsroom/news-releases/voya-financial-announces-agreement-adp-provide-integrated-employee-benefits.

86.    As alleged above, the Plan, despite being a MEP, has uniform features across all its participating employers. It is a single Plan with a single Plan document that all participating employers must agree to and cannot alter. It files a single Form 5500 with the Department of Labor. It provides for eligibility and vesting procedures that are generally the same for all Adopting Employers. Any differences can be easily automated. The employees of each Adopting Employer, in fact, become co-employees of the ADP TotalSource PEO.

87.    Thus, comparisons to similarly sized single employer defined contribution plans are appropriate in determining reasonable recordkeeping fees.

88.    Fees paid by the Plan are unreasonable given the bargaining power and inherent efficiencies of the MEP model and in light of the PEO structure.

## II.    Defendants breached their fiduciary duties and engaged in prohibited transactions by unlawfully paying themselves from Plan assets.

### A.  ERISA's self-dealing and prohibited transactions provisions.

89.    ERISA imposes strict fiduciary duties of loyalty and prudence upon Defendants as fiduciaries of the Plan. 29 U.S.C.

44

§1104(a)(1), states, in relevant part, that a fiduciary "shall discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries and (A) for the exclusive purpose of (i) providing benefits to participants and their beneficiaries; and (ii) defraying reasonable expenses of administering the plan."

90.    [T]he assets of a plan shall never inure to the benefit of any employer and shall be held for the exclusive purposes of providing benefits to participants in the plan and their beneficiaries and defraying reasonable expenses of administering the plan." 29 U.S.C. §1103(c)(1).

91.    Supplementing these general fiduciary duties, certain transactions are prohibited *per se* by 29 U.S.C. §1106 because they entail a high potential for abuse. Section 1106(a)(1) [ERISA §406(a)(1)] states, in pertinent part, that the fiduciary

> shall not cause the plan to engage in a transaction, if he knows or should know that such transaction constitutes a direct or indirect –
>   (C) furnishing of goods, services, or facilities between the plan and party in interest; [or]
>   (D) transfer to, or use by or for the benefit of a party in interest, of any assets of the plan[.]

45

92.     As the employer of the participants in the Plan, and entity that provided services to the Plan, and a fiduciary by exercising control over Plan assets and discretionary authority and control over the administration of the Plan, ADP TotalSource, Inc.is a party in interest. 29 U.S.C. §1002(14)(A), (B), and (C). ADP TotalSource Group, Inc. is a party in interest under 29 U.S.C. §1002(14)(A), (B), (C), and (E) because it is an employer of the participants in the Plan, and entity providing services to the Plan, a fiduciary by exercising control over Plan assets and exercising discretionary authority and control over the administration of the Plan, and owner all of the stock of ADP TotalSource, Inc. ADP is a party in interest under 29 U.S.C. §1002(14)(A) and (E) because it is a fiduciary by exercising control over Plan assets and exercising discretionary authority and control over the administration of the Plan and is an indirect owner of all of the stock of ADP TotalSource Group, Inc. and ADP TotalSource, Inc. Each of the individual defendants is a party in interest under 29 U.S.C. §1002(A) and (H) because they are named fiduciaries and officers and employees of ADP, ADP TotalSource Group, Inc., and/or ADP TotalSource, Inc. ADP executives consistently were unable to determine, upon

46

examination, what corporate subsidiary of ADP employed them. The documents used in the administration of the Plan repeatedly use the "ADP" logo and trademarks that ADP uses to identify itself to the public and its clients.

93.    Under 29 U.S.C. §1106(b) [ERISA §406(b)], fiduciaries are prohibited from engaging in self-dealing with Plan assets. Section 1106(b) provides that the fiduciary

> shall not—
>   (1) deal with the assets of the plan in his own interest or for his own account,
>   (2) in his individual or in any other capacity act in any transaction involving the plan on behalf of a party (or represent a party) whose interests are adverse to the interests of the plan or the interests of its participants or beneficiaries, or
> (3) receive any consideration for his own personal account from any party dealing with such plan in connection with a transaction involving the assets of the plan. [.]

94.    "Section 406(b) prohibits a plan fiduciary from engaging in various forms of self-dealing. Its purpose is to 'prevent[] a fiduciary from being put in a position where he has dual loyalties and, therefore, he cannot act exclusively for the benefit of a plan's participants and beneficiaries.'" *Reich v. Compton*, 57 F.3d 270, 287 (3d Cir. 1995) (Alito, J., quoting H.R. Rep. No. 93-1280 (1974)); see also 29 C.F.R.

47

§2550.408b-2(e)(1).

95.    The DOL explains in 29 C.F.R. § 2550.408b-2(e)(1):

> These prohibitions are imposed upon fiduciaries to deter
> them from exercising the authority, control, or responsibility
> which makes such persons fiduciaries when they have
> interests which may conflict with the interests of the plans
> for which they act. In such cases, the fiduciaries have
> interests in the transactions which may affect the exercise of
> their best judgment as fiduciaries.

96.    Although ERISA provides for exemptions from §1106(a)
prohibited transactions (as set forth in 29 U.S.C. §1108 and the
regulations thereunder), there are no exemptions from §1106(b)
prohibited transaction. *Nat'l Sec. Sys. v. Iola*, 700 F.3d 65, 94 (3d Cir.
2012); 29 C.F.R. §2550.408b-2(a); 29 C.F.R. §2550.408b-2(e).

97.    29 U.S.C. §1132(a)(2) authorizes a plan participant to bring
a civil action to enforce a breaching fiduciary's liability to the plan
under 29 U.S.C. §1109. Section 1109(a) provides in relevant part:

> Any person who is a fiduciary with respect to a plan who
> breaches any of the responsibilities, obligations, or duties
> imposed upon fiduciaries by this subchapter shall be
> personally liable to make good to such plan any losses to the
> plan resulting from each such breach, and to restore to such
> plan any profits of such fiduciary which have been made
> through use of assets of the plan by the fiduciary, and shall
> be subject to such other equitable or remedial relief as the
> court may deem appropriate, including removal of such
> fiduciary.

**B. Defendants unlawfully paid themselves from the Plan.**

98.    The Plan fiduciaries have included in the Plan investment options that are either mutual funds in share classes that provide revenue sharing or unitized accounts or collective trusts in which the Plan's recordkeeper or its trust/custodian affiliate maintains an account or trust that includes the underlying investment securities and cash and from which is deducted a percentage of the value of the account, termed a "recordkeeping fee," and which serves the same function as revenue sharing. The Plan fiduciaries control the amount of the recordkeeping fee in those accounts, as they control what investment options are included in the Plan (including the share class or amount revenue sharing deducted from the investment).

99.    Until 2013, all revenue sharing and recordkeeping fees were transferred to and held by the Plans' recordkeeper at the time (MassMutual Life Insurance Company) in an account called the Plan Expense Reimbursement Account (PERA) and from which Plan administrative expenses were paid, including recordkeeping fees for Mass Mutual, the compensation of the fiduciaries' legal counsel and advisor, and the compensation of Plan accountants.

49

100.  The PERA and all funds that were received in that account are and at all relevant times have been Plan assets which the Plan fiduciaries were obligated to use solely for the purpose of providing economic benefits to Plan participants or defraying reasonable expenses of administering the Plan and to not allow those assets to inure to the benefit of ADP or its subsidiaries. 29 U.S.C. §§ 1103(c)(1), 1104(a)(1)(A).

101.  Sometime in or around 2010, ADP or employees of ADP or its subsidiaries discovered that the PERA had an ongoing balance of nearly $1 million and was collecting $8.4 million each year in revenue sharing but paying only $6.7 million in Plan administrative expenses. ADP or employees of ADP or its subsidiaries recognized that they could have the PERA pay ADP $1.2 million each year out of the PERA and still have $500,000 left over in the PERA.

102.  Defendants claim that at a June 23, 2011 meeting, the Administrative Committee approved of a scheme whereby ADP employees in ADP's "ADP TotalSource" business would provide certain services to ADP's PEO clients who chose to participate in the Plan and the Plan would pay ADP TotalSource, Inc. $1.2 million each year for what was claimed to be the "expense" to ADP TotalSource, Inc. for those

50

employees to provide those services to ADP's PEO clients, including the employees' annual salary, taxes due on same, and employee benefits (including contributions and matching contributions to ADP's own corporate defined contribution plan). A total of 18 employees were supposed to provide those services.

103.   Under this scheme, a "Reimbursement Proposal" was supposed to have been submitted each year to the Administrative Committee with a request for reimbursement of $1.2 million in annual expense, including the name, position, responsibilities, salary, tax, and benefit expense for each reimbursed employee and a quarterly invoice was supposed to be submitted to the Administrative Committee for payment from the PERA to ADP TotalSource, Inc.

104.   No one submitted to the Administrative Committee or any other fiduciary of the Plan the "Reimbursement Proposal" referred to above, nor any "Reimbursement Proposal" for subsequent years.

105.   Defendants have not produced and have no minutes of a supposed June 23, 2011 Administrative Committee meeting, if such a meeting in fact occurred, or any other Administrative Committee meeting at which the Administrative Committee received a

51

"Reimbursement Proposal" or agreed to have the Plan contract with ADP or its subsidiaries to provide services to the Plan or use Plan assets to pay ADP or its subsidiaries from Plan assets.

106.  Defendants have not produced any written agreement by the Plan to hire ADP or its subsidiaries to perform services for the Plan exclusively in the interest of Plan participants, nor any written agreement that identifies the terms by which the Plan agreed to pay ADP or its subsidiaries for those services.

107.  No fiduciary of the Plan independent of ADP or its subsidiaries reviewed or approved of any arrangement for employees of ADP or its subsidiaries to provide services to the Plan or of paying Plan assets to ADP or its subsidiaries for such services.

108.  As part of ADP's PEO business, employees in ADP's TotalSource business unit provide customer service to ADP's PEO clients for the benefit of ADP's business. Those employees provide similar customer services for adopting employers who have joined the Plan. The purpose of these services is to boost ADP's TotalSource business and to retain the adopting employers as TotalSource clients. To the extent that those services relate to the Plan, they are services

52

that could be performed and usually are performed by the Plan's recordkeeper. Defendants have ADP employees perform those services instead so as to boost ADP's business. Defendants have caused the Plan to pay for these services in the form of "reimbursements" to ADP TotalSource, Inc. for the compensation and benefits of these employees. Thus, rather than working for the sole benefit of the plan participants as ERISA requires, the result of ADP's actions with those "reimbursements" is to lower the expenses and boost the profits of ADP TotalSource, Inc., which increases the profits of ADP TotalSource Group, Inc. and ADP.

109.  After ING Institutional Plan Services, LLC (ING) was hired to be the Plan's recordkeeper in 2013, the remaining assets in the PERA were transferred from MassMutual to ING National Trust (now Voya), an affiliate of Institutional Plan Services, LLC and trustee of the Plan's assets, and held in a Plan account.

110.  Defendants have caused the Plan's trustee to distribute to ADP TotalSource Inc. or other subsidiaries of ADP from the PERA $17 million from 2014 through 2021 (the last year for which Defendants

have provided information), and continues to do so, in the following

amounts each year:

| Year | Amount |
|------|--------|
| 2014 | $ 1,444,430 |
| 2015 | $ 1,013,076 |
| 2016 | $ 2,366,337 |
| 2017 | $          - |
| 2018 | $ 4,963,534 |
| 2019 | $ 2,257,515 |
| 2020 | $ 3,267,940 |
| 2021 | $ 1,347,000 |
| Total | $ 16,659,832 |

111.  Sergio Fernandez, purporting to act on behalf of the

Administrative Committee, instructed the Plan's trustee to pay ADP

TotalSource, Inc. a total of $2,414,345 in a series of letters of direction

from February 14, 2014 through July 15, 2015. No request for

reimbursement of these amounts nor any invoice for these amount were

presented to the Administrative Committee for approval or approved by

the Administrative Committee, nor did the Administrative Committee

authorize Fernandez to act on its behalf or the Plan in directing these

payments of Plan assets to ADP TotalSource, Inc.

112.  Defendant Mark Acquadro, purporting to act on behalf of the

Administrative Committee, instructed the Plan's trustee to pay ADP

TotalSource, Inc. a total of $5,120,912 in a series of letters of direction from February 18, 2016 through April 3, 2018. No request for reimbursement of these amounts nor any invoice for these amount was presented to the Administrative Committee or the Committee for approval or approved by the Administrative Committee or the Committee, nor did the Administrative Committee or the Committee authorize Acquadro to act on its behalf or the Plan in directing these payments of Plan assets to ADP TotalSource, Inc.

113.   Defendant Kristen Appleman, purporting to act on behalf of the Committee, instructed the Plan's trustee to pay ADP TotalSource, Inc. a total of $11,426,951 in a series of letters of direction from December 7, 2018 through March 9, 2022. No request for reimbursement of these amounts nor any invoice for these amount was presented to the Committee for approval or approved by the Committee, nor did the Committee authorize Acquadro to act on its behalf or the Plan in directing these payments of Plan assets to ADP TotalSource, Inc.

114.   Fernandez, Acquadro, and Appleman were acting on behalf of ADP and/or its subsidiaries in delivering Plan assets to ADP

TotalSource, Inc. to boost the profitability of ADP's TotalSource business unit and hence of ADP. Enhancing the profits of ADP and its TotalSource business increased the bonuses these executives (and the other executive committee members) received as compensation and increased the value of the stock and stock options they were granted as compensation. In exercising control over Plan assets, Fernandez, Acquadro, and Appleman acted as fiduciaries under 29 U.S.C. §1002(21)(A) and did not act solely in the interest of the Plan's participants, as required by 29 U.S.C. §1104(a)(1), but acted in the interest of ADP and its subsidiaries, in blatant violation of their fiduciary duties.

115.   Fernandez, Acquadro, and Appleman, as well as other executives of ADP or its subsidiaries who exercised control over Plan assets received stock options and/or other awards of stock in ADP and thus benefited from reducing the expenses and increasing the profits of ADP TotalSource, which increased ADP's profits and the value of their stock in ADP.

116.   ADP and ADP TotalSource Group, Inc. deny that ADP TotalSource Group, Inc. is a fiduciary to the Plan. Doc. 158 at 11 ¶27.

No Plan fiduciary, in the course of performing its fiduciary functions for the Plan, incurred the expenses for which ADP TotalSource, Inc. has been paid from the Plan. Therefore, these payments do not constitute reimbursements of the direct expenses properly and actually incurred by Plan fiduciaries incurred in the course of performing their fiduciary duties under 29 U.S.C. §1108(c)(2).

117.   Before 2019, different investment options in the Plan paid different amounts of revenue sharing, with the Voya Target Solutions funds charging the most for revenue sharing (55 bps), one fund paying no revenue sharing, and two funds paying only 10 and 15 bps in revenue sharing. The Voya Target Solutions funds constituted the largest investment in the Plan and was invested in by the least sophisticated participants. Defendants did not disclose to participants what was the revenue sharing portion of the total expense ratio of each Plan investment option. Defendants also did not disclose the nature and amount of the payments out of the Plan to ADP TotalSource, Inc. Key to Defendants' scheme was keeping the nature of these payments hidden from the participants whose retirement assets were paying them to the greatest extent possible.

57

118.  In February 2015, the Administrative Committee was presented with a proposal to level the revenue sharing fees of the Plan's investment options so that each investment option paid the same percentage of assets in revenue sharing. The Administrative Committee rejected that proposal out of concern for having to increase the revenue sharing component of the fees of Plan investment options that had lower total fees than others, which would reveal the excessive cost to participants of the amounts being paid to ADP and its subsidiaries in claimed administrative expenses. Only in 2019, during the course of a DOL investigation, did the Committee members finally set the revenue sharing component of all Plan investment options at the same percentage level.

119.  The revenue sharing that was deducted from participant investments diminished the returns on those investments, and the retirement assets of participants. The Committee controlled the amount of revenue sharing that was deducted from each Plan investment option.

120.  The amount of Plan assets that was retained in the PERA was excessive and increased each year from $4.4 million at the end of

2013 to $15 million at the end of 2020 (the last date for which

Defendants have provided information). Despite this increase in Plan

assets deducted from participant accounts (and accompanying

diminution in return on investments) and held in the PERA, the

Committee did not reduce the revenue sharing taken from Plan

investments until 2019, when the Committee reduced the revenue

sharing from 33 bps to 32 bps, when the PERA balance was $9.6 million

as the end of 2018. As of the end of 2019, despite this reduction, the

PERA balance was $12.2 million. By the end of 2020, the PERA balance

was $15 million. The Committee did not further reduce the revenue

sharing taken from Plan investments until 2021, when it reduced the

revenue sharing to 27 bps.

121.  Even though the amounts in the PERA were Plan assets

improperly deducted from participant accounts, the Committee did not

distribute all excess PERA balances back to the participants. The

Committee returned only $800,000 to participants in November 2015,

when the prior year-end balance was $4.8 million. By year-end 2015,

the PERA *still* had an excessive balance of $7.8 million. Only in 2021

did the Committee decide to make another distribution to participants,

59

this time in the amount of $5 million, even though the 2020 year-end balance was $15 million. As of the third quarter of 2022, the last date for which defendants have provided information, the PERA balance was $14.3 million. These actions have been depriving plan participants, and continue to deprive them of investment in the plan and the earnings on such investments.

122.   The Committee and its members retained excessive amounts in the PERA for the benefit of ADP and its subsidiaries to provide a source of funds with which to pay the business expenses of ADP and its subsidiaries.  The Committee and its members did so not act solely in the interest of participants, but instead for the benefit of ADP and its subsidiaries and executives who owned shares in ADP and thus would benefit from the increase in share price as a result of the benefit to ADP's finances from payments out of the PERA and whose compensation was based on the profitability of ADP or ADP's TotalSource business.

123.   Retention of these excessive amounts harmed participants because these excessive amounts should not have been deducted from participant accounts in the first place and participants thus have lost

retirement income and gains they would have received had these amount not been deducted from their investments. This lost investment opportunity constitutes a portion of the Plan's losses resulting from this breach and prohibited transaction.

