<u>NOT FOR PUBLICATION</u>

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

| | |
|---|---|
| BETH BERKELHAMMER, *et al.*, | |
| Plaintiffs, | |
| v. | No. 20cv5696 (EP) (JRA) |
| ADP TOTALSOURCE GROUP, INC, *et al.*, | **OPINION** |
| Defendants. | |

**PADIN, District Judge.**

Plaintiffs Beth Berkelhammer and Naomi Ruiz, acting individually and as representatives of a class of participants and beneficiaries of the ADP TotalSource Retirement Savings Plan (the "Plan"), bring various claims of breach of fiduciary duty and prohibited transactions under the Employee Retirement Income Security Act, 29 U.S.C §§ 1001–1193c ("ERISA")[1].  D.E. 223 ("Second Amended Complaint" or "SAC").  Plaintiffs bring these claims against Defendants ADP TotalSource Group, Inc. ("ADPTS"), the ADP TotalSource Retirement Savings Plan Committee (the "Committee"), members of the Committee, ADP TotalSource, Inc., and Automatic Data Processing, Inc. ("ADP").  *See id.*

Defendants move for summary judgment on all remaining claims in the SAC.[2]  D.E. 293 ("Defendants' Motion for Summary Judgment" or "Defendants' MSJ").[3]  Plaintiffs, in turn, move for partial summary judgment on the prohibited transaction claims they bring in Counts I and II

---

[1] Unless otherwise indicated, all citations to statutory sections herein are citations to sections of ERISA.

[2] *See infra* Section III.B.1 for further discussion of the remaining claims.

[3] The Notice of Motion for Defendants' Motion for Summary Judgment is at D.E. 292.

insofar as those claims relate to Defendants causing the Plan to pay Plan assets to ADPTS.  D.E. 277 ("Plaintiffs' Motion for Partial Summary Judgment" or "Plaintiffs' MSJ")[4] (together with Defendants' MSJ, the "Summary Judgment Motions").

Plaintiffs also move to exclude the expert opinion of Pete Swisher.  D.E. 289 ("Plaintiffs' Motion to Exclude Swisher" or "Swisher Mot.").[5]  Defendants, for their part, move to exclude the expert opinions of:  (1) Al Otto, D.E. 307 ("Defendants' Motion to Exclude Otto" or "Otto Mot.")[6]; (2) Donald Stone, D.E. 300 ("Defendants' Motion to Exclude Stone" or "Stone Mot.")[7]; (3) Dr. Edward O'Neal, D.E. 311 ("Defendants' Motion to Exclude Dr. O'Neal" or "O'Neal Mot.")[8]; and (4) Marek Pfeil, D.E. 304 ("Defendants' Motion to Exclude Pfeil" or "Pfeil Mot.")[9] (together with the Swisher Mot., the "Expert Motions").

The Court decides the Summary Judgment Motions and the Expert Motions without oral argument.  *See* Fed. R. Civ. P. 78; L. Civ. R. 78.1(b).  For the following reasons, the Court will: (1) **GRANT in part** and **DENY in part** Defendants' Motion for Summary Judgment and (2) **GRANT in part** and **DENY in part** Plaintiffs' Motion for Partial Summary Judgment.  The Court will further **GRANT in part**, **DENY *without prejudice* in part**, and **DENY *with prejudice* in part**: (1) Plaintiffs' Motion to Exclude Swisher, (2) Defendants' Motion to Exclude Otto, and (3)

---

[4] The Notice of Motion for Plaintiffs' Motion for Partial Summary Judgment is at D.E. 276.

[5] The Notice of Motion for Plaintiffs' Motion to Exclude Swisher is at D.E. 288.

[6] The Notice of Motion for Defendants' Motion to Exclude Otto is at D.E. 306.

[7] The Notice of Motion for Defendants' Motion to Exclude Stone is at D.E. 299.

[8] The Notice of Motion for Defendants' Motion to Exclude Dr. O'Neal is at D.E. 310.

[9] The Notice of Motion for Defendants' Motion to Exclude Pfeil is at D.E. 303.

Defendants' Motion to Exclude Stone. The Court will also **DENY** *without prejudice*: (1) Defendants' Motion to Exclude Dr. O'Neal, and (2) Defendants' Motion to Exclude Pfeil.

## I.    BACKGROUND

### A.    Facts[10]

Plaintiffs are participants in the Plan, a multiple-employer defined contribution 401(k) plan sponsored by ADPTS. *See* D.E. 278 ("Plaintiffs' SUF") ¶¶ 5, 6, 10.

ADTPS is a professional employer organization ("PEO") providing human resources outsourcing services. *See* D.E. 294 ("Defendants' SUF") ¶ 1. One of those services is the opportunity for employers to adopt the Plan for their employees. *See id.* ¶ 9. From 2014 through 2022, the Plan was the largest PEO multiple-employer plan in the country, serving 6,746 employers and 164,704 participants by 2022. *Id.* ¶ 12. ADPTS and ADP Total Source, Inc. are consolidated subsidiaries of ADP. *See* D.E. 282 ("Defendants' Response to Plaintiffs' SUF") ¶ 1.

The Committee is the Plan administrator and named fiduciary of the Plan charged with all aspects of administrating the Plan. *See id.* ¶ 12; Defendants' SUF ¶ 15.[11] At all relevant times,[12] the Committee was comprised of four to six members. Defendants' SUF ¶ 16. Members of the Committee are appointed by ADPTS and, at least since January 1, 2017, serve at the pleasure of ADPTS such that they may be removed at any time by ADPTS. *See* Defendants' Response to

---

[10] The facts in this Section, and throughout this Opinion, are undisputed unless otherwise indicated. However, as the parties disagree as to many of the relevant facts, and the Court is denying much of the Summary Judgment Motions because those disagreements exist, only an overview of the facts of the case is provided for context.

[11] Until December 2015, the Committee was broken up into separate investment and administration committees. Defendants' SUF ¶ 15 & n.4. The Court refers to the Committee throughout for ease of reference.

[12] The class period for Plaintiffs' claims runs from May 7, 2014, through the date of judgment. D.E. 270.

Plaintiffs' SUF ¶ 14. The Committee members during the relevant time period were executives of ADPTS, ADP Total Source, Inc., or ADP. *See id.* ¶¶ 16–24.

The Committee's Plan administration responsibilities include overseeing the Plan's service providers. *See* Defendants' SUF ¶ 15. The Committee has retained Voya as the Plan's recordkeeper (since 2012),[13] Crowe LLP (formerly Crowe Horwath LLP) ("Crowe") as its auditor, and Proskauer Rose LLP ("Proskauer") as its legal counsel. *See* D.E. 298 ("Plaintiffs' Responsive & Supplemental SUF") ¶¶ 57, 64, 320. The Plan paid these service providers from the Plan Expense Reimbursement Account ("PERA").[14] Defendants' SUF ¶ 58. Payments from the PERA were, for instance, made to Crowe for various auditing tasks and to Proskauer for legal services in connection with an audit of the Plan by the Department of Labor. *See* D.E. 315 ("Defendants' Response to Plaintiffs' Supplemental SUF") ¶¶ 284–92.[15]

The Plan also paid ADPTS from the PERA for administrative services ADPTS provided to the Plan. *See* Defendants' SUF ¶ 26; Plaintiffs' Responsive & Supplemental SUF ¶ 26. The

---

[13] Plaintiffs' original complaint included claims related to the recordkeeping fees the Plan paid to Voya. *See* D.E. 1 ("Complaint") ¶¶ 265–80. Plaintiffs have since dropped those claims. *See generally* SAC.

[14] Plaintiffs contend that Defendants caused the Plan to keep excess funds in the PERA, which "deprived Plan participants of the opportunity to invest these funds in their accounts." Plaintiffs' Opp. to Defendants' MSJ at 39; *see* Plaintiffs' Responsive & Supplemental SUF ¶ 62. Because the Court finds that Plaintiffs have abandoned any claims related to Defendants' alleged retention of excess assets in the PERA, *see infra* Section III.B.1.b.ii, no further discussion of these allegations is warranted.

[15] The parties disagree regarding the scope of the work Crowe—in connection with its review of reimbursements the Plan paid to ADPTS—and Proskauer—in connection with an audit of the Plan by the Department of Labor—performed for the Plan (and whether that work was in fact for the benefit of the Plan or, conversely, for the benefit of ADPTS). *See id.* Given that the Court has found these disputes material to Plaintiffs' prohibited transaction claims related to payments to Crowe and Proskauer for these services, *see infra* Section III.B.3.b, the Court need not discuss these facts any further here.

Committee was authorized to approve requests for reimbursement of direct expenses properly incurred by ADPTS. Plaintiffs' Responsive & Supplemental SUF ¶ 42. These requests for payments from the PERA for the reimbursement of salaries, bonuses, and taxes of ADPTS employees ostensibly providing administrative services related to the Plan (the "Reimbursable Team") were submitted quarterly to the Committee. *See id.* ¶ 44. Before any reimbursement requests from ADPTS were considered, Proskauer provided the Committee with a memo setting forth best practices for reimbursement. *See id.* ¶¶ 28–29. The Committee and ADPTS then decided on a process for estimating time spent by the Reimbursable Team on Plan administration. *See id.* ¶¶ 36–40. As part of that process, ADPTS conducted a time study to determine staffing and headcount for the Reimbursable Team to provide services to the Plan based on estimates of the average time it took to perform a specific task and then created codes for tasks performed on behalf of employers that had adopted the Plan. *See* D.E. 287 ("Plaintiffs' Response to Defendants' Supplemental SUF") ¶¶ 1–3; Plaintiffs' Responsive & Supplemental SUF ¶¶ 39–40.[16] The Reimbursable Team entered those codes for tasks performed specifically for those employers but did not enter codes for tasks supporting the Plan more generally. *See id.* ¶¶ 39–40. The Reimbursable Team members never recorded the actual time they spent on reimbursable tasks. *See* Plaintiffs' Response to Defendants' Supplemental SUF ¶ 10.

Each quarter, the Plan created a reimbursement report including an internal review of the tasks performed by each Reimbursable Team member. *See* Plaintiffs' Responsive & Supplemental

---

[16] As part of the process of creating the Reimbursable Team, the Committee also solicited quotes from its recordkeepers (first MassMutual, then Voya) for performing the reimbursable tasks, but decided against outsourcing that work. *See* Plaintiffs' Responsive & Supplemental SUF ¶¶ 50–52; *see also supra* n.15.

SUF ¶¶ 42–44.  The Plan then sent a sampling of the data in the report to Crowe.  *See id.* ¶ 45.[17]

The chair of the Committee would subsequently review the draft report before sending it to

Proskauer for review.  *See id.* ¶ 54.[18]  The Committee chair provided final approval for the

reimbursement requests.  *See id.*

Along with overseeing the Plan's service providers—including the ADPTS's

Reimbursable Team, the Committee also oversaw the investment options provided by the Plan.

*See* Defendants' SUF ¶ 15.  To help it oversee those options, the Committee retained NFP

Retirement Inc. ("NFP").  *Id.* ¶ 69.  In 2012, Voya submitted a bid to become the Plan's

recordkeeper, but also submitted a bid for the Plan's adoption of its investment line-up, which

included a suite of Voya Target Date Funds ("Voya TDFs").[19]  *See* Defendants' Response to

Plaintiffs' Supplemental SUF ¶¶ 316–18.  At that point in time, the Plan offered a suite of Dow

Jones Target Date Funds ("Dow Jones TDFs").  Plaintiffs' Responsive & Supplemental SUF

¶ 313.  On October 9, 2012, the Committee accepted both Voya's recordkeeping proposal and its

proposed investment line-up (including the Voya TDFs).  *See* Defendants' Response to Plaintiffs'

Supplemental SUF ¶¶ 320–21.  The Voya TDFs were officially added to the Plan on August 5,

2013.  Plaintiffs' Responsive & Supplemental SUF ¶ 399.[20]  As part of the agreement to add the

---

[17] The parties disagree regarding the scope of Crowe's review of those reports.  *See id.*

[18] The parties also disagree over the scope of Proskauer's review.  *See id.*

[19] "Target date funds are managed funds that shift in investment strategy as a target retirement year approaches."  *Boley v. Universal Health Servs., Inc.*, 36 F.4th 124, 128–29 (3d Cir. 2022).

[20] Defendants contend that the selection of the Voya TDFs "is neither at issue nor relevant," because any claims based on the selection of the funds are time-barred.  Defendants' Reply ISO MSJ at 2–3.  The Court agrees with Defendants that Plaintiffs may not make out a separate claim that Defendants' selection of the Voya TDFs in 2012/2013 was imprudent because § 1113(1) bars claims based on investment selection more than six years before suit and Plaintiffs did not file suit

Voya TDFs to the Plan, Voya agreed to make payments of $47,500 to the PERA for every quarter the Plan continued to offer the Voya TDFs. *See* Defendants' Response to Plaintiffs' Supplemental SUF ¶ 337.[21]

While the parties intensely dispute the extent of the Voya TDFs' underperformance, *see, e.g.*, Defendants' Response to Plaintiffs' Supplemental SUF ¶¶ 340–42, there is no dispute that the Voya TDFs began to, by at least some metrics, underperform by the second quarter of 2013. *See id.* ¶ 340. One of the performance metrics available to the Committee was a scorecard created by NFP ("NFP Scorecard"). *See* Defendants' SUF ¶¶ 135–37. The NFP Scorecard scored funds from zero to ten (with ten being the best) based on both quantitative and qualitative factors. *Id.* ¶¶ 136–37. This NFP Scorecard was incorporated in the Plan's Investment Policy Statement. *Id.* ¶ 131 (citing D.E. 296-106 ("IPS")). The IPS is "intended to assist the . . . Committee by ensuring that it makes investment-related decisions in a prudent manner." Plaintiffs' Responsive & Supplemental SUF ¶ 126 (quoting IPS at -1707[22]). The IPS creates a "Watch List," on which an investment option must be placed if it "fails to meet the criteria standards, as determined by its score." *Id.* ¶ 132 (quoting IPS at -1712). Per the IPS, "[i]f the investment option continues to

---

until 2020. *See* § 1113(1); Complaint. But that does not mean that facts regarding the selection of the Voya TDFs are necessarily irrelevant to Plaintiffs' claims that retaining the Voya TDFs in 2015 was imprudent. The Court accordingly declines to wholesale exclude facts related to the selection of the Voya TDFs at this juncture.

[21] Plaintiffs also contend that the Voya TDFs had excessive fees and that Voya required ADPTS (through the Plan) to pay platform fees charged by Voya. *See* Plaintiffs' Opp. to Defendants' MSJ at 38–39); *see also* Plaintiffs' Responsive & Supplemental SUF ¶¶ 92–96. Because the Court has determined that Plaintiffs' have abandoned all claims regarding these fees, *see infra* Section III.B.1, its discussion of these fees ends here.

[22] For clarity, the Court cites to the last four digits of the Bates stamps of the IPS.

remain on '[W]atch [L]ist' for the following three quarters, the investment option will be considered for possible removal." *Id.* ¶ 133 (quoting IPS at -1712).

By NFP's investment review in the first quarter of 2014, NFP reported to the Committee that eight out of the ten vintages of the Voya TDFs had dropped from a score of seven to a score of six and recommended that the Committee place the Voya TDFs on the Watch List, which the Committee did.  *See* Defendants' Response to Plaintiffs' Supplemental SUF ¶ 341 (citing D.E. 296-19, May 28, 2014, Committee meeting minutes).  At the next investment review, on September 17, 2014, while the Voya TDFs this time scored a seven, NFP recommended that they remain on the Watch List and the Committee accepted that recommendation.  *See id.* ¶ 349 (citing D.E. 296-20, September 17, 2014, Committee meeting minutes).  By the next quarterly investment review, the score for the Voya TDFs had again dropped to a six and the Voya TDFs remained on the Watch List.  *See* Defendants' SUF ¶ 154 (citing D.E. 296-23, December 4, 2024, Committee meeting minutes).  The Voya TDFs' score remained at a six by the next meeting on February 25, 2015, leading to the Committee continuing to keep them on the Watch List.  Defendants' Response to Plaintiffs' Supplemental SUF ¶ 352 (citing D.E. 296-26, February 25, 2015, Committee meeting minutes).  The parties disagree over whether the IPS required the Committee to consider removing the Voya TDFs from the Plan by February 25, 2015, after four consecutive quarters of the Voya TDFs being on the Watch List.  *See id.* ¶¶ 353, 376.  The parties further disagree over whether the Committee did in fact take any steps to consider removing the Voya TDFs and, if so, what those steps were.  *See id.*[23]

---

[23] Consistent with these disputes, which the Court finds genuine and material, the Court denies Defendants' Motion of Summary Judgment as to its breach of fiduciary duty claims.  *See infra* Section III.B.2.a.i.

Plaintiffs argue that, by early 2015, the Committee should have replaced the Voya TDFs with either the T. Rowe Price TDFs or the Vanguard TDFs, two widely available suites of TDFs. *See* Plaintiffs' Opp. to Defendants' MSJ at 5–6 (citing, *e.g.*, Plaintiffs' Responsive & Supplemental SUF ¶ 383). According to investment research firm Morningstar, by year-end 2014, the Vanguard TDFs and T. Rowe Price TDFs ranked among the top three providers of TDFs by market share and had each gained approximately $14 billion in net new assets that year. Defendants' Response to Plaintiffs' Supplemental SUF ¶ 383. The Voya TDFs, on the other hand, suffered $450 million in negative net flows that year. *Id.* Morningstar also gave the T. Rowe Price TDFs and Vanguard TDFs "Gold" ratings (the top ranking), whereas the Voya TDFs were rated "Neutral." *See id.* ¶ 382. Moreover, in terms of five-year return percentile rankings, Morningstar ranked the T. Rowe Price TDFs in the top fourth percentile and the Vanguard TDFs in the top fourteenth, whereas the Voya TDFs were in the top forty-third percentile. *See id.*

## B.    Procedural History

Plaintiffs filed this action on May 7, 2020, against ADPTS, ADP, the Committee, John Does 1–40, and NFP. Complaint.

NFP moved to dismiss the Complaint on July 31, 2020. D.E. 31. Separately from NFP, ADPTS, the Committee, and ADP also moved to dismiss the Complaint. D.E. 32 ("Defendants' Motion to Dismiss"). NFP then moved to compel mediation and, if unsuccessful, arbitration of Plaintiffs' claims against NFP. D.E. 54. The Hon. Esther Salas, U.S.D.J., administratively terminated the then-pending motions to dismiss and motion to compel mediation and set oral argument on those motions for June 2021, D.E. 79, at which she granted NFP's motion to compel mediation/arbitration and dismissed without prejudice Plaintiffs' claims against NFP, *see* D.E. 95. Plaintiffs then moved for entry of final judgment as to NFP or certification for interlocutory appeal, D.E. 96, which Judge Salas granted on March 31, 2022, with respect to Plaintiffs' request for entry

9

of final judgment as to NFP, D.Es. 132 & 133. The Third Circuit ultimately denied Plaintiffs' subsequent appeal of the final judgment against NFP based on the motion to compel arbitration. D.E. 193.