### C. Defendants unlawfully caused the Plan to pay ADP's legal fees.

124.  Proskauer Rose was the attorney and counselor for ADP and its subsidiaries, including ADP TotalSource Group, Inc. For ADP TotalSource Group, Inc., Proskauer provided legal services related to the employee benefits portion of ADP's TotalSource PEO business, not for the Plan.. For its work, Proskauer charged a monthly retainer of $33,000 and hourly fees.

125.  The Committees did not hire Proskauer to provide any legal services for the Plan, and there is no written engagement letter between the Plan and Proskauer that establishes any engagement of Proskauer to provide legal services to the Plan solely in the interest of Plan participants or to Committee members in furtherance of their fiduciary responsibilities to the Plan and Plan participants. Proskauer instead was hired by ADP through its subsidiary ADP TotalSource Group, Inc. to advise those corporations and their executives on how to limit or

avoid liability as fiduciaries for breach of their duties under ERISA. The Committees did not engage the services of an independent fiduciary, acting solely in the interest of participants, to determine whether Proskauer should provide any of its services for the Plan or the fiduciaries or how much, if anything, the Plan should pay for those services.

126.   From 2014 through 2021, Plan assets have been removed from the PERA to pay Proskauer legal fees for ADP Total Source Group, Inc.'s business in the total amount of $2,653,470. Proskauer submitted invoices for the payment of its legal services to ADP TotalSource Group, Inc. to the attention of ADP's Senior Corporate ERISA Counsel Jennifer Tingle.

127.   Sergio Fernandez, purporting to act on behalf of the Administrative Committee, instructed the Plan's trustee to pay Proskauer a total of $125,073 in 2014. The Administrative Committee did not review or approve of the payment of these invoices. Instead, ADP Total Source Group, Inc.'s in-house counsel Jennifer Tingle directed that these Proskauer invoices be paid from the PERA.

128.   Defendant Mark Acquadro, purporting to act on behalf of the

Administrative Committee, instructed the Plan's trustee to pay Proskauer a total of $149,970 in 2015, $171,826 in 2016, and $121,315 in 2017. The Administrative Committee did not review or approve of the payment of these invoices. Instead, ADP Total Source Group, Inc.'s in-house counsel Jennifer Tingle directed that these Proskauer invoices be paid from the PERA.

129.  Defendant Kristen Appleman, purporting to act on behalf of the Committee, instructed the Plan's trustee to pay Proskauer a total of $172,130 in 2018, $720,892 in 2019, and $453,345 in 2020, the last year for which Defendants have provided information. The Committee did not review or approve of the payment of these invoices. Instead, ADP Total Source Group, Inc.'s in-house counsel Jennifer Tingle directed that these Proskauer invoices be paid from the PERA.

130.  The payments to Proskauer include payments for advice that Proskauer provided to ADP TotalSource Group, Inc. regarding how to charge the Plan for services purportedly provided to the Plan and regarding whether ADP TotalSource Group, Inc. could charge the Plan for particular items. Committee members also used Proskauer for routine ministerial work, such as drafting and reviewing minutes of

Committee meetings. ADP executives also relied on Proskauer for advice on what amounts they could charge to the Plan for the benefit of ADP.

131.  In addition, the payments from the Plan include payments to Proskauer for representing ADP and ADP TotalSource Group, Inc. in an audit by the U.S. Department of Labor that began in 2016. The total amount Defendants have paid from the Plan to Proskauer for representing the business interests of ADP and ADP TotalSource Group, Inc. in the DOL audit is over $986,000. Only in 2022, however, ADP's general counsel instructed Tingle to stop paying these invoices from the Plan because of "DOL's posture in the audit."

132.  Even though Proskauer was representing ADP and/or ADP TotalSource Group, Inc. in this work and provided work that benefited those corporations, Tingle, acting on behalf of ADP and ADP TotalSource Group Inc. had the Plan pay *all* of Proskauer's legal fees. In making that decision, she relied on thoroughly conflicted advice from Proskauer that the Plan should pay its legal fees.

133.  DOL's audit revealed that Defendants have made payments out of Plan assets for charges that were not lawfully payable from the

Plan and have failed to make timely contributions on behalf of participants to the Plan, costing participants approximately $2.6 million in lost earnings in their retirement accounts. In December 2022, ADP TotalSource Group, Inc. or ADP TotalSource, Inc. contributed to the Plan that amount of lost earnings. Even then, the Plan fiduciaries did not seek contribution from ADP or its subsidiaries for Proskauer's legal fees regarding this audit, all of which fees Defendants had paid out of the Plan.

134.   The matter of whether the Plan should pay for representing the interests of and defending ADP and ADP TotalSource Group, Inc. in the DOL audit was never presented to the Committee. Instead, the decision to hire Proskauer to represent the interests of ADP and ADP TotalSource Group, Inc. in the DOL audit and pay for that representation from Plan assets was made by ADP and its subsidiaries through ADP and ADP TotalSource Group, Inc. executives who were acting on behalf of those corporations and not solely in the interest of the Plan.

135.   The interests in the DOL audit of ADP and ADP TotalSource Group, Inc., as well as of the Committees and it members, were in

conflict with the interests of the Plan participants. Plan participants were interested in having DOL conduct a thorough and unfettered examination of the administration of the Plan and discover fiduciary breaches, correct errors, and restore to the Plan losses that resulted from fiduciary breaches. ADP, ADP TotalSource Group, Inc., their executives, and the Committees and it members, were interested in limiting DOL's examination and avoiding the discovery of fiduciary breaches and error and liability for restoring losses to the Plan. Proskauer thus could not represent the conflicting interests of these two groups and therefore did not represent the interest of Plan participants in the DOL audit.

136.  Proskauer was hired by ADP through its subsidiary ADP TotalSource Group, Inc. to advise those corporations and their officers on how to limit or avoid liability as fiduciaries for breach of their duties under ERISA. Therefore, none of Proskauer's invoices should have been paid from the Plan because those legal services were not provided exclusively for the benefit of Plan participants, but instead were provided for the benefit of ADP, ADP TotalSource Group, Inc., and their officers.

137.  The Plan and its participants did not receive any benefit from Proskauer's representation in the DOL audit, and in fact suffered a detriment from Proskauer's limitation on the information provided to the DOL and, therefore, should not have paid *any* of Proskauer's legal fees. Defendants' payment of those fees from the Plan demonstrates that they discharged their responsibilities to the Plan's not in the sole interest of the participants, but for the benefit of ADP and its subsidiaries.

### D. Defendants unlawfully caused the Plan to pay ADP's accounting expenses.

138.  As part its scheme to enrich itself from the Plan under the guise of reimbursing itself for Plan administrative expenses. ADP, acting through its subsidiaries, hired Crowe Horwath (later Crowe) in 2011 to provide "ADP TotalSource" to provide reports to be included in ADP's reimbursement letters of its review of billing entries made by ADP employees for whom ADP sought payment from the Plan. That contract specified that the reports Crowe provided were not intended to be relied on by any other person or organization and that the reports were solely for the information and use of ADP management and could not be used for any purpose.

67

139. In the course of its investigation of the Plan, DOL subpoenaed Crowe for records regarding these services and, upon discovering that it had no contract for providing services to the Plan, ADP immediately ceased providing any further services regarding the reimbursement letters until, as of 2018, ADP executed yearly contracts for the provision of its services to the Plan and to ADP's TotalSource business. The Committee was never presented with the decision of whether to have the Plan hire Crowe or pay Crowe for these services and never authorized these payments from the Plan, either before or after 2018. Instead, ADP executives, acting on behalf of ADP and its subsidiaries made that decision for the benefit of ADP and themselves because of the benefit to their compensation arrangements from reducing the expenses of ADP's TotalSource business.

140. The services that Crowe provided with respect to the reimbursement process were not provided for the exclusive benefit of Plan participants but, instead, primarily for the benefit of ADP. Charging the Plan for Crowe's services in this respect was a furtherance of ADP's scheme to unlawfully receive Plan assets and constitutes a portion of the Plan losses from this beach and prohibited transactions.

141.   The ADP Defendants did not engage an independent fiduciary to review and approve the ADP's scheme for putatively provided services to the Plan and obtaining reimbursement of the compensation of the ADP employees who provided those services. The ADP Defendants failed to engage an independent fiduciary determine whether it was in the interest of Plan participants to engage in this scheme or whether the services the ADP employees performed were necessary for the operation of the Plan, whether the amounts charged for those services were reasonable, and whether the payments constituted reimbursement of a fiduciary's direct expenses incurred in performing necessary services for the Plan and Plan participants.

142.   These prohibited transactions caused the Plan to suffer losses of more than $19 million, including at least $16 million in payments to ADP TotalSource, Inc., at least $2.6 million in payments to Proskauer Rose, and thousands of dollars more in payments to Crowe, in addition to lost investment opportunity and the float received by ADP, given that these funds came from deductions out of Plan investment options.

III.   **Defendants selected and retained imprudent investments in the Plan.**

A. **Prudent fiduciaries regularly monitor the performance and fees of investments and remove those investments that underperform and charge excessive fees.**

143.   Plan fiduciaries have exclusive control over the investment alternatives available in the plan. Plan participants direct and allocate the assets in their accounts to one or more of these alternatives. The investment returns are credited to participants' accounts.

144.   Each investment alternative is typically a pooled investment product, such as a mutual fund, and invests in a diversified portfolio of securities in a broad asset class such as fixed income or equities. Fixed income funds may include conservative principal protection options, such as stable value funds, or other diversified portfolios of government or corporate debt securities. Equity funds invest in diversified portfolios of stocks of large, mid-size, or small domestic or international companies in a particular style such as growth or value (or a blend of the two). Balanced funds invest in a mix of stocks and bonds in varying percentages.

145.   Investment alternatives can be passively or actively managed. In a passively managed or "index" fund, the investment

manager attempts to match the performance of a given benchmark index by holding a representative sample of securities in that index, such as the S&P 500. In an actively managed fund, the investment manager uses their judgment in buying and selling individual securities (*e.g.*, stocks, bonds, etc.) in an attempt to generate investment returns that surpass a benchmark index, net of fees. Because no stock selection or research is necessary for the manager to track the index and trading is limited, passively managed investments charge significantly lower fees than actively managed funds.

146.   The fees of mutual funds and other investment alternatives are usually expressed as a percentage of assets under management, or "expense ratio." For example, if the fund deducts 1% of fund assets each year in fees, the fund's expense ratio would be 1%, or 100 basis points (bps).[26] The fees deducted from a fund's assets reduce the value of the shares owned by fund investors.

147.   When selecting investments, the importance of fees cannot be overstated. Indeed, "the duty to avoid unwarranted costs is given increased emphasis in the prudent investor rule" under the common law

---

[26] One basis point is 1/100th of one percent or 0.01%.

of trusts, which informs ERISA's fiduciary duties. Restatement (Third) of Trusts ch. 17, intro. note (2007); *see Tibble*, 575 U.S. at 529 (citing Restatement (Third) of Trusts § 90 in finding a continuing duty to monitor under ERISA). As the Restatement explains, "cost-conscious management is fundamental to prudence in the investment function." Restatement (Third) of Trusts § 90 cmt. b. While a fiduciary may consider higher-cost, actively-managed mutual funds as an alternative to index funds, "active management strategies involve investigation expenses and other transaction costs . . . that must be considered, realistically, in relation to the likelihood of increased return from such strategies." Restatement (Third) of Trusts ch. 17, intro. note; *id*. § 90 cmt. h(2).

148.  Academic and financial industry literature demonstrate that high expenses are not correlated with superior investment management. Indeed, funds with high fees on average perform worse than less expensive funds even on a *pre-fee basis*. Javier Gil-Bazo & Pablo Ruiz-Verdu, *When Cheaper is Better: Fee Determination in the Market for Equity Mutual Funds*, 67 J. Econ. Behav. & Org. 871, 873 (2008); *see also* Jill E. Fisch, *Rethinking the Regulation of Securities*

*Intermediaries*, 158 U. Pa. L. Rev. 1961, 1993 (2010) (summarizing numerous studies showing that "the most consistent predictor of a fund's return to investors is the fund's expense ratio").

> [T]he empirical evidence implies that superior management is not priced through higher expense ratios. On the contrary, it appears that the effect of expenses on after-expense performance (even after controlling for funds' observable characteristics) is more than one-to-one, which would imply that low-quality funds charge higher fees. Price and quality thus seem to be inversely related in the market for actively managed mutual funds.

Gil-Bazo & Ruiz-Verdu, *When Cheaper is Better*, at 883.

149.  In light of this effect of fees on expected returns, fiduciaries must carefully consider whether the added cost of actively managed funds is realistically justified by an expectation of higher returns net of all expenses. Restatement (Third) of Trusts ch. 17, intro. note; *id*. § 90 cmt. h(2). Nobel Prize winners in economics have concluded that virtually no investment manager consistently beats the market over time after fees are taken into account. "Properly measured, the average actively managed dollar must underperform the average passively managed dollar, net of costs." William F. Sharpe, *The Arithmetic of*

73

*Active Management,* 47 Fin. Analysts J. 7, 8 (Jan./Feb. 1991);[27] Eugene F. Fama & Kenneth R. French, *Luck Versus Skill in the Cross-Section of Mutual Fund Returns*, 65 J. Fin. 1915, 1915 (2010) ("After costs . . . in terms of net returns to investors, active investment must be a negative sum game.").

150.  To the extent managers show any sustainable ability to beat the market before expenses, the outperformance is nearly always dwarfed by mutual fund expenses. Fama & French, *Luck Versus Skill in the Cross-Section of Mutual Fund Returns*, at 1931–34; *see also* Russ Wermers, *Mutual Fund Performance: An Empirical Decomposition into Stock-Picking Talent, Style, Transaction Costs, and Expenses*, 55 J. Fin. 1655, 1690 (2000) ("on a net-return level, the funds underperform broad market indexes by one percent per year").

151.  If an individual high-cost mutual fund exhibits market-beating performance over a short period of time, studies demonstrate that outperformance during a particular period is not predictive of whether a mutual fund will perform well in the future. Laurent Barras et al., *False Discoveries in Mutual Fund Performance: Measuring Luck*

---

[27] Available at https://www.tandfonline.com/doi/10.2469/faj.v47.n1.7.

*in Estimated Alphas*, 65 J. Fin. 179, 181 (2010); Mark M. Carhart, *On Persistence in Mutual Fund Performance*, 52 J. Fin. 57, 57, 59 (1997) (measuring thirty-one years of mutual fund returns and concluding that "persistent differences in mutual fund expenses and transaction costs explain almost all of the predictability in mutual fund returns"). However, the *worst-performing* mutual funds show a strong, persistent tendency to continue their poor performance. Carhart, *On Persistence in Mutual Fund Performance*, at 57.

152.  Accordingly, investment costs are of paramount importance to prudent investment selection, and a prudent investor will not select higher-cost actively managed funds without a documented process to realistically conclude that the fund is likely to be that extremely rare exception, if one even exists, that will outperform its benchmark index over time, net of investment expenses.

153.  Prudent fiduciaries require that a fund's time-weighted returns over a relevant period must compare favorably with the performance of the appropriate benchmark index or passively managed equivalent when deciding whether to select or retain an investment in a defined contribution plan. Experts in the industry state that when an

actively managed fund underperforms the proper benchmark for three-years trailing, then it is highly unlikely it will outperform in the future, including over the five-year trailing period. When the fund's prior rolling performance falls below the benchmark over a three-year period, the fiduciary should remove the fund from the defined contribution plan. Moreover, the path to meeting this criterion includes several other triggers (such as qualitative concerns and risk assessments) whereby the fiduciary would have initiated other analysis and communicated accordingly to the underperforming manager.

154.   Defendants select and retain investment alternatives into which participants' investments are directed. Defendants also select those investment options that are removed from the Plan. These investments are designated by Defendants as designated investment alternatives offered under the Plan.

155.   Defendants failed to adequately monitor performance for investments in the Plan, and failed to engage in a prudent decision-making process when adding investments to the Plan after 2014.

## B. Defendants selected and retained imprudent, consistently underperforming, high-cost investments.

### 1. *Voya Large Cap Value Portfolio*

156.  The Voya Large Cap Value Portfolio I (IPEIX) was a large cap value investment option in the Plan from August 2013 until it was replaced during 2017. In 2014, the Fund changed its name from ING Large Cap Value Portfolio. It was added to the Plan immediately after Voya became the recordkeeper. Defendants replaced the MassMutual Fundamental Value Fund with the Voya Large Cap Value Portfolio I (IPEIX).[28] Defendants changed this fund option from one recordkeeper's proprietary fund to the new recordkeeper's proprietary fund, with no reason other than to benefit the recordkeeper and themselves.

157.  From 2013 through 2016, the Fund held $133 million to $158.4 million of participants' retirement assets.

158.  When the Voya Large Cap Value Portfolio was added to the Plan, the Fund's performance had already begun to deteriorate. As of March 31, 2013, for the prior one-year period, the Voya Large Cap

---

[28] *See* ADP TotalSource Retirement Savings Plan, *Exciting Changes Coming to Your 401(k) Plan* at 4 ("Transition Guide").

Value Portfolio substantially underperformed its benchmark (Russell 1000 Value Index) by 202 bps.[29]

159.   The Fund's underperformance continued. As of December 31, 2013, the Fund underperformed its benchmark by 167 bps for one year, and 79 bps over the trailing five-year period.[30] *See infra.* The Fund also underperformed its benchmark over the trailing three-year period.

|  | 1 Year | 5 Year |
|---|---|---|
| Voya Large Cap Value Portfolio | 30.86% | 15.88% |
| Russell 1000 Value Index | 32.53% | 16.67% |

160.   Apart from the benchmark, the Fund underperformed lower-cost alternatives of the same investment style. The Vanguard Value Index I (VIVIX) is a comparable large cap value index fund that charged 8 bps as of December 31, 2013, and was available to the Plan.[31] In contrast to the Vanguard index fund, Voya charged 60 bps (net) on the Voya Large Cap Value Portfolio during 2013.[32] The Vanguard index

---

[29] Transition Guide at 16.

[30] ING Investors Trust, N-CSR, Dec. 31, 2013, https://www.sec.gov/Archives/edgar/data/837276/000119312514086721/d657793dncsr.htm.