On August 23, 2022, Judge Salas granted in part and denied in part Defendants' Motion to Dismiss the Complaint. D.Es. 148 ("Opinion on Defendants' Motion to Dismiss") & 149. Judge Salas denied Defendants' Motion to Dismiss with respect to Plaintiffs' claims that: (1) Defendants breached their duties of prudence and loyalty by causing the Plan to pay Voya unreasonable recordkeeping fees, provide imprudent and poorly performing investment options to participants, to pay excessive fees for imprudent investment options, and pay Voya unreasonable fees for managed account services; and (2) Defendants engaged in prohibited transactions by causing the Plan to pay Voya for recordkeeping services and TotalSource for putative reimbursements. *See* Opinion on Defendants' Motion to Dismiss at 5, 39. Judge Salas also permitted Plaintiffs' claim that Defendants engaged in prohibited transactions by causing the Plan to pay investment fees to Voya to proceed, but only insofar as the claim was brought under § 1106(a)(1)(C) because she dismissed that claim with prejudice to the extent it was brought under § 1106(a)(1)(A) and (D). *See id.* Judge Salas also dismissed—this time, without prejudice—Plaintiffs' claims that Defendants breached their duties of loyalty and prudence by disclosing Plan participant data to Voya, which used the data to sell non-Plan, retail, and expensive investment products to Plan participants. *See id.*

Plaintiffs subsequently filed an amended complaint. D.E. 154 ("First Amended Complaint"). Defendants answered every count of the Amended Complaint, *see* D.E. 158, except for the count relating to the use of Plan participant data—which Defendants moved to dismiss, D.E. 159. Defendants also moved to strike Plaintiffs' jury demand. D.E. 178. On May 25, 2023,

10

the Hon. José R. Almonte, U.S.M.J., referred the parties to mediation and administratively terminated the matter, including the pending motions to dismiss and motion to strike Plaintiffs' jury demand, until the conclusion of mediation.  D.E. 188.

After the parties were unable to reach a resolution via mediation, Judge Almonte restored the case to the active docket on October 25, 2023, and granted Plaintiffs' request to file a motion for leave to file a second amended complaint.  D.E. 201.  Judge Almonte granted in part and denied in part Plaintiffs' motion for leave to file a second amended complaint.  D.E. 221.  Plaintiff accordingly filed the Second Amended Complaint on March 11, 2024.  SAC.  Defendants answered.  D.E. 231.

Defendants also renewed their motion to strike Plaintiffs' jury demand, D.E. 265, which Judge Almonte granted, D.E. 266, and the undersigned[24] affirmed on appeal, D.E. 324.

Plaintiffs, for their part, filed a motion for class certification, D.E. 230, which Judge Salas granted on February 13, 2025, D.E. 270.

On January 31, 2025, in connection with the motion for class certification, Plaintiffs clarified that they only seek relief with respect to the following counts in the Second Amended Complaint: (1) Count I, brought for Defendants' engagement in self-dealing transactions—paying Plan assets to ADPTS and Crowe and Proskauer—prohibited by § 1106(b); (2) Count II, brought for Defendants' engagement in transactions between the Plan and ADPTS and between the Plan and each of Crowe and Proskauer prohibited by § 1106(a); (3) Count III, solely as brought for Defendants' breach of fiduciary duties in failing to remove the Voya TDFs from the Plan; (4) Count IV, solely as brought for Defendants' breach of fiduciary duties with respect to excessive "fees associated with the Voya [TDFs]; (5) Count VI, solely as brought for Defendants receiving

---

[24] This case was re-assigned to the undersigned on March 18, 2025.  D.E. 274.

"payments from Voya for the inclusion and retention of the Voya [TDFs]" that constitute prohibited transactions under § 1106(a); (6) Count VII, solely as brought against ADPTS and the Committee for failure to monitor fiduciaries for the conduct underlying the remaining portions of Counts I, II, III, IV, and VI; and (7) Count IX, solely as brought against ADP and ADP TotalSource, Inc. for other remedies for the conduct underlying the remaining portions of Counts I, II, III, IV, and VI. *See* D.E. 268 ("January 2025 Clarification of Claims") at 3.

On June 6, 2025, the parties filed the instant Summary Judgment Motions and Expert Motions. Defendants moved for summary judgment on all remaining claims in the SAC, as limited by the January 2025 Clarification of Claims. Defendants' MSJ. In support of their motion, Defendants submitted their SUF and various exhibits (D.Es. 295-1–28 & 296-1–126). Plaintiffs opposed Defendants' Motion for Summary Judgment. D.E. 297 ("Plaintiffs' Opposition to Defendants' Motion for Summary Judgment" or "Plaintiffs' Opp. to Defendants' MSJ"). Plaintiffs also submitted a response to Defendants' SUF and a supplemental statement of facts. Plaintiffs' Responsive and Supplemental SUF. Defendants replied to Plaintiffs' Opposition to Defendants' Motion for Summary Judgment. D.E. 314 ("Defendants' Reply ISO MSJ"). Defendants further submitted their Response to Plaintiffs' Supplemental SUF, and more exhibits (D.Es. 316 & 317).

Plaintiffs, in turn, moved for partial summary judgment on the prohibited transaction claims they bring in Counts I and II insofar as those claims relate to Defendants causing the Plan to pay Plan assets to ADPTS. Plaintiffs' MSJ. Alongside their motion, Plaintiffs filed their SUF, and various exhibits (D.Es. 279-1–48 & 280-1–94). Defendants opposed Plaintiffs' Motion for Partial Summary Judgment. D.E. 281 ("Defendants' Opposition to Plaintiffs' Motion for Partial Summary Judgment" or "Defendants' Opp. to Plaintiffs' MSJ"). Defendants also filed their Response to Plaintiffs' SUF, D.E. 283 ("Defendants' Supplemental SUF"), and additional exhibits

12

(D.Es. 284 & 285).  Plaintiffs replied to Defendants' Opposition to Plaintiffs' Motion for Partial

Summary Judgment. D.E. 286 ("Plaintiffs' Reply ISO MSJ").  Plaintiffs further submitted their

Response to Defendants' Supplemental SUF.[25]

Plaintiffs also moved to exclude the expert opinion of Pete Swisher.  Swisher Mot.

Defendants opposed.  D.E. 290 ("Swisher Opp.").  Plaintiffs replied.  D.E. 291 ("Swisher Reply").

Defendants, for their part, moved to exclude the expert opinions of Al Otto, Donald Stone,

Dr. Edward O'Neal, and Marek Pfeil.  Otto Mot.; Stone Mot.; O'Neal Mot.; Pfeil Mot.  In support

of those motions, Defendants filed various exhibits.  D.Es. 308-1–4, 301-1–3, 311–12, 304-2–4.

Plaintiffs opposed each of Defendants' motions to exclude.  D.Es. 309 ("Otto Opp."), 302 ("Stone

Opp."), 313 ("O'Neal Opp."); D.E. 305 ("Pfeil Opp.").  Defendants replied to each opposition.

D.Es. 320 ("Otto Reply"), 318 ("Stone Reply"), 321 ("O'Neal Reply"), 319 ("Pfeil Reply").

## II.     MOTIONS TO EXCLUDE EXPERT TESTIMONY

### A.      Legal Standard

Federal Rule of Evidence 702 governs the admissibility of expert witness testimony.  The

Federal Rules of Evidence embrace a liberal policy of admissibility, including with respect to

expert testimony.  *Pineda v. Ford Motor Co.*, 520 F.3d 237, 243 (3d Cir. 2008).  Under Rule 702,

a witness qualified to provide expert testimony is permitted to give testimony that would otherwise

be impermissible, if the proponent of the qualified expert shows by a preponderance of the

evidence that (1) "the expert's scientific technical, or other specialized knowledge will help the

trier of fact to understand the evidence or to determine a fact in issue," (2) "the testimony is based

---

[25] Plaintiffs also filed an unopposed motion to seal numerous exhibits as well as the statements of material fact (and responses thereto) discussing those exhibits.  D.E. 322 ("Motion to Seal").  Judge Almonte granted Plaintiffs' Motion to Seal.  D.E. 323.  But because the parties have not filed under seal their briefs revealing the content of the sealed exhibits discussed in this Opinion, the Court will not seal this Opinion.  Any party may, however, move to seal this Opinion as appropriate.

on sufficient facts or data," (3) "the testimony is the product of reliable principles and methods," and (4) "the expert's opinion reflects a reliable application of the principles and methods to the facts of the case." Fed. R. Evid. 702. In short, "Rule 702 embodies a trilogy of restrictions on expert testimony: qualification, reliability, and fit." *Schneider ex rel. Est. of Schneider v. Fried*, 320 F.3d 396, 404 (3d Cir. 2003).

A witness is qualified to provide expert testimony if the witness has "specialized expertise," but this qualification requirement is interpreted "liberally." *Id.*; *see In re Paoli R.R. Yard PCB Litig.*, 35 F.3d 717, 741 (3d Cir. 1994) ("*Paoli I*") (affirming rejection of "overly rigorous requirements of expertise" and expressing "satisf[action] with more generalized qualifications"); *Pineda*, 520 F.3d at 244 (proposed expert witness need not be the "best qualified"). A witness's testimony is reliable if it is founded on "good grounds," meaning the testimony is "based on the 'methods and procedures of science' rather than on 'subjective belief or unsupported speculation.'" *Schneider*, 320 F.3d at 404 (quoting *Paoli I*, 35 F.3d at 742). In certain cases, the relevant reliability concerns "may focus upon personal knowledge or experience" instead of "scientific foundations." *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 150 (1999). Finally, a witness's testimony "fits" a case if it is "relevant for the purposes of the case and . . . assist[s] the trier of fact." *Schneider*, 320 F.3d at 404; *see United States v. Ford*, 481 F.3d 215, 219 n.6 (3d Cir. 2007) ("[F]it is [primarily] a relevance concern.").

So long as good grounds for the witness's testimony are shown, the testimony "should be tested by the adversary process—competing expert testimony and active cross-examination— rather than excluded from [the trier of fact's] scrutiny for fear that [the trier of fact] will not grasp its complexities or satisfactorily weigh its inadequacies." *United States v. Mitchell*, 365 F.3d 215, 244 (3d Cir. 2004) (quoting *Ruiz-Troche v. Pepsi Cola of P.R. Bottling Co.*, 161 F.3d 77, 85 (1st

Cir. 1998)); *Kannankeril v. Terminix Int'l, Inc.*, 128 F.3d 802, 806 (3d Cir. 1997), *as amended* (Dec. 12, 1997) ("Admissibility decisions focus on the expert's methods and reasoning; credibility decisions arise after admissibility has been determined.").

Rule 702 is often described as requiring a trial judge to act as a "gatekeeper" before expert testimony reaches a trier of fact. *See, e.g.*, *Kannankeril*, 128 F.3d at 806 (citing *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 589 (1993)). In this case, the trier is of fact is the undersigned because Plaintiffs' jury demand has been stricken. *See* D.Es. 266 & 324. While "Rule 702 applies whether the trier of fact is a judge or a jury," the Third Circuit has made clear that "district courts do retain 'latitude' to decide 'how' to apply [the Rule 702] requirements in a bench trial." *UGI Sunbury LLC v. A Permanent Easement for 1.7575 Acres*, 949 F.3d 825, 832–33 (3d Cir. 2020). That latitude means that "it is not necessary to apply the [Rule 702 requirements] with full force in advance of trial" when that trial is a bench trial. *Perez v. First Bankers Tr. Servs., Inc.*, No. 12-4450, 2015 WL 5722843, at *2 (D.N.J. Sept. 29, 2015) (quoting *Alco Indus., Inc. v. Wachovia Corp.*, 527 F. Supp. 2d 399, 405 (E.D. Pa. 2007)); *see In re Salem*, 465 F.3d 767, 777 (7th Cir. 2006) ("Where the gatekeeper and the factfinder are one and the same—that is, the judge—the need to make such decisions prior to hearing the testimony is lessened."). Accordingly, a district court may "conditionally admit . . . expert testimony subject to a later Rule 702 determination." *UGI Sundbury*, 949 F.3d at 833; *Perez*, 2015 WL 5722843, at *2 (in a bench trial, "the court has the flexibility to allow testimony provisionally and revise its view once the testimony is taken" (quoting *Alco*, 527 F. Supp. 2d at 405)).

## B.    Analysis

The Court now addresses each of the five Expert Motions—one brought by Plaintiffs and four brought by Defendants. As detailed below—and as consistent with the latitude this Court retains to decide how exactly to apply Rule 702 in the context of a bench trial, the Court defers its

15

final rulings on the admissibility of certain testimony where it has determined that it would be better positioned to rule after hearing the testimony at trial.[26]  "This is not to say," of course, "that the Court may rule on the merits of this matter based on fundamentally flawed testimony, only that the Court will defer its ultimate decision on whether this testimony . . . is admissible under Rule 702 until after that testimony is taken at trial." *Perez*, 2015 WL 5722843, at *3.  The parties do, however, make certain arguments that the Court does consider well-suited for adjudication at this juncture[27]; the Court addresses those arguments accordingly.[28]

As such, for the reasons stated below, the Court will **GRANT in part**, **DENY *without prejudice* in part**, and **DENY *with prejudice* in part**: (1) Plaintiffs' Motion to Exclude Swisher, (2) Defendants' Motion to Exclude Otto, and (3) Defendants' Motion to Exclude Stone.  The Court will further **DENY *without prejudice***: (1) Defendants' Motion to Exclude Dr. O'Neal, and (2) Defendants' Motion to Exclude Pfeil.

### 1.     *Expert testimony of Pete Swisher*

Plaintiffs move to exclude the testimony of Pete Swisher.  Swisher Mot.  Defendants retained Swisher, the founder and President of Waypoint Fiduciary, LLC and co-founder and Managing Partner of Group Plan Systems, LLC, to provide opinions related to Plaintiffs' claims

---

[26] In the Court's view, fact-intensive reliability and relevance arguments are prime candidates for deferral given the benefits of considering them in context.  As explained *infra* Section II.B.3–4, the Court has nevertheless more closely scrutinized opinions that bear on Defendants' Motion for Summary Judgment.

[27] These types of arguments include those related to expert qualifications and to whether opinions constitute improper legal conclusions, as they are less fact- and context-dependent.

[28] The Court further notes that it has only specifically addressed the admissibility of opinions related to claims no longer at issue in this case where the parties have raised this question in the Expert Motions and Summary Judgment Motions.  The Court nevertheless cautions the parties that it will preclude any testimony at trial addressing issues only relevant to abandoned or dismissed claims.

that ADPTS and the Committee engaged in prohibited transactions when they caused the Plan to make payments to ADPTS.[29]  Swisher Opp. at 2; Swisher Mot. at 1.  Plaintiffs argue that the Court should exclude Swisher's testimony in its entirety because: (1) he offers improper legal opinions, (2) he provides improper factual narratives, (3) he invades the province of the factfinder by offering opinions regarding Defendants' states of mind, and (4) his opinions are unreliable because they rely on "an incorrect understanding of the facts that underpin his opinions" and he did not apply his personal experience in reaching those opinions.  *See* Swisher Mot.  In the event the Court does not exclude Swisher's testimony in its entirety, Plaintiffs seek to exclude opinions related to claims that are no longer at issue at this juncture of the litigation.  *Id.* at 3 n.3.  The Court addresses each argument in turn.

Plaintiffs first argue that Swisher offers improper legal opinions.  *Id.* at 6–9.  While "it is not permissible for a witness to testify as to the governing law" or "as to what the law require[s]," an expert witness may testify regarding "business customs and practices."  *United States v. Leo*, 941 F.2d 181, 197 (3d Cir. 1991).  Consistent with that principle, courts around the country regularly permit experts like Swisher to testify in ERISA cases regarding practices in the retirement industry and their opinions on whether particular conduct is consistent with those practices, even where those opinions reference language used in the ERISA legal standard.  *See, e.g.*, *Lauderdale v. NFP Ret., Inc.*, No. 21-301, 2022 WL 17324416, at *4 (C.D. Cal. Nov. 17, 2022) ("*Lauderdale I*") (declining to exclude "statements about what a 'prudent' fiduciary in the industry would do based on his experience, not whether defendants' actions violate ERISA," explaining that "[i]t is sometimes 'impossible for an expert to render his or her opinion on a subject without resorting to language that recurs in the applicable legal standard'" (quoting *Risto v. Screen*

---

[29] These claims are discussed in detail *infra* Section III.B.3.a.

*Actors Guild-Am. Fed'n of Television & Radio Artists*, No. 18-7241, 2021 WL 4143242, at *7 (C.D. Cal. July 19, 2021))); *Troudt v. Oracle Corp.*, 369 F. Supp. 3d 1134, 1142–43 (D. Colo. 2019) ("An opinion that defendants breached their duties under ERISA leaves no room for the factfinder to do its job but essentially directs judgment in plaintiffs' favor. By contrast, testimony that defendants' actions were not prudent by the standards of the industry and in the more prosaic usage of that term allows room for argument and proof that the duty of prudence under ERISA may be informed by other considerations."); *Scalia v. Reliance Tr. Co.*, No. 17-4540, 2021 WL 795270, at *21 (D. Minn. Mar. 2, 2021) (holding that opinion that the "defendants' conduct was imprudent . . . based on [expert's] extensive experience as an ERISA plan administrator, fiduciary and consultant for many years" was not an "impermissible legal conclusion[]").

Here, the Court declines to exclude all but one category of Swisher's "legal" opinions. Plaintiffs primarily challenge Swisher's "legal" opinions on the basis that he improperly applies ERISA's legal standard to Defendants' conduct. *See* Swisher Mot. at 6–9. The Court disagrees. While Swisher does at times make statements using words—like "reasonable"—that appear in the legal standard for transactions prohibited by ERISA,[30] "it is sometimes impossible for an expert to render his or her opinion on a subject without resorting to language that recurs in the applicable legal standard" and Swisher at no point opines on whether Defendants' conduct in fact satisfies ERISA's legal standards. *See Lauderdale I*, 2022 WL 17324416, at *4 (internal citations omitted). Rather, he draws on his experience and industry practices to opine on how he believes fiduciaries should and do act. The Court accordingly holds that Swisher's opinions applying the standards of the industry to Defendants' conduct—even where they include language also found in the ERISA's legal standards—do not constitute improper legal opinions. The Court does, however, find that

---

[30] For further discussion of those legal standards, *see infra* Section III.