[31] Vanguard Index Funds, N-CSR, Dec. 31, 2013, https://www.sec.gov/Archives/edgar/data/36405/000093247114004906/index_final.htm.

[32] Transition Guide at 16.

fund was 650% cheaper than the Voya Large Cap Value Portfolio, and had a history of superior investment returns. A similar difference in fees existed from 2014 through 2017.[33]

161.  For the trailing one- and five-year periods as of December 31, 2013, the Vanguard index fund outperformed the Voya Large Cap Value Portfolio.[34] *See infra.* The Fund also underperformed the Vanguard index fund over the trailing three-year period.

| Fund | 1 Year | 5 Year |
|------|--------|--------|
| Voya Large Cap Value Port I (IPEIX) | 30.86% | 15.88% |
| Vanguard Value Index (Inst) (VIVIX) | 33.07% | 16.29% |
| (+/-) Difference | -2.21% | -0.41% |

162.  In each year from 2012 through 2017, the Fund underperformed both its benchmark (Russell 1000 Value) and the Vanguard Value Index Fund.[35]

---

[33] Vanguard charged 4–8 bps, in comparison to 64 bps charged by Voya. *See* Morningstar; ADP TotalSource Retirement Savings Plan, Disclosure of Plan-Related Information, Dec. 31, 2015, at 5.

[34] Vanguard Index Funds, N-CSR, Dec. 31, 2013.

[35] Investment returns obtained from Morningstar.

| Fund | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 |
|---|---|---|---|---|---|---|
| Voya Large Cap Value Port I (IPEIX) | 14.71% | 30.86% | 10.09% | -4.46% | 13.89% | 13.55% |
| Vanguard Value Index (Inst) (VIVIX) | 15.20% | 33.07% | 13.19% | -0.85% | 16.87% | 17.14% |
| (+/-) Difference | -0.49% | -2.21% | -3.10% | -3.61% | -2.98% | -3.59% |

| Fund | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 |
|---|---|---|---|---|---|---|
| Voya Large Cap Value Port I (IPEIX) | 14.71% | 30.86% | 10.09% | -4.46% | 13.89% | 13.55% |
| Russell 1000 Value Index | 17.51% | 32.53% | 13.45% | -3.83% | 17.34% | 13.66% |
| (+/-) Difference | -2.80% | -1.67% | -3.36% | -0.63% | -3.45% | -0.11% |

163.   A prudent fiduciary will thoroughly monitor the performance of investment options provided in a defined contribution plan at least on a quarterly basis. An actively managed fund's returns over a prior rolling three-year period must compare favorably with the performance of an appropriate benchmark index or passively managed equivalent. When the fund's prior rolling three-year performance falls below the benchmark, the fiduciary would remove the fund from a defined contribution plan. This is because once an actively managed fund has failed to outperform its benchmark or passively managed equivalent

over a trailing three-year period, it is highly unlikely that the Fund will outperform relative to the benchmark in coming years.

164.   Defendants failed to continuously monitor the performance of the Voya Large Cap Value Portfolio. They failed to make a reasoned determination that maintaining the Fund was prudent in light of lower-cost and better-performing alternatives, in the best interest of Plan participants, or would generate investment returns that would exceed the benchmark or passively managed equivalent. Given the consistent underperformance, and deteriorating performance since the Voya Large Cap Value Portfolio was added to the Plan, a prudent fiduciary continuously monitoring the Plan's investment options would have removed the Fund and replaced it with a lower-cost and better performing alternative.

165.   Defendants did not decide to remove the Voya Large Cap Value fund until March 2017 and did not complete that removal until May 2017. Instead of replacing the Voya Large Cap Value with a better performing index alternative such as the Vanguard Value Index fund, Defendants replaced it with another actively managed fund—the American Funds Washington Mutual Fund. Defendants did not even

81

consider a passive index replacement for this investment category. The American Funds Washington Mutual Fund itself was an imprudent investment option for the reasons stated below.

166.  Had Defendants replaced the Voya Large Cap Value Portfolio I with the Vanguard Value Index (Instl) as of the start of the class period (no later than June 30, 2014), Plan participants would not have lost in excess of $39.4 million of their retirement savings.[36]

167.  Given its consistent poor performance, and in light of Defendants' incentives to act for the benefit of Voya, as alleged in more detail herein, Defendants retained the Voya Large Cap Value Portfolio I to benefit Voya rather than based on an independent investigation of the merits of the investment and because Voya paid additional funds into the PERA, on top of the revenue sharing deducted from that investment option, for the benefit primarily of ADP.

---

[36] Damages are measured by the difference in investment returns of the Voya Fund and the Vanguard alternative from June 30, 2014 through December 31, 2017. The losses are carried forward through December 31, 2019 using the investment returns of the Vanguard alternative to account for lost investment opportunity. Total Plan losses will be determined at trial after complete discovery in this case and are continuing.

168.   A fiduciary with any semblance of prudent investment monitoring process would have removed the Voya Large Cap Value Portfolio I from the Plan after engaging in a diligent review at any one of multiple points in time throughout the class period.

### 2. *Voya Large Cap Growth Portfolio*

169.   The Voya Large Cap Growth Portfolio I (IEOHX), another Voya proprietary fund, was added to the Plan in August 2013 only because of the change in recordkeepers from MassMutual to Voya. In 2014, the Fund changed its named from ING Large Cap Growth Portfolio. The Fund still remains an investment option in the Plan, charging 69 bps.[37]

170.   As of December 31, 2014, the Voya Large Cap Growth Portfolio underperformed its benchmark (Russell 1000 Growth) over the trailing five-year period.[38] As of December 31, 2015, the Fund underperformed its benchmark index for the trailing three years.[39]

---

[37] ADP TotalSource Retirement Savings Plan, Disclosure of Plan-Related Information, Sept. 30, 2019, at 6.

[38] Voya Investors Trust, N-CSR, Dec. 31, 2014, https://www.sec.gov/Archives/edgar/data/837276/000157104915001720/t1402358_ncsr.htm.

[39] *See* ADP TotalSource Retirement Savings Plan, Disclosure of Plan-Related Information, Dec. 31, 2015, at 4.

171.  The Vanguard Growth Index Fund (Instl) (VIGIX) is a comparable large cap growth fund, and was available to the Plan. In 2015, the Vanguard Growth Index charged 7 bps. From 2016–2019, the Fund charged 5–4 bps.[40] In comparison, Voya charged 67 bps on the Voya Large Cap Growth Fund in 2015, and 69 bps as of 2019.[41] The Vanguard index fund was up to 1,625% cheaper than the Plan's Voya large cap growth fund.

172.  As of March 31, 2020, the Voya Large Cap Growth Portfolio I underperformed its benchmark over year-to-date, one-, three-, five-, and ten-year reporting periods.[42]

|  | YTD | 1 year | 3 years | 5 years | 10 years |
|---|---|---|---|---|---|
| Voya Large Cap Growth Port I | -14.32 | -1.00 | 9.96 | 9.05 | 12.37 |
| Russell 1000 Growth TR USD | -14.10 | 0.91 | 11.32 | 10.36 | 12.97 |
| US Fund Large Growth | -15.52 | -3.81 | 8.61 | 7.53 | 10.52 |

---

[40] The expense ratios were obtained from Morningstar.

[41] ADP TotalSource Retirement Savings Plan, Disclosure of Plan-Related Information, Dec. 31, 2015, at 5; ADP TotalSource Retirement Savings Plan, Disclosure of Plan-Related Information, Sept. 30, 2019, at 6.

[42] Voya Large Cap Growth Portfolio I Fact Sheet, Q1 2020.

173.  Given the deteriorating performance since the Voya Large Cap Growth Portfolio was added to the Plan, a prudent fiduciary continuously monitoring the Plan's investment options would have removed the Fund and replaced it with a lower-cost and better performing alternative once it underperformed its benchmark over a trailing three-year period.

174.  Given its consistent poor performance, and in light of the ADP Defendants' incentives to act for the benefit of Voya, as alleged in more detail herein, the ADP Defendants added and retained the Voya Large Cap Growth Portfolio I to benefit Voya and themselves rather than based on an independent investigation into the merits of the investment.

175.  As demonstrated by the Fund's retention after years of underperforming its benchmark, Defendants failed to continuously monitor the performance of the Voya Large Cap Growth Portfolio. Defendants failed to make a reasoned decision that maintaining the actively managed Voya Large Cap Growth Portfolio was prudent, in the best interest of Plan participants, or would generate returns in excess of the benchmark or passively managed equivalent in subsequent periods.

85

Defendants retained the Voya Large Cap Growth Portfolio because Voya paid additional funds into the PERA, on top of the revenue sharing deducted from that investment option, for the benefit primarily of ADP.

176.  Had Defendants removed the Voya Large Cap Growth Portfolio I and replaced it with the Vanguard Growth Index (Instl) by December 31, 2015 after it underperformed its benchmark over the trailing three year period, Plan participants would not have lost in excess $10.4 million of their retirement savings.[43]

### 3. Federated Clover Small Cap Value Fund

177.  In connection with the selection of Voya as recordkeeper, the Federated Clover Small Cap Value Fund (Instl) (VSFIX) was added as a Plan investment option. The Fund replaced the MassMutual Select Small Company Value Fund.[44]

178.  At the time the Fund was added to the Plan, it already had a recent history of underperformance. As of March 31, 2013, for the prior

---

[43] Damages are measured by the difference in investment returns of the Voya Fund and the Vanguard alternative from December 31, 2015 through December 31, 2019. Total Plan losses will be determined at trial after complete discovery in this case and are continuing.

[44] Transition Guide at 4.

one- and three-year periods, the Federated Clover Small Cap Value Fund underperformed its benchmark (Russell 2000 Value).[45] The Fund also charged 104 bps.

179.   Following its inclusion in the Plan, the Fund's performance did not improve but continued to underperform. As of December 31, 2013, for the trailing one- and three-year periods, the Fund substantially underperformed its benchmark. For one year, the Fund underperformed by 270 bps, and for three years, it underperformed cumulatively by 684 bps.[46]

180.   Apart from underperforming its benchmark, the Fund underperformed lower-cost alternatives. The Vanguard Small Cap Value Index (Instl) (VSIIX) is a small cap value index that charged 8 bps as of December 31, 2013, and was available to the Plan.[47] In contrast, the Federated Fund charged 104 bps during 2013.[48] From

---

[45] Transition Guide at 16.

[46] Investment returns obtained from Morningstar. The cumulative underperformance was determined by summing the prior years of underperformance: 2011 (4 bps), 2012 (382 bps), and 2013 (270 bps).

[47] Vanguard Index Funds, N-CSR, Dec. 3,1 2013, https://www.sec.gov/Archives/edgar/data/36405/000093247114004906/index_final.htm.

[48] Transition Guide at 14.

2016–2019, the Federated Fund charged 101 bps compared to 6 bps for Vanguard.[49] As a result, the Vanguard index fund was up to 1,583% cheaper than the Federated Fund yet substantially outperformed.

181.   For the trailing one-, five-, and ten-year periods, as of December 31, 2013, the Vanguard index fund substantially outperformed the Federated Fund. *See infra*. The Vanguard index fund also substantially outperformed over the trailing 3 years.[50]

| Fund | 1 Year | 5 Year | 10 Year |
|---|---|---|---|
| Federated Clover Small Cap Value (Instl) (VSFIX) | 31.82% | 18.17% | 9.11% |
| Vanguard Small Cap Value Index (Inst) (VSIIX) | 36.55% | 20.54% | 9.73% |
| (+/) Difference | -4.73% | -2.37% | -0.62% |

182.   For each year from 2011 through 2016, the Federated Fund underperformed the Vanguard index fund, and for eight of the nine years from 2011 through 2019, it underperformed that comparable index fund.

---

[49] Expense ratios obtained from Morningstar.
[50] Investment returns obtained from Morningstar.

183.  As of March 31, 2020, the Federated Clover Small Cap Value Fund underperforming its benchmark over the trailing one-, three-, five-, and ten-year periods.[51]

184.  Defendants failed to continuously monitor the performance of the Federated Small Cap Value Fund when it became clear the active manager was unable to outperform its benchmark net of expenses. They failed to make a reasonable determination that maintaining the Federated Fund was prudent, in the best interest of Plan participants, or would generate returns in excess of the benchmark or passively managed equivalent in subsequent periods.

185.  Given the Federated Clover Small Cap Value Fund underperformed its benchmark since it was added to the Plan, and that underperformance continued thereafter, a prudent fiduciary continuously monitoring the Plan's investment alternatives would have removed the Fund and replaced it with a lower-cost and better performing investment alternative, including once it underperformed its benchmark over a trailing three-year period. Defendants did not

---

[51] Federated Clover Small Cap Value Fund Fact Sheet, Q1 2020.

remove the Federated Clover Small Cap Value Fund until August 2020, and then replaced it with another actively managed fund—the BMO Disciplined Small Cap Value fund—without considering a passive index replacement such as the Vanguard Small Cap Value Index.

186.  Had Defendants removed the Federated Clover Small Cap Value Fund (Instl) and replaced it with the Vanguard Small Cap Value Index (Instl) as of the start of the class period (no later than June 30, 2014), Plan participants would not have lost in excess $15.1M of their retirement savings.[52]

### 4. American Funds Washington Mutual Investors  Fund

187.  The American Funds Washington Mutual Investors Fund (R4) (RWMEX) is a large cap blend investment option that was added to the Plan during 2017. When the Fund was added, it charged 64 bps.[53]

188.  American Funds identifies the S&P 500 Index as its benchmark. At the time Defendants were considering adding the American Funds Washington Mutual Investors Fund to the Plan, the

---

[52] Damages are measured by the difference in investment returns of the Federated Fund and the Vanguard alternative from June 30, 2014 through December 31, 2019. Total Plan losses will be determined at trial after complete discovery in this case and are continuing.

[53] Expense ratio obtained from Morningstar.

manager demonstrated its inability meet its active management investment objective of generating investment returns that exceeded its benchmark net of expenses. As of December 31, 2016, the Fund underperformed its benchmark over five- and ten-year periods.[54]

| Fund | 5-Year | 10-Year |
|------|--------|---------|
| American Funds Washington Mutual Investors (R4) (RWMEX) | 13.27% | 6.45% |
| S&P 500 Index | 14.66% | 6.95% |
| (+/) Difference | -1.39% | -0.50% |

189.  As of December 31, 2016, the Fund likewise underperformed the Vanguard Institutional Index (Instl Plus) (VIIIX), an S&P 500 index fund that charged only 2 bps, over five- and ten-year periods.[55] The Vanguard index fund also was available to the Plan. For the trailing three-year period as of December 31, 2016, the American Funds mutual fund underperformed both its benchmark and the Vanguard S&P 500 index fund.

[54] Washington Mutual Investors Fund, Form N-1A, Apr. 7, 2017, https://www.sec.gov/Archives/edgar/data/104865/000005193117000682/wmif485b.htm.

[55] Vanguard Institutional Index Funds, Form N-CSR, Dec. 31, 2016, https://www.sec.gov/Archives/edgar/data/862084/000093247117003360/institlindexfinal.htm.

190.   With an expense ratio of 2 bps compared to 64 bps for the American Funds option from 2017 through 2019, the Vanguard S&P 500 index fund was 3,100% cheaper.[56]

191.   As of March 31, 2020, the American Funds Washington Mutual Investors Fund underperformed its benchmark over all reporting periods (year-to-date, one-, three-, five-, and 10-years).[57]

192.   Given the American Funds Washington Mutual Investors Fund's underperformance, including its inability to outperform its benchmark and a passively managed alternative over a trailing three-year period as of December 31, 2016, a prudent fiduciary would not have included this actively managed fund in the Plan.

193.   Had Defendants selected the Vanguard Institutional Index Fund (Instl Plus) rather than the underperforming American Funds Washington Mutual Investors Fund (R4) during 2017, Plan participants would not have lost in excess $7.96M of their retirement savings.[58]

---

[56] Expense ratios obtained from Morningstar.

[57] American Funds Washington Mutual Investors Fund Fact Sheet, Q1 2020.

[58] Damages are measured by the difference in investment returns of the American Funds' fund and the Vanguard alternative from January 1, 2018 through December 31, 2019. Total Plan losses will be

### 5. *Voya Target Solution Collective Trusts*

194.  Target date funds are designed to provide a single diversified investment vehicle for participants. In general, they can be attractive to participants who do not want to actively manage their retirement savings to maintain a diversified portfolio. Target date funds automatically rebalance their portfolios to become more conservative as the participant gets closer to retirement. The "target date" refers to the participant's target retirement date, and is often part of the name of the fund. For instance, target date "2030" funds are designed for individuals who intend to retire in the year 2030.

195.  Since August 2013, the Voya Target Solution Trusts have been the Plan's target date fund solution. The target date funds were previously named the ING Target Solution Trusts. From 2014 through 2018, the Voya Target Solution Trusts held a substantial percentage of the Plan's total assets. According to the Plan's Form 5500, in 2014, the Voya target date funds accounted for $856.6 million of the Plan's $2.734

---

determined at trial after complete discovery in this case and are continuing.

billion in assets (or 31%). By 2018, the Voya target date funds had $1.5 billion of the Plan's $4.4 billion in assets (or 34%).

196.  The Voya Target Solution Trusts are actively managed target date funds. Defendants added the Voya target date funds to the Plan shortly after the selection of Voya as the Plan's recordkeeper during 2013, because Voya became recordkeeper. These funds replaced the existing target date fund solution, the Wells Fargo Advantage target date funds.[59] At the time they were added to the Plan, the Voya target date funds had less than five years of performance history since they were created on December 1, 2009.[60]

197.  Given their consistent poor performance, and in light of the ADP Defendants' incentives to act for the benefit of Voya, as alleged in more detail herein, Defendants retained the Voya target date funds to benefit Voya and themselves rather than based on an independent investigation of the merits of the investments.

198.  Using the Voya target date funds benefitted ADP because they allowed ADP to charge revenue sharing in the funds to fund the

---

[59] *See* Transition Guide at 4.
[60] Transition Guide at 20.

94

PERA and benefit ADP. Until 2016, Defendants charged the highest asset-based fee to fund the PERA in the Voya target date funds (55 bps). The Voya target date funds generated more revenue for the PERA than any other Plan investment option and generated nearly half of the PERA revenues from 2014 through 2016.