18

Swisher's occasional references to what ERISA requires constitute improper testimony "as to what the law require[s]." *See Leo*, 941 F.2d at 197. Swisher, for instance, states that "[a]s far as [he] [is] aware, there is no requirement under ERISA regarding the frequency of plan committee meetings." *See* D.E. 280-60 ("Swisher's Report") ¶ 80 n.107. The Court will not permit Swisher to testify regarding what ERISA requires, whether or not it is couched in his own awareness of those requirements. The Court will therefore exclude Swisher's testimony to the extent he specifically offers opinions or testimony regarding what ERISA requires but will permit Swisher to testify regarding the standards of his industry and his application of those standards to Defendants' conduct.

Plaintiffs next argue that Swisher offers an improper narrative, claiming that Swisher's Report and rebuttal report, D.E. 280-56 ("Swisher's Rebuttal Report"), "amount to a mostly uncited factual narrative of the events in this case . . . ." Swisher Mot. at 14–16. While it is true that "an expert cannot be presented to the jury [or trier of fact] *solely* for the purpose of constructing a factual narrative based on record evidence," *Krys v. Aaron*, 112 F. Supp. 3d 181, 206 (D.N.J. 2015), the Court finds that Defendants are not offering Swisher "solely" to provide a factual narrative. Rather, Swisher's Report and Swisher's Rebuttal Report explain the facts as he understands them, with citations, in service of explaining the opinions he reaches based on those facts. *See generally* Swisher's Report; Swisher's Rebuttal Report. Because the reports thus "provide[] more than simple narratives of [Defendants'] version of the factual events at issue in this case" and "provide[] opinions based upon facts that could be accepted by the factfinder," the Court will not, on improper factual narrative grounds, exclude Swisher's Report or Swisher's Rebuttal Report, nor preclude Swisher from testifying. *Pledger v. Reliance Tr. Co.*, No. 15-4444, 2019 WL 4439606, at *12 (N.D. Ga. Feb. 25, 2019).

The Court similarly declines to exclude opinions Plaintiffs contend concern the state of mind of certain individuals and entities. *See* Swisher Mot. at 16–18. "[E]xperts may not provide testimony concerning 'the state of mind' or 'culpability'" of parties or other individuals/entities, *Krys*, 112 F. Supp. 3d at 203, but Plaintiffs have failed to identify any such testimony in Swisher's Report. For one, the paragraphs Plaintiffs claim contain Swisher's "opinions about Defendants' state of mind, intent, and motives include no reference to any intent, motive, o[r] state of mind." *Pledger*, 2019 WL 4439606, at *13; *compare, e.g.*, Swisher Mot. at 16 (characterizing "opinions related to [ADPTS's] choices in how it delivered services" in ¶ 54 of Swisher's Report as improper state of mind opinions), *with* Swisher's Report ¶ 54 ("ADPTS's choice to provide the services offered by the Client Service Team meant that Voya's cost structure was lower than it would have been if Voya had provided some or all of these services, and I therefore take this into account in evaluating Plan fees in Section 6.").[31] Moreover, although Swisher does come closer to impermissibly crossing into state of mind territory in describing how fiduciaries in his industry operate,[32] the Court nevertheless finds that those descriptions are proper custom and practice opinions rather than speculative opinions regarding anyone's state of mind. Swisher is, at bottom, explaining—based on his experience in his field—his understanding of how fiduciaries in his field tend to act. This is precisely the type of expert testimony that courts routinely admit in ERISA cases to help the trier of fact understand the evidence and determine a fact in issue. *See, e.g.*,

---

[31] Should Defendants attempt to elicit at trial testimony from Swisher that does in fact improperly characterizing Defendants' state of mind, Plaintiffs shall, of course, have the opportunity to object to any such testimony.

[32] *See, e.g.*, Swisher Mot. at 16 ("In terms of fiduciary governance, Swisher goes on to opine that 'retirement plan fiduciaries and their professional advisors understand that they have discretion over process details'. . . ." (quoting Swisher's Report ¶ 67)) (citation modified).

*Troudt*, 369 F. Supp. at 1143 (permitting expert to "testify as to what fiduciaries in the industry consider prudent conduct" in certain circumstances"). The Court will accordingly permit Swisher to testify regarding the same.

Plaintiffs finally argue that Swisher's opinions are unreliable because they (1) are based on an incorrect understanding of the facts and (2) do not apply his personal experience. *See* Swisher Mot. at 10–14. Because this is a bench trial and, as explained *supra*, the Court therefore is afforded flexibility in determining when to decide whether testimony comports with Rule 702, the Court is inclined to hear Swisher's testimony and "reserve ruling on these [reliability] arguments until after trial." *Perez*, 2015 WL 5722843, at *3.[33]

Given that the Court has, as explained above, declined to exclude Swisher's testimony in its entirety, the Court now turns to Plaintiffs' request that it exclude opinions related to claims that are no longer at issue at this juncture of the litigation. *See* Swisher Mot. at 3 n.3. Because Defendants do not appear to oppose this request and the Court agrees that opinions related to claims no longer at issue would not help "the trier of fact to understand the evidence or to determine a fact in issue," Fed. R. Evid. 702(a), the Court will exclude Swisher's Report and Swisher's Rebuttal Report and testimony to the extent they address issues only relevant to abandoned or dismissed claims.

Accordingly, and in sum, the Court will: **GRANT** Plaintiffs' Motion to Exclude Swisher to the extent he (1) specifically offers opinions or testimony regarding what ERISA requires or (2)

---

[33] Though the Court does not decide this issue at this juncture, it notes that Plaintiffs' arguments may go more to weight than admissibility. *See New Jersey Dep't of Env't Prot. v. Amerada Hess Corp.*, No. 15-6468, 2019 WL 4052431, at *6 (D.N.J. Aug. 28, 2019) ("[A]n expert opinion is not inadmissible because it may contain flaws, nor is it excludable because it provides testimony regarding only one facet or aspect of an action but does not prove the whole case; such vulnerabilities affect the weight of the testimony, not its admissibility." (quoting *Feit v. Great-W. Life & Annuity Ins. Co.*, 460 F. Supp. 2d 632, 641 (D.N.J. 2006))).

21

addresses issues only relevant to abandoned or dismissed claims; **DENY** *without prejudice* Plaintiffs' Motion to Exclude Swisher to the extent Plaintiffs challenge the reliability of his testimony; and **DENY** *with prejudice* Plaintiffs' Motion to Exclude Swisher in all other respects.

### 2. *Expert testimony of Al Otto*

Defendants, for their part, move to exclude the testimony of Al Otto. Otto Mot. Plaintiffs retained Otto, a CEO of a company serving the government defined contribution plan community, to provide opinions regarding their claims that ADPTS and the Committee engaged in prohibited transactions when they caused the Plan to make payments to ADPTS and improperly maintained excessive assets in the PERA. Otto Mot. at 1. Defendants argue that the Court should exclude Otto's testimony in its entirety because: (1) he is not qualified to offer his opinions, (2) he provides impermissible legal conclusions, and (3) his opinions are unreliable since he did not use reliable principles and methods. *Id.* at 5–18.

The Court begins with Defendants' argument regarding qualification. Defendants contend that Otto is not qualified to opine on the Plan because it is a multiple-employer plan ("MEP") rather than a single-payer plan and Otto does not have sufficient experience with MEPs to have developed "specialized knowledge" of those types of plans. *See id.* at 5–7. The Court disagrees. As an initial matter, Defendants mischaracterize the record when they assert that Otto "has not acted as a fiduciary in any capacity with respect to a MEP." *Id.* at 6 (citing D.E. 308-3 ("Otto Dep.") at 40:5–25). Plaintiffs accurately point out that shortly after giving the answer regarding his experience on which Defendants rely, Otto corrected that same answer and explained that he had in fact acted as a fiduciary with respect to a MEP. Otto Opp. at 3 n.3 (citing Otto Dep. at 49:14–51:23). In any event, even if Otto had never acted as a fiduciary with respect to a MEP, the Court finds that Otto's thirty years of experience advising fiduciaries and acting as a fiduciary to defined contribution plans more broadly (whether single- or multi-employer) is sufficient to

22

qualify him to render the opinions he offers in this case. *See Holbrook v. Lykes Bros. S.S. Co.*, 80 F.3d 777, 782 (3d Cir. 1996) (concluding that "[i]n light of [the Third Circuit's] liberal standard governing the qualifications of a proffered expert witness, and [its] acceptance of more general qualifications," the district court had erred in "restrict[ing] [expert's] testimony based on a requirement that the witness practice a particular specialty to testify concerning certain matters"); *Floorgraphics, Inc. v. News Am. Mktg. In-Store Servs., Inc.*, 546 F. Supp. 2d 155, 167 (D.N.J. 2008) ("It is well settled that an expert cannot be excluded because the trial court does not deem the proposed expert to be the most qualified or because the proposed expert does not have the specialization the Court considers to be the most appropriate.").[34]

Defendants also call for the Court to reject Otto's efforts to opine on legal issues. Otto Mot. at 7–12. Defendants first maintain that Otto improperly opines that Defendants did not comply with ERISA based on his review of guidance from Proskauer provided to Defendants. *See id.* at 8–10. Because most of Defendants' discussion of Otto's use of that guidance bears on the reliability of Otto's opinions (which the Court addresses below) rather than whether his opinions are impermissibly legal, the Court need only address whether Otto in fact ultimately opines that Defendants did not comply with ERISA—which would constitute an improper legal opinion, *see supra* Section II.B.1. On that point, the Court concludes that Defendants have failed to identify

---

[34] The Court further notes that Defendants have, along with Otto's deposition testimony, also mischaracterized the holding of another district court confronted with a motion to exclude Otto's testimony. *Compare* Otto Mot. at 7 (citing *Cunningham v. Cornell Univ.* ("*Cunningham I*"), No. 16-6525, 2019 WL 4735876 (S.D.N.Y. Sept. 27, 2019), *aff'd*, 86 F.4th 961 (2d Cir. 2023), *rev'd and remanded on other grounds*, 604 U.S. 693 (2025), for the proposition that "Otto's testimony has been excluded in other matters . . . for lacking the relevant expertise"), *with Cunningham I*, 2019 WL 4735876, at *8–10 (expressly rejecting party's motion to exclude Otto's testimony on qualification grounds because "specific experiences [relevant to the case at issue] [were] not necessary for Otto to opine on best practices of a prudent fiduciary for large-scale retirement plan" and instead excluding Otto's opinions on grounds that his methodology was unreliable).

any instance of Otto opining that Defendants failed to comply with ERISA's requirements. For one, none of the portions of Otto's report, D.E. 308-1 ("Otto's Report"), that Defendants claim state that Defendants did not comply with ERISA do any such thing. *Compare* Otto Mot. at 8, *with* Otto's Report ¶¶ 114, 126, 129, 148. Moreover, just as was the case with Swisher's opinions, Otto's opinions regarding what a "knowledgeable" fiduciary would do and what is "necessary" and "reasonable" do not apply the legal standards of ERISA to Defendants' conduct. Instead, they, at minimum, attempt to articulate and apply the customs and practices of the retirement plan industry, [35] which is permissible. *See supra* Section II.B.1 (citing *e.g.*, *Lauderdale I*, 2022 WL 17324416, at \*4 (examining *Otto's* testimony and declining to exclude his "statements about what a 'prudent' fiduciary in the industry would do based on his experience, not whether defendants' actions violate ERISA")). Remaining consistent with its ruling on Plaintiffs' Motion to Exclude Swisher, the Court will, however, exclude Otto's references to what ERISA requires because they improperly opine "as to what the law require[s]." *See Leo*, 941 F.2d at 197.[36] Accordingly, the Court will exclude Otto's testimony to the extent he specifically offers opinions or testimony regarding what ERISA requires but will permit Otto to testify regarding the standards of his industry and his application of those standards to Defendants' conduct.

---

[35] The Court touches on Defendants' argument that Plaintiffs have not established that Otto's opinions actually stem from industry practice and custom when addressing the reliability of Otto's method *infra*.

[36] These references include Otto's statement that he "understands that ERISA strictly prohibits a fiduciary from dealing with the assets of the plan for their own account, acting adversely to the plan in a particular transaction, or receiving a fee from the Plan." D.E. 308-2 ("Otto's Rebuttal Report") ¶ 10. The Court cautions, however, that this finding does not extend to Otto's opinions based on industry practices and customs developed to comply with ERISA—just those explicitly explaining ERISA's legal standards and requirements.

24

As previewed above, the Court now addresses the reliability of Otto's opinions. Defendants argue that Otto's opinions are unreliable because they are just based on his experience rather than being tethered to any sort of reliable methodology. *See* Otto Mot. at 13–18. Because the Court may defer its ultimate decision on whether testimony is reliable until after that testimony is taken at trial, *see supra*, the Court will do so here with respect to Otto's testimony. The Court nevertheless cautions Plaintiffs that for any opinions elicited from Otto at trial to ultimately be admitted, they must be based on a traceable methodology stemming from industry customs and practices. *See Cunningham I*, 2019 WL 4735876, at *9 ("[C]onclusory statement[s] of applied knowledge of the industry's customs and practices [are] insufficient under Rule 702 because general references to an expert's experience do not provide a reliable basis for his proposed testimony." (internal citations omitted)).

Finally, although Defendants do not raise this argument in their Motion to Exclude Otto,[37] the Court will exclude Otto's testimony to the extent it addresses issues only relevant to abandoned or dismissed claims as it would not help "the trier of fact to understand the evidence or to determine a fact in issue," Fed. R. Evid. 702(a).[38]

As explained above, the Court will accordingly: **GRANT** Defendants' Motion to Exclude Otto to the extent (1) he specifically offers opinions or testimony regarding what ERISA requires or (2) addresses issues only relevant to abandoned or dismissed claims; **DENY** *without prejudice*

---

[37] Defendants do, however, make this argument in their Motion for Summary Judgment. *See* Defendants' MSJ at 39–40.

[38] The Court will, for instance, exclude as irrelevant Otto's testimony regarding the propriety of Defendants holding a certain amount of assets in the PERA account. *See infra* Section III.B.1.

Defendants' Motion to Exclude Otto to the extent Defendants challenge the reliability of his testimony; and **DENY** *with prejudice* Defendants' Motion to Exclude Otto in all other respects.

### 3. Expert testimony of Donald Stone

Defendants also move to exclude the testimony of Donald Stone. Stone Mot. Plaintiffs retained Stone, a retirement industry advisor and consultant, to provide opinions related to their claims that Defendants breached their fiduciary duties when they did not remove the Voya TDFs from the Plan by early 2015.[39] *See* Stone Opp. at 1. Defendants contend that the Court should exclude Stone's testimony in its entirety because: (1) he offers improper legal opinions and (2) his opinions are unreliable as he did not use reliable principles and methods and did not himself perform the loss calculations he offers. *See* Stone Mot. at 5–25. The Court considers each argument *ad seriatim*.

To start, Defendants once again argue that Plaintiffs' expert offers impermissible legal conclusions. *See id.* at 5–8. For precisely the same reasons articulated *supra* Sections II.B.1 and 2 in relation to Swisher and Otto, the Court finds that Stone does not—as Defendants claim—opine as to whether Defendants' conduct violated ERISA, and further finds that Stone's opinions applying the standards of the industry to Defendants' conduct—even where they include language (like "prudent") also found in the ERISA's legal standards—do not constitute improper legal opinions. The Court accordingly declines to exclude Stone's testimony on those grounds.[40]

---

[39] This claim is discussed substantively *infra* Section III.B.2.

[40] Because Defendants do not, as they did with Otto (and Plaintiffs did with Swisher), point the Court to any instances where Stone explicitly states what ERISA requires, the Court does not exclude Stone's testimony on that basis at this juncture. The Court nevertheless cautions Plaintiffs that no such testimony will be admitted, nor will any testimony that is untethered from industry custom and practice.

Defendants' remaining arguments concern the reliability of Stone's opinions.  *See* Stone Mot. at 8–25.  As the Court has done with respect to the parties' reliability arguments related to Swisher's and Otto's testimony, the Court will—with one exception—defer its ultimate decision on the reliability of Stone's opinions until after Stone testifies at trial.  That one exception pertains to Defendants' contention that Stone's calculation of the losses Plaintiffs suffered as a result of the Defendants' alleged breaches of fiduciary duty should be excluded as unreliable.  *See id.* at 23–25.  The Court agrees with Defendants that Stone's opinion regarding those losses should be excluded.  While Plaintiffs are correct that "it is well settled that an expert 'may rely on the opinion of another expert in formulating his or her opinion,'" Stone Opp. at 32–33 (quoting *E. Allen Reeves, Inc. v. Michael Graves & Assocs., Inc.*, No. 10-1393, 2015 WL 105825, at *5 (D.N.J. Jan. 7, 2015)), "experts may not simply 'parrot' ideas of other experts," *Leese v. Lockheed Martin Corp.*, 6 F. Supp. 3d 546, 553 (D.N.J. 2014).  Here, parroting the idea of another expert is precisely what Stone did when he opined regarding the losses Plaintiffs sustained by simply restating the calculations performed by another of Plaintiffs' experts (Dr. O'Neal).  *See* D.E. 301-1 ("Stone's Report") ¶ 177 & n.165 ("Dr. O'Neal performed loss calculations").  Stone did not, for instance, use Dr. O'Neal's calculations to formulate a distinct opinion of his own, nor did he purport to independently analyze or validate Dr. O'Neal's calculations.  *See id.*  The Court will therefore exclude O'Neal's Plan loss calculations as unreliable.  *See, e.g.*, *In re Johnson & Johnson Talcum Powder Prods. Mktg., Sales Pracs., and Prods. Liab. Litig.*, No. 16-2738, 2026 WL 161184, at *125 (D.N.J. Jan. 20, 2026) (excluding several opinions of certain experts because "[s]imply adopting or repeating another expert's conclusions . . . does not constitute a reliable method under Rule 702"); *Torain v. City of Philadelphia*, No. 14-1643, 2023 WL 174952, at *5 (E.D. Pa. Jan. 12, 2023) (holding than an expert's "report fail[ed] the reliability prong of the *Daubert* test . . . and

[was] therefore inadmissible" where "[i]t [was] clear that [expert] [was] simply parroting the opinions of another expert").