199.  The Voya Target Solution Trusts became the Qualified Default Investment Alternative ("QDIA"). If a participant has not made or does not make an investment election, any contributions she receives or makes to the Plan are automatically defaulted in the QDIA.

200.  Selecting, monitoring, and replacing the QDIA takes on added importance. 401(k) participants rarely make trades in their plan account.[61] Therefore, participants may solely rely on their single target date fund selection over their investment horizon to meet their retirement goals, which underscores the importance of a prudent and loyal section and continuous oversight of a plan's target date fund vehicle.

---

[61] Olivia Mitchell, Gary Mottola, Stephen Utkus, and Takeshi Yamaguchi, *The Inattentive Participant: Portfolio Trading Behaviors in 401(k) Plans*, at 17–18 (June 2006).

201.  Both prior to and after the Voya Target Retirement Trusts were added to the Plan, they have underperformed their stated benchmark index. ADP and Voya have identified the S&P Target Date Index for the corresponding target dated fund as the benchmark.[62]

202.  Prior to being added to the Plan, as of March 31, 2013, each of the target dated Voya Target Solution Trusts underperformed their benchmark for the trailing three-year reporting period.[63]

| Plan  Investment | Benchmark | Percentage of Underperformance (Three Year) |
|---|---|---|
| ING Target Solution Trust: 2015 | S&P Target Date 2015 Index | 15.32% |
| ING Target Solution Trust: 2020 | S&P Target Date 2020 Index | 13.24% |
| ING Target Solution Trust: 2025 | S&P Target Date 2025 Index | 8.52% |
| ING Target Solution Trust: 2030 | S&P Target Date 2030 Index | 9.62% |
| ING Target Solution Trust: 2035 | S&P Target Date 2035 Index | 6.79% |

---

[62] *E.g.,* Transition Guide at 16; ADP TotalSource Retirement Savings Plan, Disclosure of Plan-Related Information, Dec. 31, 2015, at 3.

[63] Transition Guide at 16.

| | | |
|---|---|---|
| ING Target Solution Trust: 2040 | S&P Target Date 2040 Index | 12.40% |
| ING Target Solution Trust: 2045 | S&P Target Date 2045 Index | 7.00% |
| ING Target Solution Trust: 2050 | S&P Target Date 2050 Index | 8.41% |
| ING Target Solution Trust: 2055 | S&P Target Date 2055 Index | 5.41% |

203. After being included in the Plan for over two years, as of December 31, 2015, each of the target dated Voya Target Solution Trusts underperformed their benchmark for the trailing five-year reporting period.[64]

| Plan  Investment | Benchmark | Percentage of Underperformance (Five Year) |
|---|---|---|
| Voya Target Solution Trust: 2020 | S&P Target Date 2020 Index | 8.25% |
| Voya Target Solution Trust: 2025 | S&P Target Date 2025 Index | 9.31% |
| Voya Target Solution Trust: 2030 | S&P Target Date 2030 Index | 6.97% |

---

[64] ADP TotalSource, Quarterly Investment Summary, Dec. 31, 2015, at 3.

| Voya Target Solution Trust: 2035 | S&P Target Date 2035 Index | 8.37% |
|---|---|---|
| Voya Target Solution Trust: 2040 | S&P Target Date 2040 Index | 7.65% |
| Voya Target Solution Trust: 2045 | S&P Target Date 2045 Index | 5.72% |
| Voya Target Solution Trust: 2050 | S&P Target Date 2050 Index | 5.87% |
| Voya Target Solution Trust: 2055 | S&P Target Date 2055 Index | 4.72% |

204.  Despite the Voya target date funds' underperformance relative to their benchmarks prior to and after their inclusion in the Plan, Defendants failed to make a reasoned decision whether maintaining the actively managed Voya target date funds was in the best interest of Plan participants or prudent as the QDIA when lower-cost and better performing alternatives were available in the market. Defendants thus failed to make a reasoned determination whether the actively managed Voya target date funds could be expected to generate returns in excess of the benchmark index net of expenses in subsequent periods.

205.   From 2013 through at least 2015, the Voya Retirement

Solution Trusts charged 91 bps.[65] As of September 30, 2019, Voya

presently charges 66 bps.[66]

206.   In comparison, Vanguard offers substantially lower-cost

mutual funds and collective trust target date funds that were available

to the Plan. Since 2003, Vanguard has offered the Vanguard Target

Retirement Funds (Investor shares), and since June 2015, has offered

them in the lower-cost Institutional Target Retirement Funds.[67] From

2013 through 2019, the Investor shares charged 16–17 bps, and the

Institutional funds charged 9 bps.[68] The Voya Retirement Solution

---

[65] Transition Guide at 16; ADP TotalSource Retirement Savings Plan, Disclosure of Plan-Related Information, Dec. 31, 2015, at 5.

[66] ADP TotalSource Retirement Savings Plan, Disclosure of Plan-Related Information, Sept. 30, 2019, at 4.

[67] Vanguard Chester Funds, Form N-CSR, Mar. 31, 2006, https://www.sec.gov/Archives/edgar/data/752177/000093247106000887/chesterfundsfinal.htm; Vanguard Chester Funds, Form N-CSR, Sept. 30, 2019, https://www.sec.gov/Archives/edgar/data/752177/000110465919068922/a19-22238_1ncsr.htm.

[68] *E.g.,* Vanguard Chester Funds, Form N-CSR, Sept. 30, 2014, https://www.sec.gov/Archives/edgar/data/752177/000093247114006878/chester_final.htm; Vanguard Chester Funds, Form N-CSR, Sept. 30, 2019, https://www.sec.gov/Archives/edgar/data/752177/000110465919068922/a19-22238_1ncsr.htm.

trusts thus charged as much as over 1,000% the fees of Vanguard target date funds. Since June 2007, Vanguard also has offered lower-cost collective trust versions of its target date funds called the Vanguard Target Retirement Trusts. From 2013 through 2019, the Plus shares charged 6–7 bps, and from 2015 through 2019, the Select shares charged 5 bps.[69]

207.  In addition to the Voya Retirement Solution Trusts, since December 2012, Voya has offered the retail mutual fund equivalent of the collective trust target date funds through the Voya Target Retirement Funds.[70] The collective trusts and mutual funds are managed by the same portfolio manager using the same investment objective and glide path.[71] Accordingly, the investment returns of the

---

[69] *E.g.,* Vanguard Target Retirement 2020 Trust Plus Fact Sheet, Mar. 31, 2019, https://institutional.vanguard.com/iippdf/pdfs/FS1653.pdf; Vanguard Target Retirement 2020 Trust Select Fact Sheet, Mar. 31, 2019, https://institutional.vanguard.com/iippdf/pdfs/FS1676.pdf.

[70] Voya Separate Portfolios, Form N-CSR, May 31, 2014, https://www.sec.gov/Archives/edgar/data/1392116/000157104914003741/t1401474_n-csr.htm.

[71] *See, e.g.*, Voya Separate Portfolios, Form N-CSR, May 31, 2014, https://www.sec.gov/Archives/edgar/data/1392116/000157104914003741/t1401474_n-csr.htm; Transition Guide at 19; Voya Target Solution Trust Series, Holistic Retirement Solution: Helping Participants Meet Their Retirement Goals,

Voya target date mutual funds reasonably approximate the returns of the similar Voya Retirement Solution Trusts included in the Plan.[72]

208.   From 2013 through 2019, the Voya Target Retirement I target date mutual funds have consistently underperformed the lower-cost Vanguard Target Retirement target date mutual funds.[73] For 2013 and 2014, each of the target dated Voya funds (*i.e.,* 2020–2060 target date) underperformed the comparable Vanguard Target Retirement target date funds. For the three-year period ending December 31, 2015, these Voya target date funds cumulatively underperformed the Vanguard target date alternatives based on the relative performance of the Voya and Vanguard funds during that period.

---

https://institutional.voya.com/document/investor-guide/voya-target-solution-trust-series-investor-guide.pdf; Voya Target Retirement 2030 Fund Fact Sheet, 4Q 2019, file:///C:/Users/kurt/Downloads/voya-target-retirement-2030-fund-fact-sheet.pdf..

[72] Because the annual returns for the Voya Retirement Solution Trusts are not publicly available, the investment returns of the Voya Target Retirement mutual funds were relied on for comparison purposes.

[73] Vanguard Target Retirement Investor "Inv" shares were used from 2013–2015, and the Vanguard Institutional Target Retirement Funds were used thereafter. The investment returns were obtained from Morningstar.

209. As of December 31, 2019, each of the Voya Retirement Solution Trusts in the Plan underperformed their benchmarks for the trailing five-year period.[74]

| Plan  Investment | Benchmark | Percentage of Underperformance (Five Year) |
|---|---|---|
| Voya Target Solution Income Trust | S&P Target Date Retirement Income | 3.55% |
| Voya Target Solution Trust:  2020 | S&P Target Date 2020 Index | 12.41% |
| Voya Target Solution Trust:  2025 | S&P Target Date 2025 Index | 6.49% |
| Voya Target Solution Trust:  2030 | S&P Target Date 2030 Index | 5.67% |
| Voya Target Solution Trust:  2035 | S&P Target Date 2035 Index | 4.86% |
| Voya Target Solution Trust:  2040 | S&P Target Date 2040 Index | 5.87% |
| Voya Target Solution Trust:  2045 | S&P Target Date 2045 Index | 5.85% |
| Voya Target Solution Trust:  2050 | S&P Target Date 2050 Index | 7.20% |
| Voya Target Solution Trust:  2055 | S&P Target Date 2055 Index | 8.06% |

210. Given the Voya Retirement Solution Trusts underperformed their benchmark and lower-cost alternatives since December 31, 2013, a prudent fiduciary would have removed the actively managed Voya

---

[74] ADP TotalSource Retirement Savings Plan, Disclosure of Plan-Related Information, Dec. 31, 2019, at 4.

target date funds in favor of a prudent alternative at least by the start of the class period.

211.  Had Defendants removed the Voya Retirement Solution Trusts and replaced them with the lower-cost and better performing Vanguard Target Retirement Funds as of the start of the class period (no later than June 30, 2014), Plan participants would not have lost in excess of $46 million of their retirement savings.[75]

## C. Defendants failed to ensure reasonable investment management expenses for investment alternatives in the Plan.

212.  It is a simple principle of investment management that the larger the size of an investor's available assets, the lower the investment management fees that can be obtained in the market. Thus, large retirement plans have substantial bargaining power to negotiate low fees for investment management services. Jumbo multi-billion dollar plans, such as the Plan, have even greater bargaining power.

---

[75] Based on the lack of publicly available information on the Voya Retirement Solution Trusts, damages are measured by the difference in the annual investment returns of the Voya Target Retirement I Funds and the Vanguard Target Retirement Funds from June 30, 2014 through December 31, 2019. Vanguard Target Retirement Investor "Inv" shares were used from 2013–2015, and the Vanguard Institutional Target Retirement Funds were used thereafter.

213.   Mutual funds and collective trusts frequently offer multiple share classes, which are often classified as either "retail" class or "institutional" class. Retail-class shares are identical to institutional-class shares in every way, except that retail shares charge higher fees, which reduce the investor's assets. Although institutional share classes typically have minimum investment thresholds, funds will waive the minimums for large institutional investors, even those much smaller than the Plan.

214.   Since the only difference between the share classes is cost, a prudent investor will select the lower cost option, because doing so saves money. That did not happen in the Plan. Throughout the relevant time period, the Plan's investment lineup has included higher-cost share classes instead of the identical lower-cost share classes that were available to the Plan.

215.   The Plan included the following investments, which were up to 113% more expensive than the available identical lower-cost alternatives:

104

| Year | Plan Investment Alternative | Plan Fee | Identical Lower Cost Mutual Fund | | Plan's Excess Cost |
|------|------|------|------|------|------|
| 2015 | American Funds EuroPacific Growth | 84 bps | American Funds EuroPacific Growth (R6) (RERGX) | 49 bps | 71.43% |
| 2017 | American Funds Washington Mutual Fund | 64 bps | American Funds Washington Mutual Fund Investors (R6) (RWMGX) | 30 bps | 113.33% |
| 2017 | Federated Clover Small Cap Value | 102 bps | Federated Clover Small Cap Value (R6) (VSFSX) | 95 bps | 7.37% |
| 2015 | Fidelity Total Bond | 45 bps | Fidelity Advisor Total Bond (Z) (FBKWX) | 36 bps | 25.00% |
| 2018 | Fidelity Advisor Total Bond | 36 bps | Fidelity Total Bond (K6) (FTKFX) | 30 bps | 50.00% |
| 2015 | John Hancock Disciplined Value Mid Cap | 87 bps | John Hancock Disciplined Value Mid Cap (R6) (JVMRX) | 73 bps | 19.18% |
| 2016 | T. Rowe Price Mid Cap Growth | 101 bps | T. Rowe Price Mid Cap Growth (I) (RPTIX) | 63 bps | 60.32% |
| 2016 | T. Rowe Price New Horizons | 78 bps | T. Rowe Price New Horizons (I) (PRJIX) | 65 bps | 20.00% |
| 2015 | Vanguard Balanced Index | 8 bps | Vanguard Balanced Index (Inst) (VBAIX) | 7 bps | 14.29% |

216.   At all relevant times, the Plan's investment options charged unreasonable fees for the services provided to the Plan compared to alternatives that were readily available to the Plan, including lower-cost share classes of otherwise identical mutual funds, separately managed accounts, and collective trust investments.

217.   Though it is difficult to discern the share classes or total Plan investment alternative expense ratios from available data, preliminary calculations indicate that Defendants' failure to include the least-expensive shares of identical investments in the Plan resulted in losses to participants of nearly $9 million.[76]

## IV.   Defendants breached their fiduciary duties and engaged in prohibited transactions by causing the Plan to pay excessive managed account fees.

### A. The managed account services market.

218.   Managed accounts are investment services under which providers make investment decisions for participants to allocate their retirement savings among a mix of assets classes, commonly referred to as asset allocation.

---

[76] Total Plan losses will be determined at trial after complete discovery in this case and are continuing.

106

219.  Managed account providers in 401(k) plans limit the investment options they consider to those funds chosen by the plan sponsor to create plan participants' asset allocations. Thus, managed account service providers create a fund of a plan's funds for plan participants.

220.  Most managed account service providers, including Financial Engines Advisors LLC ("Financial Engines") and their competitors, utilize computer programs based on modern portfolio theory and Monte Carlo simulations to create plan participants' asset allocations. Representatives can modify client-directed inputs but cannot modify outputs and recommendations from the software program. There is no quality advantage in choosing one provider's algorithm over another. Therefore, fees play a large role in the returns based on the managed account providers' services.

221.  Plan participants can allocate any percentage of their portfolio or contributions to managed account services.

222.  Managed account service providers act as fiduciaries with respect to the investment advice their software systems provide retirement plan participants. If managed accounts are included in a

107

401(k) plan, their selection, like other investment options, must be the result of a prudent selection process and have reasonable expenses.

223.  Plan fiduciaries can contract directly with a managed account provider to offer managed account services to plan participants. Alternatively, some managed account providers use "subadvised" arrangements to offer their services through a recordkeeper. In a subadvised arrangement, the plan fiduciary retains the ultimate decision-making power on whether to offer managed accounts and the fees charged to participants.

224.  Plan fiduciaries can also contract with multiple managed account providers, only incurring a fee if Plan participants utilize the managed account services, thus increasing access to managed account providers and spurring competition without incurring additional fees for participants.

225.  Recordkeepers, including Voya, can provide a data feed to multiple managed account service providers in order to provide managed account services to a defined contribution plan.

226.  Managed account service providers use two types of information strategies to create asset allocations for participants. The

first type of strategy is referred to as customized service—allocating a participant's account based solely on age or other factors that can be easily obtained from the plan's recordkeeper, such as gender, income, current account balance, and current savings rate. The other strategy is referred to as personalized service, which purports to take into account additional personal information to inform asset allocations, such as risk tolerance or spousal assets.

227.   The United States Government Accountability Office has conducted a study of managed accounts in order to provide information to protect participants in such accounts. This study found that, from 2012 to 2014, managed account service providers that offered a personalized service reported that generally fewer than one-third, and sometimes fewer than 15% of Plan participants using the managed account service furnish this personalized information.[77] When the personalized data is used, asset allocations are nearly the same (less than a 5% difference), or do not change, from the customized services

---

[77] United States Government Accountability Office, Report to Congressional Requesters, 401(K) PLANS, Improvements Can be Made to Better Protect Participants in Managed Accounts, June 2014, available at https://www.gao.gov/assets/670/664391.pdf (hereinafter "2014 GAO Study").

109

asset allocation decisions.[78] Therefore, when a plan sponsor selects a managed account provider that charges for personalized services, participants are not getting the full value of the services for which they are paying an unnecessarily higher fee.

228.  Additionally, without personalized information from plan participants, managed accounts are similar to other  asset allocation solutions. For example, target-date funds, like managed accounts, provide simple investment portfolio decisions for plan participants by providing a professionally managed asset allocation that is targeted to participant time horizons with a professional managing the asset allocation glide path. Indeed, Financial Engines cites target-date funds as potential substitutes for its management account services in its 2016 Form 10-K.

229.  Customized and personalized managed accounts often offer little to no advantage over lower-cost funds, such as target-date funds, risk-based funds, and balanced funds. Vanguard reported in August 2013 that managed account services generally return less than or equal to the returns of Vanguard's lower-cost professionally managed

---

[78] *Id.*

allocation products, such as target-date funds, risk-based funds and balanced funds.[79] Nonetheless, managed account participants with lower rates of return still pay substantial additional fees for managed account services compared to the fees they would incur for target-date funds, risk-based funds and balanced funds, which provide similar asset allocations.

230.  As with any investment product, prudent fiduciaries monitor whether the managed account service is providing plan participants value beyond substitute lower cost alternatives, such as target date funds. As demonstrated by the chart below, lower-cost alternatives, such as balanced funds or target date funds, are prudent alternatives, which provide the objective of participants being able to avoid having to make frequent decisions about asset allocations.

231.  As can be seen in the chart, annualized rates of return for managed accounts are significantly below the rate of return for a single target date fund or balanced fund after fees.