While, as noted above, the Court reserves the right to later exclude Stone's testimony on reliability grounds, the Court has nevertheless engaged in a closer review of the attacks Defendants make on the reliability of Stone's opinion that a prudent fiduciary would have replaced the Voya TDFs with either the Vanguard TDFs or the T. Rowe Price TDFs.  *See* Stone Opp. at 15 (citing Stone's Report ¶¶ 165–76); Stone Mot. at 8–25.  The Court does so because that opinion is germane to whether Plaintiffs' breach of fiduciary claims survive summary judgment[41] and "courts can only consider admissible evidence on a summary judgment motion," *Snead v. Casino*, 700 F. Supp. 3d 203, 216 (D.N.J. 2023).  Having considered Defendants' arguments regarding the reliability of the relevant opinion,[42] the Court concludes that those arguments go more to the weight than the admissibility of that opinion.  *See Krys*, 112 F. Supp. 3d at 199 ("[T]he Court finds that [d]efendants' challenges to the underlying bases for [the expert] [r]eport go to weight, not admissibility, and therefore constitute challenges properly presented through cross-examination . . . ."); *In re Paoli R.R. Yard PCB Litig.*, 916 F.2d 829, 857–58 (3d Cir. 1990) ("*Paoli II*") ("[T]he reliability requirement must not be used as a tool by which the court excludes all questionably reliable evidence. . . . [I]f the challenged procedure is more accurately described as an application of an accepted methodology, it is not the proper subject of a Rule 702-based exclusion, but is rather the subject of cross-examination of the expert and resolution by the jury.").  The Court accordingly

---

[41] *See infra* Sections III.B.2.a.ii–iii (relying on Stone's analysis to deny Defendants summary judgment on loss and loss causation).

[42] Defendants challenge the factual bases of Stone's testimony, as well as his methodology.  *See* Stone Mot. at 8–25.

conditionally admits Stone's opinion that a prudent fiduciary would have replaced the Voya TDFs with either the Vanguard TDFs or the T. Rowe Price TDFs.

For the reasons explained above, the Court will therefore: **GRANT** Defendants' Motion to Exclude Stone to the extent he opines on the amount of loss sustained by Plaintiffs; **DENY** *without prejudice* Defendants' Motion to Exclude Stone to the extent Defendants otherwise challenge the reliability of his testimony; and **DENY** *with prejudice* Defendants' Motion to Exclude Stone in all other respects.

### 4.    *Expert testimony of Dr. Edward O'Neal*

Defendants further move to exclude the testimony of Dr. Edward O'Neal.  O'Neal Mot. Plaintiffs retained Dr. O'Neal, who holds a Ph.D. in finance, to opine on the amount of loss sustained by Plaintiffs due to Defendants' improper retention of the Voya TDFs.  O'Neal Opp. at 1.  Defendants assert that the Court should exclude Dr. O'Neal's testimony in its entirety because it is unreliable as it (1) is not based on any specialized analysis or data and (2) is derivative of Stone's unreliable opinion.  O'Neal Mot. at 9–18.

Because the Court has conditionally admitted the opinion from Stone on which Dr. O'Neal relies, the Court declines to (at this point in the proceedings) exclude Dr. O'Neal's testimony as derivative of Stone's unreliable opinion.

As for Defendants' arguments regarding the bases for Dr. O'Neal's testimony, *see id.* at 9–17, while the Court reserves the right to later exclude Dr. O'Neal's testimony on reliability grounds, the Court finds that Defendants' arguments go to weight rather than to admissibility.[43] Defendants, for instance, maintain that Dr. O'Neal's loss calculations are unreliable because the

---

[43] As it did with Stone, the Court more closely scrutinized the reliability of Dr. O'Neal's testimony because it relies on Dr. O'Neal's testimony in determining whether Plaintiffs' breach of fiduciary claims survive summary judgment.  *See infra* Section II.B.2.a.ii.

funds against which he compares the Voya TDFs are unreliable comparators. *See* O'Neal Mot. at 11. But an expert's opinion is not "excludable because it provides testimony regarding only one facet or aspect of an action but does not prove the whole case." *New Jersey Dep't of Env't Prot.*, 2019 WL 4052431, at *6. In any event, given that Stone, not Dr. O'Neal, is the one who identified the comparator funds, that argument is closely connected to the one regarding Dr. O'Neal's opinions deriving from Stone's opinions—an argument which the Court has already (preliminarily) rejected. The Court will therefore conditionally admit Dr. O'Neal's testimony.

As such, the Court will **DENY** *without prejudice* Defendants' Motion to Exclude Dr. O'Neal.

### 5.   *Expert testimony of Marek Pfeil*

Defendants finally move to exclude the testimony of Marek Pfeil. Pfeil Mot. Plaintiffs retained Pfeil, currently the President of Harmony Point Wealth Advisors, to compare the investment characteristics of the Voya TDFs with those of the T. Rowe Price TDFs and the Vanguard TDFs, as relevant to Plaintiffs' breach of fiduciary claims. Pfeil Opp. at 1–2. Defendants argue that Pfeil's testimony should be excluded because his opinions (1) are not tied to any facts at issue in this case and therefore cannot help the trier of fact understand the evidence or determine a fact in issue and (2) are unreliable as they are not supported by any reliable methodology. Pfeil Mot. at 8–17. Consistent with its approach to similar arguments raised as to Swisher and Otto, the Court will defer its ruling on both arguments until after the facts and evidence relevant to these arguments are developed at trial. The Court will nevertheless again remind Defendants that an expert's opinion is not "excludable because it provides testimony regarding only one facet or aspect of an action but does not prove the whole case." *New Jersey Dep't of Env't Prot.*, 2019 WL 4052431, at *6.

The Court will therefore **DENY** *without prejudice* Defendants' Motion to Exclude Pfeil.

## III.    SUMMARY JUDGMENT MOTIONS

### A.    Legal Standard

A court may grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). An issue is "genuine" if there is a sufficient evidentiary basis on which a reasonable jury could return a verdict for the non-moving party. *Kaucher v. Cnty. of Bucks*, 455 F.3d 418, 423 (3d Cir. 2006) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). A factual dispute is "material" if it might affect the outcome of the case under governing law. *Id.* (citing *Anderson*, 477 U.S. at 248).

The movant bears the initial responsibility to establish the basis for the motion for summary judgment and to identify the portions of the record that demonstrate the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). When the nonmoving party bears the burden of proof on an issue, the moving party's initial burden can be met simply by "pointing out to the district court . . . that there is an absence of evidence to support the nonmoving party's case." *Id.* at 325.

After the moving party has met its initial burden, the non-moving party must set forth specific facts showing that there is a genuinely disputed factual issue for trial by "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations, . . . admissions, interrogatory answers, or other materials" or by "showing that the materials cited do not establish the absence or presence of a genuine dispute." Fed. R. Civ. P. 56(c). Summary judgment is appropriate if the non-moving party fails to rebut by making a factual showing "sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322.

31

Under Rule 56, a court must view the evidence presented in the light most favorable to the non-moving party. *See Anderson*, 477 U.S. at 255. However, "conclusory, self-serving affidavits are insufficient to withstand a motion for summary judgment," *Blair v. Scott Specialty Gases*, 283 F.3d 595, 608 (3d Cir. 2002), as are unsworn statements in memoranda and unsupported statements in pleadings, *Schoch v. First Fidelity Bancorporation*, 912 F.2d 654, 657 (3d Cir. 1990).

**B.    Analysis**

ERISA is designed "to protect . . . the interests of participants in employee benefit plans and their beneficiaries . . . by establishing standards of conduct, responsibility, and obligation for fiduciaries of employee benefit plans, and by providing for appropriate remedies, sanctions, and ready access to the Federal courts." § 1001(b). It also, however, "presents a careful balancing between ensuring fair and prompt enforcement of rights under a plan and the encouragement of the creation of such plans." *Sweda v. Univ. of Pennsylvania*, 923 F.3d 320, 327 (3d Cir. 2019).

ERISA imposes duties of prudence and loyalty on fiduciaries. Pursuant to the duty of prudence, fiduciaries are required to administer a plan "with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent [person] acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims. . . ." § 1104(a)(1)(B). And according to the duty of loyalty, a plan fiduciary must "discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries . . . for the exclusive purpose of . . . providing benefits to participants and their beneficiaries" and "defraying reasonable expenses of administering the plan." *Id.* § 1104(a)(1)(A).

To "supplement[] the fiduciary's general duty of loyalty to the plan's beneficiaries," Congress further enacted § 1106, which "categorically bar[s] certain transactions deemed 'likely to injure the pension plan.'" *Harris Tr. & Sav. Bank v. Salomon Smith Barney, Inc.*, 530 U.S. 238, 241–42 (2000) (quoting *Comm'r v. Keystone Consol. Indus., Inc.*, 508 U.S. 152, 160 (1993)).

These "prohibited transactions" include "transactions between [a] plan and [a] party in interest," § 1106(a), and also those "between [a] plan and [a] fiduciary," § 1106(b).

Plaintiffs bring claims for breach of the fiduciary duties of prudence and loyalty under § 1104, as well as prohibited transaction claims under § 1106(a) and (b), against ADPTS and the Committee. *See* SAC. Plaintiffs also bring a derivative failure to monitor fiduciaries claim against ADPTS and the Committee and a claim against nonfiduciaries ADP and ADP Total Source, Inc. for other remedies (e.g., restitution and disgorgement of funds transferred to those nonfiduciaries). *See id.*

Defendants move for summary judgment on all remaining causes of action. Defendants' MSJ. Plaintiffs, in turn, move for partial summary judgment on the prohibited transaction claims they bring in Counts I and II insofar as those claims relate to Defendants causing the Plan to pay Plan assets to ADPTS. Plaintiffs' MSJ. Given that the parties disagree on precisely which claims and counts remain in this case, the Court will first address the fate of Counts IV and VI (which Plaintiffs explicitly abandon at least in part), as well as the survival of claims related to fees paid either by the Plan to Voya or vice versa and those related to Defendants holding excess funds in the PERA. The Court will then turn to the remaining breach of fiduciary duty (Count III) and prohibited transaction (Counts I and II) causes of actions, and, finally, to the derivative failure to monitor (Count VIII) and other remedies (Count IX) causes of actions.

For the reasons stated below, the Court will (1) **GRANT in part** and **DENY in part** Defendants' Motion for Summary Judgment and (2) **GRANT in part** and **DENY in part** Plaintiffs' Motion for Partial Summary Judgment**.**

      *1.     Claims related to Voya fees and PERA balance (including Counts IV and VI)*

In Plaintiffs' Opposition to Defendants' Summary Judgment Motion, Plaintiffs aver that they no longer "seek separate relief" on Counts IV and VI. Plaintiffs' Opp. to Defendants' MSJ at 9 n.4. Plaintiffs nevertheless assert that Count IV—which, in their view, "is limited to the fees associated with the Voya TDFs that partially funded the PERA account ([January 2025 Clarification of Claims] at 3), . . . is subsumed in Counts I and II related to ADPTS's improper payments received from the Plan's PERA account," and that Count VI—"which is limited to the payments from Voya for the inclusion and retention of the Voya TDFs ([January 2025 Clarification of Claims] at 3]), [is] subsumed in Count III relating to Defendants' imprudent and disloyal retention of the Voya TDFs." *Id.* Plaintiffs further maintain that, while they do not bring separate prohibited transaction claims "related to the fees charged on the Voya TDFs, the Plan's payment of Voya's platform fees, or issues related to the Plan's PERA account," evidence related to these issues is "indicative of Defendants' unlawful conduct" with respect to their prohibited transaction claims. *See id.* at 38–39.

Defendants, for their part, argue that the claims related to Voya fees and the PERA account, as so-described by Plaintiffs, are not properly before the Court because they "vary materially from the SAC." *See* Defendants' MSJ at 25; Defendants' Reply ISO MSJ at 15.

As set forth below, having examined the interplay between the Second Amended Complaint, the January 2025 Clarification of Claims, and the Summary Judgment Motions on these issues, the Court finds that Plaintiffs: (1) have wholly abandoned Counts IV and VI, (2) may properly rely on evidence of payments from Voya to the Plan for the retention of the Voya TDFs to support their breach of fiduciary duty claim in Count III but may not rely on such evidence to support their prohibited transaction claims in Counts I and II, (3) have abandoned claims related

to platform fees paid to Voya, and (4) may not rely on Defendants' retention of excess assets in the PERA to support any of their remaining causes of action. The Court will therefore **GRANT** Defendants' Motion for Summary Judgment on Counts IV and VI, as well as to the extent it seeks to dismiss: (a) prohibited transaction claims based on payments from Voya to the Plan, (b) any claims related to Voya platform fees, and (c) any claims related to Defendants' retention of excess assets in the PERA.

### a.    Counts IV and VI

The Court begins by addressing whether Plaintiffs have abandoned Counts IV and VI of their Second Amended Complaint and concludes that they have indeed done so. The Court will therefore **GRANT** Defendants' Motion for Summary Judgment to the extent it seeks the dismissal of Counts IV and VI as described in the Second Amended Complaint.

Plaintiffs brought Count IV for "breach of fiduciary duties . . . related to excessive investment management fees," SAC ¶¶ 351–58, and Count VI for "prohibited transactions . . . related to investment services and fees," *id.* ¶¶ 366–71. In Plaintiffs' Opposition to Defendants' Summary Judgment Motion, Plaintiffs state that they "do not seek separate relief" on Counts IV and VI. Plaintiffs' Opp to Defendants' MSJ at 9 n.4. Plaintiffs have therefore explicitly abandoned Counts IV and VI. Accordingly, the Court will **GRANT** Defendants' Motion for Summary Judgment to the extent it seeks the dismissal of Counts IV and VI as described in the Second Amended Complaint. *See Pers. v. Teamsters Loc. Union 863*, No. 12-2293, 2013 WL 5676739, at *4 (D.N.J. Oct. 16, 2013) (explaining that "[w]here a party only defends a subset of claims in opposition to a dispositive motion, [a] [c]ourt [should] construe those claims that were not defended as abandoned" and thus dismissing claims at summary judgment that the plaintiff had "explicitly abandoned").

35

### b.    Subsumed claims

While the Court's discussion of Counts IV and VI should end with their dismissal, Plaintiffs have complicated the issue by arguing that certain claims from Counts IV and VI are subsumed by causes of actions they have not abandoned (Counts I through III).   *See* Plaintiffs' Opp. to Defendants' MSJ at 9 n.4.   Plaintiffs have further muddied the waters by twice re-characterizing their causes of actions: once in the January 2025 Clarification of Claims and now in opposition to Defendants' Motion for Summary Judgment.   The Court must therefore determine whether Plaintiffs are correct when they suggest certain claims are subsumed in their remaining causes of action such that Plaintiffs may properly pursue them or whether Plaintiffs have abandoned those claims.

### i.    Payments from Voya to the Plan

The Court first considers whether claims related to payments Voya made to the Plan are subsumed in any remaining cause of action, and concludes that they are subsumed in Count III (for breach of fiduciary duties) but not Counts I or II (for prohibited transactions).

Plaintiffs suggest that Defendants retained the Voya TDFs due in part to financial incentives from Voya, including those coming in the form of payments from Voya to the Plan. *See* Plaintiffs' Opp. to Defendants' MSJ at 11–18; *see supra* Section I.A.   The propriety of Defendants' retention of the Voya TDFs is directly at issue in Count III, in which Plaintiffs assert that such retention was disloyal and imprudent.   The Court will therefore permit Plaintiffs to rely on evidence of payments from Voya to the Plan for the retention of the Voya TDFs to support their breach of fiduciary duty claim in Count III.

The Court will not, however, permit Plaintiffs to rely on such evidence to support their prohibited transaction claims in Counts I and II.   As described in the Second Amended Complaint,

Counts I and II are brought specifically for transactions among Defendants, Proskauer, and Crowe prohibited by § 1106(a) and (b). *See* SAC ¶¶ 328–43. Voya is not one of the parties listed in Counts I and II. *See id.* Transactions involving Voya cannot, therefore, be subsumed in Counts I and II.[44] And, because Counts I and II are the only two remaining prohibited transaction claims, Plaintiffs may not pursue a prohibited transaction claim based on payments from Voya to the Plan.[45]

ii.      Platform fees and PERA balance

The Court next turns to claims related to the Plan's payment of Voya's platform fees and Defendants' retention of excess assets in the PERA. Plaintiffs explain that they "do not pursue separate prohibited transaction" causes of action related to those issues. Plaintiffs' Opp. to Defendants' MSJ at 38. Instead, they argue that "Defendants' handling of these issues provides

---

[44] Further supporting this conclusion is that transactions involving payments to which Voya was a party are specifically referenced in the now-abandoned Count VI. *See id.* ¶¶ 366–71. It is therefore clear that if Plaintiffs had wanted to include such transactions in a cause of action, they would have done so. The Court will not permit Plaintiffs to, at summary judgment, improperly shoehorn a category of transactions into an inapposite cause of action.

[45] It appears to the Court that Plaintiffs have attempted to restyle Count IV—a breach of fiduciary duty cause of action "related to excessive investment management fees"—as encompassing a claim related to payments *from Voya* to the Plan. *See* Plaintiffs' Opp. to Defendants' MSJ at 9 n.4 ("Count IV, which is limited to the fees associated with the Voya TDFs that partially funded the PERA account ([January 2025 Clarification of Claims] at 3), . . . is subsumed in Counts I and II related to ADPTS's improper payments received from the Plan's PERA account."). But Count IV only addresses payments from the Plan *to Voya* stemming from "excessive management fees." *See* SAC ¶¶ 351–58. Plaintiffs "may not amend [their] complaint through arguments in [their] brief in opposition to a motion for summary judgment." *Bell v. City of Philadelphia*, 275 F. App'x 157, 160 (3d Cir. 2008). In any event, Plaintiffs' further suggestion that the Count IV fiduciary duty cause of action supposedly related to payments *from Voya* to the Plan is itself, in turn, subsumed by Counts I and II has been rejected by the Court as described above. The Court may therefore both dismiss Count IV and prohibit Plaintiffs from bringing any prohibited transaction claim related to Voya.

37

additional evidence" for Plaintiffs' prohibited transaction causes of action (Counts I and II). *See id.* at 38–39.

The Court, however, agrees with Defendants that Plaintiffs have abandoned any prohibited transaction claims related to the Plan's payment of Voya's platform fees and Defendants' retention of excess assets in the PERA. *See* Defendants' Reply ISO MSJ at 15. For one, as outlined *supra* Section III.B.1.b.i, the only remaining prohibited transactions causes of action are Counts I and II, and neither count involves payments to or from Voya, much less the specific platform fees Plan paid to Voya.[46] As for claims related to Defendants' retention of excess assets in the PERA, the Court finds that these claims are not subsumed in Counts I and II either. Plaintiffs' allegation that Defendants retained excess assets in the PERA instead of paying those assets out to Plan participants is, at bottom, an allegation that Defendants failed to make a transaction. *See* Plaintiffs' Opp. at Defendants' MSJ at 39 ("Defendants failed to return all excess funds to Plan participants."). But Counts I and II only cover prohibited transactions *that did occur* among Defendants, Proskauer, and Crowe; they do not address transactions that Defendants failed to make. *See* SAC ¶¶ 328–43 (alleging in Counts I and II that Defendants "caused the Plan to pay Plan assets" not that Defendants failed to cause the Plan to pay Plan assets).