---

[79] 2014 GAO Study, citing Vanguard, *Professionally Managed Allocations and the Dispersion of Participant Portfolios* (Valley Forge, PA; August 2013).



Figure 8: Example of Annualized Rates of Return from One Record Keeper for Different Types of Professionally Managed 401(k) Portfolios, 2007-2012, Net of Additional Fees

Source: GAO representation of Vanguard returns data.  |  GAO-14-310

232.  Plan fiduciaries are required to act prudently in selecting and monitoring managed account providers, including monitoring managed account providers' fees in relation to the services provided and other managed account providers' fees, and monitoring the performance of the managed account providers in relation to other alternative, lower-cost products.

233.  The 2014 GAO study cites information stating that the additional fee a participant generally pays for a managed account is the primary disadvantage of managed account services.

112

234.   Each managed account providers' publicly filed Form ADV disclosure states that all managed account service fees are negotiable. The fees are charged through various methods: a flat fee, a capped percentage of assets under management, a tiered assets-under-management fee, an uncapped percentage of assets under management fee, or some combination. Therefore, two participants with a similar balance but a different provider, or a fee that was not negotiated, can pay vastly different amounts for the same service. *See* 2014 GAO Study.

235.   As of 2014, managed account providers that did not charge a flat rate charged annual fees ranging from 8 bps to 100 bps of a participant's account balance.[80] At least one provider in the 2014 study offered a $20 per-participant flat fee. The 2014 table below, created by the GAO, shows the difference in fees for participants with an account balance of $10,000 or $500,000 at the start of the class period.

---

[80] *See* 2014 GAO Study.

**Table 4: Example of Variation in 401(k) Plan Managed Account Fees**

| Provider | Type of fee | Example of annual fee charged on $10,000 account balance | Example of annual fee charged on $500,000 account balance |
|---|---|---|---|
| A | Flat fee | $20 | $20 |
| B | Variable fee,[a] capped[b] | $25 | $250 |
| C | Variable fee | $10 | $500 |
| D | Variable fee, direct arrangement[c] | As low as $8 | As low as $400 |
|  | Variable fee, subadvised arrangement[d] | As high as $40 | As high as $2,000 |
| E | Variable fee, tiered,[e] default[f] | As high as $35 | As high as $1,100 |
|  | Variable fee, tiered, opt-in[f] | As high as $60 | As high as $2,350 |
| F | Variable fee, tiered | Averages $45-$50 | Averages $2,250-$2,500 |
| G | Variable fee, default | As low as $45 | As low as $2,250 |
|  | Variable fee, opt-in | As high as $55 | As high as $2,750 |
| H | Variable fee, large plan | As low as $25 | As low as $1,250 |
|  | Variable fee, small plan | As high as $100 | As high as $5,000 |

Source: GAO analysis of managed account provider case studies.  |  GAO-14-310

236.  To demonstrate the impact of fees, the below illustration shows the impact of a participant charged an additional annual fee of 8 to 100 bps of their account balance against what the participant would pay in other investments without the managed account fee:

114



Figure 10: Variation in Additional Participant Fees Paid for a Managed Account Over a 20-Year Period Given Different Fee Rates

Source: GAO analysis of information from providers and published data on managed account fees and returns.  |  GAO-14-310

237.  The 2014 GAO Study reported that there are few independent sources of comprehensive and consistent information on managed account fees charged by providers that participants could use to compare fees across providers, and that even fee information provided in managed account providers' SEC filings was confusing or incomplete. For example, Financial Engines' 2020 Part 2A Form ADV states that retirement program clients pay 50 to 100 basis points in a tiered-assets under management structure, negotiable to less than 50 bps for plans over $20 million and that "[s]ervice and fees are generally

115

negotiated and subject to agreement."[81] Financial Engines' Form ADV demonstrates that managed account fees are subject to economies of scale.

238.   The 2014 GAO study also noted that managed account fees are subject to economies of scale. Participants in large plans, like the Plan, can obtain significantly lower fees than participants in small plans.[82]

239.   Because managed account service providers provide confusing and incomplete fees in their disclosures, the duty of a plan sponsor—held to the standard of a prudent expert under ERISA—is to carefully analyze fees charged by multiple providers and diligently negotiate fees.

240.   The only way for a plan sponsor to accurately compare fees of managed account providers is to perform competitive bidding through a request for proposal.

---

[81] Available at https://www.edelmanfinancialengines.com/media/pdf/edelman-financial-engines-adv, 17, 20-21.

[82] *See* 2014 GAO Study at 40.

116

241.  In November 2017, retirement plan investment advisor Cammack Retirement Group stated that managed account service provider contract terms and fees are a major fiduciary concern and described the importance of conducting an RFP for managed account services to show a due diligence process by interviewing vendors and "test-driving" their respective products.[83]

242.  Regular negotiation of managed account fees is also necessary because managed account fees fell during the class period. For example, as of 2019, based on Form ADVs of managed account providers that did not charge a flat rate, fees were as low as 3 bps, compared to a low of 8 bps in 2014. Financial Engines 2016 Form 10-K references a "downward pressure on fees we charge for services." In 2017, Financial Engines' CEO stated that traditionally Financial Engines had a 1 bps step down per year in fees and a 2-point step down in 2018.

---

[83] John Buckley, *Fiduciary Considerations When Adding and Reviewing Managed Accounts*, Cammack Retirement Group, November 2017, https://cammackretirement.com/knowledge-center/insights/fiduciary-considerations-when-adding-and-reviewing-managed-accounts.

243.  From the early 2000s to the present, as recordkeeping fees compressed, managed account services have become more utilized in defined contribution plans, and competition for managed account services has increased.

244.  Therefore, in order to capture market conditions and negotiate current fees, prudent practice requires that Plan sponsors conduct requests for proposals for managed account services every three to five years.

**B. Defendants failed to monitor the Plan's managed account fees resulting in the participants paying excessive fees.**

245.  The Plan's fiduciaries contracted with Voya Retirement Advisors LLC ("Voya Retirement Advisors") to provide managed account services throughout the relevant time period.  This was a direct conflict of interest as is set forth below.

246.  In July 2013, the Plan began allowing Voya Retirement Advisors' predecessor, ING Investment Advisors, LLC, to offer managed account services to the Plan's participants.

247.  Financial Engines has acted as sub-advisor for the Plan's managed accounts since July 2013.

118

248.  Defendants allowed Voya to decide the Plan's managed account provider not based on merit, but because Voya requested that Voya Retirement Advisors provide managed account services. This enabled Voya to obtain lucrative revenues for its affiliate without any acquisition cost.

249.  Moreover, unlike investment advisors who choose from the wide array of investments available in the market, Voya Retirement Advisors limits its investment recommendations to the investment alternatives available in the Plan, a far smaller number, and many of which are its own proprietary funds. This not only provided Voya the revenue from the managed account overall fee paid by participants, but also provided Voya additional revenue from its proprietary accounts which Voya recommended within the managed accounts.

250.  In 2013, Sergio Fernandez executed an Investment Advisory Services Agreement with ING Investment Advisors LLC (now known as Voya Retirement Advisors) on behalf of the Plan. Under the Agreement, in effect from 2014 through 2021, Fernandez (and apparently the Committee and its members) committed ADP TotalSource Group, Inc. as Plan Sponsor to pay ING/Voya annually a platform fee of $6 per

119

participant with an account balance. As of January 1, 2022, after this lawsuit was filed, Defendant Kristen Appleman executed a second amendment to the Agreement on behalf of the Committee and the Plan, by which the platform fee was reduced to $5.

251.  Although ADP TotalSource Group, Inc. as Plan Sponsor was obligated under the Agreement to pay the platform fee, Defendants caused the Plan to pay the platform fee out of the PERA in a total amount from 2014 through 2021 (the latest time period for which Defendants have provided information) that exceeds $4 million. This is another example of Defendants acting for the benefit of ADP and its subsidiaries by reducing their corporate expenses and increasing their corporate profits, which benefitted ADP executives who served as Committee members through their profit-based bonuses and stock compensation. These conflicted advisory services did not benefit any participants other than those who contract with ING/Voya for those services. Even as to those participants, the actions of Defendants were not for their exclusive benefit, as required by ERISA. Therefore, the Plan, including participants who did not use the services, should not have paid this platform fee.

120

252.  As to participants who use the managed accounts, the fees were excessive. Voya Retirement Advisors charges Plan participants who use its services on an uncapped percentage of assets basis. As of March 2018, Voya Retirement Advisors' fees were 60 bps per year on assets up to $100,000, 40 bps on assets between $100,001 to $250,000 and 20 bps on assets of $250,001 or more. The fee is deducted monthly.

253.  Voya Retirement Advisors' fees in the Plan are excessive. Voya Retirement Advisors charged Plan participants as much as *2,000%* of other managed account providers that provide a similar service. For example, Russell Investments Capital, LLC charges managed account fees as low as 3 bps annually for large plans, and no greater than 28 bps annually for managed account services in any plan. Morningstar Retirement Manager charges retirement plan participants in large plans, such as the Plan, fees as low as 5 bps annually for managed account services. ProManage provides managed account services for as low as 5 bps. GuidedChoice charges less than 45 bps for any size plan, and the fee is only applied to the first $100,000 in assets. The Plan's managed account fee applies to all participant assets, even

those over $100,000. The Plan could have utilized these competitors to provide managed account services to Plan participants for a lower fee.

254.   Financial Engines cites Morningstar, GuidedChoice and ProManage, LLC as direct competitors in a "competitive industry" in Financial Engines' 2016 Form 10-K. ADP, in fact, uses Guided Choice as the managed account services provider for the non-MEP ERISA plans it administers through ADP Retirement Services.

255.   The managed account service of each of these providers, as well as Russell, is superior or at least equal in quality to Voya Retirement Advisors' managed account services.

256.   The amounts Plan's participants paid to Voya Retirement Advisors for managed account services rose dramatically between 2014 and 2018, from approximately $770,000 to $2.3 million.

257.   In spite of this tripling of fees, Defendants never investigated Voya Retirement Advisors' growing revenue, determined whether Voya Retirement Advisors' managed account fees were reasonable, or put the managed account services out to bid.

## V.  Defendants breached their fiduciary duties by allowing the Plan's service providers to collect and use Confidential Plan Participant Data for profit.

### A. Confidential Plan Participant Data and its value to recordkeepers with affiliates offering financial products and services.

258.  ERISA requires plan fiduciaries to ensure the reasonableness of *all sources of compensation* received by plan service providers in connection with the provision of services to retirement plans, including "indirect" compensation from sources "other than the covered plan[.]" 29 CFR §2550.408b-2(c)(viii)(B)(2).

259.  Many defined contribution plan service providers have affiliated businesses that sell other financial products and services. Retirement plan recordkeepers receive not only the names and contact information of plan participants, but also social security numbers, financial information and other non-public highly confidential and sensitive information relating to those participants, such as home and cellular phone numbers, work and personal email addresses, investment history, identity of their investments, account balances, investment contribution amounts, age, income, marital status, call center notes, and access to knowledge of "triggering events" such as

123

when a plan participant is nearing retirement, among other valuable information (hereinafter "Confidential Plan Participant Data").

260.  Protecting this sensitive financial information is the responsibility of the recordkeeper, which obtains it solely in its role as recordkeeper for the Plan, and for no other purpose. Allowing a recordkeeper to use this information outside the Plan for its own profit is a fiduciary breach.

261.  Apart from it being a fiduciary breach to allow the recordkeeper to use this information for non-Plan purposes, Defendants wholly failed to determine the value to Voya by allowing Voya to market and sell non-Plan products from the sensitive information it obtained. The importance of monitoring and restricting the additional compensation obtained by retirement plan service providers through cross-selling using Confidential Plan Participant Data, and the potential harms to employees and retirees of such practices, have long been recognized by government agencies and officials, the retirement plan industry, and knowledgeable plan fiduciaries.

262.  In January 2011, the United States Government Accountability Office found that such cross-selling can substantially

124

increase a service provider's compensation at the expense of plan

participants, and that plan fiduciaries can prevent it:

> Cross-selling products outside of a plan to participants can
> substantially increase a service provider's compensation,
> which creates an incentive for the service provider to steer
> participants toward the purchase of these products even
> though such purchases may not serve the participants best
> interest. For example, products offered outside a plan may not
> be well suited to participants' needs or participants may be
> able to secure lower fees by choosing investment funds within
> their plans comparable with products offered outside their
> plan. Industry professionals we spoke with said that cross-
> selling IRA rollovers to participants, in particular, is an
> important source of income for service providers. For example,
> according to an industry professional, a service provider could
> earn $6,000 to $9,000 in fees from a participant's purchase of
> an IRA, compared with $50 to $100 in fees if the same
> participant were to invest in a fund within a plan. Plan
> sponsors can take steps to preclude service providers from
> cross-selling non-plan products and services to plan
> participants.[84]

263.   In March 2013, another GAO study found that "service

providers' call center representatives encouraged rolling 401(k) plan

savings into an IRA even with only minimal knowledge of a caller's

---

[84] United States Government Accountability Office, Report to the
Ranking Member, Committee on Education and the Workforce,
House of Representatives, "401(K) Plans: Improved Regulation
Could Better Protect Participants from Conflicts of Interest" at 36,
available at https://www.gao.gov/products/gao-11-119 (hereinafter
"2011 GAO Study").

financial situations. Participants may also interpret information about their plans' service providers' retail investment products contained in their plans' educational materials as suggestions to choose those products."[85]

264.   This is consistent with the findings of a 2015 study by the Council of Economic Advisers discussing the effects of the conflicted investment advice provided by financial advisors incentivized to encourage 401(k) plan participants to rollover their investments into individual IRAs:

> A retiree who receives conflicted advice when rolling over a 401(k) balance to an IRA at retirement will lose an estimated 12 percent of the value of his or her savings if drawn down over 30 years. If a retiree receiving conflicted advice takes withdrawals at the rate possible absent conflicted advice, his or her savings would run out more than 5 years earlier.[86]

---

[85] United States Government Accountability Office, Report to Congressional Requesters, "401(K) PLANS, Labor and IRS Could Improve the Rollover Process for Participants," March, 2013, available at https://www.gao.gov/assets/660/652881.pdf (hereinafter "2013 GAO Study").

[86] Council of Economic Advisers, "The Effects of Conflicted Investment Advice on Retirement Savings," February 2015, at 3, available at: https://obamawhitehouse.archives.gov/sites/default/files/docs/cea_coi_re port_final.pdf (hereinafter "2015 CEA Report").

265.  Rollovers "to IRAs are expected to approach $2.4 trillion cumulatively from 2016 through 2020. These large sums of money eligible for rollover represent a significant revenue source for investment advice providers."[87]

266.  Conflicts of interest such as those held by service providers incentivized to cross-sell non-plan products "cost families an estimated $17 billion every year." 2015 CEA Report at 2.

267.  "As participants retire or terminate employment and are encouraged to move their 401(k) assets into IRAs, they are moving from a heavily regulated system with fiduciary protection to one without similar protections."[88]

268.  The financial services industry is highly competitive, and it is generally known in the financial services industry, and by investment

---

[87] Prohibited Transaction Exemption 2020–02, Improving Investment Advice for Workers & Retirees, 85 Fed. Reg. 82798 at 82803 (Dec. 18, 2020).

[88] AARP, Comment Letter on Improving Investment Advice for Workers & Retirees (August 6, 2020) at 9, available at https://www.dol.gov/sites/dolgov/files/EBSA/laws-and-regulations/rules-and-regulations/public-comments/1210-ZA29/00080.pdf

professionals and plan fiduciaries, that Confidential Plan Participant
Data is an extremely valuable asset.[89]

269.   Financial Engines has stated that the wealth management
industry is highly competitive, and a company's competitive advantage
is substantially dependent upon its ability to obtain, maintain and
protect client goodwill and relationships and confidentiality,
competitively-valuable and trade secret information pertaining to
clients, prospective clients, and referral sources.

270.   MassMutual recently encouraged its financial salespersons
to cross-sell non-plan products to retirement plan participants in order
to "build a stream of business in the future."[90] MassMutual advises that
"Advisors who sell and manage retirement plans tend to have
significantly more assets under management. They also are in a
position to capture downstream retail sales opportunities through IRA

---

[89] *See, e.g., Fidelity Brokerage Serv. LLC v. Michael Miller*, No. 13-
02390, Doc. 1-2 (M.D. Fla. Sep. 16, 2013) (Fidelity policy stating that
"*Information is an asset of tremendous value in the financial services
industry.*").

[90] MassMutual@WORK, "Why Sell retirement plans? For Financial
Professional Use Only. Not For Use With The Public," 2019, available at
https://webcache.googleusercontent.com/search?q=cache:KKzfEh8Ie08J:
https://wwwrs.massmutual.com/retire/pdffolder/rs3264.pdf+&cd=1&hl=
en&ct=clnk&gl=us.

rollovers and other ancillary sales. Consider the personal assets of

CEOs, CFOs, senior executives and other plan participants."[91]

271.   Retirement plan participants have an absolutely reasonable

expectation that their Confidential Plan Participant Data will be

protected by the plan sponsor and not disclosed outside of the plan for

non-plan purposes, such as allowing the plan's recordkeeper to use this

Confidential Participant Data to proactively solicit participants to

invest in retail financial products and services.

272.   Allowing a retirement plan's recordkeeper to exploit

Confidential Plan Participant Data is contrary to plan participants' best

interests because the recordkeeper has the advantage of employer

approval of its selection for the Plan and the implicit endorsement of

these non-plan services and products, without competition.

273.   Further, Defendants failed to disclose to Plan participants

that their confidential financial information was being used in this way.

274.   The revenue generated by these sales is significant and often

represents multiples of the recordkeeping fees received by the

recordkeeper with an affiliated brokerage and other affiliated entities

---

[91] *Id.*

that sell non-plan financial, banking, and insurance products and

services. The illustration below is used by professionals in the

retirement plan industry to demonstrate the effect of non-plan product

sales by recordkeepers with affiliated businesses on total recordkeeper

compensation; it demonstrates that selling non-plan products and

services can produce multiples of the explicit recordkeeping fees while

participants are unaware of it





275.   Numerous experts on fiduciary process have written articles confirming the obligation to monitor revenue received by recordkeepers from the sale of non-plan products to plan participants.[92]

**B. Defendants failed to monitor or restrict Plan service providers' misuse of Confidential Plan Participant Data.**

276.   Contrary to their fiduciary obligation to act for the sole benefit of Plan participants, Defendants allow Voya and its affiliates to collect, use, transmit, and profit from Confidential Plan Participant Data, without any restrictions.