The Court accordingly finds that Plaintiffs have abandoned any prohibited transaction claims related to the Plan's payment of Voya's platform fees and Defendants' retention of excess

---

[46] In fact, Count V—which Plaintiffs have entirely abandoned, *see* Plaintiffs' Opp. to Defendants' MSJ at 9—did include claims related to these platform fees. *See* SAC ¶¶ 251–52 (describing platform fees as a type of "managed account[]" fee), 359–65 (setting forth Count V, which Plaintiffs brought for "breach of fiduciary duties . . . related to unreasonable managed account fees"). Again, the Court will not permit Plaintiffs to, in essence, attempt to amend their Second Amended Complaint in opposition to summary judgment. *See supra* nn. 44–45.

assets in the PERA and will not permit Plaintiffs to rely on evidence related to these issues to support their prohibited transaction claims in Counts I and II.[47],[48]

### 2. Breach of fiduciary duties claims (Count III)

The Court now turns to the claims still active in this action. Plaintiffs allege Defendants breached their fiduciary duties of prudence and loyalty when they retained the Voya TDFs in the Plan's investment line-up after early 2015. *See* SAC; Plaintiffs' Opp. to Defendants' MSJ at 11. Defendants move for summary judgment on these claims as set forth in Count III, asserting that the claims fail as a matter of law. *See* Defendants' MSJ at 12–25. Plaintiffs, for their part, argue that the record evinces genuine issues of material fact with respect to these claims such that summary judgment is inappropriate. *See* Plaintiffs' Opp. to Defendants' MSJ at 11–26.

Because the Court finds that Plaintiffs have adduced evidence from which a reasonable trier of fact could conclude that Defendants breached both their duties of prudence and loyalty, the Court will **DENY** Defendants' Motion for Summary Judgment as to Count III.

### a. Duty of prudence

The bulk of the parties' arguments concern the duty of prudence. The Court starts there. Plaintiffs claim that Defendants breached their duty of prudence when they failed to engage in a

---

[47] Plaintiffs do not appear to suggest that the PERA balance and Voya platform fee issues are somehow subsumed in Count III (brought for breach of fiduciary duty for the retention of the Voya TDFs). For the avoidance of doubt, the Court nevertheless finds that they are not, given that (1) a breach of fiduciary duty cause of action regarding the Voya platform fees was separately brought and dismissed, *see supra* n.44, and (2) Count III is limited to Defendants' decision to keep the Voya TDFs whereas the PERA included many sources of funds wholly unrelated to the Voya TDFs.

[48] The Court specifies that it has only dismissed any claims specifically concerning the retention of excess funds in the PERA—not everything related to the PERA in any respect. Given that Plaintiffs allege in Counts I and II that Defendants caused the Plan to pay its assets from the PERA to ADPTS, payments actually made from the PERA are at the heart of those properly brought prohibited transaction causes of action.

reasoned decision-making process that would have led a prudent fiduciary to remove the Voya TDFs by early 2015. *See* Plaintiffs' Opp. to Defendants' MSJ at 11. Defendants argue that they, as a matter of law, did not breach that duty. *See* Defendants' MSJ at 15–21.

ERISA fiduciaries are held to the "prudent person" standard of care, whereby they must exercise "the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent [person] acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims. . . ." § 1104(a)(1)(B). To act in accordance with this duty of prudence, a fiduciary must employ "'appropriate methods to investigate the merits of [an] investment' and 'engage[] in a reasoned decision[-]making process, consistent with that of a 'prudent [person] acting in [a] like capacity.'" *Cho v. Prudential Ins. Co. of Am.*, No. 25-1134, 2026 WL 74499, at *1 (3d Cir. Jan. 9, 2026) (quoting *DiFelice v. U.S. Airways, Inc.*, 497 F.3d 410, 420 (4th Cir. 2007)). The duty of prudence also "involves a continuing duty to monitor investments and remove imprudent ones . . . ." *Tibble v. Edison Int'l*, 575 U.S. 523, 530 (2015).

A breach of the duty of prudence occurs when (1) "a plan fiduciary" (2) "breaches [the duty" (3) "causing a loss to the plan." *Mator v. Wesco Distribution, Inc.*, 102 F.4th 172, 184 (3d Cir. 2024) (quoting *Sweda*, 923 F.3d at 328). Here, the parties do not dispute that the relevant Defendants were Plan fiduciaries, so only the second and third elements are at issue.

In determining whether a fiduciary has breached the duty of prudence, courts "focus[] on [the] fiduciary's conduct in *arriving at an investment decision*, not on its results, and ask[] whether [the] fiduciary employed the *appropriate methods* to investigate and determine the merits of a particular investment." *In re Unisys Sav. Plan Litig.*, 74 F.3d 420, 434 (3d Cir. 1996) (emphases added) (citing, *inter alia*, *Roth v. Sawyer-Cleator Lumber Co.*, 16 F.3d 915, 917–18 (8th Cir.

1994)).  It is therefore "a process-driven obligation."  *Cho*, 2026 WL 74499, at *2 (quoting *Johnson v. Parker-Hannifin Corp.*, 122 F.4th 205, 213 (6th Cir. 2024)).

An ERISA plan may suffer a loss where investments selected by a fiduciary perform worse than other investments. *See Brotherston v. Putnam Invs., LLC*, 907 F.3d 17, 34 (1st Cir. 2018) ("To the extent that the investor had a choice of investments, the decision to pick one investment over another might result in a measurable loss of opportunity.").  But for a fiduciary to be liable for that loss, there must also be "a causal connection between the breach of fiduciary duty and the alleged loss to the Plan." *Stanford v. Foamex L.P.*, 822 F. Supp. 2d 455, 478 (E.D. Pa. 2011). Courts have recognized the possibility that, in certain cases, a "lack of prudence in the procedures used to select investments may not have caused the [complained of] loss," given that "[a] prudent investor may have . . . selected [the same challenged investments] . . . that over the relevant years performed worse than [other investments] for reasons that would have been reasonably unforeseeable to or discounted by the prudent investor."  *Brotherston*, 907 F.3d at 34. Accordingly, "where a fiduciary fails to fully investigate an investment decision as required under ERISA's 'prudent person' standard, he is not liable for losses from that investment if the investment is objectively prudent, because the requisite causal link does not exist." *Stanford*, 822 F. Supp. 2d at 478 (first citing *Roth*, 16 F.3d at 919; then citing *Fink v. Nat'l Savings & Trust Co.*, 772 F.2d 951, 962 (D.C. Cir. 1985) (Scalia, J., concurring in part and dissenting in part)).  While the Third Circuit has not explicitly held as such,[49] both sets of parties appear to agree that objective imprudence—that "a hypothetical prudent fiduciary would have [not have] made the same

---

[49] In *Renfro v. Unisys Corp.*, the Third Circuit noted that it had "approved of an approach examining whether a questioned decision led to objectively prudent investments."  671 F.3d 314, 322 (3d Cir. 2011) (citing *In re Unisys Sav. Plan Litig.*, 173 F.3d 145, 153–54 (3d Cir. 1999)). The Third Circuit did not, however, not go so far as to require a showing of objective imprudence. *See id.*

[investment] decision," *see Roth*, 16 F.3d at 919—must be proved for Plaintiffs to prevail on their duty of prudence claim.

Plaintiffs and Defendants disagree, however, as to who bears the burden of proving (or disproving) causation. Plaintiffs appear to suggest that the Third Circuit in *Renfro* "endorsed" a burden-shifting approach adopted by numerous circuits, in which "[o]nce Plaintiffs prove a breach of fiduciary duty and a prima facie loss to the Plan, the burden shifts to the fiduciary to prove that the loss was not caused by its breach." Plaintiffs' Opp. to Defendants' MSJ at 19 (citing *McDonald v. Provident Indem. Life Ins. Co.*, 60 F.3d 234, 237 (5th Cir. 1995)). Plaintiffs are correct that several circuit courts have adopted this burden-shifting approach. *See Brotherston*, 907 F.3d at 17 (the First Circuit collecting cases and joining the Fourth, Fifth, and Eighth Circuits in employing the approach). But they are incorrect that the Third Circuit "endorsed" that framework in *Renfro*. As noted *supra* n.49, *Renfro* did not require a showing of objective imprudence, much less endorse an approach shifting the burden of disproving causation. *See* 671 F.3d at 322. The Third Circuit's position on this issue remains as it was in 1999 in *In re Unisys Savings Plan Litigation*, where the court "recognize[d] that [its] sister circuits ha[d] divided in deciding this question" and noted that it had "yet to express [itself] on this issue," but concluded that it had "no need to address the issue of which party bears the burden of proving causation of damages resulting from a breach of fiduciary duty" since it had found no breach in that case. 173 F.3d at 160. Though a quarter of a century has elapsed since then, the circuits remain divided on this question, with several circuit courts holding that the burden on causation remains with Plaintiffs. *See Brotherston*, 907 F.3d at 17 (collecting in 2018 cases from the Sixth, Ninth, Tenth, and Eleventh Circuits holding that plaintiffs carry the burden of proving causation). This Court need not, however, decide, at this juncture, whether it is Plaintiffs or Defendants who must prove or disprove causation. That's

42

because, as explained *infra* Section III.B.2.iii, summary judgment is not warranted as there is sufficient evidence of objective imprudence in the record to preclude summary judgment on causation, regardless of which side bears the burden of proof on causation.

Ultimately, following the framework outlined above, the Court finds that Plaintiffs have raised genuine issues of material fact with respect to each of the three contested issues—(1) procedural imprudence, (2) loss, and (3) objective imprudence—such that summary judgment may not be granted to Defendants on Plaintiffs' breach of the duty of prudence claim.

i.      Procedural imprudence

The Court begins by assessing the process undertaken by Defendants to monitor the Voya TDFs.  "Hindsight indeed is 20/20, so the focus must be 'on a fiduciary's conduct in arriving at a [a] decision.'"  *McCaffree Fin. Corp. v. ADP, Inc.*, No. 20-5492, 2023 WL 2728787, at *13 (D.N.J. Mar. 31, 2023) (quoting *Sweda*, 923 F.3d at 329) (alteration in original).  It is "the fiduciary's real-time decision-making process" that a court must assess, with "'due regard [given] to the range of reasonable judgments a fiduciary may make based on her experience and expertise' and the 'difficult tradeoffs' inherent in every investment decision."  *Cho*, 2026 WL 74499, at *2 (quoting *Hughes v. Nw. Univ.*, 595 U.S. 170, 177 (2022)).

The decision-making process to be evaluated here is Defendants' conduct in deciding to retain the Voya TDFs beyond early 2015—the period in which Plaintiffs allege these investments were underperforming.  This type of decision is (potentially) actionable because, as the Supreme Court has explained, "even in a defined-contribution plan where participants choose their investments, plan fiduciaries are required to conduct their own independent evaluation to determine which investments may be prudently included in the plan's menu of options.  If the

43

fiduciaries fail to remove an imprudent investment from the plan within a reasonable time, they breach their duty." *Hughes*, 595 U.S. at 176 (citing *Tibble*, 575 U.S. at 529–30).

Here, Plaintiffs argue that Defendants' process to retain the Voya TDFs after early 2015 was imprudent because Defendants (1) did not employ a prudent process in selecting the Voya TDFs in the first place, (2) acted contrary to the terms of the IPS when they kept the Voya TDFs as investment options, (3) applied an inconsistent process when overseeing the Voya TDFs, and (4) ignored significant events that should have triggered the removal of the Voya TDFs. *See* Plaintiffs' Opp. to Defendants' MSJ at 12–18. Defendants, for their part, respond that (1) the selection process for the Voya TDFs is irrelevant because claims based on their selection are time-barred, (2) Defendants did not act contrary to the terms of the IPS, (3) there were meaningful differences between the other process Plaintiffs claim Defendants should have followed in evaluating the Voya TDFs, and (4) there were no significant events that should have triggered the removal of the Voya TDFs. *See* Defendants' Reply ISO MSJ at 2–7.

The Court need not address each of these issues here because—viewing the evidence in the light most favorable to the non-moving party (here, Plaintiffs)—it finds that Plaintiffs have presented sufficient evidence to create a genuine dispute as to whether Defendants acted prudently here. Plaintiffs have, for instance, pointed to record evidence suggesting that Defendants violated the terms of the IPS by failing to consider a replacement for the Voya TDFs in early 2015. *See, e.g.*, Plaintiffs' Responsive and Supplemental SUF ¶¶ 341, 346, 349, 351–53 (suggesting that the IPS required that a fund remaining on the Watch List for three consecutive quarters be considered for removal but Defendants failed to do so after the Voya TDFs were on the Watch List for three consecutive quarters). Defendants' arguments regarding whether Defendants were in fact required to consider a replacement for the Voya TDFs in early 2015 and whether they complied with any

such requirement, *see* Defendants' Reply ISO MSJ at 5, do not negate Plaintiffs' record evidence. The Court therefore concludes that there is a genuine dispute as to whether Defendants complied with the IPS by failing to consider a replacement for the Voya TDFs in early 2015 and that this genuine dispute precludes summary judgment for Defendants. *See Lauderdale v. NFP Ret., Inc.*, 21-301, 2022 WL 17260510, at *10 (C.D. Cal. Nov. 17, 2022) ("*Lauderdale II*") (discussing a dispute between the parties regarding which version of the investment policy statement was operative and whether the defendant had complied with the various versions and ultimately finding "a genuine dispute over whether [the defendant] acted contrary to its own policies to favor [the funds at issue] in failing to remove the funds within a reasonable time" that the court could not "resolve . . . at summary judgment"); *Mills v. Molina Healthcare, Inc.*, 694 F. Supp. 3d 1272, 1285–86 (C.D. Cal. 2023) ("Defendants have not shown as a matter of law that the selection of the [relevant target date funds] complied with the [investment policy statement] or was the product of an investigation that satisfied their duty of prudence."); *Trauernicht v. Genworth Fin., Inc.*, No. 22-532, 2024 WL 3996019, at *9 (E.D. Va. Aug. 29, 2024) ("The interpretation of the IPS is a factual dispute . . . .").

Denying summary judgment on the issue of procedural imprudence is consistent with the principle that "[r]arely will . . . a determination [of whether a fiduciary breached a duty] be appropriate on a motion for summary judgment." *Bd. of Trs. of S. California IBEW-NECA Defined Contribution Plan v. Bank of New York Mellon Corp.*, No. 09-6273, 2011 WL 6130831, at *3 (S.D.N.Y. Dec. 9, 2011) (citing *Hunt v. Magnell*, 758 F. Supp. 1292, 1297 n.6 (D. Minn. 1991)); *Nunez v. B. Braun Med., Inc.*, No. 20-4195, 2023 WL 12217223, at *1 n.2 (E.D. Pa. Apr. 21, 2023) (denying summary judgment and concluding that "the factfinder must ascertain the extent to which [the defendants] acted prudently as the plaintiffs' fiduciary" in light of "the idea that 'a

45

determination of reasonableness . . . is properly a question for the factfinder, and is inappropriate in the summary judgment context.'" (quoting *Pension Fund-Mid Jersey Trucking Indus.-Loc. 701 v. Omni Funding Grp.*, 731 F. Supp. 161, 169 (D.N.J. 1990))).

The general principle that summary judgment is not the appropriate time for a court to determine whether a fiduciary breached a duty is not absolute, of course.  In fact, Defendants have astutely directed the Court to instances where courts have granted defendants summary judgment on alleged breaches of the duty of prudence.  *See* Defendants' MSJ at 19–20.  The record here, however, is sufficiently distinguishable from those rare cases.  In *In re Quest Diagnostics Inc. ERISA Litigation*, for example, plaintiffs relied (in part) on defendants' alleged failure to adhere to an investment policy statement, but that statement required only that the fiduciary consider performance, as one of many factors, in determining whether to retain an investment.  No. 20-7936, 2024 WL 4285163, at *8 (D.N.J. Sept. 25, 2024).  The court accordingly found that the decision to retain the investment after "short-term performance issues . . . was not a failure to adhere to the [investment policy statement] because performance was just one factor . . . to consider."  *Id.*  By contrast, Plaintiffs' targeted allegations of Defendants' failure to comply with the term of the IPS specifically requiring Defendants to consider removal of the Voya TDFs after they were on the Watch List for a certain number of quarters here are a far cry from the plaintiffs' amorphous allegations in *Quest* that the defendants violated the investment policy statement by failing to sufficiently consider the performance of the funds.[50]  Moreover, while it is true that

---

[50] Another of the cases Defendants cite in support of summary judgment on this issue, *Silva v. Evonik Corp.*, involved an even weaker investment policy statement argument.  No. 20-2202, 2024 WL 3379067, at *6 (D.N.J. June 28, 2024) (granting the defendant summary judgment on procedural imprudence where the plaintiff asserted not that the defendant had violated the terms of the investment policy statement but simply that the statement was "vague or imprecise"), *appeal dismissed sub nom. Allen v. Evonik Corp*, No. 24-2392, 2024 WL 5399757 (3d Cir. Dec. 13, 2024).

"[a]ny discrepancy in benchmark performance cannot, on its own, support a finding of prudence," the *Quest* court nevertheless looked to the benchmark performance of the challenged funds and found that those funds actually mostly exceeded the performance of their benchmarks at the relevant times. *See id.* at *9 (quoting *Silva*, 2024 WL 3379067, at *6). Here, by contrast, the Plaintiffs have brought forward evidence suggesting that Voya TDFs often underperformed their benchmarks from March 2014 through early 2015. *See* Plaintiffs' Responsive and Supplemental SUF ¶¶ 340–41, 352; *see also supra* Section I.A. Because "[a] fund's underperformance, as compared to a 'meaningful benchmark,' may offer a building block for a claim of imprudence," *Smith v. CommonSpirit Health*, 37 F.4th 1160, 1167 (6th Cir. 2022), Plaintiffs have therefore offered the underperformance of the Voya TDFs as a building block for their imprudence claim— one that would not be sufficient alone for that claim to survive summary judgment but that does militate in favor of denial of summary judgment where, as here, it is stacked on top of the other building blocks Plaintiffs have laid down.

The Court accordingly finds that there are sufficient genuine disputes of fact to warrant denying summary judgment on procedural imprudence grounds.

ii.    Loss

The Court now turns to the losses to the Plan. Plaintiffs seek to recover the Plan's losses under § 1109(a), which provides that a fiduciary who breaches a fiduciary duty is "personally liable to make good to such plan any losses to the plan resulting from each such breach . . . ." *See* SAC ¶ 7. As explained *infra*, an ERISA plan may suffer a loss where investments selected by a fiduciary perform worse than other investments. *See Brotherston*, 907 F.3d at 34. "Losses to a plan from breaches of the duty of prudence may [therefore] be ascertained, with the help of expert analysis, by comparing the performance of the imprudent investments with the performance of a

47

prudently invested portfolio." *Evans v. Akers*, 534 F.3d 65, 74 (1st Cir. 2008) (citing *Graden v. Conexant Sys. Inc.*, 496 F.3d 291, 301 (3d Cir. 2007)).