277.   Defendants' conduct with respect to service provider use of Confidential Plan Participant Data and cross-selling is contrary to its

---

[92] *E.g.*, Multnomah Group, "Protecting Participant data: How to Monitor and Mitigate Recordkeeper Conflicts of Interests," available at https://f.hubspotusercontent20.net/hubfs/309123/PDF_Files/ White_Papers/Guide_Protecting%20Participant%20Data.pdf; Newport Group, "Plan Facts: Qualified Plan Cross-Selling and Its Impact on Fiduciaries" (Second Quarter 2019), available at https://www.newportgroup.com/NewportGroup/media/Documents/R714e -062719-PlanFacts-Qualified-Plan-Cross-Selling-and-Its-Impact-on- Fiduciaries-Newport-Group.pdf; Erik Daley, "Fee Compression: Five Ways Providers Monetize Recordkeeping," at 5–6, available at https://cdn2.hubspot.net/hubfs/309123/PDF_Files/White_Papers/Multno mah%20Group%20White%20Paper_Fee%20Compression%20%20Five% 20Ways%20Providers%20Monetize%20Recordkeeping.pdf?__hstc=8127 6488.82c7764856f9d967005cf8f7b2898976.1651772846379.16517728463 79.1651772846379.1&__hssc=81276488.1.1651772846379&__hsfp=3427 262324.

fiduciary obligations and significantly harmed the Plan and its participants. *First*, Defendants employed *no process whatsoever* for monitoring cross-selling revenue collected by Plan service providers nor *any process whatsoever* for assessing harms to participants or the Plan caused by cross-selling practices. *Second,* the Plan was significantly harmed as a result of the transfer of assets out of the Plan caused by cross-selling. *Third,* Plan participants were significantly harmed, in that they paid excessive and unwarranted fees for non-Plan products. *Fourth,* Defendants' conduct in failing to assess and control vendor cross-selling is directly contrary to the conduct of comparable fiduciaries in like situations.

### 1. *Defendants failed to monitor or restrict cross-selling.*

278. Defendants failed to monitor or ensure that compensation generated by Voya and its affiliates was reasonable, in violation of their fiduciary duties.

279. Defendants' process with respect to determining whether to allow service providers to use Confidential Plan Participant Data for non-Plan purposes was not just flawed, it was non-existent. Plan fiduciaries *never considered* whether allowing the Plan's service

providers to use their position and inherent access to information to market non-Plan products to Plan participants would harm the Plan or its participants. While the Plan's service agreement explicitly states that Voya *will* market its non-Plan products to Plan participants, the Minutes of the Plan's Administrative and Investment Committees are silent on the issue.

280.  Defendants failed to protect Plan participants and their valuable Confidential Plan Participant Data, whether by negotiating for lower fees if cross-selling was allowed or limiting the use of Confidential Plan Participant Data to Plan purposes.

## 2. *The Plan suffered significant harms as a result of Voya' cross-selling practices.*

281.  Defendants advertise to Plan participants (including in Plan enrollment materials) that participants may "speak with a retirement consultant," who is in fact an Investment Advisor Representative ("IAR") of Voya Financial Advisors, Inc. ("VFA"), an affiliate of Voya.

282.  While Defendants disclose to Plan participants that "neither Voya nor its affiliated companies or representatives offer legal or tax advice," Defendants do not disclose to Participants that VFA IARs are

compensated for these services based on a conflicted commission-based structure.

283.  VFA discloses via its publicly filed Form ADVs Part 2A that its IARS have a "conflict of interest" that "affects the judgment of IARS when making recommendations" because they receive "commission-based" compensation.

284.  VFA also provides tuition rebates and prizes to IARs who meet goals for achieving assets under management, which VFA acknowledges creates a conflict of interest.

285.  IARs who provide phone services to participants of plans recordkept by VFA affiliates are paid referral fees to steer participants to managed accounts—including the excessively priced managed account in the Plan, as alleged above.

286.  Moreover, VFA acknowledges that, through its IARS, it solicits participants to roll-over their assets out of the ERISA-protected Plan and into Voya' proprietary financial products.

287.  Some VFA IARs own insurance agencies and are therefore incentivized to sell, for example, fixed annuities, which earn them additional fees.

288.   VFA acknowledges that IARs have a "number of conflicts of interest" that incentivize them to "choose which . . . product to recommend to you based on the fees that the IAR will incur, rather than your investment needs."

289.   While VFA acknowledges and discloses to its clients this conflicted compensation structure, Defendants advertise VFA's services to Plan participants under the imprimatur of their fiduciary oversight without disclosing or explaining that the IARs' advice is admittedly conflicted and that the IARs are compensated for their work as "retirement consultants" to Plan participants based on sales commissions, prizes, and other conflicted compensation.

290.   As a result of having conflicted commissioned salespeople have direct access to Plan participants under the guise of providing "consulting services," Plan participants have rolled significant assets out of the Plan and into Voya-managed accounts and financial products.

291.   As a result of cross-selling practices permitted by the Plan, Voya has received significant additional compensation.

135

292.  This compensation includes fees for Voya products, including fees generated from the administration and management of IRAs and annuities funded with rollovers from Plan assets.

293.  This compensation directly results from the uncontrolled access to Confidential Plan Participant Data which Defendants allowed Voya in connection with the provision of recordkeeping and other services.

294.  Voya discloses in its "Privacy Notice" to Plan participants that it collects private, confidential information, such as Social Security numbers, account balances, assets, transactions, and investment experience:

| What? | The types of personal information we collect and share depend on the product or service you have with us. This information can include:<br>• Social Security number and account balance<br>• Assets and transaction or loss history<br>• Investment experience and employment information |
|---|---|

295.  Voya collects Confidential Plan Participant Data as a direct result of Voya's recordkeeping relationship with the Plan.

296.  Voya acknowledges that it automatically collects this data whenever a participant, through their employer-sponsored Plan, opens an account.

136

| How does Voya collect my personal information? | We collect your personal information, for example, when you<br>• open an account or give us your contact information<br>• apply for insurance or seek advice about your investments<br>• tell us about your investment or retirement portfolio<br><br>We also collect your personal information from others, such as credit bureaus, affiliates, or other companies. |
|---|---|

297.  Voya further admits that it uses this data for its own marketing purposes, yet does not allow Plan participants to opt out of this marketing.

| Reasons we can share your personal information | Does Voya share? | Can you limit this sharing? |
|---|---|---|
| For our everyday business purposes – such as to process your transactions, maintain your account(s), respond to court orders and legal investigations, detect and prevent fraud, or report to credit bureaus | Yes | No |
| For our marketing purposes – to offer our products and services to you | Yes | No |
| For joint marketing with other financial companies | No | We don't share |
| For our affiliates' everyday business purposes – information about your transactions and experiences | Yes | No |
| For our affiliates' everyday business purposes – information about your creditworthiness | No | We don't share |
| For our affiliates to market to you | Yes | Yes |
| For nonaffiliates to market to you | No | We don't share |

298.  Voya shares Confidential Plan Participant Data with its affiliates for marketing purposes, including account balances, contact information, and other data, without restriction.

299.  The fact that Voya agrees to limit this sharing—though only for affiliate marketing—upon request by participants shows, at minimum, it is possible for Voya to implement such limitations.

300.  Voya offers "Retirement Consulting" to Plan participants, a "service" targeting participants "who are retiring or changing jobs"

137

using targeted messages on the participant website, mailings and follow-up outreach by phone. Conflicted commission-compensated representatives "explain and offer the rollover IRA products" offered by Voya affiliates.

301.  Defendants could have, but did not, negotiate restrictions on sharing of Confidential Plan Participant Data, on a Plan-wide basis, protecting this valuable Plan asset and this confidential information.

302.  The SEC and the New York Attorney General investigated this same practice of cross selling by another recordkeeper in defined contribution retirement plans, Teachers Insurance Annuity Association, and assessed a fine of $92 million and ordered it stopped. (cite)

303.  The transfer of funds outside the Plan significantly harmed the Plan by reducing its assets and, thus, its bargaining power in the investment market. Fewer participants in the Plan also had the effect of increasing per-capita recordkeeping fees if the Plan fell below enrollment thresholds.

304.  "Plan leakage"—or loss of assets as a result of transfers out of retirement plans—is known to result in higher costs to participants because "larger retirement plans are better positioned to negotiate with

recordkeepers and investment providers to secure institutionally priced investment products and lower fees by trading on their size and bargaining power."[93] "[L]ucrative commissions" incentivizing cross sales by plan service providers that result in "amounts rolled out" of retirement plans is one of "the root causes of plan leakage[.]"[94]

305.   In studying the question of whether to add a mutual fund window to the federal government's Thrift Savings Plan, its governing board was highly influenced by the threat of Plan leakage.[95] A member of the Federal Retirement Thrift Investment Board explained: "To the extent that a [mutual fund window] discourages participants from choosing to invest elsewhere, the money that might have otherwise left the Plan will help reduce per capita administrative costs even for participants who do not participate in the window."[96] The larger and

---

[93] Noah Zuss, "Understanding Retirement Plan Leakage Triggers and Costs", Plan Sponsor (Mar. 18, 2022), available at https://www.plansponsor.com/in-depth/understanding-retirement-plan-leakage-triggers-costs/.

[94] Allen Steinberg, "Et Tu, Wells Fargo?", RetireAware (Oct. 5, 2018), available at https://blog.retireaware.com/2018/05/10/et-tu-wells-fargo/.

[95] Federal Retirement Thrift Investment Board, Minutes of the Meeting of the Board Members November 17, 2014, at 3.

[96] Memorandum on Mutual Fund Window Option, Gregory T. Long, Executive Director, Federal Retirement Thrift Investment Board, May 19, 2014, at 11.

better-capitalized a plan is, the more power it has in the market to lower fees for all of its participants.

306.  Publicly available data and documents obtained in discovery suggest that millions of dollars of assets were rolled out of the Plan and into Voya nonplan products *every year* of the class period as a result of cross-selling allowed by Defendants. For example, Defendants' Annual Reports to DOL (Form 5500) show hundreds of millions of dollars in payments to participants including rollovers. Documents produced in discovery show that only a small portion of these were direct payments to participants. It is reasonable to infer, accordingly, that Voya used Confidential Plan Participant Data to induce the transfer of millions of dollars of rollovers into its proprietary products each year.

| Year | Form 5500 Payments to Participants Including Rollovers |
|---|---|
| 2013 | $269,173,579 |
| 2014 | $269,897,750 |
| 2015 | $350,385,583 |
| 2016 | $347,378,715 |
| 2017 | $465,743,558 |
| 2018 | $498,910,952 |
| 2019 | $565,035,553 |
| 2020 | $697,621,092 |

140

307.  This inference is consistent with the 2011 GAO Study, which noted that "approximately 69 percent" of "survey respondents who received a lump-sum distribution from their retirement plans rolled their distributed funds into IRAs." 2011 GAO Study at 38.  Moreover, "data from three large service providers indicate that, among participants who terminated their DC plan, between 42 and 48 percent of participants' plan assets were rolled into IRAs[.]" 2011 GAO Study at 38–39.

308.  The inference from the Form 5500 data that millions of dollars of assets were rolled out of the Plan and into Voya non-plan products is also supported by an industry expert who reports a typical "capture rate" – *i.e.*, the rate at which service providers who cross-sell (such as Voya) are able to "capture" the assets of retiring workers into proprietary products – at 15%–30%.

### 3. Plan participants paid significantly higher fees for Voya non-Plan products as a result of Defendants' fiduciary breaches.

309.  Plan participants have suffered significant losses as a result of Defendant's failure to monitor and control cross-selling by plan service providers. Confidential Plan Participant Data was made

available to conflicted sales representatives who had access to participants' personal details, including at vulnerable times in their lives, and marketed under the imprimatur of employer-sponsored Plan approval. These sales representatives admittedly had incentives to offer conflicted advice and induce participants to purchase non-Plan products and services that were not in their best interests.

310.   Participants who opt for individual brokerage accounts with Voya outside the Plan pay higher fees than they pay inside the Plan. Even without paying for discretionary management by a Voya Financial advisor, Voya brokerage accounts charge not only administrative maintenance fees, but also transactional fees that can amount to hundreds of dollars over the course of a year.[97] In contrast, inside the Plan, there are no additional fees for individual transactions or recurring purchases.

311.   Voya Financial brokerage accounts also charge higher fees indirectly. Because "the only available Mutual Fund share classes are A

---

[97] Voya Financial, Investor Channel Schedule of Miscellaneous Account and Service Fees Effective January 1, 2021, Available at: chrome-extension://efaidnbmnnnibpcajpcglclefindmkaj/https://professionals.voya.com/stellent/public/176264.pdf.

and C shares" within Voya IRAs, participants who invest in said accounts will pay higher fees for retail class shares. Retail class shares will be significantly more costly than the institutional class shares potentially available in Tier II of the Plan.

312.  Individual transactional fees can amount to significant sums because they will be charged with each new investment. Each time an IRA account holder makes a purchase of equity shares they will be charged a transaction fee.

313.  This is consistent with the GAO's finding that "owners of IRAs generally pay higher fees than participants in 401(k) plans because an individual IRA's account balance is usually not big enough to purchase an amount of investments large enough to qualify for volume discounts on fees." 2011 GAO Study at 40. These fees are in the range of two to three times higher than in-plan fees. *Id.*

314.  Moreover, because of the lack of disclosure requirements on fees associated with IRAs, as compared with the exhaustive disclosures required inside ERISA-governed plans, "participants may be unaware of the higher fees associated with IRAs' rollovers and may not understand

that paying these higher fees can reduce their retirement savings over time." *Id.*

315.  It is reasonable to infer from the fact that Voya representatives are heavily incentivized to induce plan participants to roll assets out of the Plan and into proprietary Voya financial products that Voya thereby receives increased compensation at the expense of the participant.

316.  This inference is consistent with the GAO's 2011 finding that "a service provider could earn $6,000 to $9,000 in fees from a participant's purchase of an IRA, compared with $50 to $100 in fees" if the participant were to remain in the plan instead of rolling assets out. 2011 GAO Study at 41.

### 4. Numerous similarly-situated fiduciaries have restricted or eliminated the cross-selling activities of plan service providers.

317.  As early as 2010, numerous other defined contribution plan fiduciaries, recognizing the value of Confidential Plan Participant Data, prohibited cross-selling by their plans' recordkeepers.

318.  For example, in 2010, Jefferson County Public Schools in Colorado *required* in its Request for Proposal that the recordkeeper

144

contractually agree not to have the recordkeeping representative cross-sell products.

319.  The 2011 GAO Study recognized that Plan sponsors, over a decade ago, could, and did, "require" service providers to sign non-solicitation agreement prohibiting cross-selling by service providers. 2011 GAO Study at 41.

320.  In 2018, fiduciaries of the Yale University Retirement Account Plan restricted its recordkeeper, TIAA, from cross-selling to retirement plan participants. *See Vellali v. Yale*, No 3:16-cv-01345-AWT, Doc. 309-2 at 297:10–300:16 (D. Conn. Feb. 2, 2021).

321.  In August 2019, fiduciaries on the Oregon Savings Growth Plan, a plan recordkept by Voya, advisory committee discussed the importance that its recordkeeper not cross-sell any products and *confirmed that its recordkeeping contract restricted cross-selling practices.*

322.  Fiduciaries of other defined contribution retirement plans have entered into settlement agreements limiting service providers' use of participant data for non-plan purposes. For example, in a 2016 settlement agreement, the Oracle Corporation 401(k) Savings and

145

Investment Plan agreed to instruct its recordkeeper "that in performing previously agreed upon recordkeeping services with respect to the Plan, it must not solicit current Plan participants for the purpose of cross-selling proprietary non-Plan products and services, including, but not limited to Individual Retirement Accounts . . ." Doc. 42-4 at 2.[98] Settlement agreements entered into by the following plans include similar language to the Oracle settlement: the Emory University Retirement Plan and the Emory Healthcare, Inc. Retirement Savings and Matching Plan, *see* Doc. 42-5 at 2, the Vanderbilt University Retirement Plan and Vanderbilt University New Faculty Plan, *see* Doc. 42-6 at 2, Massachusetts Institute of Technology Supplemental 401(k) Plan, *see* Doc. 42-7 at 2, and The Johns Hopkins University 403(b) Plan, *see* Doc. 42-8 at 2.

## CLASS ACTION ALLEGATIONS

323.  29 U.S.C. §1132(a)(2) authorizes any participant or beneficiary of the Plan to bring an action individually on behalf of the Plan to enforce a breaching fiduciary's liability to the Plan under 29 U.S.C. §1109(a).

---

[98] All citations are to ECF header page numbers.

324.   In acting in this representative capacity and to enhance the

due process protections of unnamed participants and beneficiaries of

the Plan, as an alternative to direct individual actions on behalf of the

Plan under 29 U.S.C. §1132(a)(2), Plaintiffs seek to certify this action as

a class action on behalf of all participants and beneficiaries of the Plan.

Plaintiffs seek to certify, and to be appointed as representatives of, the

following Class:

> All participants and beneficiaries of the ADP TotalSource
> Retirement Savings Plan from May 7, 2014 through the date
> of judgment, excluding Defendants.

And the following subclass:

> All participants and beneficiaries of the ADP TotalSource
> Retirement Savings Plan who utilized the Plan's managed
> account services from May 7, 2014 through the date of
> judgment, excluding Defendants.