Here, Plaintiffs' expert Dr. O'Neal concludes that the Plan would have avoided either $42.9 million or $43.7 million in losses had Defendants replaced the Voya TDFs with, respectively, the Vanguard TDFs or the T. Rowe Price TDFs by the start of the second quarter of 2015. Plaintiffs' Responsive and Supplemental SUF ¶ 396 (citing D.E. 311-2 ("O'Neal Report")). Given that the Court has reviewed Dr. O'Neal's testimony and conditionally found it admissible, *see supra* Section II.B.4, his analysis regarding the Plan's losses raises a sufficient dispute of fact as to the existence of loss to the Plan to send to the trier of fact the ultimate question of whether the Plan actually suffered any loss, and, if so, how much loss. *See Ramos v. Banner Health*, No. 15-2556, 2019 WL 1777524, at *11 (D. Colo. Apr. 23, 2019) ("[S]hould [p]laintiffs prevail on their claim that [investment manager] breached its fiduciary duty by not earlier recommending removal, at the very least, [the investment manager] may be liable for losses between when it should have recommended removal and when it actually did so. There is a genuine dispute over the amount of losses, if any, caused by [p]laintiffs' alleged breach, which must be resolved by the trier of fact.").

### iii.    Objective imprudence

Having determined that Plaintiffs have adduced evidence sufficient to defeat Defendants' Motion for Summary Judgment on procedural imprudence and loss (on which Plaintiffs indisputably would bear the burden of proof at trial), the Court moves on to the relevant causation inquiry: whether the Voya TDFs were objectively prudent such that any loss suffered by Plaintiffs could not have been caused by their retention. As explained above, while the parties dispute whether it is Plaintiffs or Defendants who will ultimately bear the burden to prove or disprove

48

causation, the Court concludes that, either way, summary judgment is not appropriate on this because the record evinces disputes of material fact. *See id.*

"A decision is 'objectively prudent' if 'a hypothetical prudent fiduciary would have made the same decision" "despite its imprudent decision-making process." *Tatum v. RJR Pension Inv. Comm.*, 761 F.3d 346, 363 (4th Cir. 2014) (first quoting *Plasterers' Loc. Union No. 96 Pension Plan v. Pepper*, 663 F.3d 210, 218 (4th Cir. 2011); then citing, *inter alia*, *In re Unisys Sav. Plan Litig.*, 173 F.3d at 153–54). Here, Defendants have not established, as a matter of law, that their decision to retain the Voya TDFs in early 2015 was objectively prudent. While they bring forward evidence from which a trier of fact could reasonably reach that conclusion (whether or not they bear the burden of proof on it),[51] Plaintiffs have presented evidence from which a trier of fact could reasonably reach the opposite conclusion (that the retention of the Voya TDFs was objectively imprudent)[52]. Accordingly, Defendants are not entitled to summary judgment based on (what they claim is) the objective prudence of their decision to retain the Voya TDFs in early 2015. *See, e.g.*, *Stanford*, 822 F. Supp. 2d at 479 (declining to decide which party bore the burden of proof on causation and then denying summary judgment on objective prudence because "the evidence in the record [was] not sufficient to permit [the court] to say, as a matter of law, that the requisite causal link either ha[d] been or c[ould not] be established"); *Lauderdale II*, 2022 WL 17260510, at *17 (holding that disputed issues of fact precluded summary judgment as to objective prudence); *Mills*, 694 F. Supp. 3d at 1287 (use of competing benchmarks against which challenged funds were

---

[51] *See, e.g.*, Defendants' SUF ¶¶ 115, 117, 204, 208 (citing expert report of Dr. Russell Wermers explaining that the Voya TDFs appropriately seek to mitigate the ups and downs of the market and opining that the Voya TDFs did not underperform comparator funds).

[52] *See, e.g.*, Plaintiffs' Responsive and Supplemental SUF ¶¶ 300, 332, 369–70, 81–83 (citing facts suggesting that the Voya TDFs underperformed comparator funds, earned less favorable independent performance peer group ratings, and were not endorsed by NFP).

49

compared "only showed that there [were] fact issues to be resolved at trial" (citing *Brotherston*, 907 F.3d at 34)).

And given that, as explained above, Plaintiffs have also raised genuine issues of material fact as to procedural imprudence and loss, the Court will **DENY** Defendants' Motion for Summary Judgment as to Plaintiffs' breach of the duty of prudence claim in Count III of the Second Amended Complaint.

### b.    Duty of loyalty

The Court now briefly addresses Plaintiffs' claim that Defendants breached their duty of loyalty.

ERISA imposes a duty of loyalty on fiduciaries by requiring that a fiduciary "discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries . . . for the exclusive purpose of . . . providing benefits to participants and their beneficiaries" and "defraying reasonable expenses of administering the plan." § 1104(a)(1)(A)(i), (ii). Put simply, a fiduciary must act with "'an eye single' toward beneficiaries' interests." *Pegram v. Herdrich*, 530 U.S. 211, 235 (2000) (quoting *Donovan v. Bierwirth*, 680 F.2d 263, 271 (2d Cir. 1982)).

As a preliminary matter, the Court disagrees with Defendants that Plaintiffs have not in fact brought a duty of loyalty claim. *See* Defendants' MSJ at 12 n.7; *see* Defendants' Reply ISO MSJ at 9–10. Defendants suggest that Plaintiffs "sue only for imprudence and cannot 'recast purported breaches of the duty of prudence as disloyal acts.'" Defendants' MSJ at 12 n.7 (quoting *Rosen v. Prudential Ret. Ins. & Annuity Co.*, 718 F. App'x 3, 7 (2d Cir. 2017)). But Defendants ignore that, in her Opinion on Motion to Dismiss, Judge Salas held that Plaintiffs had not sued only for imprudence but had instead also plausibly alleged that "Defendants made decisions on

behalf of the Plan with the intent to benefit themselves or Voya" in breach of the duty of loyalty. *See* Opinion on Motion to Dismiss at 19–22.

And while many of the allegations Judge Salas discussed in reaching that finding are no longer relevant,[53] the Court nevertheless concludes that Plaintiffs have in fact brought a claim that Defendants breached their duty of loyalty when they retained the Voya TDFs and, further, that the claim survives summary judgment. Plaintiffs have, for instance, adduced evidence that ADPTS received payments from Voya while the Voya TDFs were included in the Plan line-up. *See, e.g.*, Plaintiffs' Responsive and Supplemental SUF ¶¶ 333–35; *see supra* Section I.A. A reasonable trier of fact could therefore find that Defendants' decision to continue to offer the Voya TDFs "was primarily motivated by interests beyond those of participants and beneficiaries." *See Spence v. Am. Airlines, Inc.*, 775 F. Supp. 3d 963, 1003 (N.D. Tex. 2025). And whether Defendants were in fact primarily motivated by other interests is precisely the type of "fact-intensive inquiry [that] is inappropriate for resolution at summary judgment." *Scalia*, 2021 WL 795270, at *28.

The Court will thus **DENY** Defendants' Motion for Summary Judgment as to Plaintiffs' breach of the duty of loyalty claim in Count III of the Second Amended Complaint. And because the Court has done the same for Defendants' Motion for Summary Judgment as to the breach of the duty of prudence claim in Count III, the Court will **DENY** Defendants' Motion for Summary Judgment as to the whole of Count III.

### 3.  *Prohibited transaction claims (Counts I and II)*

Alongside their breach of fiduciary duty claims in Count III, Plaintiffs bring prohibited transaction claims in Counts I and II. *See* SAC ¶¶ 328–43. These prohibited transaction claims cover two sets of allegedly prohibited transactions: (1) payments of Plan assets to ADPTS, in

---

[53] Judge Salas discussed, for instance, allegations relevant to claims regarding various payments to Voya—claims that Plaintiffs have now abandoned. *See id.*

51

violation of § 1106(a)—as part of Count II—and § 1106(b)—as part of Count I,[54] and (2) payments of Plan assets to service providers Crowe and Proskauer, in violation of § 1106(a)—as part of Count II.[55]  *See id.*; *see also* Plaintiffs' Opp. to Defendants' MSJ at 27–37.

Defendants move for summary judgment on Counts I and II in their entirety.  *See* Defendants' MSJ at 25–38.   Plaintiffs both oppose Defendants' Motion for Summary Judgment on Counts I and II, *see* Plaintiffs' Opp. to Defendants' MSJ at 27–37, and themselves move for summary judgment as to ADPTS and the Committee on the first set of prohibited transactions: the payments of Plan assets to ADPTS in violation of § 1106(a)—as part of Count II, and § 1106(b)— as part of Count I, *see* Plaintiffs' MSJ. [56]

For the reasons set forth below, the Court will (1) **GRANT** Plaintiffs' Motion for Partial Summary Judgment to the extent that Defendants rely on § 1108 to exempt their conduct from the claims outlined in Count I, (2) **DENY** Plaintiffs' Motion for Partial Summary Judgment in all other respects, (3) **GRANT** Defendants' Motion for Summary Judgment as to Plaintiffs' § 1106(a)(1)(D) claims in Count II to the extent they relate to payments to Crowe and Proskauer, and (4) **DENY** Defendants' Motion for Summary Judgment as to Counts I and II in all other respects.[57]

---

[54] This first set of prohibited transactions is discussed *infra* Section III.B.3.a.

[55] This second set of prohibited transactions is discussed *infra* Section III.B.3.b.

[56] Plaintiffs do not move for summary judgment on the prohibited transaction claims related to payments to service providers.  *See id.*

[57] As a preliminary matter, the Court rejects Defendants' arguments—applicable to all of Plaintiffs' claims in Counts I and II—that (1) Plaintiffs do not have constitutional standing to bring their prohibited transaction claims because they have not shown injury in fact and (2) loss is a necessary element of a § 1106 claim and Plaintiffs have failed to show loss resulting from any challenged transaction.  *See* Defendants' Opp. to Plaintiffs' MSJ at 24–28.  While Defendants are

a.        Payments to ADPTS outlined in Counts I and II

The Court begins with the set of prohibited transactions upon which both sides move for summary judgment.  Plaintiffs allege that the Committee caused the Plan to make improper payments to ADPTS when the Committee approved payments to ADPTS ostensibly for Plan administration work performed by ADPTS employees—conduct which violated both § 1106(a) and § 1106(b).  *See* SAC ¶¶ 328–43.  Defendants, on the other hand, maintain that the Plan acted for the sole benefit of the Plan when it reimbursed ADPTS at cost for those Plan administration services, such that those reimbursements could not have violated ERISA's bar on certain transactions under § 1106(a) and § 1106(b).  *See* Defendants' MSJ at 25–33.

---

correct that the Supreme Court recently explained that "[d]istrict courts must . . . , consistent with Article III standing, dismiss suits that allege a prohibited transaction occurred but fail to identify an injury," *Cunningham v. Cornell Univ.* ("*Cunningham II*"), 604 U.S. 693, 708 (2025), Plaintiffs have sufficiently identified two injuries to the Plan stemming from the prohibited transactions: that the Plan improperly paid ADPTS and the service providers amounts in excess of what they should have been paid such that (1) the Plan suffered economic losses and (2) Defendants obtained improper gains from those payments.  Defendants' statutory argument similarly fails.  Defendants suggest that § 1109, the provision of ERISA under which Plaintiffs bring this action for violations of 1106, makes loss an element of § 1106 claim that Plaintiffs must prove.  *See* Defendants' Opp. to Plaintiffs' MSJ at 25.   But in doing so, Defendants cite only applications of § 1109 to breach of fiduciary duty claims brought under § 1104—not to prohibited transaction claims brought under § 1106.  *See id.* (citing, *e.g.*, *Pioneer Centres Holding Co. Emp. Stock Ownership Plan & Tr. v. Alerus Fin., N.A.*, 858 F.3d 1324, 1327 (10th Cir. 2017) (addressing only the burden of proving loss causation on breach of fiduciary duty claims)).  And, in any event, the Court agrees with the Ninth Circuit that "[s]ince the prohibition against transactions between plans and parties in interest [in § 1106] is *per se* in nature, a violation does not depend on whether any harm results from the transaction." *Bugielski v. AT&T Servs., Inc.*, 76 F.4th 894, 901 (9th Cir. 2023) (quoting Ronald J. Cooke, ERISA Practice & Procedure § 6.49 (Dec. 2022 update)); *see Reich v. Hall Holding Co.*, 990 F. Supp. 955, 967 (N.D. Ohio 1998) (collecting "several cases in which courts have held that proof of harm or loss resulting from a prohibited transaction is not necessary to establish a violation under [§ 1106]" before itself reaching that same conclusion), *aff'd sub nom. Chao v. Hall Holding Co.*, 285 F.3d 415 (6th Cir. 2002).  The Court therefore need not further address at this juncture the question of loss in connection with Plaintiffs' prohibited transaction claims in Counts I and II. *See Hall Holding Co.*, 990 F. Supp. at 967 ("Although it may prove to be true that the defendants caused no monetary loss to the [plan], the issue of loss goes to the appropriate remedy, not to whether a violation of § [11]06 has occurred. The Court will determine the appropriate remedy for the defendants' violation of § [11]06(a)(1)(A) and (D) at trial.").

Defendants also seek to avail themselves of reimbursement-related exemptions outlined in § 1108, which they claim apply to Plaintiffs' claims under both § 1106(a) and § 1106(b). *See* Defendants' Opp. to Plaintiffs' MSJ at 28–40. On that point, Plaintiffs respond that § 1108 only applies to § 1106*(a)* claims—not those brought under § 1106*(b)*, and that, either way, Defendants cannot establish that any § 1108 exemption renders their conduct lawful. *See* Plaintiffs' MSJ at 22–33, 37.

As outlined below, the Court ultimately finds that there are genuine disputes of fact precluding summary judgment for either Plaintiffs or Defendants as to Plaintiffs' claims regarding payments to ADPTS under both § 1106(a) and § 1106(b). In so finding, the Court rejects Defendants' argument that the statutory exemptions set forth in § 1108 apply to Plaintiffs' claims brought under § 1106(b).

i.       § 1106(b) violations (Count I)

§ 1106(b) prohibits fiduciaries from causing an ERISA plan to engage in particular transactions between the plan and its fiduciary. *See* § 1106(b). "This provision is a blanket prohibition against a fiduciary's 'act[ing] on behalf of' or 'represent[ing]' a party with interests 'adverse to the interests of the plan' in relation to a transaction with the plan." *Reich v. Compton*, 57 F.3d 270, 287–88 (3d Cir. 1995), *as amended* (Sept. 8, 1995). Specifically, under § 1106(b), a fiduciary may not:

(1) deal with the assets of the plan in his own interest or for his own account,

(2) in his individual or in any other capacity act in any transaction involving the plan on behalf of a party (or represent a party) whose interests are adverse to the interests of the plan or the interests of its participants or beneficiaries, or

(3) receive any consideration for his own personal account from any party dealing with such plan in connection with a transaction involving the assets of the plan.

§ 1106(b).

54

Plaintiffs contend the Committee violated § 1106(b)(1)–(3) when it caused the Plan to pay Plan assets to ADPTS in the form of supposed reimbursements for Plan administration services provided by ADPTS and further argue that § 1108 is not applicable to claims brought under § 1106(b).  *See* Plaintiffs' MSJ at 12–24.  The Court agrees with Plaintiffs that § 1108 provides no defense to § 1106(b) claims and will therefore **GRANT** Plaintiffs' Motion for Partial Summary Judgment to the extent that Defendants rely on § 1108 to exempt their conduct from the claims outlined in Count I.  The Court also finds, however, that the record evinces genuine disputes of material fact as to each of the three subsections of § 1106(b) such that it must otherwise **DENY** Plaintiffs' Motion for Partial Summary Judgment as to Count I and also **DENY** Defendants' Motion for Summary Judgment as to Count I.

### 1.     Analysis of § 1106(b)(1)–(3)

Plaintiffs contend that the Committee violated each subsection of § 1106(b) by engaging in self-dealing transactions involving Plan assets.  They argue that: (1) the Committee dealt with the assets of the Plan in their own interest in violation of § 1106(b)(1) by causing the Plan to pay Plan assets to ADPTS as purported reimbursement for administrative services provided to the Plan, (2) the Committee acted in transactions on behalf of an adverse party (ADPTS) in violation of § 1106(b)(2) by causing the Plan to make those payments to ADPTS, and (3) the members of the Committee received consideration for their own account in violation of § 1106(b)(3) when they caused the Plan assets to be paid to ADPTS.  *See* Plaintiffs' MSJ at 15–22.  Defendants' primary response to these arguments is that the Committee members were acting in their capacities as Plan fiduciaries—not ADPTS (or ADP or ADP Total Source, Inc.) executives—when they approved the reimbursements to ADPTS and that the reimbursements drove no additional profit to ADPTS

because the reimbursements were at cost for the direct expenses incurred by ADPTS in administering the Plan. *See* Defendants' Opp. to Plaintiffs' MSJ at 10–20.

The dispositive issues regarding these § 1106(b) claims and Defendants' responses thereto are therefore whether Defendants stood to gain from the Committee's approval of purported reimbursements from the Plan to ADPTS, in whose interest the Committee members were acting when they approved those payments (which is itself informed by whether Defendants stood to gain from that approval), and whether ADPTS's interests were adverse to the Plan's. And, as presented here, these are precisely the types of issues that are not suited for resolution of summary judgment. The parties, for instance, dispute whether the reimbursements paid to ADPTS were in fact simply reimbursements at cost for direct expenses incurred by ADPTS in administering the Plan such that Defendants were acting in the Plan's interest in approving them or instead were used by Defendants to pay ADTPS employees' salaries and benefits with Plan assets rather than out of ADPTS's own pockets such that Defendants were acting in ADPTS's interest. *Compare* Plaintiffs' MSJ at 15–22 (pointing to, *inter alia*, ADPTS's failure to keep contemporaneous time records of actual expenses incurred in proving services to the Plan as evidence that the Committee was acting in ADPTS's interest), *with* Defendants' Opp. to Plaintiffs' MSJ at 10–20 (identifying evidence suggesting that ADPTS did not earn profit from payments from the Plan and that the reimbursement requests were carefully considered and reviewed to ensure no excess payments were made to ADPTS). Accordingly, while each side has adduced sufficient evidence to survive the other's summary judgment motion on these § 1106(b) claims, neither side has presented undisputed facts that would preclude a reasonable factfinder from concluding that Defendants did or did not violate § 1106(b).

2.   Availability of exemptions under § 1108

The Court now considers whether any of the exemptions in § 1108(b)(2) and § 1108(c)(2) apply to Plaintiffs' § 1106(b) claims, as Defendants argue they do. *See, e.g.*, Defendants' Opp. to Plaintiffs' MSJ at 28–33.