325.   This action meets the requirements of Rule 23 and is

certifiable as a class action for the following reasons:

a.   The Class includes over 100,000 members and is so

large that joinder of all its members is impracticable.

b.   There are questions of law and fact common to the

Class because Defendants owed fiduciary duties to the Plan and to

all participants and beneficiaries and took the actions and made omissions alleged herein as to the Plan and not as to any individual participant. Thus, common questions of law and fact include the following, without limitation: who are the fiduciaries liable for the remedies provided by 29 U.S.C. §1109(a); whether the fiduciaries of the Plan breached their fiduciary duties to the Plan; what are the losses to the Plan resulting from each breach of fiduciary duty; and what Plan-wide equitable and other relief the court should impose in light of Defendants' breaches of duty.

c.    Plaintiffs' claims are typical of the claims of the Class because each Plaintiff was a participant during the time period at issue in this action and all participants in the Plan were harmed by Defendants' misconduct.

d.    Plaintiffs are adequate representatives of the Class because they were participants in the Plan during the Class period, have no interest that is in conflict with any other member of the Class, are committed to the vigorous representation of the Class, and have engaged experienced and competent attorneys to represent the Class.

148

e.     Prosecution of separate actions for these breaches of fiduciary duties by individual participants and beneficiaries would create the risk of (A) inconsistent or varying adjudications that would establish incompatible standards of conduct for Defendants in respect to the discharge of their fiduciary duties to the Plan and personal liability to the Plan under 29 U.S.C. §1109(a), and (B) adjudications by individual participants and beneficiaries regarding these breaches of fiduciary duties and remedies for the Plan would, as a practical matter, be dispositive of the interests of the participants and beneficiaries not parties to the adjudication or would substantially impair or impede those participants' and beneficiaries' ability to protect their interests. Therefore, this action should be certified as a class action under Rule 23(b)(1)(A) or (B).

326.  A class action is the superior method for the fair and efficient adjudication of this controversy because joinder of all participants and beneficiaries is impracticable, the losses suffered by individual participants and beneficiaries may be small and impracticable for individual members to enforce their rights through

149

individual actions, and the common questions of law and fact predominate over individual questions. Given the nature of the allegations, no class member has an interest in individually controlling the prosecution of this matter, and Plaintiffs are aware of no difficulties likely to be encountered in the management of this matter as a class action. Alternatively, then, this action may be certified as a class under Rule 23(b)(3) if it is not certified under Rule 23(b)(1)(A) or (B).

327.   Plaintiffs' counsel, Schlichter Bogard LLP (formerly Schlichter Bogard & Denton LLP), will fairly and adequately represent the interests of the Class and is best able to represent the interests of the Class under Rule 23(g). Schlichter Bogard has been appointed as class counsel in over 30 other ERISA class actions regarding excessive fees in large defined contribution plans. Courts in these cases have consistently and repeatedly recognized the firm's unparalleled success in the area of defined contribution excessive fee litigation:

- On November 3, 2016, Judge Michael Ponsor of the United States District Court for the District of Massachusetts found that by securing a $30.9 million settlement, Schlichter Bogard had achieved an "outstanding result for the class," and "demonstrated extraordinary resourcefulness, skill, efficiency and determination." *Gordan v. Mass Mutual Life Ins., Co.*, No. 14-30184, Doc. 144 at 5 (D. Mass. Nov. 3, 2016).

- As Chief Judge Michael J. Reagan of the Southern District of Illinois recognized in approving a settlement which was reached on the eve of trial after eight years of litigation, resulting in a $62 million monetary recovery and very substantial affirmative relief to benefit the Plans, the firm had shown "exceptional commitment and perseverance in representing employees and retirees seeking to improve their retirement plans," and "demonstrated its well-earned reputation as a pioneer and the leader in the field" of 401(k) plan excessive fee litigation. *Abbott v. Lockheed Martin Corp.*, No. 06-701, 2015 WL 43984750, at *1 (S.D. Ill. July 17, 2015). The court further recognized that the law firm of "Schlichter, Bogard & Denton has had a humongous impact over the entire 401(k) industry, which has benefited employees and retirees throughout the entire country by bringing sweeping changes to fiduciary practices." *Id.* at *3 (internal quotations omitted).

- Other courts have made similar findings:

    o "It is clear to the Court that the firm of Schlichter, Bogard & Denton is preeminent in the field" "and is the only firm which has invested such massive resources in this area." *George v. Kraft Foods Global, Inc.*, No. 08-3799, 2012 WL 13089487 at *2 (N.D. Ill. June 26, 2012).

    o "As the preeminent firm in 401(k) fee litigation, Schlichter, Bogard & Denton has achieved unparalleled results on behalf of its clients." *Nolte v. Cigna Corp.*, No. 07-2046, 2013 WL 12242015 at *2 (C.D. Ill. Oct. 15, 2013).

    o "Litigating this case against formidable defendants and their sophisticated attorneys required Class Counsel to demonstrate extraordinary skill and determination." *Beesley v. Int'l Paper Co.*, No. 06-703, 2014 WL 375432 at *2 (S.D. Ill. Jan. 31, 2014). The court also emphasized that "the law firm of Schlichter, Bogard & Denton is the leader in 401(k) fee litigation." *Id.* at *8 (internal quotations omitted).

151

o U.S. District Judge Harold Baker of the Central District of Illinois acknowledged the significant impact of the firm's work, finding that as of 2013, the nationwide "fee reduction attributed to Schlichter, Bogard & Denton's fee litigation and the Department of Labor's fee disclosure regulations approach *$2.8 billion in annual savings* for American workers and retirees." *Nolte*, 2013 WL 12242015, at *2 (emphasis added).

o U.S. District Judge David Herndon of the Southern District of Illinois recognized the firm's extraordinary contributions to the retirement industry: "Schlichter, Bogard & Denton and lead attorney Jerome Schlichter's diligence and perseverance, while risking vast amounts of time and money, reflect the finest attributes of a private attorney general. *Beesley*, 2014 WL 375432 at *2.

o U.S. District Court Judge G. Patrick Murphy similarly recognized the work of Schlichter Bogard as exceptional:

> "Schlichter, Bogard & Denton's work throughout this litigation illustrates an exceptional example of a private attorney general risking large sums of money and investing many thousands of hours for the benefit of employees and retirees. No case had previously been brought by either the Department of Labor or private attorneys against large employers for excessive fees in a 401(k) plan. Class Counsel performed substantial work[,] investigating the facts, examining documents, and consulting and paying experts to determine whether it was viable. This case has been pending since September 11, 2006. Litigating the case required Class Counsel to be of the highest caliber and committed to the interests of the participants and beneficiaries of the General Dynamics 401(k) Plans."

*Will v. General Dynamics Corp.*, No. 06-698, 2010 WL 4818174 at *3 (S.D. Ill. Nov. 22, 2010).

- Schlichter Bogard handled the first full trial of an ERISA excessive fee case, resulting in a $36.9 million judgment for the plaintiffs that was affirmed in part by the Eighth Circuit. *Tussey v. ABB, Inc.*, 746 F.3d 327 (8th Cir. 2014). In awarding attorney's fees after trial, the district court concluded that "Plaintiffs' attorneys are clearly experts in ERISA litigation." *Tussey v. ABB, Inc.*, No. 06-4305, 2012 WL 5386033 at *3 (W.D. Mo. Nov. 2, 2012). Following remand, the district court again awarded Plaintiffs' attorney's fees, emphasizing the significant contribution Plaintiffs' attorneys have made to ERISA litigation, including educating the Department of Labor and federal courts about the importance of monitoring fees in retirement plans:

    > "Of special importance is the significant, national contribution made by the Plaintiffs whose litigation clarified ERISA standards in the context of investment fees. The litigation educated plan administrators, the Department of Labor, the courts and retirement plan participants about the importance of monitoring recordkeeping fees and separating a fiduciary's corporate interest from its fiduciary obligations."

    *Tussey v. ABB, Inc.,* No. 06-4305, 2015 WL 8485265 at *2 (W.D. Mo. Dec. 9, 2015).

- In *Spano v. Boeing Co.*, in approving a settlement reached after nine years of litigation which included $57 million in monetary relief and substantial affirmative relief to benefit participants, the court found that "The law firm Schlichter, Bogard & Denton has significantly improved 401(k) plans across the country by bringing cases such as this one, which have educated plan administrators, the Department of Labor, the courts and retirement plan participants about the importance of monitoring recordkeeping fees." No. 06-cv-743, Doc. 587, at 5–6 (S.D. Ill. Mar. 31, 2016) (Rosenstengel, J.) (internal quotations omitted).

153

- In approving a settlement including $32 million plus significant affirmative relief, Chief Judge William Osteen in *Kruger v. Novant Health, Inc.*, No. 14-208, Doc. 61, at 7–8 (M.D.N.C. Sept. 29, 2016) found that "Class Counsel's efforts have not only resulted in a significant monetary award to the class but have also brought improvement to the manner in which the Plans are operated and managed which will result in participants and retirees receiving significant savings[.]"

- On January 28, 2020, Judge George L. Russell of the District of Maryland found Schlichter Bogard "pioneered this ground-breaking and novel area of litigation" that has "dramatically brought down fees in defined contribution plans" after the firm obtained a $14 million dollar settlement. *Kelly v. Johns Hopkins Univ.*, No. 1:16-CV-2835-GLR, 2020 WL 434473, at *2 (D. Md. Jan. 28, 2020).

- Schlichter Bogard also was class counsel in and handled *Tibble v. Edison International*, 575 U.S. 523 (2015), the first and only Supreme Court case to address the issue of excessive fees in a defined contribution plan—in which the Court held in a unanimous 9–0 decision that ERISA fiduciaries have "a continuing duty to monitor investments and remove imprudent ones[.]" *Id.* at 529. Schlichter Bogard successfully petitioned for a writ of certiorari and obtained amicus support from the United States Solicitor General and AARP, among others. Given the Court's broad recognition of an ongoing fiduciary duty, the *Tibble* decision will affect all ERISA defined contribution plans.

- The firm's work in ERISA excessive fee class actions has been featured in the New York Times, Wall Street Journal, NPR, Reuters, and Bloomberg, among other media outlets. *See*, *e.g.*, Anne Tergesen, *401(k) Fees, Already Low, Are Heading Lower*, Wall St. J. (May 15, 2016);[99] Gretchen Morgenson, *A Lone Ranger*

---

[99] Available at http://www.wsj.com/articles/401-k-fees-already-low-are-heading-lower-1463304601.

*of the 401(k)'s*, N.Y. Times (Mar. 29, 2014);[100] Liz Moyer, *High Court Spotlight Put on 401(k) Plans*, Wall St. J. (Feb. 23, 2015);[101] Floyd Norris, *What a 401(k) Plan Really Owes Employees*,  N.Y. Times (Oct. 16, 2014);[102] Sara Randazzo, *Plaintiffs' Lawyer Takes on Retirement Plans*, Wall St. J. (Aug. 25, 2015);[103] Jess Bravin and Liz Moyer, *High Court Ruling Adds Protections for Investors in 401(k) Plans*, Wall St. J. (May 18, 2015); [104] Jim Zarroli, *Lockheed Martin Case Puts 401(k) Plans on Trial*, NPR (Dec. 15, 2014);[105] Mark Miller*, Are 401(k) Fees Too High? The High-Court May Have an Opinion*, Reuters (May 1, 2014);[106] Greg Stohr, *401(k) Fees at Issue as Court Takes Edison Worker Appeal*, Bloomberg (Oct. 2, 2014).[107]

## COUNT I: PROHIBITED SELF-DEALING TRANSACTIONS (29 U.S.C. §1106(b))

328.   Plaintiffs restate and incorporate the allegations contained

in the preceding paragraphs.

329.   In causing the Plan to pay Plan assets to ADP TotalSource,

---

[100] Available at http://www.nytimes.com/2014/03/30/business/a-lone-ranger-of-the-401-k-s.html?_r=0.

[101] Available at http://www.wsj.com/articles/high-court-spotlight-put-on-401-k-plans-1424716527.

[102] Available at http://www.nytimes.com/2014/10/17/business/what-a-401-k-plan-really-owes-employees.html?_r=0.

[103] Available at http://blogs.wsj.com/law/2015/08/25/plaintiffs-lawyer-takes-on-retirement-plans/.

[104] Available at http://www.wsj.com/articles/high-court-ruling-adds-protections-for-investors-in-401-k-plans-1431974139.

[105] Available at http://www.npr.org/2014/12/15/370794942/lockheed-martin-case-puts-401-k-plans-on-trial.

[106] Available at http://www.reuters.com/article/us-column-miller-401fees-idUSBREA400J220140501.

[107] Available at http://www.bloomberg.com/news/articles/2014-10-02/401-k-fees-at-issue-as-court-takes-edison-worker-appeal.

Inc., Proskauer Rose, and Crowe Horwath, Defendants, as executives of ADP and its subsidiaries, dealt with the assets of the Plan in their own interest or for their own account, in violation of 29 U.S.C. §1106(b)(1).

330.   In causing the Plan to use ADP through its TotalSource business unit to provide putative services to the Plan that in fact were for the benefit of ADP TotalSource and causing the Plan to pay Plan assets to ADP TotalSource, Inc., Proskauer Rose, and Crowe Horwath, Defendants, as executives of ADP and its subsidiaries, acted on behalf of a party whose interests were adverse to the interests of the Plan, its participants and beneficiaries in violation of 29 U.S.C. §1106(b)(2).

331.   In causing the Plan to pay Plan assets to ADP TotalSource, Inc., Proskauer Rose, and Crowe Horwath, Defendants ADP, ADP TotalSource Group, Inc., and ADP TotalSource, Inc. received consideration for their own personal accounts from parties dealing with the Plan in connection with transactions involving the assets of the Plan, in violation of 29 U.S.C. §1106(b)(3).

332.   The individual Defendants acted on behalf of, at the direction of, and in furtherance of the business of ADP and its subsidiaries, of which the individual Defendants were owners and

156

whose compensation depended on the financial performance of ADP and its subsidiaries.

333.   Defendants ADP, ADP TotalSource, Inc., and ADP TotalSource Group, Inc. acted as fiduciaries because they, through their executives, exercised control over Plan assets and exercised discretionary authority and control over the management of the Plan.

334.   Each Defendant is personally liable under 29 U.S.C. §1109(a) to make good to the Plan any losses to the Plan resulting from the breaches of fiduciary duties alleged in this Count and to restore to the Plan all profits they made through the use of Plan assets, and is subject to other equitable or remedial relief as appropriate, including removal as a fiduciary of the Plan.

## COUNT II: PROHIBITED TRANSACTIONS (29 U.S.C. §1106(a)) BETWEEN THE PLAN AND ADP TOTALSOURCE

335.   Plaintiffs restate and incorporate the allegations contained in the preceding paragraphs.

336.  By causing the Plan to pay Plan assets to ADP through its subsidiaries and to Proskauer Rose and Crowe Horwath, Defendants caused the Plan to engage in a transaction that they knew or should

have known constituted an exchange of property between the Plan and a party in interest in violation of 29 U.S.C. §1106(a)(1)(A).

337.  By causing the Plan to use ADP TotalSource to provide purported services to the Plan through its subsidiaries, Defendants caused the Plan to engage in a transaction they knew or should have known constituted the furnishing of services between the Plan and a party in interest in violation of 29 U.S.C. §1106(a)(1)(C).

338.  By causing the Plan to pay Plan assets to ADP through its subsidiaries and to Proskauer Rose and Crowe Horwath, the ADP Defendants caused the Plan to engage in a transaction they knew or should have known constituted a transfer of Plan assets to a party in interest in violation of 29 U.S.C. §1106(a)(1)(D).

339.  Although ERISA provides that §1106(a) "shall not apply to . . . (2) Contracting or making reasonable arrangements with a party in interest for . . . services necessary for the establishment or operation of the plan, if no more than reasonable compensation is paid therefor" (29 U.S.C. §1108(b)(2) [ERISA §408(b)(2)]), to satisfy that exemption Defendants must prove that each service for which ADP was paid was (1) "necessary for the establishment or operation of the plan", (2)

"furnished under a contract or arrangement which is reasonable," and

(3) "[n]o more than reasonable compensation is paid for such . . .

service." 29 C.F.R. §2550.408b-2(a). Proving satisfaction of this

exemption is an affirmative defense on which the Defendants have the

burden of proof.

340.   Defendants could have been entitled to receive

reimbursement of expenses without engaging in a prohibited

transaction under §1106(a) only if, among other things, an independent

fiduciary determined the services provided by the employee were

necessary to the operation of the Plan and the reimbursement to the

ADP Defendants was reasonable and constituted only the

reimbursement of direct expenses. 29 C.F.R. § 2550.408b-2(e),

§2550.408c-2(b); DOL Adv. Op. 89-09A (June 13, 1989); DOL Adv. Op.

97-03A (Jan. 23, 1997). An independent fiduciary did not determine the

services for which the ADP Defendants were reimbursed were

necessary to the operation of the Plan, that the amount of the

reimbursement was reasonable for the services provided, or that the

reimbursement paid only direct expenses under 29 C.F.R. §2550.408b-

2(e) and §2550.408c-2(b).

341.  As a direct result of these prohibited transactions, the ADP Defendants caused the Plan to suffer losses in the reduction of Plan assets in amount of the payments to ADP and its subsidiaries and to Proskauer Rose and Crowe Horwath and the lost investment returns on those assets.

342.  The individual Defendants acted on behalf of, at the direction of, and in furtherance of the business of ADP and its subsidiaries, of which the individual Defendants were owners and whose compensation depended on the financial performance of ADP and its subsidiaries.

343.  Each Defendant is personally liable under 29 U.S.C. §1109(a) to make good to the Plan any losses to the Plan resulting from the breaches of fiduciary duties alleged in this Count and to restore to the Plan all profits they made through the use of Plan assets, and is subject to other equitable or remedial relief as appropriate, including removal as a fiduciary of the Plan.

## COUNT III: BREACH OF FIDUCIARY DUTIES (29 U.S.C. §1104(A)(1)) RELATED TO IMPRUDENT AND POORLY PERFORMING INVESTMENTS

344.   Plaintiffs restate and incorporate the allegations contained in the preceding paragraphs.

345.   The scope of the fiduciary duties and responsibilities of Defendants includes managing the assets of the Plan for the sole and exclusive benefit of Plan participants and beneficiaries and acting with the care, skill, diligence, and prudence required by ERISA. Defendants are directly responsible for selecting prudent investment options, evaluating and monitoring the Plan's investments on an ongoing basis and eliminating imprudent designated investment alternatives, and taking all necessary steps to ensure that the Plan's assets are invested prudently.