§ 1108(b)(2) provides, in relevant part, "[t]he prohibitions provided in section 1106 of this title shall not apply to any of the following transactions : . . . Contracting or making reasonable arrangements with a party in interest for office space, or legal, accounting, or other services necessary for the establishment or operation of the plan, if no more than reasonable compensation is paid therefor . . . ." § 1108(c)(2), in turn, provides, in relevant part, "[n]othing in section 1106 of this title shall be construed to prohibit any fiduciary from— . . . receiving any reasonable compensation for services rendered, or for the reimbursement of expenses properly and actually incurred, in the performance of his duties with the plan . . . ."

Defendants maintain that these exemptions are applicable to § 1106(b) claims such that, here, the payments they made to ADPTS were reasonable compensation for services to the Plan under § 1108(b)(2) and (c)(2) and reimbursements of expenses properly and actually incurred under § 1108(c)(2). *See* Defendants' Opp. to Plaintiffs' MSJ at 28–33. But Defendants' invocation of § 1108 in this context runs into two unsurmountable problems. *First*, Judge Salas previously held in this case that § 1108(c)(2)'s exemptions do not apply to claims brought under § 1106(b). *See* Opinion on Defendants' Motion to Dismiss at 27–28. And *second*, although not explicitly addressed by Judge Salas, Defendants' § 1108(b)(2) arguments fail for substantially the same reasons outlined by Judge Salas in reference to § 1108(c)(2).

a.        § 1108(c)(2)

The Court starts with § 1108(c)(2).  The dispute over the application of this subsection is the more complicated one but it is also the one most constrained by a critical doctrine: that of the law of the case.  And, here, that doctrine counsels rejecting Defendants' attempt to re-litigate Judge Salas's legal ruling regarding the applicability of § 1108(c)(2) to Plaintiffs' § 1106(b) claims.

"The law of the case doctrine directs courts to refrain from re-deciding issues that were resolved earlier in the litigation." *Pub. Int. Rsch. Grp. of New Jersey, Inc. v. Magnesium Elektron, Inc.*, 123 F.3d 111, 116 (3d Cir. 1997).  The doctrine "promotes finality and judicial economy" by "prevent[ing] courts from entertaining endless appeals on the same issue" and has "developed to maintain consistency and avoid reconsideration of matters once decided during the course of a single continuing lawsuit." *Id.* (quoting 18 Charles A. Wright, Arthur R. Miller, Edward Cooper, Federal Practice and Procedure § 4478 at 788 (1981)).  While the doctrine "does not limit a federal court's power," it does "direct[] its exercise of discretion." *Id.* (citing *Arizona v. California*, 460 U.S. 605, 619 (1983)).  Accordingly, and as relevant here, "[a]lthough [the doctrine] does not limit the power of trial judges from reconsidering issues previously decided by a predecessor judge from the same court or from a court of coordinate jurisdiction, it does recognize that as a matter of comity a successor judge should not lightly overturn decisions of h[er] predecessors in a given case." *Fagan v. City of Vineland*, 22 F.3d 1283, 1290 (3d Cir. 1994).  Consistent with the principles underlying the doctrine, the Supreme Court has held that "as a rule courts should be loath[] to [revisit their prior decisions in a case] in the absence of extraordinary circumstances . . . ." *Christianson v. Colt Indus. Operating Corp.*, 486 U.S. 800, 817 (1988).  The Third Circuit has further instructed that those extraordinary circumstances warranting revisitation of a prior ruling exist where "(1) new evidence is available; (2) a supervening new law has been announced; or (3)

58

the earlier decision was clearly erroneous and would create manifest injustice." *In re City of Philadelphia Litig.*, 158 F.3d 711, 718 (3d Cir. 1998).

Here, Defendants have failed to show that Judge Salas's holding in her Opinion on Defendants' Motion to Dismiss that § 1108(c)(2)'s exemptions do not apply to claims brought under § 1106(b) "falls into any of the categories of extraordinary circumstances which would free [the Court] from the constraints of the law of the case doctrine." *Id.* Defendants, in essence, argue (1) that Judge Salas's ruling is clearly erroneous because she overread binding precedent *National Security Systems, Inc. v. Iola*, 700 F.3d 65, 93–96 (3d Cir. 2012) as applying to § 1108(c)(2)'s mention of reimbursements, and (2) that even if *Iola* did hold that all portions of § 1108(b)(2) and (c)(2) apply to § 1106, the Supreme Court's supervening decision in *Loper Bright Enterprises v. Raimondo*, 603 U.S. 369 (2024) "fatally undermine[s] that holding." *See* Defendants' Opp. to Plaintiffs' MSJ at 28–33. Defendants are incorrect on both counts.

Defendants' arguments regarding Judge Salas's reading of *Iola* depend on drawing a firm distinction between "reimbursements" and "reasonable compensation." As they correctly note, § 1108(b)(2) permits transactions paying for services "necessary for the establishment or operation of the plan . . . if no more than reasonable compensation is paid therefore." § 1108(c)(2), in turn, permits a fiduciary to "receive any reasonable compensation for services rendered, or for the reimbursement of expenses properly and actually incurred, in the performance of his duties with the plan . . . ." Because reimbursements appear only in § 1108(c)(2) and *Iola* did not specifically address reimbursements, Defendants contend that *Iola* does not speak to whether § 1108(c)(2)'s exemption of reimbursements applies to § 1106(b). *See* Defendants' Opp. to Plaintiffs' MSJ at 28–31. Not true. For one, even though the payments at issue in *Iola* were not reimbursements, as Judge Salas aptly observed in her Opinion on Defendants' Motion to Dismiss, "*Iola* concerned not

59

just the facts of the case, but more broadly the interplay between §§ 1106(b) and 1108. And [one of] *Iola's* holding[s]—that "[§ 1108(c)(2)] affords [the defendant] no defense to liability for knowingly participating in [a] § [1106(b)(3)] violation"—was unequivocal." Opinion on Defendants' Motion to Dismiss at 28 (citing and quoting *Iola*, 700 F.3d at 96). In considering the interplay between §§ 1106(b) and 1108, *Iola* examined the differences between the structures of § 1106(b) and 1106(a). 700 F.3d at 95. The *Iola* court explained that "[§11]06(a) prohibits fiduciaries from causing the plan to engage in certain transactions with parties in interest, '[e]xcept as provided in section [1108].' But § [11]06(b) contains no corresponding reference to § [11]08." *Id.* Using the surplusage canon of interpretation, the Third Circuit thus reasoned that "[b]y expressly limiting liability under § [11]06(a) by reference to the exemptions in § [11]08, then removing the same limiting principle from § [11]06(b), Congress cast § [11]06(b) as unyielding." *Id.* This analysis applies to § 1108 in its entirety—including the portion of § 1108 referencing reimbursements. It is nevertheless true that the *Iola* court went on to find that § 1108(c)(2) was ambiguous as written and that it was possible to read it as "exempt[ing] a fiduciary from the strictures of § [11]06(b) so long as compensation is reasonable." *Id.* at 95–96. Ultimately, however, the court held that § 1108(c)(2) merely "clarif[ied] what constitutes reasonable compensation for such services [in § 1108(b)(2)]," but was not an "independently operative reasonable-compensation exception." *Id.* at 96. And because it had earlier determined that that "§ [11]08(b)(2) provide[d] an exemption for § [11]08(a) transactions, but not § [11]06(b) transactions," *id.* at 94, the court found that § 1108(c)(2) could not provide a defense to a § 1108(b) violation, *id.* at 96. That reimbursements of direct expenses are not explicitly mentioned in § 1108(b)(2) but are in § 1108(c)(2) does not compel the conclusion, as Defendants suggest it does, that § 1108(c)(2) does not clarify what reasonable compensation means in § 1108(b)(2). In fact,

60

the Department of Labor's interpretation of § 1108(c)(2)—to which the *Iola* court deferred in finding that § 1108(c)(2) did not operate as an independent exemption to § 1106(b), *id.*—explicitly discusses what "direct expenses" "the term 'reasonable compensation' . . . includes." 29 C.F.R. § 2550.408c-2(b)(4). Moreover, given that the phrase "reimbursements for direct expenses" only appears in § 1108(c)(2)—not § 1108(b)(2), Defendants' position that reimbursements for direct expenses are somehow entirely distinct from reasonable compensation for services is entirely incongruous with Defendants' assertion that "the reimbursements [at issue in this case] are exempt under *both* § 1108(b)(2) and (c)(2)," Defendants' Opp. to Plaintiffs' MSJ at 33–34 (emphasis added). The Court accordingly holds that Judge Salas did not err in applying *Iola* to find that § 1106(c)(2) provides no defense to Plaintiffs' § 1106(b) claims.[58]

Next up is Defendants' argument that even if *Iola* did hold that all portions of § 1108(b)(2) and (c)(2) apply to § 1106 (as the Court has indeed found here), the Supreme Court's supervening decision in *Loper Bright* "fatally undermine[s] that holding." *See* Defendants' Opp. to Plaintiffs' MSJ at 28–33. That argument is easy to dispose of. While *Loper Bright* did overrule the interpretative framework set forth in *Chevron, U.S.A, Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837 (1984) and the *Iola* court did apply *Chevron* deference, the Supreme Court was careful to explain that *Loper Bright* "d[id] not call into question prior cases that relied on the *Chevron* framework. The holdings of those cases that specific agency actions are lawful—

---

[58] The Court also notes that other courts have treated reimbursement of expenses identically to other payments of reasonable compensation for services rendered in finding that § 1108(c)(2) does not afford a defense to § 1106(b) violations. *See, e.g.*, *Barboza v. California Ass'n of Pro. Firefighters*, 799 F.3d 1257, 1270 (9th Cir. 2015) (discussing defendant's "practice of paying its own fees and expenses from the [p]lan's assets" and determining that § 1108(c)(2)'s exemption did not apply to § 1106(b)(1) violation); *Chao v. Graf*, No. 01-0698, 2002 WL 1611122, at *9–10 (D. Nev. Feb. 1, 2002) (finding, in the context of a preliminary injunction, that § 1108(c)(2) did not provide a defense to defendants' likely violations of § 1106(b), which included "determin[ing] their own expenses from plan assets").

including the Clean Air Act holding of *Chevron* itself—are still subject to statutory *stare decisis* despite the [Supreme] Court's change in interpretive methodology."  *Loper Bright*, 608 U.S. at 412 (citation modified) (citing, *inter alia*, *CBOCS W., Inc. v. Humphries*, 553 U.S. 442, 457 (2008) ("Principles of *stare decisis*, after all, demand respect for precedent whether judicial methods of interpretation change or stay the same.  Were that not so, those principles would fail to achieve the legal stability that they seek and upon which the rule of law depends.")).  To suggest that *Loper Bright* fatally undermines *Iola* "simply because the latter applied an analytical framework denounced by the former amounts to little more than 'an argument that [*Iola*] was wrongly decided.'  That has never been a valid reason for a District Court to disavow binding Circuit precedent in the past, and it certainly is not here."  *United States v. Sacanell*, No. 24-389, 2025 WL 1921647, at *7 (E.D. Pa. July 10, 2025) (quoting *Loper Bright*, 603 U.S. at 412); *see Miller Plastic Prods. Inc v. Nat'l Lab. Rels. Bd.*, 141 F.4th 492, 503 (3d Cir. 2025) ("Moreover, *Loper Bright* did not necessarily displace our earlier precedents merely because they were guided by *Chevron*.").  The Court accordingly declines Defendants' invitation to overrule *Iola*'s established binding Third Circuit precedent.[59]

And because it has rejected the two grounds on which Defendants attempt to relitigate Judge Salas's ruling that § 1108(c)(2)'s exemptions do not apply to claims brought under § 1106(b), this Court will abide by that ruling under the law of the case doctrine.

---

[59] *See also Painadath v. Good Shepherd Penn Partners*, No. 22-3604, 2025 WL 300603, at *10 n.15 (E.D. Pa. Jan. 24, 2025) ("This interpretation of the statute comes from a decision by the U.S. Department of Labor Administrative Review Board to which the *Wiest* [*v. Lynch*, 710 F.3d 121, 130–31 (3d Cir. 2013)] court gave *Chevron* deference.  The Court applies its holding here despite the end of *Chevron*."); *Jenkins v. Greene*, No. 25-730, 2025 WL 2796766, at *3 (M.D. Pa. Sept. 29, 2025) ("[E]ven accepting [the plaintiff's] argument that [Third Circuit binding precedent's] upholding of the BOP regulation was based on the *Chevron* doctrine, this would not be enough to invalidate [that binding precedent].").

b.        § 1108(b)(2)

While much of Judge Salas's analysis of Defendants' invocation of § 1108(c)(2) also applies to their defense under § 1108(b)(2), the Court will (briefly) address § 1108(b)(2) separately because Judge Salas only explicitly addressed § 1108(c)(2). *See* Opinion on Motion to Dismiss at 27–28. Not much discussion is needed because *Iola* squarely and efficiently ends the inquiry. As noted *supra*, in *Iola*, the Third Circuit explicitly held that "§ [11]08(b)(2) provides an exemption for § [11]06(a) transactions, but not for § [11]06(b) transactions." 700 F.3d at 94. And while, as explained above, *Loper Bright* would not disturb this holding had the court applied *Chevron* deference, the court did not apply *Chevron* deference because it found no need to defer to the Department of Labor's interpretation of § 1108(b)(2) in reaching its holding. *See id.* (noting that the Department of Labor's interpretation was consistent with the court's statutory analysis but not deferring to that interpretation under *Chevron*). Given that this Court is bound by *Iola*, the Court need not look any further to reject Defendants' arguments that § 1108(b)(2) exempts any violations of § 1106(b).

Accordingly, consistent with the Court's holdings that neither § 1108(b)(2) nor § 1108(c)(2) apply to § 1106(b) violations, the Court will **GRANT** Plaintiffs' Motion for Partial Summary Judgment to the extent that Defendants rely on § 1108 to exempt their conduct from the § 1108(b) claims outlined in Count I. And, for the reasons explained further above, the Court will **DENY** Plaintiffs' Motion for Partial Summary Judgment as to all other aspects of Count I and also **DENY** Defendants' Motion for Summary Judgment as to Count I.

ii.        § 1106(a) violations (Count II)

Alongside their § 1106(b) claims, Plaintiffs also bring claims for violations of § 1106(a) in Count II of their Second Amended Complaint. *See* SAC ¶¶ 335–43. In Count II, Plaintiffs contend

that ADPTS and the Committee violated § 1106(a)(1)(A), (C), and (D) by causing the Plan to pay

Plan assets to ADPTS. *See* Plaintiffs' MSJ at 35–37.

§ 1106(a) prohibits certain transactions between an ERISA plan and a party in interest. *See*

§ 1106(a). Fiduciaries and those providing services to a plan are considered parties in interest.

*See* § 1002(14). The transactions between a plan and a party in interest prohibited by § 1106(a)(1)

include, as relevant here, those a fiduciary:

> knows or should know . . . constitute[] a direct or indirect—
>
> (A) sale or exchange, or leasing, of any property between the plan and a party in interest; . . .
>
> (C) furnishing of goods, services, or facilities between the plan and a party in interest; [and]
>
> (D) transfer to, or use by or for the benefit of a party in interest, of any assets of the plan . . . .

§ 1106(a)(1).

There is no dispute that, unlike with § 1106(b), § 1108's exemptions, if proven, provide

defenses to claims brought under § 1106(a). *See* Opinion on Motion to Dismiss at 25 (citing

*Sweda*, 923 F.3d at 336).

The parties do dispute, however, whether § 1106(a) requires Plaintiffs to show that the

fiduciary causing *any* prohibited transaction listed in § 1106(a)(1) do so for the subjective intent

to benefit the party in interest. While Judge Salas did include subjective intent as an element of

any § 1106(a) claim, *see* Opinion on Motion to Dismiss at 23, Plaintiffs initially argued in their

briefing that the subjective intent element only applies to violations of § 1106(a)(1)(C) and (D) but

not to violations of § 1106(a)(1)(A), *see* Plaintiffs' MSJ at 34. After the Supreme Court's decision

in *Cunningham II*, 604 U.S. 693—which came down after Plaintiffs had served their moving brief,

Plaintiffs instead argued that *Cunnigham II* compels the conclusion that a showing of subjective

intent to benefit a party in interest is only required for § 1106(a)(1)(D) claims, *see* Plaintiffs' Reply ISO MSJ at 9 & n.5.

The Court agrees with Plaintiffs that *Cunningham II* now controls and constitutes supervening precedent warranting revisiting Judge Salas's holding that subjective intent is an element of a claim under § 1106(a)(1)(A) and (C).[60]  The Opinion on Motion to Dismiss correctly relied on the Third Circuit's 2019 decision in *Sweda*, *see* Opinion on Motion to Dismiss at 23, wherein the court held that "absent factual allegations that support an element of intent to benefit a party in interest, a plaintiff does not plausibly allege that a 'transaction that constitutes a direct or indirect . . . furnishing of goods, services, or facilities between the plan and a party in interest' prohibited by § 1106(a)(1)(C) has occurred.'"  *Sweda*, 923 F.3d at 338.  While *Sweda* did not explicitly hold the same for claims brought under § 1106(a)(1)(A) (given that it decided issues related to that subsection on other grounds), it strongly suggested that its analysis of § 1106(a)(1)(C) would compel the same conclusion for § 1106(a)(1)(A).  *See id.* (speaking in terms of the "common thread in § 1106(a)(1)" and explaining that "[t]he element of intent to benefit a party in interest effects the purpose of § 1106(a)(1), which is to rout out transactions that benefit such parties at the expense of participants").  As so outlined, at the time of the Opinion on the Motion to Dismiss, subjective intent to benefit a party of interest was an element of a claim under § 1106(a)(1)(A), (C), and (D) in the Third Circuit.

---

[60] There is no doubt—and Plaintiffs do not dispute—that § 1106(a)(1)(D) requires a showing of a subjective intent to benefit the party in interest.  *See Sweda*, 923 F.3d at 337–38 ("In *Reich*, we held that specific intent is required because of the plain meaning of the statutory phrase 'for the benefit [in § 1106(a)(1)(D)," and also because if § 1106(a)(1)(D) did not require 'subjective intent to benefit a party in interest, it would produce unreasonable consequences that we feel confident Congress could not have wanted.'" (quoting *Reich*, 57 F.3d at 278–79)).