346.   As the Supreme Court has confirmed, ERISA's "duty of prudence involves a continuing duty to monitor investments and remove imprudent ones[.]" *Hughes*, 142 S. Ct. at 741 (quoting *Tibble,* 575 U.S. at 530).

347.   Defendants selected and retained for years as Plan investment options the Voya Large Cap Value Portfolio, the Voya Large

161

Cap Growth Portfolio, the Federated Clover Small Cap Value, the American Funds Washington Mutual Investors, and the Voya Target Solution Trusts with high expenses and poor performance relative to other investment options that were readily available to the Plan at all relevant times. In doing so, Defendants failed to make investment decisions based solely on the merits of the investment funds and what was in the interest of Plan participants. Defendants therefore failed to discharge their duties with respect to the Plan solely in the interest of the participants and beneficiaries and for the exclusive purpose of providing benefits to participants and their beneficiaries and defraying reasonable expenses of administering the Plan. This was a breach of fiduciary duties.

348.  Defendants failed to engage in a prudent process for monitoring the Plan's investments and removing imprudent ones within a reasonable period. This resulted in the Plan continuing to offer excessively expensive funds with inferior historical performance compared to superior low-cost alternatives that were available to the Plan.

162

349.   Total Plan losses will be determined at trial after complete discovery in this case and are continuing.

350.   Each Defendant is personally liable under 29 U.S.C. §1109(a) to make good to the Plan any losses to the Plan resulting from the breaches of fiduciary duties alleged in this Count and is subject to other equitable or remedial relief as appropriate. Each Defendant knowingly participated in the breach of the other Defendants, knowing that such acts were a breach, enabled the other Defendants to commit a breach by failing to lawfully discharge its own fiduciary duties, knew of the breach by the other Defendants and failed to make any reasonable effort under the circumstances to remedy the breach. Thus, each Defendant is liable for the losses caused by the breach of its co-fiduciary under 29 U.S.C. §1105(a).

## COUNT IV: BREACH OF FIDUCIARY DUTIES (29 U.S.C. §1104(A)(1)) RELATED TO EXCESSIVE INVESTMENT MANAGEMENT FEES

351.   Plaintiffs restate and incorporate the allegations contained in the preceding paragraphs.

352.   This Count alleges breach of fiduciary duties against Defendants.

163

353. The scope of the fiduciary duties and responsibilities of Defendants includes managing the assets of the Plan for the sole and exclusive benefit of Plan participants and beneficiaries and acting with the care, skill, diligence, and prudence required by ERISA. Defendants are directly responsible for selecting prudent investment options, evaluating and monitoring the Plan's investments on an ongoing basis and eliminating imprudent designated investment alternatives, and taking all necessary steps to ensure that the Plan's assets are invested prudently.

354. As the Supreme Court has confirmed, ERISA's "duty of prudence involves a continuing duty to monitor investments and remove imprudent ones[.]" *Hughes*, 142 S. Ct. at 741 (quoting *Tibble,* 575 U.S. at 530).

355. Defendants' failure to adequately monitor and ensure that the Plan included only the least-expensive available share classes to the inclusion of funds with excessive investment management and other fees.

356. Total Plan losses will be determined at trial after complete discovery in this case and are continuing.

164

357.  Each Defendant is personally liable under 29 U.S.C. §1109(a) to make good to the Plan any losses to the Plan resulting from the breaches of fiduciary duties alleged in this Count and is subject to other equitable or remedial relief as appropriate.

358.  Each Defendant knowingly participated in the breach of the other Defendants, knowing that such acts were a breach, enabled the other Defendants to commit a breach by failing to lawfully discharge its own fiduciary duties, knew of the breach by the other Defendants and failed to make any reasonable effort under the circumstances to remedy the breach. Thus, each Defendant is liable for the losses caused by the breach of its co-fiduciary under 29 U.S.C. §1105(a).

## COUNT V: BREACH OF FIDUCIARY DUTIES (29 U.S.C. §1104(a)(1)) RELATED TO UNREASONABLE MANAGED ACCOUNT FEES

359.  Plaintiffs restate and incorporate the allegations in the preceding paragraphs.

360.  Defendants were required to discharge their duties with respect to the Plan solely in the interest of, and for the exclusive purpose of providing benefits to Plan participants and beneficiaries,

defraying reasonable expenses of administering the Plan, and acting with the care, skill, prudence, and diligence required by ERISA.

361.  Defendants' flawed process for monitoring and controlling the Plan's managed account fees was a fiduciary breach in that Defendants failed to engage in a reasoned decision-making process that compared Voya Retirement Advisors' services and fees to other providers. Defendants also failed to monitor the amount of revenue received by the Plan's managed account service provider, determine if those amounts were competitive or reasonable for the services provided to the Plan, or use the Plan's size to reduce fees. Moreover, Defendants failed to solicit bids from competing providers. This caused the managed account compensation paid to Voya Retirement Advisors to exceed a reasonable fee for the services provided. This conduct was a breach of fiduciary duties. In addition, Defendants caused the Plan as a whole to pay a portion of the Voya Retirement Advisors fee through the PERA, and thus caused all participants to pay for Voya Retirement Advisors' managed account services, even though only a portion of participants used those services.

362.  Defendants were obligated to monitor all sources of compensation for each of the Plan's service providers, including Voya Retirement Advisors. Defendants' failure to monitor and control these payments caused the Plan to pay inflated managed account fees to Voya Retirement Advisors. Had Defendants monitored or controlled these payments, they could have recovered the excess for the benefit of the Plan.

363.  Total Plan losses will be determined at trial after complete discovery in this case and are continuing.

364.  Each Defendant is personally liable under 29 U.S.C. §1109(a) to make good to the Plan any losses to the Plan resulting from the breaches of fiduciary duties alleged in this Count and is subject to other equitable or remedial relief as appropriate.

365.  Each Defendant knowingly participated in the breach of the other Defendants, knowing that such acts were a breach, enabled the other Defendants to commit a breach by failing to lawfully discharge its own fiduciary duties, knew of the breach by the other Defendants and failed to make any reasonable effort under the circumstances to remedy

the breach. Thus, each Defendant is liable for the losses caused by the breach of its co-fiduciary under 29 U.S.C. §1105(a).

### COUNT VI: PROHIBITED TRANSACTIONS (29 U.S.C. §1106(A)(1)) RELATED TO INVESTMENT SERVICES AND FEES

366.  Plaintiffs restate and incorporate the allegations contained in the preceding paragraphs.

367.  As a provider of investment services to the Plan, Voya is a party in interest. 29 U.S.C. §1002(14)(B).

368.  By placing investment options in the Plan managed by Voya, Defendants caused the Plan to engage in transactions that Defendants knew or should have known constituted an exchange of property between the Plan and Voya prohibited by 29 U.S.C. §1106(a)(1)(A); a direct or indirect furnishing of services between the Plan and Voya prohibited by 29 U.S.C. §1106(a)(1)(C); and transfers of the Plan's assets to, or use by or for the benefit of Voya prohibited by 29 U.S.C. §1106(a)(1)(D). These transactions occurred each time the Plan paid fees to Voya and its affiliates in connection with the Plan's investments in Voya investments and managed accounts.

369.  Total losses to the Plan will be determined after complete discovery in this case and are continuing.

168

370.  Under 29 U.S.C. §1109(a), Defendants are liable to restore all losses to the Plan resulting from these prohibited transactions, and to provide restitution of all proceeds of these prohibited transactions and are subject to other appropriate equitable or remedial relief.

371.  Each Defendant knowingly participated in these transactions with knowledge that the transactions were a breach, enabled the other Defendants to cause the Plan to engage in these transactions, and knew of these transactions and failed to make any reasonable effort under the circumstances to remedy or discontinue the transaction. Thus, under 29 U.S.C. §1105(a), each Defendant is liable for restoring all proceeds and losses attributable to these transactions.

## COUNT VII: BREACH OF FIDUCIARY DUTIES (29 U.S.C. §1104(A)(1)) RELATED TO FAILURE TO SAFEGUARD CONFIDENTIAL PLAN PARTICIPANT DATA

372.  Plaintiffs restate and incorporate the allegations in the preceding paragraphs.

373.  This Count alleges breach of fiduciary duties against all Defendants.

374.  Defendants were required to discharge their duties with respect to the Plan solely in the interest of, and for the exclusive

purpose of providing benefits to Plan participants and beneficiaries, defraying reasonable expenses of administering the Plan, and acting with the care, skill, prudence, and diligence required by ERISA.

375.  Defendants' disclosure of Plan participant data to Voya, without any restrictions as to the use of Plan participant data, was a fiduciary breach in that sensitive, highly confidential personal financial data was disclosed and used for purposes of soliciting non-plan retail products from Plan participants.

376.  By allowing Voya and its affiliates to use Confidential Plan Participant Data to solicit the purchase of retail non-plan products, Defendants failed to act in the exclusive interest of participants.

377.  Total Plan losses will be determined at trial after complete discovery in this case and are continuing.

378.  Each Defendant is personally liable under 29 U.S.C. §1109(a) to make good to the Plan any losses to the Plan resulting from the breaches of fiduciary duties alleged in this Count and is subject to other equitable or remedial relief as appropriate.

379.  Each Defendant knowingly participated in the breach of the other Defendants, knowing that such acts were a breach, enabled the

other Defendants to commit a breach by failing to lawfully discharge its own fiduciary duties, knew of the breach by the other Defendants and failed to make any reasonable effort under the circumstances to remedy the breach. Thus, each Defendant is liable for the losses caused by the breach of its co-fiduciary under 29 U.S.C. §1105(a).

### COUNT VIII: FAILURE TO MONITOR FIDUCIARIES (AGAINST DEFENDANTS ADP TOTALSOURCE GROUP, INC. AND ADP TOTALSOURCE RETIREMENT SAVINGS PLAN COMMITTEE)

380.   Plaintiffs restate and incorporate the allegations contained in the preceding paragraphs.

381.   This Count is asserted against Defendants ADP TotalSource Group, Inc. and ADP TotalSource Retirement Savings Plan Committee.

382.   Defendant ADP TotalSource Retirement Savings Plan Committee is the named fiduciary with the overall responsibility for the control, management and administration of the Plan, in accordance with 29 U.S.C. §1102(a). ADP TotalSource Group, Inc. is the Plan Administrator of the Plan, under 29 U.S.C. §1002(16)(A)(i) with responsibility and complete discretionary authority to control the operation, management and administration of the Plan, with all powers necessary to enable it to properly carry out such responsibilities,

including the selection and compensation of the providers of administrative services to the Plan and the selection, monitoring, and removal of the investment options made available to participants for the investment of their contributions and provision of their retirement income, and has delegated this role to the ADP TotalSource Retirement Savings Plan Committee.

383.  ADP TotalSource Group, Inc. had ultimate responsibility for the Committee's decisions with respect to the Plan, and was responsible for monitoring the performance of Committee members and taking any necessary corrective actions, including removing Committee members who failed to fulfil their fiduciary duties.

384.  ADP TotalSource Group, Inc. and the ADP TotalSource Retirement Savings Plan Committee had ultimate responsibility for the decisions of NFP and other consultants and/or delegees with respect to the Plan, and were responsible for monitoring their performance and taking any necessary corrective actions, including removing delegees who failed to fulfil their fiduciary duties.

385.  A monitoring fiduciary must ensure that the person to whom it delegates fiduciary duties is performing its fiduciary obligations,

172

including those with respect to the investment and holding of plan assets, and must take prompt and effective action to protect the plan and participants when the delegate fails to discharge its duties.

386.   To the extent any of the fiduciary responsibilities of the ADP TotalSource Retirement Savings Plan Committee or ADP TotalSource Group, Inc. were delegated to another fiduciary, their monitoring duties included an obligation to ensure that any delegated tasks were being performed in accordance with ERISA's fiduciary standards.

387.   Defendants ADP TotalSource Retirement Savings Plan Committee and ADP TotalSource Group, Inc. breached their fiduciary monitoring duties by, among other things:

a.   Failing to monitor their appointees, including the Committee and its members, to evaluate their performance, or to have a system in place for doing so, and standing idly by as the Plan suffered enormous losses as a result of its appointees' imprudent actions and omissions with respect to the Plan;

b.   Failing to monitor their appointees' fiduciary process, which would have alerted any prudent fiduciary to the potential breach because of the excessive administrative and

173

investment management fees and consistent underperformance of Plan investments in violation of ERISA;

c.  Failing to ensure that the monitored fiduciaries had a prudent process in place for evaluating the Plan's administrative fees and ensuring that the fees were competitive, including a process to identify and determine the amount of all sources of compensation to the Plan's recordkeeper and the amount of any revenue sharing payments; a process to prevent the recordkeeper from receiving revenue sharing that would increase the recordkeeper's compensation to unreasonable levels even though the services provided remained the same; and a process to periodically obtain competitive bids to determine the market rate for the services provided to the Plan;

d.  Failing to ensure that the monitored fiduciaries considered the ready availability of comparable and better performing investment options that charged significantly lower fees and

expenses than the Plan's mutual fund and insurance company variable annuity options; and

e.  Failing to remove appointees whose performance was inadequate in that they continued to maintain imprudent, excessive cost, and poorly performing investments, all to the detriment of Plan participants' retirement savings.

f.  Failing to remove appointees whose performance was inadequate in that they allowed the misuse of Confidential Plan Participant Data.

388.  Had Defendants ADP TotalSource Retirement Savings Plan Committee and ADP TotalSource Group, Inc. discharged their fiduciary monitoring duties prudently as described above, the losses suffered by the Plan would have been minimized or avoided. Therefore, as a direct result of the breaches of fiduciary duty alleged herein, the Plan, the Plaintiffs, and the other Class members lost tens of millions of dollars of retirement savings.

## COUNT IX: OTHER REMEDIES AGAINST ADP, ADP TOTALSOURCE, INC., AND ADP TOTALSOURCE GROUP, INC.
### (29 U.S.C. §1132(a)(3))

389.   Plaintiffs restate and incorporate the allegations contained in the preceding paragraphs.

390.   Under 29 U.S.C. §1132(a)(3), a court may award "other appropriate equitable relief" to redress "any act or practice" that violates ERISA. A defendant may be liable under that section regardless of whether it is a fiduciary. A nonfiduciary transferee of proceeds from a breach of a fiduciary duty or prohibited transaction is subject to equitable relief if it had actual or constructive knowledge of the circumstances that rendered the transaction or payment unlawful.

391.   By virtue of its role and responsibilities in appointing and monitoring the ADP TotalSource Retirement Savings Plan Committee members and other ADP TotalSource executives who served as Committee members and controlled the payments to ADP TotalSource, Inc., a wholly owned subsidiary of ADP TotalSource Group, Inc., both of which are wholly owned subsidiaries (directly and indirectly) of ADP and are controlled by ADP, , constituting a part of ADP's TotalSource business unit, ADP TotalSource Group, Inc., ADP TotalSource, Inc., and

ADP knew or should have known that ADP TotalSource employees were providing purported services to the Plan and that ADP's subsidiaries were receiving payments of Plan assets in violation of ERISA as prohibited transactions as alleged in Counts III and IV and the inuring of Plan assets to the benefit of an employer in violation 29 U.S.C. §1103(c)(1).

392.   To the extent any proceeds from those transactions and the profits ADP TotalSource made through the use of Plan assets are not recovered under the preceding Counts, the Court should order restitution and disgorgement under 29 U.S.C. §1132(a)(3) to restore those funds to the Plan.

393.   On information and belief, ADP TotalSource has not dissipated the entirety of the proceeds on nontraceable items, and the proceeds can be traced to particular funds or property in ADP TotalSource's possession.

## JURY TRIAL DEMANDED

394.   Pursuant to Fed. R. Civ. P. 38 and the Constitution of the United States, Plaintiffs demand a trial by jury.

177

## PRAYER FOR RELIEF

For these reasons, Plaintiffs, on behalf of the Plan and all similarly situated Plan participants and beneficiaries, respectfully request that the Court:

- find and declare that Defendants have breached their fiduciary duties as described above;

- find and adjudge that Defendants are personally liable to make good to the Plan all losses to the Plan resulting from each breach of fiduciary duty, and to otherwise restore the Plan to the position it would have occupied but for the breaches of fiduciary duty;

- determine the method by which Plan losses under 29 U.S.C. §1109(a) should be calculated;

- order Defendants to provide all accountings necessary to determine the amounts Defendants must make good to the Plan under §1109(a);

- remove the fiduciaries who have breached their fiduciary duties and enjoin them from future ERISA violations;

178

- surcharge against Defendants and in favor of the Plan all amounts involved in any transactions which such accounting reveals were improper, excessive and/or in violation of ERISA;

- reform the Plan to include only prudent investments;

- reform the Plan to obtain bids for recordkeeping and to pay only reasonable recordkeeping expenses;

- reform the Plan to obtain bids for managed account services and to pay only reasonable managed account service fees if the fiduciaries determine that managed account services is a prudent alternative to target date or other asset allocation funds;

- certify the Class, appoint each of the Plaintiffs as a class representative, and appoint Schlichter Bogard LLP as Class Counsel;

- award to the Plaintiffs and the Class their attorney's fees and costs under 29 U.S.C. §1132(g)(1) and the common fund doctrine;

179

- order the payment of interest to the extent it is allowed by law; and

- grant other equitable or remedial relief as the Court deems appropriate.

March 11, 2024                    Respectfully submitted,

/s/ _____

SPIRO HARRISON
Thomas Kenny
830 Morris Turnpike 2nd Floor
Short Hills, NJ 07078
(973) 310-4026
tkenny@spiroharrison.com

*Local Counsel for Plaintiffs*

SCHLICHTER BOGARD LLP
Jerome J. Schlichter (*pro hac vice*)
Michael A. Wolff (*pro hac vice*)
Joel D. Rohlf (*pro hac vice*)
100 South Fourth Street, Suite 1200
St. Louis, MO, 63102
(314) 621-6115
(314) 621-5934 (fax)
jschlichter@uselaws.com
mwolff@uselaws.com
kstruckhoff@uselaws.com
jrohlf@uselaws.com

*Lead Counsel for Plaintiffs*