65

That state of affairs was upended in 2025, several years after the Opinion on the Motion to Dismiss was rendered, when the Supreme Court decided *Cunningham II*.  Defendants are correct that *Cunningham II* "concerned how § 1108 intersects with § 1106 at the pleading stage." Defendants' Opp to Plaintiffs' MSJ at 20 n.7 (citing *Cunningham II*, 604 U.S. at 708).  But Defendants fail to grapple with the unequivocal holding the Supreme Court reached in rejecting any requirement to plead allegations that disprove the applicability of § 1108 exemptions.  That unequivocal holding is set forth here:

> [§] 1106(a)(1)(C) contains three elements.  It prohibits fiduciaries from (1) "caus[ing a] plan to engage in a transaction" (2) that the fiduciary "knows or should know . . . constitutes a direct or indirect . . . furnishing of goods, services, or facilities" (3) "between the plan and a party in interest."  [§] 1106(a)(1)(C)'s bar is categorical: Any transaction that satisfies its three elements is presumptively unlawful.  Nothing in that section removes from its categorical bar transactions that were necessary for the plan or involved reasonable compensation.  Accordingly, under § 1106(a)(1)(C), plaintiffs need only plausibly allege each of those elements of a prohibited-transaction claim.

*Cunningham II*, 604 U.S. at 700.  Nowhere does the court mention any subjective intent element in this exclusive list of elements of a § 1106(a)(1)(C) claim.  Accordingly, while the Court is ordinarily bound by Third Circuit precedent like *Sweda* and is loath to set it aside, it finds that *Cunningham II* is "clearly irreconcilable" with *Sweda*[61] such that the Court is "bound by the intervening higher authority."  *See United States v. Hernandez*, 721 F. Supp. 3d 310, 314 (D. Del. 2024) (quoting *Day v. Apoliona*, 496 F.3d 1027, 1031 (9th Cir. 2007)); s*ee also Fenza's Auto, Inc. v. Montagnaro's, Inc.*, No. 10-3336, 2011 WL 1098993, at *7 (D.N.J. Mar. 21, 2011) (explaining that "[w]hen subsequent Supreme Court decisions implicate Third Circuit precedent, a district

---

[61] It is true that *Cunningham II* did not specifically examine whether or not subjective intent is an element of § 1106(a)(1)(C), but the Court nevertheless finds that by listing the three elements of such a claim, explaining that those are the *only* three required elements, and then not including subjective intent as one of those three elements, the Supreme Court has held that it is not a required element.

court may set aside Third Circuit precedent only if the Supreme Court has effectively overruled that precedent, or has rendered a decision that is necessarily inconsistent with Third Circuit authority" (internal citations omitted)).  The Court therefore holds that Plaintiffs are not required to establish that Defendants had the subjective intent to benefit a party in interest to make out a claim under § 1106(a)(1)(C).  And, consistent with the Supreme Court's approach to § 1106(a)(1)(C) and the distinct language used in § 1106(a)(1)(D),[62] the Court further holds that § 1106(a)(1)(A) does not require a showing of subjective intent to benefit a party in interest, either.

With this discussion of the elements of Plaintiffs' § 1106(a)(1)(A), (C), and (D) claims in mind, and as explained below, the Court ultimately finds that genuine disputes of material fact preclude summary judgment on Plaintiffs' *prima facie* case for § 1106(a)(1)(A)(D) but not for § 1106(a)(1)(A) and (C) (at least as brought against the Committee chairs).  The Court does, however, find that Defendants have brought forth sufficient evidence as to their asserted exemptions under § 1108(b)(2) and (c)(2) for those defenses to survive summary judgment, which, in turn, precludes granting summary judgment to either side on Plaintiffs' § 1106(a) claims.  The Court will accordingly **DENY** Plaintiffs' Motion for Partial Summary Judgment as to Count II to the extent it alleges violations based on payments from the Plan to ADPTS and also **DENY** Defendants' Motion for Summary Judgment with respect to those same allegations.

1.    Analysis of § 1106(a)(1)(A), (C), and (D)

Because—as explained above—§ 1106(a)(1)(A) and (C) do not require Plaintiffs to show that the Committee had the subjective intent to benefit ADPTS when they caused the Plan to make payments to ADPTS, Plaintiffs have established *prima facie* violations of § 1106(a)(1)(A) and (C)

---

[62] Recall that § 1106(a)(1)(D) specifically prohibits transfers of assets "for the benefit of a party in interest," whereas § 1106(a)(1)(A) and (C) do not.

by—at minimum—the Committee Chairs who approved these payments to ADPTS.[63]   These fiduciaries "kn[ew] or should [have] know[n]" that paying Plan assets to ADPTS "constitute[d] a direct or indirect": (1) "exchange . . . of . . . property between the [P]lan and a party in interest" (ADPTS) under § 1106(a)(1)(A)[64] and (2) "furnishing of . . . services . . . between the Plan and a party in interest" (ADPTS) under § 1106(a)(1)(C).  *See* § 1106(a)(1); *see also Gilliam v. Edwards*, 492 F. Supp. 1255, 1264 (D.N.J. 1980) (finding violation of § 1106(a)(1)(C) where fiduciary caused plan to pay him for services he furnished to the plan).

Disputes of fact do, however, avert a similar finding for § 1106(a)(1)(D) at this stage of the proceedings.  That's because Plaintiffs must show that those causing the Plan to transfer Plan assets to ADPTS subjectively intended to benefit ADPTS.  *See supra* n.60.  For substantially the same reasons outlined below in the Court's discussion of the § 1108 exemptions to these § 1106(a) claims, there are genuine disputes of material fact as to the intent of the Committee members in

---

[63] The parties dispute the extent of the involvement of the other Committee members in causing the payments to be made the ADPTS.  *See, e.g.*, Plaintiffs' Responsive & Supplemental SUF ¶¶ 33, 42–54.  This dispute is to be settled by the trier of fact after trial.

[64] Defendants argue that these payments were not an exchange of property under § 1106(a)(1)(A) because only "transactions involving real or movable property" are covered by this subsection. *See* Defendants' Opp. to Plaintiffs' MSJ at 22.  To support that position, they look to the other types of transactions prohibited in § 1106(a)(1)(A)—sales and leases of property—and cite to various definitions of "sale" and "lease" from Black's Law Dictionary that involve real or moveable property.  *See id.*  But Defendants ignore that the fact that *some* definitions of sale or lease of property involve real or moveable property does not compel the conclusion that a sale or lease of property *must* involve real or moveable property—much less that exchanges of property must as well.  In any event, Defendants have not cited any cases limiting § 1106(a)(1)(A) as they suggest, *see id.*, nor has the Court been able to independently identify any.  In fact, in the context of other decisions interpreting ERISA, the Third Circuit has suggested that "property" is not a distinct category of plan assets and that property of an ERISA plan includes both tangible and intangible property.  *See Sec'y of Lab. v. Doyle*, 675 F.3d 187, 203 (3d Cir. 2012) (explaining that "term 'plan assets' should be given its ordinary meaning, and therefore should be construed to refer to property owned by an ERISA plan" and noting that such property includes "tangible or intangible" property).  The Court accordingly declines to exclude the relevant conduct here from the scope of § 1106(a)(1)(A).

making the payments to ADPTS—e.g., whether these were just reimbursements at cost leading to no profit to ADPTS. Summary judgment is therefore inappropriate here. *See Spear v. Fenkell*, No. 13-2391, 2016 WL 5661720, at *26 (E.D. Pa. Sept. 30, 2016) (finding that "genuine issues of fact preclude[d] summary judgment" on portions of ERISA claims because "they turn[ed] on questions of knowledge and intent, and the factual disputes that attend[ed] them [were] genuine and material"), *clarified on other grounds on denial of reconsideration*, 2016 WL 7475814 (E.D. Pa. Dec. 29, 2016); *Watkinson v. Great Atl. & Pac. Tea Co.*, 585 F. Supp. 879, 883 (E.D. Pa. 1984) (noting in considering ERISA claims that "[a]s a general rule, summary judgment is inappropriate in actions involving state of mind").

### 2.    Exemptions under § 1108

Although Plaintiffs have established a *prima facie* case as to § 1106(a)(1)(A) and (C), they are not entitled to summary judgment on these claims, due to Defendants' assertion of the exemptions listed in § 1108(b)(2) and (c)(2). But Defendants are not entitled to summary judgment on these claims either, given that genuine disputes of material fact as to these exemptions remain.

As explained *supra*, § 1108(b)(2) exempts from liability § 1106(a) violations where "no more than reasonable compensation is paid" for "office space, or legal, accounting, or other services necessary for the establishment or operation of the plan" for which a fiduciary has "[c]ontract[ed] or ma[de] reasonable arrangements with a party in interest." § 1108(b)(2). §1108(c)(2), in turn, exempts any § 1106(a) violations where a fiduciary has "receiv[ed] any reasonable compensation for services rendered, or for the reimbursement of expenses properly and actually incurred, in the performance of his duties with the plan . . . ." § 1108(c)(2). Defendants maintain that they have met both exceptions here. *See* Defendants' Opp. to Plaintiffs' MSJ at 33–40. Plaintiffs argue Defendants have met neither. *See* Plaintiffs' MSJ at 24–33. The Court, for

69

its part, finds that it cannot resolve these disputes at this juncture. While Defendants have met their summary judgment burden of production on these affirmative defenses on which they will ultimately bear the burden of proof at trial, the record evinces genuine disputes as to whether the expenses the ADPTS team providing services for the Plan were actually incurred and reasonable, as well as whether the services to the Plan were furnished under a "reasonable arrangement." *Compare, e.g.*, Defendants' Supplemental SUF ¶¶ 1–12 & Defendants' SUF 39–40, 42–46, 54 (setting forth the process by which ADPTS tracked expenses incurred for servicing the Plan and approved those expenses), *with* Plaintiffs' SUF ¶¶ 30–31, 35–36, 63, 65–67 (providing evidence suggesting that ADPTS's process was deficient and did not include contemporaneous time records of the work done to service the Plan). The Court therefore declines to grant either side summary judgment as to Defendants' assertion of the exemptions outlined in § 1108(b)(2) and (c)(2). *See, e.g.*, *Kanawi v. Bechtel Corp.*, 590 F. Supp. 2d 1213, 1227 (N.D. Cal. 2008) (denying all parties' summary judgment motions as to the applicability of an exemption under § 1108(b)(2) because the court could not "say, as a matter of law, that [the transactions at issue] were reasonable so that the exemption applie[d]").

With Defendants unable to establish those exemptions as a matter of law, the Court will accordingly **DENY** Defendants' Motion for Summary Judgment on Count II to the extent that count alleges violations based on payments from the Plan to ADPTS. But because Defendants have sufficiently brought forth evidence supporting those exemptions (which apply to each of § 1106(a)(1)(A), (C), and (D), the Court will concurrently **DENY** Plaintiffs' Motion for Summary Judgment with respect to those same portions of Count II.

70

b.        Payments to service providers outlined in Count II

The Court now turns to the second set of prohibited transactions outlined by Plaintiffs in Count II: the payments of Plan assets to service providers Crowe and Proskauer in violation of § 1106(a)(1)(A) and § 1106(a)(1)(D).[65]    Plaintiffs contend that Defendants violated § 1106(a)(1)(A) and (D) when they caused the Plan to pay Crowe for accounting and audit services connected to the reimbursements to ADPTS for ADPTS's services and Proskauer for legal services in connection with a 2016 Department of Labor audit of the Plan. *See id.* at 36–37.  Only Defendants move for summary judgment on these claims. *See* Defendants' MSJ at 34–37; *see generally* Plaintiffs' MSJ.  Because much of its analysis applies to the payments to both companies, the Court addresses the payments to Crowe and Proskauer together.  And, for the reasons stated below, the Court finds that genuine issues of fact preclude summary judgment for Defendants on Plaintiffs' § 1106(a)(1)(A) claims as to these payments, but not on Plaintiffs' § 1106(a)(1)(D) claims for those same payments.

i.        § 1106(a)(1)(D) violations

The Court first finds that Defendants are entitled to summary judgment as to Plaintiffs' claims under § 1106(a)(1)(D) as they relate to both Crowe and Proskauer.  As explained *supra* Section III.B.3.a.ii, for § 1106(a)(1)(D) claims like these, Plaintiffs must show that Defendants subjectively intended to benefit Crowe and/or Proskauer when causing the Plan to transfer Plan assets to those companies.  But Plaintiffs' arguments regarding these transfers all focus on Defendants' intent to benefit *themselves*—not Crowe and Proskauer. *See, e.g.*, Plaintiffs' Opp. to

---

[65] In their Opposition to Defendants' Motion for Summary Judgment, Plaintiffs indicate that they are no longer pursuing § 1106(b) claims in Count I associated with payments to Proskauer and Crowe. *See* Plaintiffs' Opp. to Defendants' MSJ at 36 n.8.  For the avoidance of doubt, these claims are **DISMISSED** from the SAC.

71

Defendants' MSJ at 38 ("But defending ADPTS in a [Department of Labor] investigation does not further the Plan's purposes. Such services benefitted *ADPTS*." (emphasis added)). Having not independently identified any evidence supporting a reasonable inference that Defendants intended to benefit Crowe and/or Proskauer when they made these transfers of Plan transfers,[66] the Court will thus **GRANT** Defendants' Motion for Summary Judgment as to Plaintiffs' § 1106(a)(1)(D) claims in Count II to the extent they relate to payments to Crowe and Proskauer.

### ii. § 1106(a)(1)(A) violations

The Court does, however, find Plaintiffs have made out a *prima facie* case for § 1106(a)(1)(A) as to payments to both Crowe and Proskauer. For these claims, Plaintiffs need not establish that Defendants subjectively intended to benefit Crowe and/or Proskauer when they caused an "exchange . . . of . . . property between the [P]lan and a party in interest" (here, Crowe and/or Proskauer). § 1106(1)(a)(1)(A); *see supra* Section III.B.3.a.ii. Because Defendants do not dispute that such an exchange occurred between the Plan and Crowe and/or the Plan and Proskauer, *see* Defendants' MSJ at 34–37; Defendants' Reply ISO MSJ at 14–15, Plaintiffs have accordingly made out their *prima facie* case as to § 1106(a)(1)(A).

But, here again, Defendants have asserted exemptions under § 1108(b)(2)—that these were payments of "no more than reasonable compensation" for "office space, or legal, accounting, or

---

[66] The Court recognizes that while at first blush it appears obvious that payments to any entity like Crowe and Proskauer would subjectively be intended to benefit that entity, that it is not necessarily the case. Take the situation here, for instance. Plaintiffs do not claim that Crowe and/or Proskauer did not actually provide services for which they were transferred Plan assets or that there was some sort of special deal that Defendants struck with Crowe and/or Proskauer to unduly enrich those entities. The crux of their claims under § 1106(a) is instead that Crowe and Proskauer provided services for which they were improperly paid from *Plan* assets rather than ADPTS's assets. In other words, it's not the fact of payment that Plaintiffs take issue with; it's where those payments came from. So, it matters that the parties in interest receiving transferred Plan assets—Crowe and Proskauer—are not the same as those Defendants intended to benefit.

other services necessary for the establishment or operation of the plan" for which they had "[c]ontract[ed] or ma[de] reasonable arrangements with [Crowe and/or Proskauer]." § 1108(b)(2); *see* Defendants' MSJ at 34–37.  That said, Defendants have not established their entitlement to these exemptions as a matter of law.  Genuine disputes of material fact remain as to whether the payments Defendants made to Crowe and Proskauer were "reasonable."  *See, e.g.*, Defendants' SUF ¶ 68 & Plaintiffs' Responsive and Supplemental SUF ¶ 68.  The Court will therefore **DENY** Defendants' Motion for Summary Judgment as to Plaintiffs' § 1106(a)(1)(A) claims in Count II to the extent they relate to payments to Crowe and Proskauer.

### 4. *Derivative failure to monitor claim (Count VIII)*

In addition to their prohibited transaction and breach of fiduciary duty claims, Plaintiffs bring a derivative failure to monitor claim against ADPTS and the Committee in Count VIII of the Second Amended Complaint.  *See* SAC ¶¶ 380–88.  Defendants move for summary judgment on this claim.  *See* Defendants' MSJ at 40.  But because the parties agree that Count VIII rises and falls with the prohibited transaction and breach of fiduciary claims in Counts I, II, and III, *see id.*; *see* Plaintiffs' Opp. to Defendants' MSJ at 39, and the Court has not outright dismissed any of those counts, the Court will **DENY** Defendants' Motion for Summary Judgment as to Count VIII. *See Mator*, 102 F.4th at 191 (vacating dismissal of derivative monitoring claim after having vacated dismissal of fiduciary breach claim given that "[w]hether a 'monitoring claim survives depends on whether [the] underlying breach of fiduciary duty . . . claims survive'" (quoting *In re Allergan ERISA Litig.*, 975 F.3d 348, 354 n.11 (3d Cir. 2020)).

### 5. *Other remedies claim against ADP and ADP Total Source, Inc. (Count IX)*

Defendants also move for summary judgment on Count IX—a claim for restitution and disgorgement under § 1132(a)(3) brought against nonfiduciaries ADP and ADP Total Source, Inc. to the extent they received Plan assets not recovered under Counts I, II, III, and VIII.  *See* SAC

73

¶¶ 389–93; Defendants' MSJ at 40. Defendants contend that "no evidence supports that [ADP] or ADP Total Source, Inc. play any role in or have any oversight of any issues challenged in the [Second Amended Complaint]." Defendants' MSJ at 40. The Court, however, finds that Plaintiffs have brought forth sufficient evidence to suggest that those entities—which are closely affiliated with ADPTS—may have had actual or constructive knowledge of the unlawfulness of the claimed prohibited transactions and breaches of fiduciary duties. *See, e.g.*, Plaintiffs' SUF ¶¶ 1–3, 16–25 (explaining the corporate structure of ADP and its subsidiaries and the positions at ADPTS and ADP Total Source, Inc. held by the members of the Committee); *see Harris Tr. & Sav. Bank*, 530 U.S. at 253 (permitting "action[s] for restitution against . . . transferee[s] of tainted plan assets" where the transferee has "actual or constructive knowledge of the circumstances that rendered the transaction unlawful"). The Court will accordingly **DENY** Defendants' Motion for Summary Judgment as to Count IX.

## IV.    CONCLUSION

For the foregoing reasons, the Court will: (1) **GRANT in part** and **DENY in part** Defendants' Motion for Summary Judgment and (2) **GRANT in part** and **DENY in part** Plaintiffs' Motion for Partial Summary Judgment. The Court will further **GRANT in part**, **DENY *without prejudice* in part**, and **DENY *with prejudice* in part**: (1) Plaintiffs' Motion to Exclude Swisher, (2) Defendants' Motion to Exclude Otto, and (3) Defendants' Motion to Exclude Stone. The Court will also **DENY *without prejudice***: (1) Defendants' Motion to Exclude Dr. O'Neal, and (2) Defendants' Motion to Exclude Pfeil. An appropriate Order accompanies this Opinion.


Dated: March 30, 2026

/s/ Evelyn Padin
Evelyn Padin, U.S.D.J.
